# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

BRENDA KOEHLER, KELLY PARKER, LAYLA BOLTEN,
and GREGORY HANDLOSER,

*Plaintiffs-Appellants,*

v.

INFOSYS TECHNOLOGIES LIMITED INC.,
AND INFOSYS PUBLIC SERVICES, INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Wisconsin
District Court No: 2:13-cv-00885-PP

## APPELLANTS' OPENING BRIEF

Daniel Kotchen
Daniel Low
KOTCHEN & LOW LLP
1918 New Hampshire Ave. NW
Washington, DC 20009
dkotchen@kotchen.com
dlow@kotchen.com

*Attorneys for Plaintiffs-Appellants*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2272

Short Caption: Koehler et al. v. Infosys Techs. Ltd., Inc.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Brenda Koehler, Kelly Parker, Gregory Handloser, Layla Bolten

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Kotchen & Low LLP, VK Vandaveer PLLC, DVG Law Partner LLC

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Daniel Kotchen     Date: 11/20/25

Attorney's Printed Name:  Daniel Kotchen

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑ **No** ☐

Address:  Kotchen & Low LLP

   1918 New Hampshire Avenue NW, Washington, DC 20009

Phone Number: 202-468-4014     Fax Number: 202-280-1128

E-Mail Address: dkotchen@kotchen.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................iv

STATEMENT OF JURISDICTION.......................................................1

ISSUES PRESENTED ..........................................................................1

STATEMENT OF THE CASE ...............................................................3

    I.      The District Court Excluded Dr. Neumark's Findings of Extreme Disparities in Employment Outcomes by Race or National Origin. ......................................................................5

    II.     Class Certification Was Denied Because Dr. Neumark's Opinions Were Excluded. ......................................................8

    III.    Infosys Withheld PeopleFluent Data and Analyses While Inaccurately Claiming That Its Production Was Complete and Allowed a Key Custodian to Wipe His Hard Drive.........9

    IV.    The District Court Granted Summary Judgment Without Considering Dr. Neumark's Opinions or the PeopleFluent Analyses and Applied the Individual Rather than Pattern-or-Practice Framework. ........................................................13

    V.     The Experiences of the Four Named Plaintiffs Reflect Discrimination..................................................................15

SUMMARY OF THE ARGUMENT.........................................................18

STANDARD OF REVIEW ....................................................................23

ARGUMENT...........................................................................................25

    I.      The District Court Erred in Excluding Dr. Neumark's Name-Matching Methodology Sua Sponte for Employees and

Abused its Discretion in Excluding Neumark's Name-Matching as Unreliable Where He Used Generally Accepted Peer-Reviewed Methodology...............................25

A.     The District Court Erred in Excluding Dr. Neumark's *Employee* Analyses Sua Sponte Without Providing Plaintiffs the Opportunity to Be Heard.......................26

B.     The Inputs to Dr. Neumark's Opinions Go to Weight, Not Admissibility. ........................................33

C.     Name-Matching Methodology Is Well-Established and Reliable.......................................35

D.     Dr. Neumark Is Qualified to Perform Name-Matching Analyses. ..................................45

E.     The District Court Abused Its Discretion in Finding Dr. Neumark's Analyses Were Not Relevant. ...................48

II.     The District Court Abused Its Discretion in Denying Class Certification.......................................49

III.     The District Court Abused Its Discretion in Refusing to Consider the PeopleFluent Analyses on Summary Judgment. .........................................50

IV.     The District Court Erred in Granting Summary Judgment Where Dr. Neumark's Opinions and the PeopleFluent Analyses Improperly Were Not Considered and Where There Were Disputed Issues of Material Fact. ...............56

A.     Summary Judgment Should Be Vacated and Remanded to Allow the District Court to Consider the Impact of Considering Neumark's Opinions and the PeopleFluent Analyses, and to Properly Apply the *Teamsters* Pattern-or-Practice Framework.................56

B. Plaintiffs Have Demonstrated Genuinely Disputed Issues of Material Fact. ............................................... 59

    1. Gregory Handloser. ............................................. 65

    2. Kelly Parker. ...................................................... 69

    3. Brenda Koehler. ................................................. 73

    4. Layla Bolten. ...................................................... 77

    5. Koehler and Parker's Disparate Impact Claim. 80

CONCLUSION ................................................................................ 80

CERTIFICATE OF COMPLIANCE ............................................... 82

REQUIRED SHORT APPENDIX ................................................... 83

# TABLE OF AUTHORITIES

**Cases**

*Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)............................. 70

*Ames v. Ohio Dep't of Youth Services*, 605 U.S. 303 (2025).................... 14

*Baron v. City of Highland Park*, 195 F.3d 333 (7th Cir. 1999) ............. 64

*Bateman v. United States Postal Serv.*, 231 F.3d 1220 (9th Cir. 2000) . 51

*Bell v. EPA*, 232 F.3d 546 (7th Cir. 2000) ............................................. 62

*Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360 (7th Cir. 2015) .................. 24

*Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709 (N.D. Tex. 2009)36

*Brown v. M & M/Mars*, 883 F.2d 505 (7th Cir. 1989)........................... 76

*Carolina Cas. Ins. Co. v. E.C. Trucking*, 396 F.3d 837 (7th Cir. 2005) . 28

*Castaneda v. Partida*, 430 U.S. 482 (1977) ..................................... 20, 37

*Chavez v. Illinois State Police*, 251 F.3d 612 (7th Cir. 2001) ................. 37

*Christensen v. Weiss*, 145 F.4th 743 (7th Cir. 2025)............. 50, 51, 53, 54

*Clevenger v. A.M. Castle & Co.*, No. 21-CV-5889, 2025 U.S. Dist. LEXIS 61529 (N.D. Ill. Mar. 31, 2025).................................................... 68

*Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867 (1984) ........... 57

*Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983)........................ 70

*Design Basics LLC v. Campbellsport Bldg. Supply, Inc.*, No. 13-C-560, 2016 U.S. Dist. LEXIS 73963 (E.D. Wis. June 7, 2016) ................ 66

*Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576 (7th Cir. 2019).... 25

*EEOC v. O&G Spring & Wire Forms Specialty Co.*, 38 F.3d 872 (7th Cir. 1994)........................................................................................... 61

*EEOC v. Paramount Staffing, Inc.*, No. 02:06-cv-2624, 2010 U.S. Dist. LEXIS 49042 (W.D. Tenn. May 17, 2010).................... 20, 36, 46, 47

*EEOC v. Target Corp.*, 460 F.3d 946 (7th Cir. 2006)............................. 64

*EEOC v. Univ. of Chi. Hospitals*, 276 F.3d 326 (7th Cir. 2002)....... 77, 78

*Emmel v. Coca-Cola Bottling Co. of Chi.*, 95 F.3d 627 (7th Cir. 1996).. 67

*Fischer v. Avanade, Inc.*, 519 F.3d 393 (7th Cir. 2008) .......................... 66

*Garcia v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 660 F.2d 1217 (7th Cir. 1981) .................................................................. 37

*Giacoletto v. Amax Zinc Co.*, 954 F.2d 424 (7th Cir. 1992) .................... 68

*Gomes v. Avco Corp.*, 816 F. Supp. 131 (D. Conn. 1993) ....................... 37

*Grube v. Lau Indus.*, 257 F.3d 723 (7th Cir. 2001) ............................... 64

*Hernandez v. Texas*, 347 U.S. 475 (1954) ........................................... 37

*Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733 (7th Cir. 2013) ................ 67

*Hunt v. City of Markham, Ill.*, 219 F.3d 649 (7th Cir. 2000) ................. 78

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) ............... 3

*Lambert v. Roechling Auto. Duncan, LLP*, Civ. No. 7:08-925, 2009 U.S. Dist. LEXIS 68848 (D.S.C. July 10, 2009) ..................................... 72

*Lindahl v. Air France*, 930 F.2d 1434 (9th Cir. 1991) .......................... 66

*Lindale v. Tokheim Corp.*, 145 F.3d 953 (7th Cir. 1998) ...................... 77

*Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711 (7th Cir. 2021) .................................................................. 75

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ...................... 63

*McKinney v. Office of the Sheriff*, 866 F.3d 803 (7th Cir. 2017)............. 63

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986) ........................ 79

*Mister v. Illinois Cent. Gulf R.R. Co.*, 832 F.2d 1427 (7th Cir. 1987) .... 34

*Moss v. BMC Software, Inc.*, 610 F.3d 917 (5th Cir. 2010) .................... 74

*Murphy v. Caterpillar Inc.*, 140 F.4th 900 (7th Cir. 2025)............. passim

*O'Connor v. DePaul Univ.*, 123 F.3d 665 (7th Cir. 1997) ...................... 60

*Ortiz v. Werner Entes., Inc.,* 834 F.3d 760 (7th Cir. 2016) .................... 62

*Palmer v. Cognizant Tech. Sols. Corp.*, No. CV 17-6848, 2022 U.S. Dist. LEXIS 198737 (C.D. Cal. Oct. 27, 2022) ...................................... 38

*Perez v. K & B Transp., Inc.*, 967 F.3d 651 (7th Cir. 2020)........ 19, 24, 28

*Perfetti v. First Nat'l Bank*, 950 F.2d 449 (7th Cir. 1991) ............... 62, 69

*Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993) ............................................................................................... 51

*Ramos v. SimplexGrinnell LP*, 796 F. Supp. 2d 346 (E.D.N.Y. 2011) ... 35

*Red Barn Motors, Inc. v. NextGear Cap., Inc.*, 915 F.3d 1098 (7th Cir. 2019)............................................................................................... 24

*Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712 (7th Cir. 2005)... 64, 68

*Scott v. Dart*, 99 F.4th 1076 (7th Cir. 2024)........................................... 24

*Semiconductor Energy Lab. Co. v. TCL China Star Optoelectronics Tech. Co.*, No. 8:21-cv-00554, 2023 U.S. Dist. LEXIS 242865 (C.D. Cal. Mar. 21, 2023) ................................................................................. 35

*Stewart Title Guar. Co. v. Cadle Co.*, 74 F.3d 835 (7th Cir. 1996)... 28, 33

*Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753 (7th Cir. 2013) ................ 34

*Thanongsinh v. Bd. of Educ.*, 462 F.3d 762 (7th Cir. 2006) ................... 62

*Thiessen v. GE Cap. Corp.*, 267 F.3d 1095 (10th Cir. 2001)................... 59

*Trans Energy, Inc. v. EQT Prod. Co.*, 743 F.3d 895 (4th Cir. 2014) 24, 50, 55

*Troupe v. May Dep't Stores Co.*, 20 F.3d 734 (7th Cir. 1994) ........... 55, 62

*Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044 (7th Cir. 2000).................... 78

*United States EEOC v. MVM, Inc.*, No. TDC-17-2864, 2018 U.S. Dist. LEXIS 81268 (D. Md. May 14, 2018)............................................ 44

*United States v. Alamosa Cnty.*, 306 F. Supp. 2d 1016 (D. Colo. 2004) ................................................................................. 36, 37, 43

*United States v. City of N.Y.*, 717 F.3d 72 (2d. Cir. 2013) ..................... 58

*United States v. Vill. of Port Chester*, No. 06 Civ. 15173, 2008 U.S. Dist. LEXIS 4914 (S.D.N.Y. Jan. 17, 2008) ........................................... 37

*Vichio v. United States Foods, Inc.*, 88 F.4th 687 (7th Cir. 2023).... 64, 65

*Walker v. Soo Line R.R.*, 208 F.3d 581 (7th Cir. 2000).......................... 24

*Wallace v. SMC Pneumatics*, 103 F.3d 1394 (7th Cir. 1997)........... 60, 61

*Yong-Qian Sun v. Bd. of Trs.*, 473 F.3d 799 (7th Cir. 2007) ................. 60

*Young v. UPS, Inc.*, 575 U.S. 206 (2015) ............................................... 57

*Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672 (7th Cir. 2003) ................................................................................................ 67, 77

**Statutes**

28 U.S.C. § 1291 ................................................................................ 1

28 U.S.C. § 1331 ................................................................................ 1

42 U.S.C. § 1981 ................................................................................ 1

42 U.S.C. § 2000e ............................................................................... 1

**Rules**

Fed. R. App. P. 4 ............................................................................... 1

Fed. R. Civ. P. 30 ............................................................................ 74

Fed. R. Civ. P. 6 ...................................................................... 21, 50

Fed. R. Evid. 1002 .......................................................................... 68

Fed. R. Evid. 801 ............................................................................ 73

**Treatises**

Kevin Fiscella, *Use of Geocoding and Surname Analysis to Estimate Race and Ethnicity*, 41 Health Servs. Res. 1482 (2006) ................ 46

Lauderdale & Kestenbaum, *Asian American Ethnic Identification by Surname*, 19 Population Research & Policy Review 283 (2000) ... 40

Marianne Bertrand & Sendhil Mullainathan, *Are Emily and Greg More Employable than Lakisha and Jamal? A Field Experiment on Labor Market Discrimination*, 94 Am. Econ. Rev. 991 (2004) ...... 45

Pablo Mateos, *A Review of Name-based Ethnicity Classification Methods and their Potential in Population Studies*, 13 Population, Space and Place  (2007) .............................................................. 39, 40, 43

Pablo Mateos, *Names, Ethnicity and Populations* (2014) ............. passim

Raphael Susewind, *What's in a Name?  Probabilistic Inference of Religious Community from South Asian Names*, 27 Field Methods 319 (2015) ..................................................................................... 40

Tej Sheth et al., *Cardiovascular and Cancer Mortality Among Canadians of European, South Asian and Chinese Origin from 1979 to 1993,* 161 Canadian Med. Ass'n J. 132 (1999) .................. 43

**Regulations**

41 C.F.R. § 60-2.1 ................................................................................ 9

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction pursuant to 28 U.S.C. §1331 over this federal employment discrimination class action, which brings claims under Title VII of the Civil Rights Act, 42 U.S.C. §2000e and 42 U.S.C. §1981. The district court granted summary judgment against Plaintiffs on all claims on June 24, 2025 (Required Appendix "RA" 174-75) and entered judgment against the Plaintiffs-Appellants on June 30, 2025 (RA248).

Plaintiffs timely filed their Notice of Appeal on July 28, 2025. Dkt. 224; Fed. R. App. P. 4(a)(1)(A). Accordingly, this Court has appellate jurisdiction pursuant to 28 U.S.C. §1291.

## ISSUES PRESENTED

1. Whether the district court erred in excluding Plaintiffs' expert Dr. David Neumark's name-matching methodology for Infosys employees sua sponte without notice, and abused its discretion in excluding Neumark's name-matching methodology, which is a generally accepted peer-reviewed technique with a known error rate, and any error understates the statistical disparities.

**2.** Whether the order denying class certification should be vacated where it was based on the erroneous exclusion of Dr. Neumark's opinions.

**3.** Whether the district court abused its discretion in denying Plaintiffs' motion to file a supplemental brief on summary judgment to incorporate statistical analyses of Infosys' workforce prepared by Infosys' affirmative action vendor, PeopleFluent, where Plaintiffs were unable to obtain the PeopleFluent documents until after the summary judgment deadline because of Infosys' discovery misconduct.

**4.** Was there a material issue of fact precluding summary judgment where Dr. Neumark's opinions and PeopleFluent analyses were improperly excluded, the *Teamsters'* pattern-or-practice framework should have been applied because class certification should have been granted, and the Named Plaintiffs presented sufficient evidence of discrimination even under an individualized analysis.

## STATEMENT OF THE CASE

Plaintiffs-Appellants filed this proposed class action employment discrimination case on August 1, 2013, alleging a pattern or practice of discrimination based on race or national origin in hiring, promotions, and terminations under the framework established in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). Dkt. 1.

Defendant-Appellee Infosys Technologies Limited, Inc. is an Indian company headquartered in Bangalore, India, whose U.S. workforce consists of approximately 15,000 employees, approximately 89% of whom are South Asian. *Id.*¶¶2, 6; Separate Appendix "SA" 170¶6 (Neumark Rpt.). Defendant-Appellee Infosys Public Services, Inc. is a wholly-owned subsidiary of Infosys Technologies Limited, Inc. located in Rockville, Maryland, which employs over 15 employees in the United States. Dkt. 19¶13. Both Infosys entities are referred to collectively hereafter as "Infosys."

Infosys provides information technology staffing and consulting services to clients located in the U.S. SA3¶1. It employs approximately 20,000 individuals in the United States, over 89% of whom are South Asian. *Id.* Employees are assigned to projects with end clients, such as

Microsoft or Bloomberg. SA73-74¶¶65-66. When their client projects end, or when employees are removed from client projects, they're placed in an unallocated status called the "bench" and must look for new client projects within Infosys. SA73-75¶¶66, 68. Open positions on client projects are filled through both external hiring and internal placement. SA36-37¶7.

Infosys prioritizes Indian employees, especially H-1B visa workers, for projects. SA5-6¶6. Infosys devotes substantial resources to developing an "inventory" of workers with approved visas to fill U.S. positions. SA5-6¶6; SA8-9¶13. To create this "inventory" of visa workers, Infosys uses fraudulent "invitation letters" signed by clients and purporting to identify existing work to apply for tens of thousands of visas per year. SA5-8¶¶6-8 & n.6. Hiring managers are advised to place Indians in positions "because they will work off the clock without murmur and they can always be transferred across the nation without hesitation." SA3¶2. Similarly, Infosys' Talent Acquisition Unit, which is responsible for identifying and recruiting individuals for open positions, is instructed to focus on recruiting South Asian candidates, partly based on "culture fit." SA10-11¶13. Infosys resisted and obstructed legally mandated efforts to

place or hire qualified Americans for open positions, in favor of sponsoring green cards that were "almost exclusively" for Indians. SA11-13¶¶14-15 & n.21. Infosys' own recruiters are given a list of common Indian names to help them identify Indian talent. SA11¶14. Infosys instructs recruiters to focus on hiring Indian job candidates because of an assumption that they "know our style and culture" and because "Americans don't know shit."  SA3¶2; SA10-11¶¶2, 13.

## I. The District Court Excluded Dr. Neumark's Findings of Extreme Disparities in Employment Outcomes by Race or National Origin.

Plaintiffs' expert, Dr. David Neumark, is a professor of economics at University of California at Irvine, has done extensive research on labor market discrimination, and has numerous publications. SA169¶1. Neumark examined statistical disparities in hiring, promotions, and terminations between Indians or South Asians and non-Indians or non-South Asians at Infosys. SA169-70¶3. He found that 89% of Infosys' U.S. workforce was South Asian, compared to only 20% of relevant benchmarks, an extreme disparity of 202 standard deviations. SA170-71¶6. (Two standard deviations is statistically significant. SA172-73¶11). He found that 58% of Indians were promoted by Infosys, but only

21% of non-Indians (53 standard deviations). SA171¶8. And while 11% of terminations of Indian Infosys employees were involuntary, 23% of terminations of non-Indians were involuntary (12 standard deviations). SA171¶9.

Analyses performed for Infosys by its affirmative action vendor, PeopleFluent, corroborate Neumark's findings. The PeopleFluent data shows that Infosys has employed a 94.49% Asian workforce in the United States.[1] This far exceeds goals set to curb employment that favors a single race.[2] In 2011, Infosys promoted 14.94% of its Asian employees, as compared to just 5.89% of its non-Asian workers, and in 2014, it promoted 4.97% of its Asian workforce and only 0.11% of its non-Asian workforce.[3]

---

[1] Dkt. 123-9 at 278 (noting that 94.49% of Infosys' workforce was Asian in 2014); SA212-13 ¶2; SA215 tbl.2 (Grunert Decl.). While these PeopleFluent documents are cited as an example, similar disparities in hiring, promotions, and terminations exist across the entire class period. The PeopleFluent analyses use the EEO racial category "Asian." This category encompasses South Asian, and the vast majority of Infosys' Asian employees are South Asian. *See* SA175-76 ¶¶15-16 (noting that the overwhelming majority of Infosys' "Asian" employees are South Asian).

[2] *See, e.g.*, SA212-13 ¶2; SA214-20 tbls.1-7; Dkt. 123-11; Dkt. 123-12; Dkt. 123-13; Dkt. 123-14; Dkt. 123-15.

[3] *See, e.g.*, SA212-13 ¶2; SA221 tbl.8; Dkt. 123-16; Dkt. 123-17.

These disparities exist across all verticals, job groups, and job locations at Infosys.[4] Infosys involuntarily terminates a significantly higher percentage of its non-Asian workforce (between 6.67% and 12.54% of all non-Asians, as compared to just 0.54% and 0.75% of all Asians).[5] These rates are higher for non-Asians across all of Infosys' job groups and verticals, and across the vast majority of its job locations.[6]

Infosys' employee records don't directly identify whether every applicant or employee is Indian or South Asian, but employee records identify most employees' country of birth. SA208¶3. Neumark relied on place of birth to determine race or national origin for employees born in any South Asian country. SA208¶4. For the relatively small percentage of employees who were not identified as having been born in a South Asian country, Neumark classified as South Asian those employees who had South Asian names, i.e., a surname that matched the surname of an

---

[4] *See, e.g.*, SA212-13 ¶2; SA221-25 tbls.8-12; Dkt. 123-14; Dkt. 123-15; Dkt. 123-16; Dkt. 123-17; Dkt. 123-18.

[5] *See, e.g.*, SA212-13 ¶2; SA226 tbl.13; Dkt. 123-19; Dkt. 123-20.

[6] *See, e.g.*, SA212-13 ¶2; SA226-30 tbls.13-17; Dkt. 123-14; Dkt. 123-15; Dkt. 123-19; Dkt. 123-20; Dkt. 123-21.

employee born in a South Asian country. *Id.* To reduce the likelihood of false positives, Neumark reviewed the list of names and identified the 63 most obviously Western surnames and reclassified those names as non-South Asian. SA209¶5.

Infosys filed a *Daubert* motion to exclude Neumark's opinions on December 19, 2016 (Dkt. 97), including on the ground that his name-matching analysis was unreliable as applied to Infosys applicants. SA162-66. The district court granted the motion on September 24, 2022, finding his name-matching was unreliable as to applicants, and sua sponte extending that finding to Infosys employees. RA169-70.

## II. Class Certification Was Denied Because Dr. Neumark's Opinions Were Excluded.

Plaintiffs filed their motion for class certification on September 24, 2016 (Dkt. 88). The district court denied the motion without prejudice almost six years later, on September 14, 2022. RA172. In denying certification, the district court reasoned that "[t]he plaintiffs' motion for class certification explicitly relies on Neumark's analysis to show numerosity and predominance, and it likely ought to have done so for commonality." RA171-72. The court found that Plaintiffs were therefore

unable to carry their burden of demonstrating that the Rule 23 class certification requirements had been satisfied. *Id.*

## III. Infosys Withheld PeopleFluent Data and Analyses While Inaccurately Claiming That Its Production Was Complete and Allowed a Key Custodian to Wipe His Hard Drive.

On July 24, 2015, Plaintiffs requested "[d]ocuments and ESI relating to the demographics or statistics of Infosys' United States work force." Dkt. 123-1 at Req. No. 5. As a federal contractor, Infosys is required to conduct affirmative action analyses. 41 C.F.R. §60-2.1. Infosys contracted with PeopleFluent to provide those analyses. SA212-13¶2. PeopleFluent provides Infosys with annual statistical reports concerning Infosys' hiring, promotion, and termination practices for its U.S. workforce. SA212-13¶2; SA214-30 tbls.1-17. The PeopleFluent documents demonstrated that Infosys knew its employment metrics were highly disproportionate in favor of South Asians, as discussed above, and fell squarely within Plaintiffs' document request. Dkt. 123-1 at Req. No. 5.

Infosys withheld the PeopleFluent documents from production, while inaccurately representing that all responsive documents had been produced. SA235-36 5:19-6:3, 7:8-11, 25:23-26:4 (Hr'g Tr. (June 2, 2017));

Dkt. 135 at 7-8 & n.16; Dkt. 134-31 at 2. Plaintiffs only learned about the PeopleFluent data from a third party on June 14, 2016. Dkt. 135 at 10. Plaintiffs subpoenaed the documents directly from PeopleFluent on June 15, 2016, but PeopleFluent didn't complete its production of documents until January 2017. *Id.* PeopleFluent ultimately produced about 40,000 analyses and spreadsheets. *Id.* at 11.

After Plaintiffs obtained the PeopleFluent documents, the parties conferred about Infosys' failure to produce them. Dkt. 112 at 2; Dkt. 134-12¶2. Infosys conceded that the PeopleFluent documents were responsive and accessible to Infosys. Dkt. 120 at 2 (admitting that "Documents were available"); Dkt. 134-12¶¶2-3 (explaining that Infosys' counsel admitted during a meet and confer on January 30, 2017 that the PeopleFluent analyses were responsive to Plaintiffs' July 24, 2015 document request No. 5, but Infosys asserted that production of underlying raw employee data excused production of the responsive PeopleFluent analyses); Dkt. 134-31 at 2 (indicating that Infosys had no additional documents responsive to Request No. 5).

Because the PeopleFluent documents were improperly withheld and were not produced until *after* Plaintiffs filed their summary

judgment opposition on December 5, 2016 (Dkt. 93), Plaintiffs orally moved to take additional discovery related to the documents and to amend their summary judgment opposition to include the PeopleFluent documents, but the Court denied the motion. SA238-39.

Separately, Infosys failed to preserve documents of a key custodian, Sanjay Jalona, and allowed him to wipe his hard drive and destroy all relevant ESI in his possession. Dkt. 135 at 2-3, 16-18. Infosys was on notice of the relevance of Jalona's files no later than September 27, 2013, when Plaintiffs repeatedly referred to Jalona and his role in this dispute in their Amended Complaint. *Id.* at 2; Dkt. 4¶¶98-99; *see also* Dkt. 19¶¶28-30, 103-04 ("Mr. Jalona … encouraged recruiters to focus their efforts on Indian candidates."). Plaintiffs identified Jalona in their Initial Disclosures as likely to have discoverable materials. Dkt. 135 at 2; Dkt. 134-4 at 2. Jalona worked for Infosys for 15 years and served as an Executive Vice President and was a member of Infosys' affirmative action steering committee. Dkt. 135 at 2. He was involved in decision-making about hiring policies and the use of visa-workers and was involved in Plaintiff Handloser's termination. *See id.*; Dkt. 13-1¶¶5, 7-9 (Marrero Decl.); Dkt. 4¶99.

Plaintiffs expected that Jalona would have documents concerning his involvement with (and discriminatory instructions to) the Talent Acquisition department. Documents collected from other custodians reveal that he was intimately involved in both reviewing Handloser's performance and terminating Handloser.[7] At the start of this case, Infosys didn't stop automatic deletion of emails, didn't pull backup tapes from email and file servers (resulting in tapes being overwritten), and didn't otherwise collect a corpus of documents from relevant custodians, including Jalona.[8] *Id.* at 4-5 (citing Dkt. 124-2 at 1-3; Dkt. 134-17 at 1-2). Infosys also failed to collect or preserve Jalona's documents when Jalona left Infosys' employment in July or August 2015. *Id.* at 5-6. Infosys claims

---

[7] Dkt. 135 at 3 & n.2 (citing Dkt. 134-5; Dkt. 95-50; Dkt. 96-50; Dkt. 134-6); Dkt. 134-6 156:9-11 (Q: "So you say that the decision [to terminate Handloser] was coming right from the very top?" A: "Right."), 156:12-19 (explaining that Sanjay Jalona made the decision to terminate Handloser's employment).

[8] Rather, the only step apparently taken by Infosys in 2013, 2014, or 2015 was to send a notice of the litigation to an undisclosed list of potentially relevant custodians in 2013 (and in later years to some additional custodians), and may have given undisclosed directions about preservation. Infosys apparently failed to issue follow-up notices or reminders to custodians about the litigation or the ongoing need to preserve documents for the litigation. Dkt. 135 at 5 n.8.

that it allowed Jalona to take his Infosys laptop and Infosys' proprietary files with him, and never made a copy, even though Jalona left Infosys to become the CEO of a competitor. *Id.*; Dkt. 134-23 at 1. In other words, Infosys allowed relevant documents from Mr. Jalona and others on its servers and backup tapes to be destroyed after it had a duty to preserve them, and permitted Jalona to take the last remaining copy of his documents with him and made no immediate efforts to recover them. Dkt. 135 at 4-7.

Infosys also failed to preserve relevant ESI for other custodians, including Rohit Kedia and Chris Webber, and was not "able to locate usable ESI for [them]." *Id.* at 6-7; Dkt. 134-13.

IV. **The District Court Granted Summary Judgment Without Considering Dr. Neumark's Opinions or the PeopleFluent Analyses and Applied the Individual Rather than Pattern-or-Practice Framework.**

Infosys filed a summary judgment motion on September 23, 2016, and briefing was completed on January 17, 2017. Dkts. 78, 80, 108. The district court addressed Infosys' *Daubert* motion to exclude the opinions of Neumark before ruling on summary judgment because "a good deal of the plaintiffs' argument relied on Neumark's opinions." RA180 5:10-18

13

(Hr'g Tr. (June 24, 2025)). After excluding Neumark's opinions and denying class certification in an order dated September 14, 2022, RA172-73, the district court granted Infosys' summary judgment motion in an oral ruling, and without oral argument, on June 24, 2025. RA242 67:21-25.

Because the district court had denied the motion for class certification, the court applied the *McDonnell Douglas* standard rather than the pattern-or-practice framework for class actions established under *Teamsters*. RA213 38:2-4, 15-16.

The district court granted summary judgment on the Named Plaintiffs' disparate treatment claims because it found that they didn't satisfy the *McDonnell Douglas* elements, RA215-37 40:16-62:14, and didn't demonstrate "background circumstances." RA217-81 42:22-43:12; RA224 49:18-22. [9] The district court granted summary judgment on

---

[9] The district court later acknowledged that the background circumstances requirement had been rejected in *Ames v. Ohio Department of Youth Services*, 605 U.S. 303 (2025), shortly before the district court's summary judgment ruling. SA146.

Plaintiffs' disparate impact claim because, without Neumark's analyses (or the PeopleFluent analyses), the statistical evidence was insufficient to support the claim. RA214-15 66:2-13, 67:1-16.

V. **The Experiences of the Four Named Plaintiffs Reflect Discrimination.**

In addition to offering evidence of discriminatory policies and practices, and statistical evidence of discrimination, each Named Plaintiff offered evidence that the adverse employment actions taken by Infosys against them were discriminatory.

Infosys claims that it terminated Plaintiff Gregory Handloser as part of a Reduction in Force ("RIF") that targeted employees with the lowest appraisal score – 4. Dkt. 80 at 4, 31; SA150-56¶¶192-94. But Handloser's supervisor had informed Handloser that he had received a score of 3, and prior to this litigation, Infosys never informed Handloser of a lowered score, or that he had been terminated as part of a RIF. *Id.*; SA27-29¶¶50-51. Handloser's supervisor wanted to promote Handloser based on his job performance, and when told that Handloser was instead going to be fired, warned Infosys that Handloser would have a legal claim

against the company, "supported by records and data that he will undoubtedly have with him." SA27-29¶¶50, 52.

Plaintiff Kelly Parker was terminated by Infosys from her contractor position and was rejected for a full-time job opening that replaced her contractor position. SA21-22¶¶36-39; SA24¶43. Although Parker performed well and was liked and respected by her colleagues, the position was filled by an Indian visa worker, for whom Infosys fraudulently secured a visa, and who Parker herself had to train and who lacked a key qualification for the job. SA21¶36; SA20-24¶¶40-43. Parker was pretextually told that she was being terminated because her desk and the IT area were not "tidy" and that she arrived late once. SA24¶44. Infosys also claims that her contractor position was for a fixed term, but the document creating a fixed term was not created until after Infosys had selected her Indian replacement for the position. *Id.*; SA105¶107.

On April 24, 2012, Brenda Koehler interviewed for a position with Infosys that she was qualified for, but Infosys instead hired a South Asian for the position. SA18-19¶¶29-30. On three separate occasions before Koehler's scheduled interview, including an hour before the interview was scheduled to begin, Infosys contacted Koehler to let her

16

know it would be calling Koehler for the interview. SA18-19¶¶29-32. Eighteen minutes before Koehler's interview was scheduled to begin, Infosys executives, including the two executives who interviewed Koehler, were sent an email to evaluate five candidates, including Koehler, for the role Koehler was to be interviewed for. Dkt. 95-16. The "Comments" for Koehler stated: "candidate not reachable." *Id.* (email dated April 24, 2012, 9:42 a.m.). Eight minutes later, at 9:50 a.m., Infosys emailed Koehler, changing how the interview would proceed. SA18-19¶30. Instead of Infosys calling Koehler directly, Koehler would have to call into a conference line to participate in the interview, which she did. SA18-19¶¶30-31. The interview was perfunctory, and the interviewers were dismissive of Koehler's experience. SA19¶31. Infosys claimed that Koehler was not qualified, claiming a lack of experience related to two qualifications that were not even listed in the job announcement as requirements. SA19¶32; SA54-56¶¶36-37. Koehler had extensive experience in both areas and demonstrated her proficiency during her interview. SA19¶32; SA54-56¶¶35, 37. Infosys has also offered contradictory information about specifically which position Koehler applied for. SA58-61¶40. Infosys recruited and hired a South Asian for

17

the position, even though he had minimal interest in the position, had to relocate, and quit after two months. SA19-20¶¶33-34.

Finally, Layla Bolten was constructively discharged. SA32-33¶61. She has extensive experience and qualifications, but was repeatedly harassed, insulted, and belittled, including being called a "stupid American" and a liar. SA29-32¶¶53, 57-60. Her colleagues often spoke only Hindi at work to exclude her. SA32¶59. Her responsibilities gradually decreased, and she was assigned little work despite proactive requests. SA31-32¶¶57-58. She was told to vacate her workstation and sit in the corner. SA127-128¶¶156-157. Conditions worsened after she raised concerns with a supervisor. SA32¶ 59.

## SUMMARY OF THE ARGUMENT

This appeal seeks relief from four separate orders because: (1) the district court improperly excluded Dr. Neumark's opinions, which were reliable and relevant; (2) the denial of class certification was based on the improper exclusion of Neumark; (3) the district court abused its discretion in refusing to consider the PeopleFluent analyses on summary judgment where Infosys improperly withheld them; and (4) the district court erred in granting summary judgment where it should have

considered and included as part of its analysis Neumark's opinions, the PeopleFluent analyses, and the pattern-or-practice framework, and because Plaintiffs presented genuine issues of material fact.

1.    Infosys sought to exclude Neumark's name-matching methodology as unreliable as applied to *applicants*. The district court not only agreed, but sua sponte extended that exclusion to *employees*, who bring promotion and termination claims. But sua sponte exclusion without allowing Plaintiffs to respond was erroneous. *Perez v. K & B Transp., Inc.*, 967 F.3d 651, 656 (7th Cir. 2020) ("A district court is entitled to rule on expert admissibility sua sponte[] [a]s long as the district court has given the parties an opportunity to be heard.") (citation omitted). Plaintiffs would have explained how the name analysis had minimal impact on Neumark's *employee* analysis, as the vast majority of employees' ethnicities were classified based on Infosys data, not name analysis, and any errors would *understate* the disparities found by Neumark.

The district court abused its discretion in finding Neumark's name-matching methodology unreliable, as courts have repeatedly accepted similar methodologies, which are generally accepted, peer-reviewed and

19

published, and have a known error rate. *Castaneda v. Partida*, 430 U.S. 482, 486-87 & n.5 (1977) (relying on surname analysis in finding statistical evidence supported finding of discrimination); *EEOC v. Paramount Staffing, Inc.*, No. 02:06-cv-2624, 2010 U.S. Dist. LEXIS 49042, at *30-32 (W.D. Tenn. May 17, 2010) (rejecting argument that "surname analysis is not a generally accepted method of identifying individuals [and] has an unknown error rate"); Pablo Mateos, *Names, Ethnicity and Populations* at 117-18, 123-37 (2014), *available at* bit.ly/44ggieZ (explaining that name-matching to determine ethnicity has been widely used in various fields, surveying peer-reviewed name matching studies, and discussing generally accepted methodology).

2.    The district court denied class certification because Plaintiffs' motion depended on Neumark's opinion, which the court excluded. Because the exclusion of Neumark was erroneous, the court's certification decision should be vacated.

3.    Infosys improperly withheld important PeopleFluent analyses of Infosys' workforce demographics while inaccurately claiming that it had produced all documents responsive to a request for such demographic analyses. Plaintiffs learned of the existence of the

20

PeopleFluent documents from a third party and immediately subpoenaed them from PeopleFluent. The district court denied Plaintiffs' motion to supplement their summary judgment briefing to address the PeopleFluent documents and analyses, which was an abuse of discretion, as Plaintiffs' failure to timely file them with their opposition brief was the result of "excusable neglect" where Plaintiffs didn't obtain the documents until after Plaintiffs filed their opposition, Plaintiffs acted in good faith, and Infosys wouldn't have been prejudiced by supplementation. Fed. R. Civ. P. 6(c)(1).

4.     The district court erred in granting summary judgment for several reasons. First, the district court improperly excluded Neumark's opinions, which Plaintiffs heavily relied on in opposing summary judgment. RA180 5:14-18 ("a good deal of the plaintiffs' argument [opposing summary judgment] relied on Neumark's opinions"). Second, the district court improperly refused to consider the PeopleFluent analyses, which demonstrated dramatic disparities in employment outcomes by race. Third, because the district court denied class certification, it declined to apply the *Teamsters* pattern-or-practice framework on summary judgment. But if Neumark's opinions had

21

properly been considered, class certification should have been granted, and the pattern-or-practice framework should have been applied.

Even under an individualized analysis, each Plaintiff has demonstrated genuinely disputed issues of material fact. Each demonstrated that they were qualified or performed well, suffered an adverse employment action, that similarly situated Indians or South Asians received more favorable treatment than them, and that the reasons offered by Infosys for the adverse employment actions were pretextual. For example, Infosys blamed poor performance for Gregory Handloser's termination, but his supervisor gave him a favorable performance review, which was inexplicably overridden by executives without Handloser ever being informed of his revised score. Infosys also claims that Handloser was terminated as part of a reduction in force, which was not communicated to Handloser when he was terminated. Instead, Handloser's supervisor wanted to promote him and warned Infosys that, upon his termination, Handloser would have a well-supported legal claim.

Kelly Parker trained her visa-holding Indian replacement for the job she had been performing and for which she was rejected.

Brenda Koehler was rejected for a position based on a purported lack of qualifications that were not listed in the job description, and which Koehler nonetheless possessed despite Infosys' pretextual statements to the contrary. Infosys has also offered conflicting and pretextual statements about what position Koehler interviewed for and who was hired for the position, and Infosys executives pretextually disqualified Koehler from consideration as "not reachable" *before* her interview was even to begin.

Layla Bolten was constructively discharged where she was repeatedly harassed, insulted, and belittled, such as being called "stupid American," falsely accused of lying, and told to vacate her desk and sit in the corner.

Finally, the disparate impact claim was rejected for lack of statistical support, but if Neumark's opinions and the PeopleFluent analyses are properly considered, summary judgment on the disparate impact claim should be denied.

## STANDARD OF REVIEW

This court reviews the district court's decision whether to admit expert testimony for an abuse of discretion. *Walker v. Soo Line R.R.*, 208

F.3d 581, 586 (7th Cir. 2000). "A district court is entitled to rule on expert admissibility sua sponte … [a]s long as the district court has given the parties an opportunity to be heard." *Perez*, 967 F.3d at 656 (citation omitted).

Denial of class certification is reviewed for an abuse of discretion, "'which can occur when a district court commits legal error or makes clearly erroneous factual findings.'" *Scott v. Dart*, 99 F.4th 1076, 1088 (7th Cir. 2024) (quoting *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015)). Review of the denial of certification "'must also be exacting'" because it "'can have a considerable impact on the playing field of litigation.'" *Id.* (quoting *Red Barn Motors, Inc. v. NextGear Cap., Inc.*, 915 F.3d 1098, 1101 (7th Cir. 2019)).

The "denial of [a] motion for leave to file a supplemental brief [on] … summary judgment" is reviewed for an "abuse of discretion, reversing only if there is a clear abuse of discretion or the real possibility that a party was unfairly prejudiced by the decision[]." *Trans Energy, Inc. v. EQT Prod. Co.*, 743 F.3d 895, 907 (4th Cir. 2014).

This court's "review of a grant of summary judgment is *de novo* and all reasonable inferences are drawn in favor of the nonmovant." *Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019).

**ARGUMENT**

The district court's decision should be vacated or reversed where: (1) the district court improperly excluded Dr. Neumark's opinions; (2) the district court's denial of class certification was based on its improper exclusion of Neumark's opinions; (3) Plaintiffs should have been allowed to submit a supplemental summary judgment brief regarding the PeopleFluent documents based on excusable neglect; and (4) the grant of summary judgment was based partly based on the improper exclusion of Neumark's opinions, the improper refusal to consider the PeopleFluent documents, and the denial of class certification, and each Plaintiffs presented evidence creating genuine issues of material fact.

I. **The District Court Erred in Excluding Dr. Neumark's Name-Matching Methodology Sua Sponte for Employees and Abused its Discretion in Excluding Neumark's Name-Matching as Unreliable Where He Used Generally Accepted Peer-Reviewed Methodology.**

The district court abused its discretion in excluding Dr. Neumark's name-matching opinions because: (A) the court improperly excluded

Neumark's analyses based on name-matching of Infosys *employees* sua sponte without an opportunity for Plaintiffs to respond where Infosys only sought exclusion of name-matching for *applicants*; (B) Neumark's statistical analyses are properly subject to cross-examination, not exclusion, where he relied on the best available race and national origin data; (C) Neumark's name-matching analysis is reliable where it's consistent with peer-reviewed methodology and name-matching has a known error rate; (D) Neumark was qualified to perform a name-matching analysis, which relied heavily on computer matching; and (E) the district court's finding that Neumark's opinions were not relevant was contingent on its erroneous finding that his opinions were not reliable.

### A. The District Court Erred in Excluding Dr. Neumark's *Employee* Analyses Sua Sponte Without Providing Plaintiffs the Opportunity to Be Heard.

Dr. Neumark found vast disparities in employment decisions between Indians and non-Indians at Infosys, with statistical disparities of 11.57 and 53.45 standard deviations for terminations and promotions, respectively. SA171¶¶8-9; SA195 tbl.12; SA198 tbl.15. To determine whether an Infosys employee was South Asian or Indian, Neumark

26

largely relied on data provided by Infosys for Infosys *employees*. The Infosys data coded race for 86% of employees and contained information on which employees were born in India or other countries for most employees. SA208¶¶2-3. For Infosys *applicants*, Infosys had much more limited data regarding race or place of birth. For individuals for whom Infosys didn't have such data, Neumark performed a name-matching analysis to categorize race or national origin based on whether the individual had an Indian or South Asian name. SA208¶4.

Because Neumark's name-matching analyses applied mainly to applicants rather than employees, Infosys limited its *Daubert* challenge of name-matching to his hiring analyses of applicants. RA169 (citing Dkt. 98 at 29); RA31 29:15-18 (Hr'g Tr. (June 11, 2020)) (Infosys' counsel: "the reason why Neumark engages in this rather odd name matching analysis is that when you analyze *applicant* data, you don't have national origin information") (emphasis added).

The district court excluded Neumark's applicant analyses based on his name-matching methodology and sua sponte extended the exclusion to Neumark's employee analyses. RA169 ("It is not clear why Neumark's

methodology would be flawed only with regard to the applicant studies" and not "for incumbent employees").

"A district court is entitled to rule on expert admissibility sua sponte … [a]s long as the district court has given the parties an opportunity to be heard." *Perez*, 967 F.3d at 656; *see also Carolina Cas. Ins. Co. v. E.C. Trucking*, 396 F.3d 837, 842 (7th Cir. 2005) ("Although it is not favored, a district court may enter summary judgment *sua sponte* so long as the losing party is given notice and an opportunity to be heard on the underlying issues."); *Stewart Title Guar. Co. v. Cadle Co.*, 74 F.3d 835, 836-37 (7th Cir. 1996) (reversing dismissal without notice and opportunity to be heard, and observing that such *sua sponte* dismissals conflict with adversarial system principles and turn the district court into a proponent rather than an independent entity, and drain judicial resources by creating avoidable appeals and remands).

Here, the district court didn't give Plaintiffs the opportunity to address the reliability of Neumark's classification of Indians and South Asians for Infosys *employees* as opposed to *applicants*. *Cf.* SA163 (Infosys' Mot. to Exclude) ("Dr. Neumark materially inflates the number of unsuccessful *applicants* who are deemed to be non-South Asian" based

28

on his name-matching analysis) (emphasis added). The district court assumed that "Neumark used his [name] matching and excluding methodology to determine race … in the promotion and termination studies … for incumbent employees," even though he largely relied on Infosys' data to categorize the ethnicity of incumbent employees, and relied on name-matching for only a fraction of employees. RA169; *see* SA208¶¶2-3.

Had Plaintiffs had the opportunity to respond, Plaintiffs would have been able to develop the record regarding the small percentage of employees whose race was classified based on name-matching, that it had no material effect on Neumark's analyses or conclusions, and that even an extremely large error rate wouldn't have affected the statistical significance of his findings. For example, Neumark would have submitted a declaration detailing what percentage of employees were classified as Indian or non-Indian based on their place of birth, how many were classified based on name-matching, and how errors in name-matching wouldn't have affected his opinions on disparities in promotions or terminations.

The record reflects that "Infosys' data systems regarding *employees* include information regarding employee place of birth, as well as self-reported race information." Siskin Rpt. at 9 (Dkt. 97-3) (emphasis added). Specifically, Neumark used the file Infosys24962 to classify Indian or South Asian ethnicity for records of employees or hires that reflected that India or another South Asian country was the place of birth. *Cf.* SA207 tbl.1.5 ("South Asian ethnicity was determined using birthplace from Infosys24962" for employees born in a South Asian country); SA208¶3 ("For these records, of course, it is straightforward to identify South Asians or, more narrowly, Indians."). Although not in the record because the district court didn't give Plaintiffs the opportunity to brief the issue for employees, on remand Plaintiffs would submit evidence that 45,040 out of 52,636 Infosys employee records in Infosys24962 (over 85%) reflect that an employee was born in India.[10] Thus, Neumark classified ethnicity for the vast majority of employees without name matching.

---

[10] There are 46,979 Infosys employees during the relevant period (SA171-72 ¶10), but 52,636 rows of employee records in Infosys24962., as some employees appear more than once. Even if every duplicated record was

Moreover, as Neumark explained in another case – and if given an opportunity, would explain here – any misclassifications in a name-matching analysis would have *understated* rather than overstated the statistical disparities in employment outcomes that he observed between South Asians and non-South Asians, such that the disparities he reports are conservative, and they represent a lower boundary on the extent of the disparities. Pls.' *Daubert* Opp'n at 7-8, Dkt. 204, *Phillips v. Wipro, Ltd.*, No. 4:18-cv-00821 (S.D. Tex. Oct. 5, 2021) ("As Dr. Neumark observes, any misclassification of employees 'only weakens the estimated differences [he] find[s] between those classified as South Asian or non-South Asian.'") (quoting Neumark Rpt.¶ 21)); *see also* Lang Dep. Tr. 48:1-4 (Feb. 20, 2025), Dkt. 139-3, *Sugg v. Virtusa*, No. 3:18-cv-08036 (D.N.J. June 11, 2025) (testifying that "this [name-matching] was a technique that … put some bounds" and that "this conservative approach was a way to mitigate potential errors").

---

an employee born in India, 84% (39,383/46,979) of employees would have been born in India.

Neumark explained why misclassification necessarily understates the statistical disparities: hypothetically assuming an involuntary termination rate of 5% for South Asians and 20% for non-South Asians, and assuming there were 100 people in each group, and that 10% of South Asians are misclassified as non-South Asian and vice versa, the involuntary termination rates would be overstated as 6.5% for South Asians and understated as 18.5% for non-South Asians, thereby *understating* the racial disparity (i.e., the disparity between the 5% and 20% involuntary termination rate (15%) would be understated as the difference between 6.5% and 18.5% (12%), or a disparity of non-South Asians being 2.85 times more likely to be terminated rather than 4 times more likely). Neumark *Wipro* Rpt.¶ 21 n.14, Dkt. 239-1, *Phillips*, No. 4:18-cv-00821 (S.D. Tex. Nov. 23, 2021) (sealed). The statistical implications of misclassifications were not understood by the district court, which stated that it was "*not clear* how the plaintiffs can make this assertion [that Infosys overstates the effect of misclassifications], particularly regarding Neumark's classification *of applicants* for whom there is no nationality or racial data." RA168 (emphasis added).

Moreover, given that name-matching was applied to less than 15% of employees, the effect of misclassification of employees would be reduced by over 85% compared to the example above, i.e., a 10% misclassification of non-South Asian would result in the involuntary termination rate of South Asians being only slightly understated as 19.8% instead of 20%.

Because Plaintiffs were not given notice or the opportunity to present evidence in support of the *employee* name-matching, the exclusion of Neumark's promotion and termination opinions should be vacated or reversed. *Stewart Title*, 74 F.3d at 836-37 (declining to consider "harmless error" argument for sua sponte ruling because the record was not fully developed). As discussed below, the district court's exclusion of Neumark should also be reversed on the merits.

## B. The Inputs to Dr. Neumark's Opinions Go to Weight, Not Admissibility.

In calculating statistical disparities, Neumark relied on the data Infosys produced, which was missing place of birth data for a small percentage of employees and for most applicants. In order to obtain a more comprehensive dataset, Neumark used a name-matching analysis

to determine race or national origin for employees who were not known to be born in a South Asian country. Infosys withheld PeopleFluent documents that would have allowed Neumark to analyze and consider the categorizations used in those analyses.

Where Infosys failed to collect more comprehensive data, and failed to provide better data that was available, i.e., the PeopleFluent data, it was appropriate for Plaintiffs' expert to rely on the data that Infosys produced. *See Mister v. Illinois Cent. Gulf R.R. Co.*, 832 F.2d 1427, 1430 (7th Cir. 1987) ("The plaintiffs' expert used the best data available; that the data were not better is the [defendant]'s fault, and we agree with the district court that the data at hand were good enough even though imperfect.").

To the extent Neumark input inaccurate race or national origin data in conducting his analyses, that goes to the weight rather than the admissibility of his opinions, and any weaknesses can be addressed on cross-examination. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766-67 (7th Cir. 2013) (possibly inaccurate data inputs go to weight rather than admissibility).

Moreover, as Neumark would testify, any inaccuracies in Neumark's name matching would have *understated* the statistical disparities between groups, such that Neumark's analyses are conservative and represent the lower boundary for what the actual disparities were. Neumark *Wipro* Rpt.¶ 21 n.14, Dkt. 239-1, *Phillips*, No. 4:18-cv-00821 (S.D. Tex. Nov. 23, 2021) (sealed). That the disparities may have been larger than what Neumark's analysis shows goes to weight rather than admissibility. *Semiconductor Energy Lab. Co. v. TCL China Star Optoelectronics Tech. Co.*, No. 8:21-cv-00554, 2023 U.S. Dist. LEXIS 242865, at *21 (C.D. Cal. Mar. 21, 2023) (denying *Daubert* motion where expert's assumptions were "conservative"); *Ramos v. SimplexGrinnell LP*, 796 F. Supp. 2d 346, 369 (E.D.N.Y. 2011) ("calculations of plaintiffs' expert should not be rejected because they are based on conservative assumptions that inured to defendant's benefit").

## C. Name-Matching Methodology Is Well-Established and Reliable.

The district court abused its discretion in finding that Dr. Neumark's name-matching analysis was unreliable. Contrary to the district court's clearly erroneous findings: (1) name-matching is generally

35

accepted in relevant scientific communities; (2) name-matching has been subjected to peer review and publication; (3) there's a standard methodology; and (4) name-matching has been tested and there's a low error rate. RA166-67; *see also Paramount Staffing*, 2010 U.S. Dist. LEXIS 49042, at *30 (rejecting argument that "surname analysis is not a generally accepted method of identifying individuals [and] has an unknown error rate").

### 1. Name Matching Is a Generally Accepted Method of Identifying Ethnicity.

While the district court found that there's no evidence that name-matching is generally accepted (RA166), name matching is a generally accepted methodology. *Paramount Staffing*, 2010 U.S. Dist. LEXIS 49042, at *30 (rejecting argument that "surname analysis is not a generally accepted method" and observing that "several courts have admitted … surname analysis as evidence of discrimination"); *Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709, 717 n.7 (N.D. Tex. 2009) ("The parties agree that experts commonly use Spanish surname databases as the foundation for analysis in voting rights litigations"); *United States v. Alamosa Cnty.*, 306 F. Supp. 2d 1016, 1022 (D. Colo. 2004) ("surname

identification is an accepted means of identifying which voters are likely Hispanic"); *United States v. Vill. of Port Chester*, No. 06 Civ. 15173, 2008 U.S. Dist. LEXIS 4914, at *35 n.13 (S.D.N.Y. Jan. 17, 2008) ("Neither party disputes that Spanish Surname Analysis is an accepted methodology").

Courts have consistently admitted surname analyses as evidence of discrimination. *Castaneda*, 430 U.S. at 486-87 & n.5 (relying on surname analysis in finding statistical evidence supported finding of discrimination); *Hernandez v. Texas*, 347 U.S. 475, 480 n.12 (1954) ("The State challenges any reliance on names as showing the descent of persons in the County. However, … names provide ready identification of the members of this class."); *Garcia v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 660 F.2d 1217, 1225 (7th Cir. 1981) (holding that district court "properly admitted" surname analysis in employment discrimination case); *Alamosa Cnty.*, 306 F. Supp. 2d at 1022 (finding name-matching analysis "probative"); *Gomes v. Avco Corp.*, 816 F. Supp. 131, 136 (D. Conn. 1993) (allowing expert name analysis to determine national origin and finding weaknesses were factual issues for trial); *see also Chavez v. Illinois State Police*, 251 F.3d 612, 643 (7th Cir. 2001) ("The numbers of

37

Hispanics represented can be estimated through an analysis of Hispanic surnames").

Name-matching analyses to identify Indians or South Asians in an almost identical context to here were offered in the following employment discrimination cases: by both side's experts, including Neumark, in *Buchanan v. Tata Consultancy Services, Ltd.*,[11] by Neumark in *Phillips v. Wipro Ltd.*,[12] by Dr. Philip Johnson in *Palmer v. Cognizant Technology Solutions Corp.*, No. CV 17-6848, 2022 U.S. Dist. LEXIS 198737, at \*37, 39 n.17 (C.D. Cal. Oct. 27, 2022), and by Dr. David Lang in *Sugg v. Virtusa.*[13]

In addition, name-matching is an accepted methodology in a variety of fields, including statistics. Mateos, *Names, Ethnicity, and Populations,*

---

[11] *See* Neumark *Tata* Expert Rpt. at 19-21, app.a ¶¶1-9, Dkt. 115-1, *Buchanan v. Tata Consultancy Servs., Ltd.*, No. 15-cv-01696 (N.D. Cal. Feb. 21, 2017); Lazear Decl. Ex. 1 (Expert Report of Edward P. Lazear) at 16, Dkt. 128, *Buchanan*, No. 15-cv-01696 (N.D. Cal. Mar. 20, 2017).

[12] *See* Neumark *Wipro* Rpt. ¶¶ 22-30, Dkt. 239-1, *Phillips*, No. 4:18-00821 (S.D. Tex. Nov. 23, 2021) (sealed).

[13] *See* Lang *Virtusa* Rpt. at 5 n.2, Dkt. 139-2, *Sugg*, No. 3:18-cv-08036 (D.N.J. June 11, 2025).

at 118 (explaining that name-matching to determine ethnicity has been "developed in the fields of public health/epidemiology, population genetics, linguistics, and *statistics*") (emphasis added).

### 2. Name-Matching to Identify Ethnicity Has Been Peer-Reviewed and Published.

In reaching its conclusion that Neumark's opinion was unreliable, the district court found that name-matching methodology hasn't been subjected to peer review or publication. RA166. But the district court overlooked that name-matching *has* been subject to peer review and publication. "The use of people's names' origins to subdivide contemporary populations into ethnic groups has been applied to population studies in the U.S. at least since the beginning of the 20th century" and "[t]he application of such techniques has grown very rapidly[.]" Pablo Mateos, *A Review of Name-based Ethnicity Classification Methods and their Potential in Population Studies*, 13 Population, Space and Place 1, 11 (2007) (peer-reviewed publication), *available at* https://bit.ly/3oF9SlX; *see also, e.g.*, Mateos, *Names, Ethnicity, and Populations*, at 121 ("There is a vast range of studies that developed, evaluated or applied" "name-based techniques to ascribe

ethnicity," including peer-reviewed studies); Raphael Susewind, *What's in a Name?  Probabilistic Inference of Religious Community from South Asian Names*, 27 Field Methods 319, 319-32 (2015) (peer reviewed); Lauderdale & Kestenbaum, *Asian American Ethnic Identification by Surname*, 19 Population Research & Policy Review 283 (2000) (peer reviewed), *available at* bit.ly/4lUVAYu.

### 3. There Is a Standard Methodology for Name-Matching.

The district court found that there's no evidence of any standards controlling name-matching methodology. RA166. But an accepted methodology has been established for name-matching to determine ethnicity. Professor Pablo Mateos performed a "systematic review of the most representative studies that develop new name-based ethnicity classifications," and found an accepted common methodology. Mateos, *Names, Ethnicity, and Populations*, at 117, 123-37.[14] First, a "reference list" of names with a pre-determined ethnic origin is identified, which

---

[14] Mateos offered a similar analysis in an earlier peer-reviewed article. *See* Mateos, *A Review of Name-based Ethnicity Classification Methods*, at §4 (peer-reviewed publication).

may be a purpose-built list from administrative files, typically containing hundreds or thousands of unique names. Mateos, *Names, Ethnicity, and Populations,* at 123, 124-26. Second, known ethnic origin information in the reference population, such as self-reported ethnicity, country of birth, or nationality, is used to classify individuals on the reference list into ethnic groups, then those individuals are aggregated by surname and assigned to the ethnic group with the highest frequency for that name, producing a reference list. *Id.* at 126. Third, the target population is classified into ethnic groups using a manual or automatic method, or a combination of both. *Id.* at 124 tbl.6.1, 129. The manual method requires an expert to decide the ethnicity of a name, but doesn't require a reference list. *Id.* at 129. The automatic method involves using "an automated algorithm to search for the name of each individual in the target population against the reference list, and then assign the pre-coded ethnic group for that name to the individual." *Id.* at 132. Automatic classification methods typically use a "binary taxonomy," e.g., South Asian or non-South Asian. *Id.* Finally, the name matching is used to supplement rather than replace records self-identifying ethnicity. "When

some degree of ethnicity information is already available for a population, name-based classification can … complete missing data[.]" *Id.* at 137.

Here, Neumark followed the accepted name-matching methodology. He started with Infosys data that was used to code the vast majority of employees based on South Asian place of birth. SA208¶¶2-3. In order to "complete missing data," Neumark complemented that data with name-matching analysis. He created a reference list of thousands of names by identifying Infosys employees "born in a South Asian country or India." SA208-09¶¶4-5. He then "use[d] these names to identify South Asians or Indians among records on employees not born in these countries[.]" SA208¶4.

For 857 out of 46,979 employees, or 1.8%, Neumark took the additional step of identifying 63 obviously non-South Asian surnames, to "reduce the chances of false identification." SA194-95¶35 n.30, SA209-10¶5 & tbl.2.1.

### 4. There Is a Relatively Low Error Rate for Indian Name-Matching.

The district court erroneously found that there's no known or potential error rate. RA166. Studies have identified a known and

reasonably low error rate for name matching, especially for Indian names, which are especially distinctive. *See* Mateos, *A Review of Name-based Ethnicity Classification Methods*, at 22-23 (examining 13 name-matching studies and finding that the positive predictive value generally ranged from 70% to 96%); Lauderdale & Kestenbaum *Asian American Ethnic Identification by Surname*, at 290 tbl.2 (finding positive predictive value of name matching of 87% to 91% for Indian names); Tej Sheth et al., *Cardiovascular and Cancer Mortality Among Canadians of European, South Asian and Chinese Origin from 1979 to 1993,* 161 Canadian Med. Ass'n J. 132, 137 (1999) ("last names have high validity and reliability for south Asian … ethnicity"); *see also Alamosa Cnty.*, 306 F. Supp. 2d at 1022 (relying on Spanish name-matching despite error rate as high as 27%).

Thus, experts who conducted various name-matching studies found that "name-based ethnicity classification methods present a valid alternative technique for ascribing individuals to ethnic groups through their name origins, where self-identification is not available." Mateos, *Names, Ethnicity and Populations*, at 136 (collecting studies).

The reliability of Neumark's techniques is corroborated by the PeopleFluent analyses, which independently reached the same conclusions as Neumark, i.e., that Indians are vastly overrepresented in Infosys' workforce, and that there are large and statistically significant disparities in hiring, promotions, and terminations between South Asians and non-South Asians. SA212¶2, SA214-30 tbls.1-17.

Moreover, Neumark's analysis demonstrates that Infosys discriminated against employees and applicants who had non-Indian names. *Cf. Teamsters*, 431 U.S. at 328 (alleging discrimination against "Spanish-surnamed Americans"). There's evidence that Infosys attempted to recruit potential Indian employees using Indian last names. SA10-11¶¶13-14. Even though having a non-Indian sounding name isn't the same as being non-Indian, Infosys' discrimination against such persons is relevant and admissible to help demonstrate Infosys' *intent* to discriminate against non-Indians, even if their attempts to discriminate were occasionally foiled by their misperception of race or national origin based on names. *Cf. United States EEOC v. MVM, Inc.*, No. TDC-17-2864, 2018 U.S. Dist. LEXIS 81268, at *34 (D. Md. May 14, 2018) ("Discrimination where the employer is mistaken in his belief that an

employee is of a particular national origin is just as insidious as discrimination where the employer is correct…."); Marianne Bertrand & Sendhil Mullainathan, *Are Emily and Greg More Employable than Lakisha and Jamal? A Field Experiment on Labor Market Discrimination*, 94 Am. Econ. Rev. 991, 991 (2004) ("White names receive 50 percent more callbacks for interviews.").

**D.  Dr. Neumark Is Qualified to Perform Name-Matching Analyses.**

Name-matching analyses have been applied in various fields, including statistics. Mateos, *Names, Ethnicity and Populations* at 118. Dr. Neumark is an expert in statistics, and Infosys hasn't disputed that he's qualified to perform statistical analyses. SA169-70¶3 ("I have been retained by the plaintiffs as a statistical expert"); RA140 ("defendants have not challenged Neumark's general qualifications"). Neumark is a professor of economics and "has done extensive research on labor market discrimination." SA169¶1. He has performed name-matching analyses in

other cases, and testified at trial in *Tata Consultancy Services* to his analysis.[15]

Neumark relied heavily on the "automatic" name-matching method, matching names on his target list with his reference list. SA208¶4. The automatic method only requires an ability to match names on the two lists using a computer algorithm. Mateos, *Names, Ethnicity and Population* at 128-29; Kevin Fiscella, *Use of Geocoding and Surname Analysis to Estimate Race and Ethnicity*, 41 Health Servs. Res. 1482, 1493 (2006) (surname analysis "[r]equires some expertise in matching names to list"), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC1797082/. Infosys doesn't dispute that Neumark is qualified to, and in fact, accurately cross-referenced his target list against his reference list. *See Paramount Staffing*, 2010 U.S. Dist. LEXIS 49042, at *8, 30-34 (denying

---

[15] *See, e.g.*, Neumark *Tata* Rpt. at 19-21, app.a ¶¶1-9, Dkt. 115-1, *Buchanan*, No. 15-cv-01696 (N.D. Cal. Feb. 21, 2017); Neumark *Wipro* Rpt. ¶¶20-30, Dkt. 239-1, *Phillips*, No. 4:18-00821 (S.D. Tex. Nov. 23, 2021) (sealed).

motion to exclude name-matching analysis performed by a "data management expert").

For approximately 1.8% of employees, Neumark attempted to eliminate false classifications of employees as Indian or South Asian by excluding from the reference list names he recognized as "obvious Western names" or "very Western-sounding names." Dkt. 97-1 77:25-78:1, 127:4 (Neumark Dep. Tr.). Such manual name matching requires that the expert be from the "cultural background" of the type of name being identified. Mateos, *Names, Ethnicity and Population* at 129 (explaining that standard name-matching methodology requires that the experts applying manual name matching be of "different cultural backgrounds" when names of multiple different ethnic groups are being identified). Neumark is an American who has extensive familiarity with Western (non-Indian) names based on his knowledge and experience, and he limited his manual correction to 63 surnames that were the most obviously Western names, such as Johnson, Robinson, Thompson, or Smith. SA209-10¶5 & tbl.2.1; Dkt. 97-1 77:25-78:1, 127:4; *Paramount Staffing*, 2010 U.S. Dist. LEXIS 49042, at *33 (admitting manual name analysis performed by Hispanic business school graduate students,

stating that "[t]here is no evidence that a Spanish surname analysis must be performed by a linguistic expert before its results can be considered valid"). Tellingly, Infosys doesn't dispute the accuracy of his categorization of these 63 surnames as non-Indian.

Thus, the district court abused its discretion in finding that Neumark's name-matching analysis was unreliable because it was not generally accepted, was not subject to peer review or publication, lacked a standard methodology, has no known or potential error rate, and that Neumark was not qualified to perform the analysis.

E. The District Court Abused Its Discretion in Finding Dr. Neumark's Analyses Were Not Relevant.

The district court found that Neumark's statistical analyses were not relevant because the name-matching methods he used were unreliable and because he was not qualified to determine the race of Infosys employees by surname. RA170. But as discussed above, Neumark's methodologies were reliable and he was qualified to perform a name-matching analysis.

Because the district court erred in its sua sponte exclusion of Neumark's employee analysis and abused its discretion in finding his

analyses unreliable and not relevant, the exclusion of Neumark should be reversed, or at a minimum, vacated and remanded. Further, because Plaintiffs relied heavily on Neumark's opinions on both class certification and summary judgment, those decisions should be vacated and remanded, as discussed further below.

## II.     <u>The District Court Abused Its Discretion in Denying Class Certification.</u>

The district court denied Plaintiffs' motion for class certification based on its exclusion of Dr. Neumark's opinions, stating: "The plaintiffs' motion for class certification explicitly relies on Neumark's analysis to show numerosity and predominance, and it likely ought to have done so for commonality. The court will deny that motion without prejudice." RA171-72 (citation omitted). [16] Because the district court erred in excluding Neumark's opinions, its denial of class certification should similarly be vacated and remanded.

---

[16] The Court later denied Plaintiffs' request to name a new expert. SA238. And in granting summary judgment, the Court stated that her earlier ruling that she may reconsider class certification at a later time had been mooted. RA243 68:1-6.

**III.** **The District Court Abused Its Discretion in Refusing to Consider the PeopleFluent Analyses on Summary Judgment.**

The district court abused its discretion in refusing to allow Plaintiffs to supplement the summary judgment record to include the PeopleFluent documents, which include affirmative action analyses that demonstrate a pattern of systemic, company-wide discrimination.

"[T]he denial of [a] motion for leave to file a supplemental brief [on] … summary judgment" is reviewed for an "abuse of discretion, reversing only if there is a clear abuse of discretion or the real possibility that a party was unfairly prejudiced by the decision[]." *Trans Energy*, 743 F.3d at 907; *see also Christensen v. Weiss*, 145 F.4th 743, 755 (7th Cir. 2025) (applying abuse of discretion standard to the district court's decision on a motion to supplement the record after the summary judgment deadline).

If a filing deadline passes, Rule 6(b) provides that district courts may, for good cause, grant leave to file if the moving party failed to act because of "excusable neglect." Fed. R. Civ. P. 6(b)(1). Determining whether a party failed to act because of "excusable neglect" requires considering four "*Pioneer* factors": "'[1] the danger of prejudice to the

[non-moving party], [2] the length of delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith.'" *Christensen*, 145 F.4th at 755 (quoting *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). "'[E]xcusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant." *Pioneer*, 507 U.S. at 392. "[T]he determination is at bottom an equitable one, taking account of all relevant circumstances." *Id.* at 395.

The district court denied Plaintiffs' request without considering the four relevant *Pioneer* factors, requiring reversal. *Bateman v. United States Postal Serv.*, 231 F.3d 1220, 1224 (9th Cir. 2000) ("We would not ordinarily reverse a court simply for failing to articulate the *Pioneer* … test, as long as it actually engaged in the equitable analysis th[at] case[] mandate[s]."). While the parties didn't brief the *Pioneer* factors, the district court instructed the parties not to brief the issue. SA237.

Instead, the district court denied Plaintiffs' motion because "they had that opportunity" to request leave to supplement the summary

judgment record when they received the PeopleFluent analyses in 2017, "and did not take it." SA142 33:16-19 (Hr'g Tr. (Dec. 22, 2022)). But whether Plaintiffs could have sought to supplement the summary judgment record prior to the district court's decision excluding Neumark's opinions relates to only one of four relevant factors under *Pioneer*, and the district court was required to consider all four factors.

Moreover, until the district court granted the *Daubert* motion, the PeopleFluent analyses would have been largely redundant of Neumark's analyses, there was little need to supplement the record, and seeking leave to file may have simply created unnecessary briefing when the district court was wary of additional briefing. *Cf.* SA141 3:11-12 ("I think defense counsel offered briefing, and I told you all that I didn't think any more paper was necessary in this case...") (Pepper, J.); RA180-81 5:7-10, 6:18-19 (explaining that the "relatively horrifying 8.5 years" that it took the district court to reach a decision on summary judgment was partly because of the "voluminous" filings in the case).

Taking into consideration all relevant factors, including the four *Pioneer* factors, the district court abused its discretion in refusing to allow Plaintiffs to supplement the summary judgment record to include

the PeopleFluent documents. First, Infosys wouldn't have been prejudiced by consideration of the PeopleFluent analyses, which should have been produced and considered during the discovery period, and which Infosys possessed all along.

Second, the "length of the delay" in seeking to supplement after the exclusion of Neumark's opinions "and its potential impact on judicial proceedings" was minimal. *Christensen*, 145 F.4th at 755. Plaintiffs orally moved to supplement their summary judgment briefing at a status conference held on November 10, 2022, shortly after the district court issued its September 14, 2022 ruling excluding Neumark's opinions and denying class certification. RA172; SA237. (The district court stated that it didn't need further briefing on the motion. SA237). The delay in supplementing the record wouldn't have delayed overall proceedings, as the district court didn't rule on summary judgment until June 24, 2025, almost three years later (and eight and a half years after Infosys filed its summary judgment motion). RA176-247; Dkt. 78 (Sept. 23, 2016) (Mot. for Summ. J.).

Third, "the reason for the delay, including whether it was within the reasonable control of the movant," weighs in Plaintiffs' favor.

53

*Christensen*, 145 F.4th at 755. Plaintiffs were not able to timely submit the PeopleFluent materials within the deadline for filing their summary judgment opposition brief and materials because Infosys improperly withheld the PeopleFluent documents and falsely claimed to have produced all responsive documents regarding Infosys' demographics. Dkt. 134-31 at 2; Dkt. 134-12¶¶2-3; Dkt. 120 at 2. Plaintiffs only learned about the documents from a third-party witness, and promptly subpoenaed the documents from PeopleFluent directly. After the district court excluded Neumark, whose opinions would have substantially lessened the need for the PeopleFluent documents, Plaintiffs promptly asked the Court to supplement the summary judgment record to include them. SA238-39. While Plaintiffs could have moved to supplement before the exclusion of Neumark, the PeopleFluent analyses were partly redundant until then, as both demonstrated stark disparities by race in hiring, promotions, and terminations.

Fourth, Plaintiffs "acted in good faith." *Christensen*, 145 F.4th at 755. They diligently sought the PeopleFluent documents, and after obtaining the documents, promptly moved to take additional discovery related to the documents and for sanctions, explaining that the content

54

of Plaintiffs' summary judgment brief would have been different if they had the PeopleFluent documents. Dkt. 135 at 11-12. Plaintiffs moved to supplement the record to include the PeopleFluent documents promptly after similar analyses performed by Neumark were excluded.

Further, Plaintiffs were "unfairly prejudiced by the decision[]" to exclude the PeopleFluent analyses. *Trans Energy*, 743 F.3d at 907. The PeopleFluent analyses reached similar conclusions to Neumark and provided evidence that Infosys acted with discriminatory intent, and provided evidence of pretext, which would have helped Plaintiffs defeat Infosys' summary judgment motion. SA212¶2' SA214-30 tbls.1-17; *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994) (circumstantial evidence of intentional discrimination includes "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment").

Because these factors favor Plaintiffs, the district court abused its discretion in refusing to allow Plaintiffs toto supplement the summary judgment record with the PeopleFluent materials.

**IV. The District Court Erred in Granting Summary Judgment Where Dr. Neumark's Opinions and the PeopleFluent Analyses Improperly Were Not Considered and Where There Were Disputed Issues of Material Fact.**

The district court erred in granting summary judgment where: (A) it improperly failed to consider Neumark's opinions and the PeopleFluent analyses, which led it to improperly reject the *Teamsters* pattern-or-practice framework; and (B) Plaintiffs' evidence is sufficient to create genuine issues of material fact for each Plaintiff.

**A. Summary Judgment Should Be Vacated and Remanded to Allow the District Court to Consider the Impact of Considering Neumark's Opinions and the PeopleFluent Analyses, and to Properly Apply the *Teamsters* Pattern-or-Practice Framework.**

Because Plaintiffs' summary judgment opposition relied heavily on Neumark's opinions, and his opinions were improperly excluded, the district court's order granting summary judgment should also be vacated and remanded. The district court recognized that "[t]he plaintiffs' brief in opposition to the defendants' motion for summary judgment (Dkt. No. 93) and its combined additional proposed findings of fact and response to the defendants' proposed findings of fact (Dkt. No. 94) rely on and are replete with reference to Neumark's analyses." RA172.

The district court should also have considered the PeopleFluent analyses on summary judgment, and those analyses also provided statistical evidence in support of Plaintiffs' claims. The district court's improper refusal to consider the PeopleFluent analyses provides an additional reason to vacate the grant of summary judgment.

Because the district court excluded Neumark's opinions, the district court improperly denied class certification, and as a result, declined to apply the *Teamsters* pattern-or-practice framework and instead applied the *McDonnell Douglas* test for individual discrimination claims. RA213 38:2-4, 15-16. A different burden of proof is applied in *Teamsters* cases. *Teamsters*, 431 U.S. at 358 (discussing *McDonnell Douglas* and noting that its framework isn't applicable in all cases, including pattern and practice cases); *Young v. UPS, Inc.*, 575 U.S. 206, 212-13 (2015).

"The inquiry regarding an individual's claim is the reason for a particular employment decision, while 'at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking.'" *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984) (quoting *Teamsters*, 431 U.S. at 360 n.46). In a *Teamsters* pattern-or-practice case, "the

plaintiff need not initially show discrimination against any particular present or prospective employee." *United States v. City of N.Y.*, 717 F.3d 72, 84 (2d. Cir. 2013).

Where plaintiffs advance pattern-or-practice class claims, those claims are resolved in two phases: a "liability stage," and a "remedial stage." *Teamsters*, 431 U.S. at 361-62. In Phase I – the liability stage – plaintiffs establish their *prima facie* case through the presentation of statistical and other evidence that the defendant "maintained a policy of discriminatory decisionmaking." *Id.* During Phase I, a defendant's "defense must[] … be designed to meet the prima facie case of the [plaintiffs]," such as by showing that the plaintiffs' *prima facie* proof of a pattern and practice is "inaccurate or insignificant." *Id.* at 360 & n.46. Only after a defendant has addressed plaintiffs' pattern-or-practice claims do the parties and court then move on to a remedial phase in which a defendant can raise defenses specific to individual plaintiffs or class members. *Id.* at 342 n.24. But during this remedial phase, because the employer has been found to operate under a pattern and practice of discrimination, "an inference [attaches] that any particular employment decision[] … was made in pursuit of that policy." *Id.* at 362.

Because the district court applied the wrong framework in light of its denial of class certification, it applied the wrong legal standard on summary judgment. *See Thiessen v. GE Cap. Corp.*, 267 F.3d 1095, 1109 (10th Cir. 2001) (reversing summary judgment for defendants because plaintiffs' "claims cannot at this point be treated as non-class claims of individual discrimination or analyzed under the *McDonnell Douglas* framework").

**B.** **Plaintiffs Have Demonstrated Genuinely Disputed Issues of Material Fact.**

Even without Neumark's opinions or the PeopleFluent analyses, summary judgment should have been denied, as Plaintiffs established genuine issues of material fact. In an employment discrimination case, a plaintiff can avoid summary judgment in two ways: first, "by putting in enough evidence, whether direct or, more commonly, circumstantial, to create a triable issue of whether the adverse employment action of which he complains had a discriminatory motivation"; or second, under *McDonnell Douglas*, "by presenting evidence that he was qualified for the job in question and that he lost it to, or was otherwise treated less favorably than, a member of another race, sex, nationality, etc. … and

that the employer's stated reason for the adverse action is unworthy of belief, a mere pretext." *Wallace v. SMC Pneumatics*, 103 F.3d 1394, 1397 (7th Cir. 1997).

"If the employee succeeds in casting doubt on the proffered reason for the dismissal, the ultimate question of whether the employer discriminated against the employee must be left for a jury to consider." *O'Connor v. DePaul Univ.*, 123 F.3d 665, 670 (7th Cir. 1997).

Circumstantial evidence that allows a jury to infer intentional discrimination includes: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Yong-Qian Sun v. Bd. of Trs.*, 473 F.3d 799, 812 (7th Cir. 2007).

"[C]ourts should be careful in a discrimination case … not to grant summary judgment if there is an issue of *material* fact that is *genuinely*

contestable, which an issue of intent often though not always will be."
*Wallace*, 103 F.3d at 1396 .

Plaintiffs presented evidence of discriminatory intent. Plaintiffs allege that Infosys had policies and practices favoring Indians and South Asians, including creating an "inventory" of visa workers. SA5-8¶¶6-8. Plaintiffs also offer extensive anecdotal evidence of discrimination, including instructions to the Talent Acquisition department to focus on recruiting Indians, to search for Indian names in recruiting databases, and to favor Indians over Americans in jobs because "Americans don't know shit." SA3¶2; SA 10-11¶¶13-14.

If considered, the Neumark and PeopleFluent statistical analyses provide circumstantial evidence of discriminatory motive, as they show extreme disparities in Infosys' workforce, in hiring, in promotions, and in terminations, and that those disparities are statistically significant. SA170-72¶¶6-10; SA212¶2; SA214-30 tbls.1-17; *see also EEOC v. O&G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 876, 878 & n.8 (7th Cir. 1994) ("statistical disparities alone may prove intent" as "'[s]tatistics showing racial or ethnic imbalance'" are "'often a telltale sign of purposeful discrimination'") (quoting *Teamsters*, 431 U.S. at 339-40

n.20). While statistical evidence plays a more central role in a *Teamsters* pattern-or-practice case, statistical evidence is also probative in an individual case in demonstrating pretext or in providing circumstantial evidence that race was a determining factor. *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 779 n.14 (7th Cir. 2006) ("a plaintiff can use statistical comparisons between himself and those subject to similar standards but outside of his protected class to develop a case under *McDonnell Douglas*"); *Bell v. EPA*, 232 F.3d 546, 553 (7th Cir. 2000) (evidence of preferential treatment need not be "*rigorously statistical*") (quoting *Troupe*, 20 F.3d at 736); *Perfetti v. First Nat'l Bank*, 950 F.2d 449, 450-51 (7th Cir. 1991).

In addition to the evidence of discriminatory intent applicable to all Plaintiffs, each Plaintiff presented individualized evidence to satisfy the test for discrimination in an individual employment discrimination case. There are two frameworks that individual Plaintiffs can rely on to show discrimination. First, under *Ortiz v. Werner Enterprises, Inc.*, the court looks at the evidence in the aggregate to determine whether it allows an inference of prohibited discrimination. 834 F.3d 760, 765 (7th Cir. 2016). Second, under *McDonnell Douglas Corp. v. Green*, a plaintiff must first

establish a prima facie case for discrimination. 411 U.S. 792, 802 (1973). To establish a prima facie *McDonnell Douglas* case, the applicant or employee must provide evidence that he or she was qualified for a job for which the employer was seeking applicants (or for an employee, was meeting the employer's performance expectations), was rejected despite his or her qualifications (or suffered another adverse employment action), and that the position remained open and the employer continued to seek applicants from persons of complainant's qualifications (or that one or more similarly situated individuals outside his or her protected class received better treatment). *Id*; *McKinney v. Office of the Sheriff*, 866 F.3d 803, 807 (7th Cir. 2017).

The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for their employment action. *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts back to the applicant or employee to show that the proffered reason is pretextual. *Id.* at 804. A plaintiff can demonstrate pretext by establishing that "'1) the proffered reasons are factually baseless; 2) the proffered reasons were not the actual motivation [for the decision]; or 3) the proffered reasons were insufficient to motivate [the decision].'" *Grube v. Lau Indus.*, 257 F.3d

723, 730 (7th Cir. 2001) (quoting *Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir. 1999)). "[S]ummary judgment is only proper 'where no rational fact finder could believe that the employer lied about its proffered reasons for the hiring decision in question.'" *EEOC v. Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006) (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 n.8 (7th Cir. 2005)).

Where an employer raises performance as the reason for the adverse employment decision, "issues of satisfactory performance and pretext overlap, allowing [the court] to 'proceed directly to … pretext'" and "skip the *McDonnell Douglas* prima facie analysis." *Vichio v. United States Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023) (quotation omitted). Infosys has raised issues of satisfactory performance or qualifications for Plaintiffs Gregory Handloser, Kelley Parker, and Brenda Koehler, such that the analysis can skip directly to pretext.

When reasonable inferences are properly drawn in favor of (1) Handloser; (2) Parker, (3) Koehler, and (4) Layla Bolten, there are genuine issues of material fact precluding summary judgment.

### 1. *Gregory Handloser.*

The court found that Handloser failed to establish the pretextual nature of Infosys' purported reason for terminating him—that he received a poor performance review score of 4 in his last performance evaluation, which brought him within the ambit of a reduction-in-force ("RIF"). RA236-37 61:9-62:14. But Handloser performed well in his role as a Sales Manager, signing major clients and bringing in considerable business. SA25¶46. Handloser's supervisor recommended a higher score of 3 and sought to promote him, but management changed his score in order to justify his termination, and Handloser was never informed that his score had been changed. SA25-29¶¶47, 50-51. That is sufficient to show pretext. *See Vichio*, 88 F.4th at 692-93 (reversing summary judgment in discrimination case where employee's consistent record of positive performance, followed by a sudden negative evaluation, permitted inference of pretext); *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 915 (7th Cir. 2025) ("reasonable jury could find [employer]'s justifications for taking adverse employment action against Murphy pretextual" where explanation was "difficult to reconcile with other evidence of his satisfactory performance"); *Fischer v. Avanade, Inc.*, 519

F.3d 393, 407 (7th Cir. 2008) ("genuine issue of material fact with respect to pretext exists when specific reason for promoting one employee over the plaintiff was not disclosed until after litigation") (citing *Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir. 1991)).

Moreover, the decision to reduce Handloser's score was made by senior executives, including Sanjay Jalona. SA27-29¶¶50-52; SA150-56¶¶193-94. Because Jalona's documents and ESI were improperly destroyed after Infosys had a duty to preserve them, Handloser intends to seek an adverse inference jury instruction at trial, and the jury could properly draw an adverse inference from the spoliation. Dkt. 135 at 2-7, 16-18;[17] *Design Basics LLC v. Campbellsport Bldg. Supply, Inc.*, No. 13-C-560, 2016 U.S. Dist. LEXIS 73963, at *20 (E.D. Wis. June 7, 2016) (finding that "spoliation issue precludes resolution … upon summary judgment" where nonmovant "will request an adverse inference instruction based on the spoliation").

---

[17] The district court denied without prejudice a motion for an adverse inference instruction on June 2, 2017 (SA231), after Plaintiffs had already filed their summary judgment opposition.

The court found that Handloser had presented no evidence of pretext as to Infosys' assertion that Handloser's termination was part of a RIF, relying on a declaration submitted by Infosys in support of summary judgment, which stated that Handloser was terminated as part of a RIF. RA236 61:9-24. But Handloser was never informed that his termination was part of a RIF, Infosys has failed to produce documentary evidence of a RIF, and Infosys' data shows there was no RIF, creating a disputed factual issue about whether it's a pretextual explanation. SA28-29¶51; SA149-51¶¶191-93; *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 739-40 (7th Cir. 2013) (reversing summary judgment and rejecting "posthoc justification" for firing that was not previously presented and was sufficiently suspect for a "reasonable juror to wonder whether [defendant] can ever get its story straight" and to find pretext); *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 677 (7th Cir. 2003) ("the consistency of the explanation provided by an employer at the time of an employment decision and in an administrative proceeding is evidence of the veracity of the employer's explanation at summary judgment"); *Emmel v. Coca-Cola Bottling Co. of Chi.*, 95 F.3d 627, 634 (7th Cir. 1996) ("Coca-Cola's failure to express this explanation earlier

despite several opportunities to do so" was "compelling" evidence of pretext).

In addition, the termination violated company policy, which required a Performance Improvement Plan prior to termination. SA28-29¶51; SA151-56¶194. "[A]n employer's failure to follow its own internal employment procedures can constitute evidence of pretext." *Rudin*, 420 F.3d at 727 (citing *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992)).

Moreover, in relying on the declaration Infosys submitted to show that a RIF existed and that Handloser was terminated pursuant to the RIF, RA236-37 61:9-62:14, the court improperly ignored Handloser's objection to the declaration based on Fed. R. Evid. 1002 where the declaration was purportedly based on a review of business records that were not attached as exhibits to the declaration. SA151-56¶194; Dkt. 78-2¶¶8-9; *see, e.g.*, *Clevenger v. A.M. Castle & Co.*, No. 21-CV-5889, 2025 U.S. Dist. LEXIS 61529, at *8-9 (N.D. Ill. Mar. 31, 2025) (testimony about plaintiff's performance based on review of internal reports concerning performance not admissible in the absence of personal knowledge under best evidence rule). And the underlying data contradicts the declaration's

assertion that employees with an appraisal score of 4 were subject to the RIF. SA156-57¶195.

Before Handloser's termination, Handloser's supervisor admitted in an e-mail that there was a "very definite possibility" of Handloser filing a lawsuit if he were terminated, and that this would be "not be an emotional reaction from him but instead a very calculated and methodical move on his part – supported by records and data." SA29¶52. A reasonable jury could construe this e-mail as an admission that Handloser's lawsuit is meritorious. *Perfetti*, 950 F.2d at 451 (explaining that direct evidence of pretext includes "a contradiction among the witnesses to the employment decision at issue").

### 2. *Kelly Parker.*

The district court held that Parker's claim was barred by the statute of limitations, and that she could not piggyback on Koehler's timely charge because class certification was denied. RA224 49:2-17. But tolling applies until denial of certification, and Parker filed an EEOC charge and joined as an individual Plaintiff before certification was denied, such that she properly exhausted her failure-to-hire claim. SA35¶4 (charge filed on November 22, 2013); Dkt. 4; Dkt. 19¶9; *Am. Pipe*

*& Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353-54 (1983).

Parker presented evidence that she was qualified and performed well in the position at issue, that Infosys' assertion that she was not hired because she was unqualified is pretextual, and that a South Asian for whom Infosys fraudulently secured a visa was hired instead of her.

The court held that Parker's hiring claim could not survive summary judgment because she "provided no evidence that the defendant's explanation for not hiring her," i.e., that she was unqualified, "was pretext." RA225-26 50:24-51:6. But Infosys' claim that Parker was unqualified for a role that she had been performing, and for which she trained her replacement, is exactly the sort of implausible explanation that a juror could find unworthy of credence and warranting an inference of pretext. *Murphy,* 140 F.4th at 914.

Moreover, while Infosys claims that Parker interviewed for a "Systems Engineer" position that she was not qualified for, Parker actually interviewed for a Helpdesk/Desktop Support position supporting Harley Davidson that she had already been performing well as a contractor. SA21-22¶¶36, 38-39; SA76-79¶¶73-74. Infosys secured an H-

1B visa for Parker's Indian replacement, Kapil Kulkarni, for a project servicing Microsoft in Redmond, Washington, but Infosys then used Kulkarni to displace Parker on the Harley Davidson project. SA22-23¶¶40-41. After Parker was forced to train Kulkarni, Kulkarni served in Parker's Helpdesk role and assumed her desk, and didn't fill the "Systems Engineer" role Infosys claims Parker was unqualified for, even if Kulkarni was ostensibly given a Systems Engineer title. SA23-24¶¶41-43; SA84-86¶79; SA111-12¶114. Parker was more qualified for the actual role than Kulkarni, as she had already been performing the role, and the position required a car and driver's license, which Kulkarni lacked, because the position serviced two client locations three miles apart. SA21¶36, SA23-24¶42. Given her excellent work performance, several Harley Davidson employees questioned her termination and appealed to Infosys on her behalf, but to no avail. SA24¶43.

With respect to Parker's termination claim, Parker was performing well and was liked and respected by her colleagues. SA 21¶36; SA24¶43. While Infosys claimed, based on a Task Order for services, that Parker's contracting role was for a fixed term from June to September 15, 2013, that explanation is illogical, as Parker had been told that her position

was permanent, not temporary, and the Task Order was signed on September 4, not in June, and appears to have been prepared as justification for her discriminatory termination after her less-qualified Indian replacement Kulkarni arrived in the U.S. on September 1. SA22¶39; SA105-06¶¶107-08. The court disregarded all of this in finding that "the expiration of the staffing contract is a legitimate reason for the end of Parker's employment." RA227 52:1-2.

Parker presented evidence that Infosys told Parker that she was being terminated because she had been late to work once, and that she didn't keep her desk and the IT area "tidy." SA24¶44. The court improperly found, without elaboration, that Parker's "suggestion of a phony reason" didn't "rise above mere speculation," and further found that the statement to Parker that she was being terminated for those reasons was inadmissible hearsay. RA228-29 53:5-54:3. But the statement isn't being offered for the truth of the matter asserted—to the contrary, it's being offered to show that Infosys offered Parker a *false* justification for her termination, i.e., pretext. *Murphy*, 140 F.4th at 914; *see also Lambert v. Roechling Auto. Duncan, LLP*, Civ. No. 7:08-925, 2009 U.S. Dist. LEXIS 68848, at *10-12 (D.S.C. July 10, 2009) (finding that

plaintiff's reliance on his own testimony regarding the discriminatory comments of defendant's employees was not hearsay because they were made within the scope of employment and may have constituted party admissions under Fed. R. Evid. 801(d)(2)(D)).

### 3. *Brenda Koehler.*

Brenda Koehler presented evidence that she was qualified for the position that she applied for, that Infosys' assertion that she was not hired because she was unqualified is pretextual, and that a South Asian was hired instead of her.

While Infosys argued that Koehler was not qualified because she lacked experience with Active Directory, Microsoft DNS, and VMware, she had such experience. She had a relevant master's degree in computer science, 17 years of experience with Active Directory, as recently as a month before her interview, ample work experience with Microsoft DNS, and a relevant VMware certification and extensive VMware experience. SA15-18¶¶27-28.

Active Directory and Microsoft DNS were not even part of the list of requirements for the position. SA53¶34 (citing Koehler Dep. Ex. 4). This gives rise to an inference of pretext. *Moss v. BMC Software, Inc.*, 610

F.3d 917, 926 (5th Cir. 2010) ("An employer's reliance on a previously unmentioned job requirement to justify a challenged hiring decision would raise a genuine issue of material fact as to pretext.").

Infosys offered contradictory evidence about whether Koehler's interview demonstrated that she was not qualified for the job, offering a declaration that contradicted Infosys' own Rule 30(b)(6) deposition testimony, and was controverted by both Koehler's resume and testimony. SA19¶32; SA54-55¶36; Dkt. 93 at 18-19.

The court improperly disregarded this contradictory evidence in finding that Koehler's claim could not survive summary judgment, finding that she "presented *no evidence* that the defendant's explanation for not hiring her is a pretext for race discrimination," and inaccurately stated that Infosys has "consistently" presented "lack of qualifications" as its reason for not hiring Koehler. RA222-23 47:14-15, 47:25-48:4 (emphasis added); *see also* SA245.

Moreover, evidence of pretext includes "'weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reasons that a reasonable person could find it unworthy of

74

credence.'" *Murphy*, 140 F.4th at 914 (quoting *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 721 (7th Cir. 2021)).

The court cited an email from Koehler's interviewers stating that they rejected Koehler at a "technical level," RA222 47:8-11, but ignored circumstances that make the email's claims implausible and suggest that Koehler was interviewed merely to check a box with the preordained conclusion that she would fail. For instance, Infosys executives, including the two individuals who interviewed Koehler, were sent an email eighteen minutes *before* her interview was scheduled to begin suggesting that Koehler had already been disqualified from consideration. Dkt. 95-16 (noting "Candidate not reachable" in April 24, 2012 email from 9:42 a.m.). This email explains why Infosys repeatedly informed Koehler that it would call her for the interview, only to change how she would participate in the interview just before the interview was set to begin. SA18-19¶¶29-30.

Similarly, while the job posting indicated that VMware would be the primary role for the position, Infosys' representatives spent a considerable amount of time asking about other subjects, including DNS and Active Directory. SA19¶32. When Koehler nonetheless was able to

discuss those areas competently, consistent with her considerable experience in those areas, the interviewer sighed and stated (falsely) that Koehler lacked the relevant experience and noted the same in the email relied on by the court. *Id*.; Dkt. 78-7¶13. A reasonable juror could find that these circumstances render Infosys' claim that it rejected Koehler based on lack of qualifications unworthy of credence. *Cf. Brown v. M & M/Mars*, 883 F.2d 505, 509 (7th Cir. 1989) (jury could infer pretext where "Brown performed well in the areas in which Vincent testified Brown was deficient").

Infosys recruited, hired, and relocated a South Asian (Fazlul Halim) for the position that Koehler applied for, and offered shifting and contradictory explanations for whether Halim was hired for the position Koehler interviewed for. SA19-20¶¶33-34; SA58-62¶¶40, 42. Halim had minimal interest in the position, and quit after two months. SA20¶34. For example, Infosys admitted that there's a "mismatch" in requisition data related to the position Koehler applied for, and Infosys' corporate representative admitted that, for a list of names that Infosys contends were applicants to the same position as Koehler, she didn't know what requisition they applied to. SA58-61¶40; *see also Murphy*, 140 F.4th at

915 ("We have long held that an employer's shifting and inconsistent explanations for an adverse employment action can support an inference of pretext"); *Zaccagnini*, 338 F.3d at 679-80 (holding jury could find company's shifting rationales constituted pretext and reversing grant of summary judgment).

Infosys argues that Koehler didn't apply for and was not considered for a position at Harley in Milwaukee, but its corporate representative admitted that she was considered for the Harley position. SA61-62¶42 (citing Groves (30(b)(6)) Dep. Tr. 32:8-9, 76:10-18 (July 28, 2016) (stating further that this was the same position for which "Halim was interviewed for")); *see also id.* (citing Groves (30(b)(6)) Dep. Tr. 24:18-21, 28:23-24; 31:20-32:19; 72:11-15 (July 28, 2016); Groves Dep. Ex. 5 ("Please evaluate these Windows candidates for Harley" and listing Koehler's name)).

### 4. *Layla Bolten.*

To substantiate a claim of constructive discharge, Ms. Bolten must show "that she was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable." *EEOC v. Univ. of Chi. Hospitals*, 276 F.3d 326, 331-32 (7th Cir. 2002) (citing *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998)).

This standard may be satisfied two ways. First, "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." *Id.* at 332; *see also Hunt v. City of Markham, Ill.*, 219 F.3d 649, 655 (7th Cir. 2000) ("A person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable."). Second, an employee who resigns as a result of "*discriminatory harassment*" can also prove constructive discharge when the "discriminatory work environment [was] 'even more egregious than ... [a] hostile work environment.'" *See Univ. of Chi. Hospitals*, 276 F.3d at 331-32 (quotation *Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000)).[18]

---

[18] Hostile work environment standards under Title VII require that discriminatory harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the plaintiff's] employment and create an abusive

Bolten has demonstrated both intolerable working conditions and that Infosys' conduct communicated that she had no hope of advancement or would be terminated based on her race or national origin. She was highly qualified and performed well, and was promised a promotion. SA29-31¶¶53, 55-56. Instead, Bolten's responsibilities were gradually decreased until she was assigned little work despite proactive requests. SA31-32¶¶57-58. Colleagues spoke Hindi at work to prevent her participation in her assigned project. SA32¶59; SA122¶140. Bolten was repeatedly harassed, insulted, and belittled by her Indian co-workers, such as being called "stupid American," and falsely accused of not working enough and lying on her time sheet. SA31-32¶¶57, 60; SA121¶138. Bolten complained to a supervisor about harassment, but conditions worsened thereafter, including frequent taunts and rude remarks from her Indian co-workers and supervisor. SA32¶60; SA127-28¶156. She finally resigned after being rudely told to pack up her workstation and "sit in the corner." SA32-33¶61; SA127-29¶¶156-58.

---

environment.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quotation omitted).

A reasonable jury could have concluded from these facts, combined with statistical evidence, that Infosys had discriminatory motivation in its constructive termination of Bolten.

### 5. *Koehler and Parker's Disparate Impact Claim.*

The district court granted summary judgment on Plaintiffs Koehler and Parker's disparate impact claims because, after Neumark's opinions were excluded, they could not provide statistical evidence sufficient to show a causal connection between Infosys' discriminatory policies and Plaintiffs' adverse employment actions. RA242 67:8-16. But as discussed in Argument Sections I and III, *supra*, the exclusion of Neumark was erroneous, and the district court should have considered the belatedly-produced PeopleFluent analyses that provided statistical evidence sufficient to show that Infosys' policies caused the exclusion of Koehler and Parker from the jobs they sought (even though the PeopleFluent analyses were not addressed in Koehler and Parker's summary judgment opposition because they had not yet been produced).

### CONCLUSION

For the foregoing reasons, the district court's judgment should be vacated or reversed and remanded.

Date: November 20, 2025

KOTCHEN & LOW LLP

*/s/Daniel Kotchen*
Daniel Kotchen
Daniel Low

*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 32(c) because this brief contains 13,980 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in Microsoft Word using 14-point Century Schoolbook, a proportionally spaced typeface.

Date: November 20, 2025

KOTCHEN & LOW LLP

*/s/ Daniel Kotchen*

Daniel Kotchen

*Attorney for Plaintiffs-Appellants*

No. 25-2272

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

BRENDA KOEHLER, KELLY PARKER, LAYLA BOLTEN,
and GREGORY HANDLOSER,

*Plaintiffs-Appellants,*

v.

INFOSYS TECHNOLOGIES LIMITED INC.,
AND INFOSYS PUBLIC SERVICES, INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Wisconsin
District Court No: 2:13-cv-00885-PP

## APPELLANTS' REQUIRED SHORT APPENDIX

Daniel Kotchen
Daniel Low
KOTCHEN & LOW LLP
1918 New Hampshire Ave. NW
Washington, DC 20009
dkotchen@kotchen.com
dlow@kotchen.com

*Attorney for Plaintiffs-Appellants*

# RULE 30 CERTIFICATE OF COMPLIANCE

I hereby certify that all of the materials required by 7th Cir. R. 30(a) and 30(b) are included in the Required Short Appendix bound with this Brief or in Plaintiffs'-Appellants' Separate Appendix. The Short Appendix contains only the materials required by 7th Cir. R. 30(a), and all 30(b) materials are included in the Separate Appendix.

Dated: November 20, 2025

KOTCHEN & LOW LLP

*/s/ Daniel Kotchen*
Daniel Kotchen

*Attorney for Plaintiffs-Appellants*

# INDEX TO APPLELANTS' APPENDIX

| Description of Document | Document or Proceeding Date | District Court ECF Docket Number | Page ("RA #") |
|---|---|---|---|
| Court Minutes and Order for Motion Hearing on Defendants' Motion to Exclude Expert Opinions of David Neumark | 6/11/20 | 196 | 1 |
| Transcript of Motion Hearing on Defendants' Motion to Exclude Expert Opinions of David Neumark | 6/11/20 | 204 | 3 |
| Order Granting Defendants' Motion to Exclude (Dkt. 97), Denying Plaintiffs' Motion for Partial Summary Judgment (Dkt. 86), and Denying Plaintiffs' Motion to Certify Class (Dkt. 88) | 9/14/22 | 205 | 70 |
| Court Minutes and Order Granting Infosys' Motion for Summary Judgment | 6/24/25 | 217 | 174 |
| Transcript of Motion Hearing on Infosys' Motion for Summary Judgment | 6/24/25 | 230 | 176 |
| Judgment in a Civil Case | 6/30/25 | 219 | 248 |

Court Minutes and Order

DATE:            June 11, 2020
JUDGE:           Pamela Pepper
CASE NO:         2013-cv-885
CASE NAME:  Brenda Koehler, *et al.* v. Infosys Technologies Limited Incorporated, *et al.*
NATURE OF HEARING:      Motion Hearing
APPEARANCES:            Daniel Kotchen – Attorney for the plaintiffs
                        Ellen Boshkoff – Attorney for the defendants
                        Samantha Rollins – Attorney for the defendants
COURTROOM DEPUTY:       Kristine Wrobel
TIME:                   9:36 a.m. – 11:34 a.m.

## AUDIO OF THIS HEARING AT DKT. NO. 195

The court apologized to the parties for the length of time the court had taken to address this case, explaining that part of the delay was due to the court's previously busy trial calendar and the long-standing district court vacancy. The court noted, however, that some delay also resulted from the sheer volume of documents the parties had filed and the amount of litigation over discovery.

The court recounted that there were six pending motions: Defendants' Motion for Summary Judgment (Dkt. No. 78); Plaintiffs' Motion for Class Certification (Dkt. No. 81); Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 86); Defendants' Motion to Exclude the Expert Opinion of David Neumark (Dkt. No. 97); Plaintiffs' Motion for Joinder of Davina Linguist (Dkt. No. 157); and Plaintiffs' Motion to Strike and/or for Leave to File Responses to Infoysys' Notices of Supplemental Authority (Dkt. No. 177). The court explained that it had not put the motions for summary judgment or the motion to certify the class on the agenda for today's hearing because it had concluded that it needed to decide the motion to exclude the expert opinion before deciding those motions.

The court denied the plaintiffs' motion for joinder of Davina Linguist, concluding that her claim was substantively different from the claims of the current plaintiffs, that allowing her joinder at this stage would not result in judicial economy and that allowing her joinder would delay the case and be unfair to the other parties. The court expressed frustration at the filing of the motion to strike, noting that it had addressed the issue of argument in notices of supplemental authority at the time it had allowed the filing of the notices. Nonetheless, it granted the defendants' motion to strike and ordered the defendants to re-file Dkt. No. 175 (removing pages 2-6) and Dkt. No. 176 (removing all but the first paragraph).

The court heard argument on the defendants' motion to exclude the expert opinion of David Neumark. The court told the parties that it would try to get them a decision as soon as possible and may set a hearing to issue an oral ruling.

The court **DENIES** the plaintiff's motion for joinder of Davina Linguist. Dkt. No. 157.

The court **GRANTS** the defendant's motion to strike and/or for leave to file responses to Infosys' notices of supplemental authority. Dkt. No. 177.

The court **ORDERS** the defendant's to re-file Dkt. No. 175 (removing pages 2-6) and Dkt. No. 176 (removing all but the first paragraph).

Dated in Milwaukee, Wisconsin this 11th day of June, 2020.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

---------------------------------------------------------------

BRENDA KOEHLER, et al,              )
                                    )
                Plaintiffs,         )  Case No. 13-CV-885
                                    )  Milwaukee, Wisconsin
     vs.                            )
                                    )  June 11, 2020
INFOSYS TECHNOLOGIES LTD, INC.,     )  9:36 a.m.
et al,                              )
                                    )
                Defendants.         )
                                    )
---------------------------------------------------------------

**TRANSCRIPT OF MOTION HEARING**
BEFORE THE HONORABLE PAMELA PEPPER
UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:

For the Plaintiff
BRENDA KOEHLER, et al:          Kotchen & Low LLP
                                By: Daniel A Kotchen
                                1918 New Hamshire Ave NW
                                Washington, DC 20009
                                202-468-4014
                                Email: Dkotchen@kotchen.com


For the Defendant
INFOSYS TECHNOLOGIES LTD,
INC., et al:                    Faegre Drinker Biddle & Reath LLP
                                By: Ellen E Boskoff & Samantha
                                Rollins
                                300 N Meridian St - Ste 2700
                                Indianapolis, IN 46204
                                317-237-0300
                                Email: Ellenboshkoff@yahoo.com




U.S. Official Transcriber:      SUSAN M. ARMBRUSTER, RMR
Transcript Orders:              Susan_armbruster@wied.uscourt.com

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.

TRANSCRIPT OF PROCEEDINGS

Transcribed From Audio Recording

*   *   *

THE CLERK: Court calls Brenda Koehler, et al. V. Infosys Technologies Limited Incorporated, et al.. Please state your appearances starting with the attorney for the plaintiffs.

MR. KOTCHEN: Good morning, Your Honor this is Daniel Kotchen from Kotchen & Low.

THE CLERK: And for the defendant.

MS. BOSHKOFF: Good morning, Your Honor. This is Ellen Boshkoff from Faegre Drinker Biddle & Reath on behalf of the defendants.

MS. ROLLINS: Also for the defendant is Samantha Rollins from Faegre Drinker Biddle & Reath.

THE COURT: Good morning to everyone. I hope this phone call finds you and everyone you care about safe and healthy. Let me start out if I may by indicating that I know you all have been waiting a long time for an opportunity to get some argument. You had asked back in 2018 for the opportunity to argue some of the motions that are pending, and I'll go through some of those in a minute.

At that time I indicated to you given my calendar and particularly our trial calendar as well as the shortage of judges here in our district that it made no sense for me to schedule argument when a small forest of trees had given their

lives for the amount of paper that you all had filed, and I haven't been able to get through that paper. And so simply listening to argument without at least looking through -- going through what had been filed didn't make any sense. So I realize this case has been pending for a good chunk of several folks' lifetimes, and I also realize that you have been waiting a long time to have the opportunity to argue. I'm sorry about that. I regret that. I would like to move the calendar more quickly than I have been doing, but there have been a number of factors that have contributed to the inability to do that. Some of those factors are entirely my responsibility managing my own caseload. Some of those are a result of the court situation being short a judge and for a while a magistrate judge as well.

Some of those are, quite frankly, attributable to the parties. There have been a boatload of paper filed here, a tremendous amount of litigation over discovery issues. You all spent an inordinate amount of time with Judge Jones trying to work through a lot of these issues. And the more "stuff" we get, the harder it is to work through all that in a sufficient manner particularly when we still got criminal cases that are trying to move and prisoner cases that are trying to move and, of course, recently on top of everything else, the universe has intervened in a way that none of us expected, and that's impacted the movement of cases as well. I suppose there's one positive silver lining and I hate to be trite about it, but it

opened up a little bit of time in our calendar because we're not having in-person hearings right now, and so we have been able to fit in more telephone hearings as a result.

But at any rate for the delay that's attributable to me, I wanted to express my apologies to you all and to your clients and tell you that hopefully moving forward we'll be able to take this a little bit more expeditiously and in an organized fashion.

The second thing I want to do is walk through quickly the motions that are pending and not all of those are on the docket for today and there's a reason for that and we'll talk about that in a minute. Currently pending is the defendant's motion for summary judgment. That is at Docket Number 78. The plaintiffs had filed a partial motion for summary judgment. That's at Docket Number 86. The plaintiffs have also filed a class certification motion at Docket Number 88. Then, at Docket Number 97, there's a motion to exclude the expert report of Dr. Neumark and his expert testimony. That's at Docket Number 97. I think I may have misspoken. It's 97. That is on for today. At Docket Number 157, there's a motion to join as a plaintiff Davina Linguist. That is on for today. And then finally at Docket Number 177, there is a motion to strike, and that is on for today.

So the first three motions that I mentioned, the two summary judgment motions and class certification motion are not

Case 2:13-cv-00885-PP    Filed 09/08/22    Page 4 of 67    Document 204    RA6

on the docket for argument today. The ones that are on the docket are the motion to exclude Dr. Neumark's report and testimony, and then the motion for joinder and the motion to strike.

With regard to why those first three motions are not on the calendar for today, it's an issue that the parties have raised in relation to the motion to exclude Dr. Neumark and that is the question of whether or not I need to decide on Dr. Neumark's testimony before I can intelligently decide the motions for summary judgment and class certification. And I'll answer that question in a minute, but you may be able to conclude from the fact that the first three motions aren't on the schedule for argument today that I am going to explain to you why I believe I do need to decide the motion with regard to the expert testimony before I can decide those other motions.

So putting the expert testimony motion on for a hearing today is step one in being able to address the class certification motion and summary judgment motions.

Next I want to tell you that with regard to the last two motions that I mentioned, I don't see any need for argument; that is, the motion for joinder and the motion to strike and I'll explain to you now what my ruling is on those, get those out of the way because I think the real issue here is the motion regarding expert testimony.

The motion to join is the motion made by the

plaintiffs. Again, it's at Docket Number 157. And the plaintiffs are asking to join Davina Linguist, who is the former Head of Diversity at Infosys. What the plaintiffs are proposing to do is to add Ms. Linguist as a plaintiff with a claim of retaliation against the defendants. The plaintiffs claim that Ms. Linguist was demoted and then constructively fired in retaliation for her participation on behalf of the plaintiffs in this particular lawsuit. And the plaintiffs made the motion under Rules 21 and 15(a), permissive joinder basically.

So what the plaintiffs have argued is that Ms. Linguist's claims arise from the same transaction or occurrence as the transactions or occurrences that lead to the other plaintiffs' claims. And then they say because that this is because the defendant retaliated against Ms. Linguist because of her pro-plaintiff testimony in the case. They also argue that there are common questions of fact and law because both the -- currently plaintiffs' claims and Ms. Linguist's claims relate to discrimination and concealment of discrimination. They argue that there won't be any prejudice in adding her because she was going to testify as a witness at trial anyway about retaliation and about efforts that the defendants made to retaliate against her and so no harm no foul basically and that that evidence will -- The evidence in the current plaintiff's case will support Ms. Linguist's case and her situation isn't that complex.

The plaintiffs argue there will be great prejudice to Ms. Linguist because if she's not joined, she would have to file her own case. She'd have to relitigate some issues that have already been established. I don't know what those are, and she'll have to engage in substantial discovery. They also argue that filing this motion for joinder at the time that it was filed is not a delay of any sort because Ms. Linguist basically didn't realize she had a claim until around the time that she sought joinder. And then finally the plaintiffs argued judicial economy. There won't be duplicative trials, duplicative discovery, et cetera.

So that's the basis of that motion. I'm going to deny the motion to join Ms. Linguist as -- as a plaintiff. I must confess I disagree with the plaintiffs on almost every point that they raise in terms of why they believe that joinder is appropriate.

In terms of common questions of law or fact as I understand it, Ms. Linguist is proceeding on a retaliation theory. All the other plaintiffs in this case are proceeding on discrimination theories. And in point of fact to take it one step further, Ms. Linguist is complaining about post -- post-complaint retaliation. The original plaintiffs are complaining about discrimination based on race or ethnicity that occurred long before allegedly the complaint was filed in hiring or in promotion so just -- Yeah, at the basis level I suppose,

Ms. Linguist's argument says, hey, I stood up and said you guys shouldn't be discriminating, and I got retaliated against and so discrimination I suppose at the fringe plays into her claim or her punitive claim. But her claim really is I did something at my job and got retaliated against. That by it's very nature is a different kind of claim than saying I was discriminated against because of my race or because of my ethnicity. I don't see any judicial economy to be gained from adding Ms. Linguist. Whether she does discovery in her own case or does discovery in this case, it sounds like she'll have to do additional discovery, which means that the defendants will also have to do additional discovery. So that's going to mean reopening discovery.

The -- The fact that she argues that she didn't delay in seeking this joinder to me is yet another piece of evidence or information indicating that -- that this is a different claim, that this is not a claim arising out of the same transaction or occurrence.

The argument that this is kind of a no harm no foul situation because Ms. Linguist would argue -- I'm sorry presents testimony at trial about this retaliation anyway seems to make a significant assumption. And that's an assumption and the defendants points this out that the defendants wouldn't make a motion in limine arguing that any such testimony would be irrelevant and might be excluded. I think we're putting the

8

cart before the horse in arguing, well, you know this testimony is going to come into this case anyway.

And so I don't -- I simply don't see any connection between the fact that she believes she may be allowed to testify and -- and adding her to this lawsuit. I don't have any authority from the plaintiffs indicating that at this late juncture that she should be added. All the cases the plaintiffs cite have to do with severance or joinder that occurred long before the summary judgment stage, and we're of course at or if you want to look at it this way past the summary judgment stage. And I think there would be severe prejudice to allowing a new plaintiff to join the case at this stage.

I understand that that may mean that Ms. Linguist decides that she wants to file her own retaliation suit separately. Of course, he has a right to do that. Of course she has a right to litigate that case. Again, the claim is significantly different from the claims of the named plaintiffs in this case, and there's just simply no reason -- There's no basis for joining her to the litigation, so I'm denying the motion at Docket Number 157 to join Ms. Linguist as a plaintiff.

The other motion that I mentioned was the motion to strike at Docket Number 177, and there's a little background to this as I think you all know. Back in January and June of 2018, the defendants filed two what they called notices of supplemental authority, and those appear at Docket Number 154

Case 2:13-cv-00885-PP    Filed 09/08/22    Page 9 of 67    Document 204 RA11

and Docket Number 163. I say they called them notices of supplemental authority because they weren't notices of supplemental authority, they were additional argument.

What the defendants did basically was in the first paragraph or so of each of those notices, they said, Judge, we're filing this to call your attention to the fact that this court or that court decided such and such a case. One of them was *Tata* I think, and I can't recall the other one, and we're letting you know that that case is relevant to this lawsuit. Had they left it at that point, then they would have been perfectly within our local rules, and they would have filed a notice of supplemental authority. They didn't. They went ahead and added additional argument about why they thought these cases were relevant and what these cases showed.

I granted the first sort of motion to file supplemental authority. That's Docket Number 154, but I said and I did this in text-only orders granted. I didn't write separate orders, but I said in the text-only order at Docket Number 160 that in the future if you're going to give me notice of supplemental authority, you have to follow our civil local rule 7K, which says that it doesn't include argument. You simply notify me of what the case is. I grant -- and then what I did is I tried to limit the second motion. I issued an order, another text-only order at Docket Number 163, saying I granted the motion to the extent that it informed me about the new case,

but I denied it to the extent that it offered additional argument.

What the clerk's office did then because I guess I didn't tell anybody to redact anything or change anything so the clerk's office I think frankly logically docketed those two notices, and they are now on the docket. The plaintiffs have now turned around at Docket Number 177 and asked to strike the documents that the clerk's office docketed because they contain argument. They seem to be under the impression that somehow or another the defendants had some role in getting those documents on the docket and that they were defying my order by putting notices that had argument within them on the docket when I said no, you can't do that.

The defendants are absolutely correct in their response. It wasn't them. They didn't -- They didn't cause those notices to go on the docket. The clerk's office had to do something with those documents. And since I had granted both of them to some extent and nobody had given me a redacted version of the one that I had sort of granted in part and I hadn't required anybody to give a redacted version of the one that I granted in part, they just put them on the docket. I don't know what other choice they had. I think they did exactly what they were supposed to do.

The defendant say they even reached out to the plaintiffs and told them this, but the plaintiffs didn't

withdraw the motion. I think this is kind of emblematic of some of the way this litigation has gone. This is frustrating. This motion is unnecessary and frankly kind of silly. You know, I'll require the defendants to provide a redacted copy -- not redacted. They can just take out the argument at Docket Number 175. They can take out pages 2 through 6 and at Docket Number 176. They can take out everything after the first paragraph and re-file them. I think it's silly to do that because I've already made a ruling, and I'm not going to take into account any of the argument that I said that they were not allowed to make to begin with, but at least that will get this motion off the docket.

I certainly hope and I've expressed hopes in this case before years before now and they've remained unfulfilled that you guys can find some way to litigate this without this kind of mess. This doesn't -- This is not civil or professional. It doesn't advance anybody's ball in any direction, and it basically takes time and effort and energy from everybody away from deciding the real issues here that the parties want decided. But you know that having been said, I'll grant the motion to strike, and I'll ask the defendant to resubmit the document at Docket Numbers 175 and 176 with just the paragraphs that give us notice of the name of the case and the citation so again removing pages 2 through 6 of Docket Number 175 and removing everything after the first paragraph in docket 176.

So what that leaves then for discussion today I think is the motion to exclude the expert opinion of Dr. Neumark, and that's at Docket Number 97. And even within that, I want to share with you that there are a couple of issues that I don't think need argument.

There was a preliminary issue that I kind of hinted at earlier when I talked about the summary judgement and classification motions, and that is a dispute between the parties over whether or not there was a need to decide this motion, this Docket Number 97, to exclude Dr. Neumark's testimony and expert opinion at this point or whether it should wait. I have to under *American Honda Motor Company v. Allen*, 600 F.3d 813 at 815 and 816, which is a Seventh Circuit case from 2010, I have to go through the full *Daubert* analysis prior to ruling on a class certification motion if the expert report is and the word that the *Honda Motor Company* case used was critical to class certification.

The Seventh Circuit has gone on in later cases to define the word critical by saying the testimony is critical if it's important to an issue decisive for the motion for class certification. That's *Messner v. North Shore Univ. HealthSystems* at 669 F.3d 802 at 812, Seventh Circuit case from 2012.

*Messner* went on to say that if a district court has doubts about whether an expert's opinions may be critical for

class certification decision, the court should go ahead and make the *Daubert* ruling. That's *Messner* at page 812. The defendant has argued that (indiscernible) that definition. The plaintiff (indiscernible) statistics demonstrating "that the racial (indiscernible) workforce of new hires, promotions and terminations were between a dozen and hundreds of standard deviations from the norm". That's at Docket Number 98 at page 9, and it's quoting the plaintiffs pleading Docket Number 88 at page 2.

The plaintiffs respond that Dr. Neumark's opinion isn't critical because now they're basing their motion entirely on evidence from PeopleFluent, which is a third-party contractor that performs "affirmative action analyses" on the defendant's behalf under federal law. The plaintiffs say this at Docket Number 123 at pages 2 and 3 and 8 and 9.

I don't see any reason not to rule on the expert opinion first. *Messner* says that if there's any question, if there's any doubt, if any I guess another way to put it dispute, that's the not the word that *Messner* uses, but I think it's accurate, about whether Neumark's opinion is critical, then I should go ahead and make a determination on it. And the plaintiffs have, in fact, in numerous places in the class certification motion referred to Dr. Neumark's opinion. I realize that they are now saying they are relying -- they are relying on this PeopleFluent. But if you just look at the class

certification brief at Docket Number 88, they are like one, two, three, four, five, six, seven, I think I've come up with eight or nine different places, and that's not all of them that I identified where Dr. Neumark's name appears in the brief, and they also discuss Dr. Neumark's opinions in their reply brief. That's at Docket Number 116 on numerous pages despite the fact that by that time, they were also relying on or at least had access to and were using PeopleFluent data.

So the idea that well, you know, we're not relying on him for class certification anymore, Dr. Neumark being him, is belied by the pleadings themselves. Dr. Neumark is all over the class certification proceedings. And so simply on that basis, I think that it is critical -- Dr. Neumark's testimony is critical to the class certification motion or even at a lower level, there is certainly some question as to whether it's critical. And under *Messner*, that means I should decide it.

There's also a rather odd dispute that seems to have come up over the Seventh Circuit decision in *Adams v. Ameritech*, and I think that kind of both parties have sort of misread *Adams v. Ameritech* or read it to read some things that I think it doesn't say. The plaintiffs argue that *Adams* says that it's the defendant's burden to prove that Dr. Neumark's statistics weren't caused -- that the deviations from -- the standard deviations were not caused by discrimination, and I'm not sure where that comes from in *Adams*. *Adams*, as you all may recall,

was a disparate impact case, first of all. It was not a discrimination case, but it was a case in which the Seventh Circuit talked about statistics and what role statistical analysis may play in a disparate impact case.

And in that case, the district court had excluded some expert reports and some expert testimony. And in that context again, the Seventh Circuit talked about, you know, what it is that statistics can and can't do and how they can and can't be relevant. But the *Adams* court was considering all of those factors in the context of -- of summary judgment. And so it was looking at not only the *Daubert* standard of whether the testimony is relevant to the trier of fact and reliable as that phrase is defined in the *Daubert* line of cases, but it was also looking at the *McDonnell Douglas* burden-shifting framework. In other words, the substantive disparate impact analysis.

And so I think the parties have kind of conflated the *McDonnell Douglas* burden-shifting analysis with the pure *Daubert* expert witness 702 analysis in incorporating these kind of burden-shifting arguments into their pleadings.

Now, granted there's a paragraph or a couple of paragraphs in *Adams* where the Seventh Circuit was looking at a case called *Mister v. Illinois Central Golf Railroad Company*, 832 F.2d 1427 at 1431, a Seventh Circuit case from 1987. And in discussing *Mister*, the Court said *Mister* also -- This is the *Adams* court quoting, *Mister* also noted the importance of making

sure that any testing adequately accounts for the real variables that the employer took into account. The plaintiff's evidence there was wanting because it assumed that the job applicants were identical in every respect expert for race even though other factors like physical condition, employment history or other nonracial variables might have entered into the employer's calculus. But importantly, it was the movant for summary judgment and the person seeking exclusion of the expert testimony that had the responsibility of offering alternative explanations. The only one that had actually advanced was that it was concerned about the distance its employees had to travel from the job site, et cetera. That's from at *Adams* at 231 F.3d at 424.

And taken out of context, I suppose it might sound as if it might read as if the Court was saying the defendant has a burden of proof to offer an alternative explanation for the statistical deviations that the expert finds.

But you can't take that quote out of context. That quote came from the *Adams* court larger discussion -- court's larger discussion of the *McDonnell Douglas* burden-shifting framework. And so both in *Mister* and in *Adams*, the discussion about offering alternative explanations had to do with the substantive issue of disparate impact or discrimination and the burden shifting back and forth between the plaintiff to show that there's some evidence of discrimination, and then the

defendant to show that there are alternative explanations for that discrimination.

There is no such burden shifting piece to the *Daubert* analysis. I can't -- There are no cases out there that say there is. The Seventh Circuit has reiterated over and over and over again the *Daubert* standard. The defendant also misreads *Adams* I think. The defendant says *Adams* somehow stands for the proposition that I have to exclude an expert opinion if the only thing it does is defeat the null hypothesis, and that somehow the plaintiff has to offer some external evidence that's unrelated to the opinion showing that there's discrimination.

Again, that's not what *Adams* says. When you look at *Daubert*, you have to look at whether or not the expert is qualified, whether or not the science is based on reliable methodologies and analyses, and whether the opinion or testimony is relevant to the case, whether it makes one or more of the elements of the substantive case more or less likely even if it's not dispositive on that element.

So external evidence doesn't -- doesn't really have any role in this discussion. The questions that you ask about the expert analysis have to do with the *Daubert* factors. And so again in *Adams*, the *Adams* court was ruling on a summary judgment motion. And the question was did, first of all, did the district court error in excluding *Daubert* under *Daubert* an expert opinion because of its methodology? And second, if there

was an error, would the case have to be remanded to consider summary judgment in light of that error and take into account the statistical analysis?

So I don't see how anybody can read *Adams* to say that if the only thing that an expert's opinion does is defeat the null hypothesis, then it has to be excluded. In fact, there are Seventh Circuit cases that indicate that -- I'll get to that -- that the null hypothesis is -- defeating a null hypothesis is at least the first step in determining whether or not there was discrimination. I mean, obviously if -- if you can't defeat the null hypothesis, you're going to have a really hard time showing that there was some level of discrimination if there are, you know, 50 -- 45 percent of the population is of African American and 45 percent of the work force is of African American, you've already got yourself kind of on your back foot in terms of proving that there was discrimination in hiring.

So it's a step, but I can't find any case law that says what the defendants appear to believe that *Adams* says which is that if all the expert's opinion does is prove that first step is defeat the null hypothesis, then it has to be excluded.

So number one, I think that I've decided that it's appropriate to decide the *Daubert* motion before moving to the class certification and to the summary judgments motions. And second of all, I don't think *Adams* stands for any of the propositions that either of the parties indicate that it stands

for.

Finally, before I turn to you all for argument, I will note that -- that Dr. Neumark's expert witness report, which appears at Docket Number 97-2, lays out his qualifications in the first couple of paragraphs. I've not seen any dispute as to his qualifications. There is an argument that the defendants make at one point when they're discussing how he figured out whose names or who was South Asian or Indian, and the defendants say, well you know, he's not an expert in name analysis and in figuring out what names belong with what ethnicities. But generally speaking as to his expertise as a labor economist and his research and his CV, there doesn't seem to be any dispute in that regard, and so I haven't considered that much in -- in what I've looked at in terms of this motion.

So what I think is really critical and what I'd like to hear from you all about today is -- is the discussions relating to Dr. Neumark. And in particular, I have a few specific questions or specific areas that I'd like to hear from you about, and I am going to throw them out there and -- and, perhaps, if you'll take notes, and then you can address them and incorporate them into your arguments.

One of the first questions I have is that the defendants argue that, of course, if you look at both their base employees -- that's their phrasing -- and their deputee employees; that is, folks who are hired in India and transferred

to the United States to work here for a set period of time, the defendants appear to be conceding that if you aggregate those two groups, yes, numerically they are going to be more people of Indian and South Asian ethnicity and a significantly greater number of Indian and South Asian ethnicity than people of other ethnic groups.

So number one, I'm going to be interested in knowing whether the defendants are admitting that. But number two, I'm going to be interested in the plaintiffs' view on if the defendants are admitting that, then what does Dr. Neumark's defeat of the null hypothesis get us? And I think that's really a part of what the defendants argued was that so he proved that there were more people of Indian and South Asian decent or ethnicity in that aggregate group. So what, we knew that.

The second question I have in that same regard is to the defendant, which is why does that matter? Why is it significant that the base employees may be composed of a different or may have a different composition than the entire "employee group" if you factor in deputees?

And then with regard to the name methodology that Dr. Neumark used figuring out what kind of names --  figuring out who was of South Asian or Indian ethnicity and who was not by using this name system. I'd be very interested in the parties arguments on how that name system, that name methodology means the reliability requirements of *Daubert*, and those

specifically are found in *Daubert* at pages 593 and 594 -- *Daubert* sorry 593 and 594, whether the expert's theory or technique can be and has been tested, whether the theory or technique has been subjected to peer review and publication, the known or potential rate of error, and the general acceptance and the relevant scientific community. Those are the four factors that *Daubert* tells us that we have to look at in determining the reliability of the scientific method or validity of the scientific method under 702. So I'm going to be very interested to hear argument about that name methodology in that context.

So giving you that framework and giving you a little bit of a head's up on what -- what questions I have, I'll turn to you all and give you an opportunity now, and I'll shut up and give you all an opportunity to speak. And given that this is the defendant's motion, I guess I will start with Ms. Boshkoff. I don't know if you'll be arguing for the defendant.

MS. BOSHKOFF: Yes, Your Honor. Thank you. Are you ready for me to start?

THE COURT: Yes.

MS. BOSHKOFF: Perfect. First of all, I apologize for the complexity of the file that we presented to you. I understand some of the concerns that you've noted, and I think all I can do at this point is acknowledge and apologize. Hopefully, we can provide at least some clarity today around the issue that you're currently considering, and so I'll just move

on to talking about that.

Under the Federal Rules of Evidence under 702 and the Supreme Court's ruling in *Daubert*, a witness is qualified who is qualified as an expert can testify only if certain criteria are met as you well know. And by the way, you're exactly right, we do not dispute his qualifications as a labor economist except for the name matching issue, and I'll get to that in a little bit, but we do dispute that he is qualified to perform a name matching analysis. Otherwise, we don't dispute his qualifications, and so that's really not on the table.

So what we're really looking at are the prongs in *Daubert*, whether the specialized knowledge will help the trier of fact, whether the testimony is based on sufficient facts or data, whether the testimony is the product of reliable principles and methodologies, and whether those principles have been reliably applied.

We're moving to exclude Dr. Neumark's report in its entirety because we maintain that his testimony meets none of these requirements. What he has presented to the Court is a series of studies that fundamentally misunderstand emphasis is workforce, and I'll talk about that in a minute. They are based on the flawed name matching methodology, and they also fail to account for any explanatory variable whatsoever, and he admits that.

In the context of this sprawling nationwide punitive

class action which can only be certified if plaintiffs provide significant proof that Infosys operated under a general policy of discrimination, we maintain that Dr. Neumark's unexamined and inaccurate workforce statistics are neither reliable nor likely to help the trier of fact.

Now, we typically talk about the touchstones of expert admissibility in terms of helpfulness and reliability. I'm going to start with reliability first because and put a pin on the idea of helpfulness because I think the issues with reliability directly impacts the issues with helpfulness.

But before I get into that, I just want to do a brief overview of Infosys' business model, which it sounds like Your Honor is well aware of. As you know, Infosys is headquartered in India. It employs, approximately, 200,000 employees across the world. The vast majority of them are in India, so its headquarters are in India. Its major training centers are in India. By far, the largest number of employees reside in India who are, of course, hired from the Indian labor market, and I'll come back to that when we talk about the deputee issues. Just ten percent of its workforce only in the $20,000 range is in US at any point in time.

Now, Infosys naturally because of its Indian origins and huge employee population in India does most of its work from India, and its business model is to support customers all over the world, including customers in the United States from India.

There is, however, a small component of employees that are in the US supporting customers on site.  And in that small component of employees that work on site really consists of two different employee groups.  The first employee group is what we call base hires, and those are people who are hired in the US from the US labor market and who work in the US.

The second component of that US on-site labor force are Indian employees on temporary -- finite temporary assignments from India.  Those employees typically work with the customers in India, and then they come to the US for a period of time to continue to support customers and then go back.

Now, so that's the composition of the workforce deputee and base hires.  During the time period relevant to the case and what Dr. Neumark was studying, well over 80 percent of the US based workforce were actually people on temporary assignment from India.

Now, let me just pause on the issue of data because I think this is where some of the confusion and the expert report comes in.  As Your Honor probably recalls some time ago, there was a discussion about the data that would be produced, and ultimately what was produced in this case was all of the workforce demographics for anyone within the punitive classes, regardless of whether they were over here on temporary assignment, the deputee, or if they were base hires.

And so we produced in discovery information about self

reported race, job titles, role changes, all that kind of employee information, but it included the deputee population, which again recall was well over 80 percent of the people that are working in the US at any given time.

So that brief background, you know, brings us to what we regard as the three main problems with Dr. Neumark's report. There are others, but these are the three main ones. First of all, he does not account for the deputee population, and I'll explain that in a minute.

Second of all, as the Court has already noted, not necessarily agreeing with our position but noted, that he uses a name matching methodology to identify Indian national origin. We believe that methodology is unscientific and unreliable -- grossly unreliable.

And third, he fails to control for any explanatory variables that could explain different outcomes, not just controlling for whether someone is a deputee or a base hire but controlling for job level or location or tenure or performance or any of those things. So I'll elaborate on that more in a minute.

But to turn first to the deputee issue, and I understand the Court had a question about this. The problem with using deputees in the analysis the way Dr. Neumark does is it makes his, among other things, labor market comparisons simply nonsensical. So we can take a look at this by looking at

table number one in his report.

In this report, he does a workforce -- he looks at a workforce snapshot, so he's looking at a moment in time who is working for Infosys in the US.  This workforce snapshot is going to show for the relevant time period that 18 percent or so are base hires and 82 percent are from India.  So they are temporary workers hired out of the Indian labor market.

Dr. Neumark takes this workforce snapshot and says, well, I'm going to take a look at US labor market.  And oh my goodness when I look at the US labor market, there's a complete mismatch.  And he says in his report, there's a billion to one -- billion to one odds this could be caused by chance.

Well, we agree.  It's not caused by chance.  The reason that there is a mismatch between the US labor market and the workforce snapshot is because well over 80 percent of the people working on these temporary assignments are from India. So you would not expect --  There would be no reasonable expectation that you would see this workforce snapshot as mirroring the US labor force.  It's not from the US labor force. 80 percent of it is from the Indian labor force.

Now, so that's what makes that analysis really kind of nonsensical, you know, as to the different question which we can probably get into on the merits as to whether this is right or wrong or whether its discriminatory.  I mean, that's a separate issue.  Our position is that an Indian company like Infosys has

27

**RA29**

no obligation to create jobs in the US. And when they transfer deputees here on permanent assignments, they are just using their labor force to fulfill work needs in the US. They don't have an obligation to create jobs, and they don't create jobs. These are transfers, not job creation.

So that issue of comparing the snapshot to the US labor market is an issue that permeates several of his analyses. But there's another problem with his analysis relating to this deputee population and; that is, that Dr. Neumark initially he didn't even differentiate between base hires and deputees. That's not in any of his initial studies. He didn't even study that code. But kind of related to this, he doesn't even look at the population. He considers a deputee whose transferred into the US as an employee in the US starting on that day, and he compares that deputee to somebody who is hired in Infosys starting on that day, so he doesn't look at the deputee population at all.

Our expert, Dr. Siskin, who plaintiffs did not move to exclude, did so, and I won't belabor all of the points that are described in his report. But what he found is that the deputee population and the base hire population are very different.

To summarize, deputees are longer tenure. They've worked for an average of three years before coming over. They are higher performing employees because only the highest performers get this opportunity to transfer to the US. They are

working for customers that they've already worked for. 90 percent of them have already worked for this customer. And of course, they are here on temporary assignment. So they differ from base employees in terms of tenure, performance, job type. They do a completely different type of job for the most part. They are lower level production type jobs whereas the base hires in the US are typically hired for the higher-level managerial jobs.

And so they are just a different employee base. But Dr. Neumark completely mingles them in his analysis, doesn't account for this variable, and that makes a lost of his comparisons, you know, frankly somewhat meaningless. So that is the issue with the deputee, which is the first major issue in his studies.

The second problem is the name matching. And basically, the reason why Dr. Neumark engages in this rather odd name matching analysis is that when you analyze applicant data, you don't have national origin information. People typically don't identify their national origin until they come to work for you. This case is a national origin case. It's based on discrimination in favor of South Asians or Indian employees. It doesn't really matter which because those groups are pretty much interchangeable, but that data is just not there in the applicant data set.

And so and we're talking about a massive data set,

well over 200,000 applications. So the deal with this, Dr. Neumark creates this name matching methodology which, by the way as I mentioned earlier, he doesn't have any expertise in. He admitted in his deposition he's never used name matching in another case. He has no expertise in what sounds like an Indian name; although, he uses those skills, and he doesn't have any expertise at all in name recognition. There's nothing in his background, his training, his studies, his publications that would support that he's qualified to do a name matching analysis.

But putting that aside, let's talk briefly about how it works. So what Dr. Neumark does is he goes where he has data, which is the Infosys employee roster. He takes the name of people who have worked for Infosys, and he creates a surname list of, approximately, 20,000 people, and he uses the data he has to identify people on that surname list who have place of birth that would suggest that they are South Asian, so he creates a South Asian master surname list.

Then, he takes everyone in the applicants pool who, you know, doesn't get a job because people who do get a job you can identify their national origin. He takes everyone in the applicant pool who doesn't get a job and he says, hey, if their name matches a name on the master surname list, I'm going to call them South Asian. But if their name doesn't match, I'm going to assume that they're in the protected group. So I'm

Motion Hearing
June 11, 2020

going to assume that these unsuccessful applicants for whom I don't really know, I'm going to assume they are all in the protected group.

So rather than discarding the non-matching names, which is the standard protocol when you do name matching, he simply assumes those are with -- non-matched names are in the protected group, and, you know, this is a massive assumption because over half of the hundreds -- well over hundred thousand applications have no match. So well over half of these applications associated with unsuccessful applicants, he's assuming that they are in a protected class simply because they don't match this list that he's created of 20,000 employees.

And to be clear, what this results in is the artificial inflation of the number of non-South Asians in the disadvantaged group. In other words, he's counting an applicant who didn't get a job as non-South Asian and subject to discrimination and in the protected class in this case simply because that person's name doesn't match someone on the list.

And to put this in context, let's think about the numbers. The master surname list has somewhat -- it has 20,000 names. I'm not sure how many are actually South Asian, but at most 20,000 names. India is a country of a population of 1.4 billion people. Dr. Neumark presents no explanation or evidence because there really is none to suggest that using an employee roster of 20,000 people is an accurate way to determine

if someone came from a company -- a country with a population of 1.4 billion.

Now, what makes this even more surprising and even less defensible is that Dr. Neumark doesn't use the data that he has. So in an applicant data set, you don't have national origin data, but you do have self identified race data. And a large number of applicants actually provide that information.

So what we're dealing are the EEO categories. There's not a category for South Asian, but there is a category for Asian. And as the plaintiffs admit in their class cert brief, Infosys' employee population of Asian employees is predominately South Asian. So Dr. Neumark could have taken this race information in his applicant pool and analyzed it, but he didn't. He didn't even consider the data he had.

Now, our expert did so. And what our expert discovered when he looked at this race information is that large numbers of people that Dr. Neumark catagoried as non-South Asian had identified themselves as Asian. That's in an appendix. But just as an example, there were 339 unsuccessful applicants with the last name of Manthry (sic), who identified as Asian. Dr. Neumark called all of them non-South Asian. There were 143 applicants with the name Bhardia, B-h-a-r-d-i-a, all of whom identified as Asian. Dr. Neumark considers them all non-South Asian. There were 117 applicants with the name Arabeeti. I can't even say it. A-r-a-b-e-e-t-i, again, all identified as

Asian, all classified by Dr. Neumark as non-South Asian. So the fact that Dr. Neumark counts all of these people and many others as non-South Asian creates this artificial support for his claim of discrimination when really it's not there.

Now, in addition to pointing out these obvious errors, Dr. Siskin, our expert, tries to work with the system and to see if he can come up with a more accurate way to classify. So one of the methods that he tried is creating name matching and then throwing out names that don't match, which is the neutral thing to do. Don't assume they're in one group or another, throw them out. So he does this and performs this rudimentary analysis, which doesn't control for any explanatory variables, completely erases the disparity that Dr. Neumark finds.

The next thing that Dr. Siskin does is he says, well, I'm going to use Asian as a proxy because most of Infosys' Asian employees are actually South Asian, and he categories employees that way, completely erases the disparity that Dr. Neumark finds.

And then finally he goes into an even more refined analysis where he takes the Infosys employee pool of Asian employees and analyzes what percentage of those are South Asian, which is a high percentage. He then adjusts his numbers to account for sort of the kind of false positive rate in the Asian category and redoes Dr. Neumark's analysis, completely erases the disparity.

33

Now, again these analyses don't account for explanatory factors. He's just reworking what Dr. Neumark did, so I want to go back to what you asked, Your Honor, in your second question, the liability requirements. Our view is that this name matching flunks all of them.

First, whether the expert's theory can be or has been tested. Well, to the extent it can be tested, Dr. Siskin has tested it. Dr. Neumark doesn't test it. But the analysis that Dr. Siskin does shows that it's invalid.

Second, whether the theory has been subject to peer review and publication. The answer to this is no. Dr. Neumark admits that he's never done this before. We've never seen it before in a case like this, and there's no evidence of peer review or publication of Dr. Neumark's system.

The known or potential rate of error. We know there is error. We know there is error because over 50 percent of the applications don't have a match, and we know there is error because Dr. Siskin has analyzed the mismatch between Asian and individuals classified by Dr. Neumark as non-South Asian.

Finally, general acceptance in the scientific community. I'm aware of no acceptance of this method in this type of case. And again, Your Honor, Dr. Neumark admits that he's not an expert in name matching, which in itself should render him unable to use this as an underpinning of his analysis. So that is the name matching issue.

34

The final issue that I want to point out is that Dr. Neumark fails to control for any explanatory variables, any variables. So he admits, for example, and this affects all of his studies. His application studies, he doesn't control for requisition, so he doesn't control for who applied for what job. His promotion studies, he doesn't control for role. We know based on Dr. Siskin's data that deputees are in the lower level jobs where it's easier to get promoted. You don't get promoted when you're at the top of the food chain. It doesn't control for that. Doesn't control for performance. Doesn't control for tenure. Doesn't control for anything. And we believe that the Seventh Circuit case law is clear that for a statistic to be relevant, and I'll get back to the helpfulness issue again in a moment. In the *Ameritech* case to be relevant, the expert has to control for explanatory variables.

In his deposition, Dr. Neumark admitted the data was there. He could have studied it. He didn't study it. Dr. Neumark is a labor economist who typically does regression analysis. Didn't do it in this case. And he also admitted that had he done it, it could have reduced these disparities, to the extent he actually finds disparities, down to nothing. And for that reason, we think that all of these analyses basically don't meet the standard of reliability.

Now, I want to move on to the point of helpfulness, whether the opinions will be helpful. And I think the Court had

some comments about the use, exactly how he's using the report or how the plaintiffs are using the report at this time and noted sort of some of the mismatches between what's being said about the report and where it's being used. But I think there has been a little bit of backtracking here in terms of the use of the expert.

Now, before we moved -- Before we filed our *Daubert* motion, plaintiff did cite the expert report in both their summary judgment brief and their class cert brief and kind of held it out as this is going to prove discrimination. You know, they cited the expert report as statistical evidence that establishes widespread pervasive discrimination.

Even as recently as their summary judgment reply brief which was filed after -- after we filed our *Daubert* brief, plaintiffs maintained that the Court could grant summary judgment in their favor on a pattern and practice case involving an alleged company-wide operating practice of discrimination based on Dr. Neumark's testimony alone. So that was the position they took then.

Now, in response to our *Daubert* motion and in response to basically Dr. Neumark's own admissions that he hasn't controlled for explanatory variables, plaintiffs have done an about face. Now, they're saying he's not offering an opinion on discrimination but only going to opine whether certain things that he's observed occurred by chance.

Now, what's the problem with this from a helpfulness standpoint? Well, the first problem is that's not what he said. His report uses the word discrimination over 100 times. And, you know, we don't believe that the plaintiffs can sort of rescue his report where he committed to finding discrimination now that he's admitted that those findings aren't really valid to say, you know, no he's not really saying that, he's saying something else. And by the way, the words strongly consistent with discrimination, those are words of findings of discrimination.

So I don't think this attempt to save his report by saying, well, it's okay, he didn't consider explanatory variables because he's not opining on discrimination. That doesn't really work. But let's put that aside and let's say the Court accepts, okay, we're going to look at a water downed version of his analysis, not an opinion about discrimination, which he can't give, but an opinion about chance. What's wrong with that?

And our response to that is that's not helpful in the context of this case. Under *Daubert*, the first issue is whether the testimony will help the trier of fact to understand the evidence or determine a fact at issue. And in the context of the breath and scope of this case and all of the errors that I already noted, the observation that something didn't happen by chance is just not helpful.

Now, in the *Adams* case, the court found that it was helpful under the circumstances of that case, which was a very different case than this one and by the way predated *Dukes* by many years. But what we're talking about in this case is the standard set by the supreme court in *Dukes* that to support class certification, the plaintiff has to present significant proof that the company offered under a general policy of discrimination. That raises the bar for relevance. And against that standard, Dr. Neumark's water-downed conclusion that this didn't happen by chance, we do not believe is helpful.

And one more thing, Your Honor, about this whole chance theory. To the extent that Dr. Neumark has validly identified disparities and in many cases his studies simply aren't valid for the reasons I already noted, it is not -- we're not going to go into court or say in opposition to class certification and we haven't, oh, these occurred by chance. We agree that certain things didn't occur by chance. We think things like time and job, job level, performance, some of those things explain why there are differences in promotion. We think things like who applied for a certain job explains why, you know, explains who got the job. We think things like the fact that there is a deputee workforce explains why Infosys' workforce doesn't mirror the US labor market, so we are not taking the position that things happen by chance and therefore Dr. Neumark's statement, if it's water downed to that, is simply

not helpful.

So, Your Honor, there are a lot of -- there are some other ancillary errors in Dr. Neumark's report which we discussed in our briefing, but what I talked about today really identifies the main reasons. And in short, we think his testimony is not -- will not be helpful to the trier of fact, is not based on sufficient data as required by *Daubert*, and is not the product of reliable principles and analysis. And for those reasons, we ask that it be excluded.

THE COURT: Thank you, Ms. Boshkoff. Let me just -- I just have two follow-up questions. I want to make sure that I'm understanding you correctly. The *Adams* or the *Ameritech* case, however you want to refer to it, may appoint a thing that an expert witness report is not required to prove the entire case. And so one might conclude that you alls argument that Dr. Neumark didn't take into account any other variables, the ones you just mentioned, time and job level, performance, deputee issue, all of those things. One might argue that one might say, well, you know Judge, the defendants are just saying the expert witness report has to prove the whole case. I think what I'm hearing you say, and correct me if I'm wrong, is that, you know, that might be true that the expert witness doesn't have to prove the whole case if there may be other expert witnesses or other expert reports. But if -- if what the plaintiffs are relying on here is Neumark to prove

discrimination then, yeah, he kind of does have to prove the whole case because in order to prove discrimination, you have to prove more than simply the fact that the null hypothesis has been defeated; is that right?

MS. BOSHKOFF: Yeah, that's right. There's a lot of difference between this case and *Adams*, including the fact that it predated *Dukes*, and it was a really different situation in terms of talking about two discreet risks. You know in that case, the court said that ruling out chance was an important step in plaintiff's proof.

THE COURT: Right.

MS. BOSHKOFF: Based on the standard, we don't think it is an important step in plaintiff's proof, and we don't think it has the same level of helpfulness that it had in that case. I'll also point out, Your Honor, in that case, the court did note, you know, it's very strange that none of the experts did a regression analysis. The court found that to it be odd but said we're going to take what we have here. Well, that's not the situation in this case.

Not only do we have Dr. Neumark's report, but we have Dr. Siskin's report and some other reports where our expert has actually done the regression analysis that shows that these things are explanatory. And without getting into whose burden it is to do what, that takes us out of the content of *Ameritech* where you basically had two experts that were doing the same

thing and the court said, well, this doesn't get you all the way, but it's a little bit helpful. We don't think even it's helpful here.

THE COURT: Yeah, I think your last sentence is what I'm getting at. I'm not saying that *Adams* is on all fours with this case. I realize there are many, many differences not the least of which that was a disparate impact case and not a discrimination case, but I was simply focusing on the statement that you can kind of pull out of context that a single expert witness report does not have to get you to the finish line. And you're saying, yeah, that may be, but the information that this expert witness report gives us, if any, doesn't even move you from the starting line.

MS. BOSHKOFF: Correct.

THE COURT: Okay. Let me just look at my notes real quick and see. I thought I had one other question. I did. With regard to the four reliability factors and you mentioned and you argued that you think that Dr. Neumark's analysis fails all four of them.

With regard to the first one, can the methodology be tested or has it been tested? My understanding of that factor always has been in the past, is it capable of repetition sort of, you know, that empirical evidence type standard. And you indicated basically that to the extent that it can be tested, Dr. Siskin has tested it. So are you arguing that it can be

tested?

MS. BOSHKOFF: Yeah. I mean, Your Honor, I'm probably not using that in the proper way. To the extent we're talking about a repeatable test, I don't think it can be tested because this is sort of a unique analysis of the employee roster. So I don't know how you could repeat this or test it in -- You know, I don't know how you can test it to see if it works. I was probably taking that a little bit out of context because what I was alluding to is the error rate that we already know, so that's probably more appropriately under prong number three, the known or potential rate of error.

THE COURT: Okay. All right. I wanted to make sure I was understanding that correctly. And then finally, you talked about the discussions that we had in the past about evidence and what was going to be produced and the fact that what ended up being produced was all of the data, so that I already was aware of. Okay. Thank you. I appreciate at it, Ms. Boshkoff. Mr. Kotchen.

MR. KOTCHEN: Yes, Your Honor. So I want to address all the points, your initial questions and the three points that Ms. Boshkoff made. I think I'll start with first the issue of statistics. Then, I'll go to the issue of including deputees and analyses, and then go into the issue of the name matching.

So the issue of statistics. I think your discussion with Ms. Boshkoff right now is spot on in terms of the way we

see things. Statistics are important. They're helpful. What Infosys seems to be saying is it is Dr. Neumark that has to carry the ball for us to prove our entire case, that we have to do that at class certification, and that's just not the law. So when you look, Your Honor, at cases like *Teamsters* and *Hazelwood* about the importance of statistical disparities in pattern of practice discrimination cases, they are, of course, relevant and they are important. Even the *Mozee* case from the Seventh Circuit.

This is a case that Infosys itself relies on. It says, these statistics, referring to the plaintiffs statistics, indicated a standard deviation of more than two. The district judge found that that number when coupled with a standard deviation applicable to temporary promotions to let men of greater than ten sufficiently significant to make out a prima facie case of disparate impact.

That is exactly our point. Dr. Neumark's, his analysis, the standard deviation that he shows is absolutely helpful for us proving our prima facie case of discrimination. So that's not all the evidence we have. So take the *Mozee* case.

In the *Mozee* case, they also found that there was -- there was affirmative action analyses consistently that the defendant failed to meet, affirmative action goals. That was evidence of intent to discriminate. Here we have witnesses that discuss things like Infosys instructing to go find people to

apply to the corporation that have last names that are Indian. We have evidence of people being passed over for promotions, of people being terminated when they are not Indian and Indians not being terminated. There's a whole host of information that we have that we think shows -- that helps prove our case. Dr. Neumark's statistical analyses is certainly relevant and important to our case. It's not like the only thing we have.

Now, we do think -- One of your initial comments, Your Honor, was you discussed whether we think Dr. Neumark's analysis is critical for class certification. We certainly think it's helpful. And that line in the brief, the paragraph we had about the PeopleFluent data, we did not mean to suggest that we should withdraw Dr. Neumark's analysis and substitute it with PeopleFluent's analysis. That wasn't our point. Our point was that the statistical disparities that Dr. Neumark identified were perfectly consistent with the years of analysis that Infosys itself has conducted in its affirmative action work.

Those two things were totally consistent. And while Infosys can take shots at Dr. Neumark in terms of hiring, his analysis with respect to promotions, his analysis with respect to terminations, they can criticize that until the cows come home, but those analyses, what Dr. Neumark found, is exactly what Infosys itself has been instructing its executives is occurring. And so to exclude Dr. Neumark for doing analyses that is spot on with Infosys' affirmative action analysis show

would be -- It doesn't seem like that would be a just result if not warranted here.

So we do think statistics are important. We think the issue of identifying statistical disparities when you're making out a prima facia case of discrimination, that is what our responsibility is.

So Infosys claims that we are required to rule out all possibilities, to rule out explanatory variables. That's not our role. If they think that the statistics, the disparities we've identified can be explained, then they can explain it. We can present those competing frameworks to the jury and let the jury decide whose analysis is right.

But to exclude our expert and allow them to go forward without our expert performing statistical disparities showing the statistical disparities to the jury would not be right. It's not fair. So that's -- At the aggregate level, that's our argument with respect to statistics and the importance of statistics in a case like this. We refer Your Honor to the *Teamsters* case, to the *Hazelwood* case, of course, *Adams* and *Mister*, as we discussed, and also to the *Mozee* case, which is Infosys own case.

Let's talk about the issue of deputees. Infosys claims that the vast majority of their US workforce are individuals here in the US are on temporary assignment and cannot be considered by the US labor force. It's just not

right, Your Honor. The deputees are here for up to three years or more. They have H1B visas, which is a vast majority of their deputees is good for three years. It can be extended for up to six years and one year after that on an on-going basis. There's nothing about what the deputees are doing here that's temporary. They compete for jobs.

So the deputees, they have to apply for visas. Then, if they are awarded visas, what happens at Infosys is they apply for and interview for jobs in the United States, and they compete against applicants and local hires. And great evidence of this is what happened with Kelly Parker. Kapil Kulkarni was in India. He received an H1B visa. He received that visa because he claimed that he had a job at Microsoft. He didn't have a job at Microsoft, but he got a visa. Kelly Parker interviewed for a help desk job in Tomahawk. She was competing against Kapil Kulkarni. She didn't get the job. Kapil Kulkarni ultimately did.

And so what Infosys' standpoint is or their stance is is Kelly Parker cannot claim discrimination vis-a-vis to Kapil Kulkarni because he came from India. When he came to the US to take that job, he entered the United States labor force. He's competing for the jobs. Other folks in India, they can't freely enter -- They are not substitutes for applicants here because they have to go through the visa process. The H1B visa process is by designed limited. There's a cap of 65,000 per year, so

it's not like we can look at all the applicants in India and compare them to all the applicants in the US and somehow have a global workforce. Kapil Kulkarni entered the United States workforce. He competed against Kelly Parker for a role.

Now, I think that one of the things that separates this case from other discrimination cases is that you have extraordinary disparities. So when you look at Infosys' United States workforce, there's evidence that it's 93 percent Indian. 93 percent. And under Infosys' view, it can explain all that away just as long as we're not saddling them with statistical disparities.

But when you look at what Dr. Neumark analyzed, those disparities exist, and they are huge. When you look at how PeopleFluent analyzed it, those disparities exist, and they're huge. And normal discrimination cases, you may have a potential workforce that's 40 percent African American and maybe the hires are 20 percent or 30 percent, evidence of discrimination. Here we have a relevant labor market that's about 11 percent Indian but a US workforce that's 93 percent Indian. That is an extraordinary difference. And so if somehow we can't use that, those statistical disparities to prove our prima facie case of discrimination, I don't know how a discrimination when it comes to hiring would work.

Let's talk about the name analysis that Dr. Neumark does. So a name analysis, of course, applies to the applicants.

There is no perfect way to identify who someone of Indian national origin is South Asian dissent. There's going to be errors no matter what you do. Dr. Siskin admits that. Dr. Neumark admits that. Dr. Siskin points out some of the errors in Dr. Neumark how he assumes people were non-South Asian when, in fact, they were South Asian applicants. But in the grand scheme of things, that is a miniscule number that Dr. Siskin points to, and Dr. Neumark includes all those errors in his table in his supplemental report.

There's no perfect way. There is no way to skin the cat. Has it been done? Yes, it has been done. It has been done in *Teamsters*, Your Honor. In *Teamsters*, they use surnames to identify individuals of Hispanic dissent. And so what Dr. Neumark did is he took names of individuals at Infosys and applied to the applicant pool, and you see his results.

Now, Infosys would say that is not a reliable methodology that's accepted because even though it was done in *Teamsters* and has been accepted in courts since *Teamsters,* there's no perfect way to do it. And so if Infosys wants perfection here, then they're absolutely right, we can't have discrimination on a pattern of practice of discrimination of hiring because there's no perfect way. We can't do it. There's not a single plaintiff in this country that would be able to satisfy Infosys' standards.

Dr. Neumark did it. He did it, and he had his

analysis. So Infosys wants to throw out his analysis. Okay, what does that get him? Still about 93 percent of their US workforce is Indian. Even when you look at local hires, their local hires are on the order of 70 percent Indian. When you look at what they do to try to recruit folks of Indian dissent, they have executives flying over from India to instruct the town acquisition group on common Indian names they should go out to look for on LinkedIn.

Think about Brenda Koehler. Brenda Koehler applied for a job in Milwaukee. Infosys hired her. I'm sorry, Infosys interviewed her, quickly rejected her. They went out and found Fazlul Halim in New York to come take the job. He didn't apply to Infosys. They went out and found him. They are shaping their applicant pool. So what Infosys wants you to do, Your Honor, is okay reject Dr. Neumark's hiring analysis. That analysis applies to the applicant pool. What's left? Well, you have a 93 percent Indian workforce. What's the physical disparity there? It's over 200 standard deviations. What's the statistical disparity of just local hires of Indian dissent? About the same.

Where does that leave us? We should still be able to use that disparity to show that Infosys has a preference for a certain category of individual in hiring. We think that the name matching analysis if you look just at the applicant pool is probative and helpful. It is not perfect, but if perfection is

the standard here, there's not a single individual that would be able to pursue a pattern of practice case in hiring.

Infosys argues it's our job to rule out all explanatory variables for the statistical disparities. We have to prove, in other words, right now that discrimination exists. If that's not in Dr. Neumark's report, we lose this case. That's effectively what they're saying because if the class isn't certified, the case is a loss. Yet when you look at how Infosys operates, they have affirmative action anchors. They had an Ernst & Young audit that was done in 2012 that said we need to have -- establish an affirmative action program because there's something wrong here. Since then, they had affirmative action analysis done every year. We didn't know about it until 2017 what the results were.

That affirmative action analysis shows a serious problem in hiring, promotions, and terminations. Infosys didn't rule out -- They didn't have any explanatory variables to suggest why it wasn't a problem. They established goals to show that they have a huge problem. So we can't use Dr. Neumark in addition to the affirmative action analysis in addition to the documentary evidence and the witnesses we have to show that there's a problem across the three classes that we seek to certify. If they have such a problem with our analysis, Your Honor, we think that is an appropriate issue to present to the jury and let the jury resolve it. But to exclude Dr. Neumark's

testimony on these various factors when he shows disparities that are perfectly consistent, almost identical to the disparities that Infosys has found, and has told their executives they need to correct, we think it's not consistent with the law, and it's not consistent with *Daubert*.

THE COURT: Sorry, I don't want to interrupt you. Are you finished?

MR. KOTCHEN: I'm looking at my notes. I think those are all the points that I have.

THE COURT: Okay.

MR. KOTCHEN: Your Honor, I do actually have one more thing. This is a bit off topic. You started this -- the hearing talking about docket entry 177. That is my responsibility. We shouldn't have made that filing, and I'm sure you said how much we want to make sure that if you are considering something Infosys is putting in, we want you to consider ours as well. It was a mistake in judgment.

On that paragraph in our *Daubert* opposition that Dr. Neumark's analysis isn't necessarily critical to the issue of class certification, you can go ahead and decide that. We of course think it's relevant in order for class certification. Our point there was not we're substituting PeopleFluent in for Dr. Neumark. Our point was we didn't want to slow down a decision on class certification. That was all, Your Honor. We should have rephrased that.

THE COURT: Okay. Thank you. Let me -- I'm looking at my notes. You said several times, Mr. Kotchen, that given that Infosys, you know, brought in PeopleFluent and did its own analysis, it "wouldn't be fair" to exclude Dr. Neumark's opinion. I don't -- I don't perceive this as, well, they got to do it their own selves so we get to do it. The issue here is whether or not Dr. Neumark's analysis, the methods that he used comply with *Daubert*. And if it didn't comply with *Daubert*, I don't think you get as a consolation prize, well, we still get to put in an expert because, you know, they did some stuff and our expert's results look like their expert's results. We still have *Daubert* in the courts regardless of what Infosys did.

MR. KOTCHEN: Your Honor, my point is if there's a question as to whether or not it's relevant and reliable, that's my point. Under the *Daubert* analysis, it has to be relevant and it has to be reliable and is it accepted in the industry? Not only is it accepted in the industry, it's critical as to how Infosys thinks about discrimination. So my point is, of course, it's relevant and, of course, it's reliable because we see Infosys conducting the exact same studies. After an Ernst & Young audit in 2012, they're doing the exact same thing, they're looking at the exact same thing, the issue of discrimination. Again, we're talking about a prima facie case of discrimination, and Infosys identifies problems through a statistical disparity analysis that is almost identical to Dr. Neumark's and shows

Case 2:13-cv-00885-PP    Filed 09/08/22    Page 52 of 67    Document 204

almost identical results.

And so under the *Daubert* analysis, it's relevant and reliable, and we think it would be helpful to the trier of fact. If Infosys has criticisms of it and they criticize their own PeopleFluent analysis too in their *Daubert* briefing, that's fine, criticize it. But the issue there is they should present their criticism to the trier of fact. They should try to exclude evidence now without it being presented to the trier of fact. It's relevant and reliable.

THE COURT: Okay. But that then brings up again the *Daubert* context which is that this kind of evidence in this circumstance is different from other kinds of evidence like your witnesses, for example, because for statistical evidence, *Daubert* makes the district court the gatekeeper. And *Daubert* says, no, you don't just get to throw anything in front of a jury and let the jury figure out, you know, whether it's good enough. You got either scientific evidence or in this case arguably, you know, quasi scientific *Kumho Tire* type evidence. The Court has to perform a gatekeeper function first and determine whether or not the methodology is reliable. It isn't just a matter of flinging all the spaghetti at the jury and seeing what sticks.

MR. KOTCHEN: I agree with that, Your Honor. But if the issue is if identifying statistical disparities is an accepted method of having a plaintiff prove his or her prima

facia case of discrimination, then we can throw out *Teamsters*. We can throw out *Hazelwood*. I think we can throw out Adams, *Mister* and *Mozee* and a whole host of cases because statistical disparities that is like -- that's an issue that plaintiffs identify as the first thing to go to in a discrimination analysis.

And again, I'll read you a quote from *Hazelwood*. Here is what *Hazelwood* says at page 307 to 308. "Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern of practice of discrimination." And so the issue is the disparities aren't somehow tested, they're not accepted, then discrimination law will change forever.

My point about PeopleFluent and is as much as Infosys wants to criticize what Dr. Neumark does, they want to criticize the fact that he's incorporating deputees in his analysis, they want to criticize the fact that he's showing gross statistical disparities in hiring. My come back to that is I understand your criticisms, but what he did is so accepted and relevant, it's what you are doing in instructing your executives on how to curb discrimination behind closed doors.

And so if disparities aren't -- If somehow that is identified as something that's not scientific enough or somehow crude, than it's going to change discrimination law.

THE COURT: Okay. So let me accept -- because I

think -- I think now I may be having a different conversation in my head than we're having with each other. I don't disagree that there are a number of cases in *Adams* or *Ameritech* whatever you guys call it is one of them and *Hazelwood* is another one of them that say disparities are a critical part of determining discrimination law. I'm not arguing that. I think the issue here is how the determination of disparities came to be, number one, the method that was used to demonstrate those disparities, number one, and whether that's reliable.

And then number two, whether the disparities mean what you say they mean as opposed to what Koehler says they mean. Your quote says from *Hazelwood* said that statistical disparities -- gross statistical disparities may in a proper case standing on their own. So that's the whole thing we're arguing here, is this a proper case?

You mentioned -- Let me go to the name matching for a second. You mentioned *Teamsters* several times now, and I think I heard you say, you know, what Dr. Neumark did here they did it in *Teamsters*. I actually wrote those words down and put an asterisk next to them.

Looking at *Teamsters*, I have it open in front of me. And in *Teamsters*, the allegations were that -- that the company had been discriminating against, forgive me for using the terminology, but the word the court used was Negros and persons of color and Spanish surnamed Americans. This doesn't --

*Teamsters* doesn't seem to me, as far as I can tell, to be a case in which the expert tried to figure out who were the African American persons and who were the persons who were Hispanic. Specifically, they were looking at people with Spanish surnames, and they were looking at people of color, and there doesn't seem to be a fight about how the disparities were determined. That doesn't seem to be the focus of *Teamsters* at all. So did I misunderstand you when you said they sort of did in *Teamsters* what Dr. Neumark did here?

MR. KOTCHEN: My point on that, Your Honor, was in *Teamsters*, they used Spanish surnames to identify individuals of Spanish dissent.

THE COURT: That's not what it says. The suit says they are not talking about people of Spanish dissent. They are talking about Spanish surnamed Americans, and I don't mean to be --

MR. KOTCHEN: Correct.

THE COURT: I don't mean to pick nits, but quite frankly, you know, the whole argument that Koehler is making here is, you know, that Dr. Neumark is assuming that somebody with a name that sounds like X is Indian or South Asian and somebody with a name that sounds like Y isn't. *Teamsters* is not talking about whether they actually were Hispanic. It is talking about whether or not they had a Hispanic surname.

MR. KOTCHEN: Correct because discrimination against

individuals of Hispanic dissent was at issue in *Teamsters*. And so the Spanish surname I take it to mean -- Of course, I don't -- I take it to mean that they are identifying individuals of Hispanic dissent using their surnames. And in a discrimination context, I don't think there's a way to avoid that. So for example, if you are looking at an applicant pool of individuals and we'll say it's a discrimination against folks of Hispanic dissent and you have a Rodriguez and you have a Smith, you're going to make judgments about the individual's race and national origin based on the name. For example, a Hispanic surname is a perfect example of that.

Now, I guarantee you if there's a case where Hispanic -- in a discrimination case of folks of Hispanic dissent that if you use a name matching, you're going to have some errors. There's no way not to in a name matching analysis. But we're not doing that to prove that every one that we identified is awarded -- wins in a discrimination case. There can be a Rodriguez who is not Hispanic. And phase two in a *Teamsters* pattern of practice case, that will come out. But because that person is an applicant, you probably won't get that until phase two.

Now, if that person is hired, then you will know because an employer will know the race of the individuals that the employer hires, and that's -- So my point is I take it from *Teamsters* they were using surnames to identify individuals of

Hispanic dissent. My broader point is if Infosys -- Accepting Infosys' argument, suppose they say the name matching approach is just too ripe with errors to be reliable. I don't know where that gets them because they are a US workforce whether you look at it in the aggregate, 93 percent Indian or even if you focus on base hires if we don't agree with it, it's 73 percent Indian. And so the disparity exists irrespective of what we see in the applicant pool. And maybe they'll argue, well, and Dr. Siskin argues this. Great news, Infosys is a leading Indian company so, of course, Indians want to go and to apply to it.

And then our response to that is why are executives flying over to Dallas to instruct the acquisition group on how to find potential employees using Indian last names? So you see how the evidence all fits together, Your Honor. And for them, Infosys wants you to accept Dr. Neumark has to prove that discrimination exists or else you can't use them, and I don't think that's the right standard to apply here.

THE COURT: Okay. I think we're probably going to have to agree to disagree on *Teamsters*. Maybe I'm not making clear what my --  I'm just standing -- Again, granted it's a long decision. I didn't read every single word of it, but I don't seen any mention of Hispanic dissent anywhere in here. They were specifically looking at people who had last names that we can I guess we can agree to disagree about.

But to your last comment looking at Dr. Neumark's

report, and this is at docket 97-2. And I'm looking at page 4 in the docket. I can't tell what page it is under his pagination. At any rate he says, "I've been retained by the plaintiffs as a statistical expert to evaluate claims of discrimination in Infosys Technologies Inc. with respect to its hiring, promotions and terminations in the United States. Specifically, I have been asked to evaluate whether the data are consistent with discrimination against applicants and employees at Infosys who are non-South Asian or non-Indian."

This makes it sound as if you all retained him to talk about whether there was discrimination. So are you now indicating that that's not what you have hired him to opine on? Hello?

MR. KOTCHEN: I'm, sorry I had you on mute.

THE COURT: You should probably.

MR. KOTCHEN: I think there's a big difference between an expert who is opining on data that is consistent with discrimination and a finding of discrimination. What you'll never -- You will never see Dr. Neumark conclude is that there is, in fact, discrimination here. What you see is standard deviations of we'll say 200, which is consistent and in fact strongly consistent with discrimination. That's what the *Adams* court said too. The more you get, the more standard deviations greater than two, the stronger the inference of discrimination is.

And so we're not -- consistent with discrimination is not a finding of discrimination, and he does not say that, and he wouldn't. He's only an expert to help us prove a prima facia case of discrimination. And we use disparities just like plaintiffs in *Hazelwood* and *Adams* and *Mister* and *Mozee* and other cases, we use disparities to show -- to help show that a prima facie case of discrimination can be shown, can be proven. It's not the only evidence we have, but I think -- I think what Dr. Neumark does is important evidence quite frankly.

THE COURT: Let me ask a last question about deputees, and I'm hearing two very different characterizations from you and from the defendants. I'm understanding the defendants to say that they have an Indian workforce in India and that some of those people have visas that enable them to come here and work. But to say that a group of folks hired out of the United States hiring pool should look the same and should mirror a group of folks who are partly hired out of the US hiring pool but also supplemented by folks who were hired out of the Indian hiring pool and then travel here is -- is kind of trying to compare apples to peanuts.

So you seem to be saying no, no, no, no, the Indian -- the person in India is competing directly with the person in New Jersey for the same job, and that's not the way I understand the defense to be explaining it. So can you help me here?

MR. KOTCHEN: Your Honor, we have a much different

point of view than defendants so --

THE COURT: I'm stunned. I'm stunned. I know that. I'm trying to -- I'm trying to understand. Tell me what's wrong with their explanation.

MR. KOTCHEN: Infosys has to admit because the witnesses testified to it that individuals in India who are visa ready such Kapil Kulkarni have to apply and interview for jobs in the United States. And they are given jobs at a strikingly higher rate than individuals like Kelly Parker, who applied and interviewed for jobs as well.

So it is -- There is no doubt that there's a factual dispute about that. But in the context of a *Daubert* motion in a *Daubert* hearing to resolve that factual dispute, we don't think -- I mean, we're happy to show you record evidence we cited in our class certification briefing. Infosys has a different point of view. I understand why they want to exclude those individuals from discrimination analysis. We don't think that's appropriate. They're competing for jobs. Kapil Kulkarni got the job that Kelly Parker interviewed for and applied for. I can think of no better way to show that folks, the visa-ready individuals are competing for the jobs here in the United States. There's -- If you have to interview and you have to apply for it and there's consideration given to people that live here in the United States, that's competition for the job.

To your point that, well, maybe that workforce in

India looks different than the workforce, you know, in Tomahawk, Wisconsin, it probably does. But if there's a predominately white county and a predominately black county and both residents are interested in working at an employer, an employer can't just focus on the preferred race -- the county that has the preferred race in hiring. It has to consider individuals on the same basis and award positions on the basis of merit.

And to allow Infosys to sidestep discrimination laws by getting visas for folks who have to compete for jobs in the United States and then prefer those folks -- giving them first preference over someone like Kelly Parker I think runs afoul of Title 7 in 1991. It's discrimination, and we think that awarding that behavior would have very perverse results.

THE COURT: Thank you. I appreciate at it, Mr. Kotchen. All right. Just a few minutes, Ms. Boshkoff, if you have any reply arguments.

MS. BOSHKOFF: Yes, Your Honor just a few points. As to this last point about whether deputees and base employees compete for the same job, which Mr. Kotchen says is a factual dispute. Actually, I don't think is a factual dispute.

As Dr. Siskin notes in the report, there are separate processes of transfer and higher. Hiring is applying against a requisition. Transferring is a different process. But let's say he's right about that. Let's say he's right. Kapil Kulkarni and his client competed for the same job. Well, that

still doesn't solve these workforce analyses because the workforce analyses are based on the premise that Infosys' workforce should look like the US labor market.

But if Mr. Kotchen is saying no, no, no, no, individuals from India compete with individuals from the United States, then we've got two workforces to consider, and I think it still underscores the point that when you have the workforce that is comprised of a mix of employees from India and from the US, you can't expect it to compare to the US labor market, so I think that's point number one as a clarification.

I don't think I need to say much about the affirmative action issue because Your Honor has pointed out that's not the *Daubert* standard. But the affirmative action reports are done the way the OFCCP tells us to do them. So the fact that they're done a certain way is by no means a statement that this is the way you should do a discrimination analysis. It's just done to follow federal guidelines.

The third point that he made is that you can't -- You can never have a discrimination case if you didn't do name matching. Well, there's discrimination cases, you know, legions without name matching. I don't think there's been really any defense of the scientific validity. And in this particular case, Dr. Neumark could have used the race data that he had, Asian, and he just chose not to. So that's not really a valid.

And I think finally, Your Honor, I heard the statement

that, you know, Infosys is saying that the reports can't be admitted unless he ruled out all explanatory variables. I don't think we need to go that far, Your Honor, because Dr. Neumark admitted he considered no explanatory variables, none. So we don't have to quibble about whether he should have considered this or not because he's not considered anything. And I think the cases *Teamster*, *Hazelwood*, all of these cases talk about statistics, and they talk about the probative value of statistics depending on the circumstances and the case. And I think as I've already explained, you know, given the obvious defects, we just think the statistics are not reliable and don't have probative value here.

THE COURT: All right. Thank you all. I appreciate -- I know we've been at this a while, and it's been a long time since you did the briefing and I appreciate your arguments. I am very much hoping to get you a decision as soon as I can. In fact, I may if I'm able to get things together, I may ask you to come back for an oral ruling as opposed to giving you a written ruling because I think the way things are going these days, I'd be able to get you something more quickly that way. But I want to consider the arguments that you've made today and take a look at a couple things again and then try to get you a decision as soon as I can.

Now, as I indicated, I think the decision on this motion is a prerequisite to ruling on the class certification

and summary judgment motions because there is cite and reliance on Dr. Neumark, and there's been some sort of differing argument I think from the plaintiffs about exactly how much reliance there is on Dr. Neumark's opinion. But be that as it may, there clearly is reliance on the opinions in those motions.

So once I am able to determine -- Once I decide the *Daubert* motion, then we'll be able to move onto the class certification and the summary judgement. So I think that's the game plan. I am going to -- I can't give you a definite date, but I'm just going to do the best I can to get it to you as quickly as possible. And with that Mr. Kotchen, anything further from the plaintiffs?

MR. KOTCHEN: Your Honor, I mean if you would allow me 30 seconds just to address Ms. Boshkoff's final points there.

THE COURT: Well, it is her motion, so traditionally she gets the last word.

MR. KOTCHEN: Then, I'll rest. I have nothing further, Your Honor.

THE COURT: Thank you. Anything else from the defense?

MS. BOSHKOFF: No, Your Honor. Thank you so much for giving us the time that you've given us today. We appreciate at it.

THE COURT: Well, I appreciate everyone's patience. I know you wanted this time for a while. I guess sometimes just

better late than never maybe.  So again, I'll try to get back to you as soon as I can.  Thank you again for your arguments today, and we'll communicate hopefully soon.  Take care.  Please stay safe everyone.

MR. KOTCHEN:  Thank you, Judge.

(Whereupon proceeding was concluded.)

C E R T I F I C A T E


        I, SUSAN ARMBRUSTER, RMR, Official Court Reporter and
Transcriptionist for the United States District Court for the
Eastern District of Wisconsin, do hereby certify that the
foregoing pages are a true and accurate transcription of the
audio file provided in the aforementioned matter to the best of
my skill and ability.


Signed and Certified September 7, 2022.

/s/Susan Armbruster

Susan Armbruster


                     Susan Armbruster, RPR, RMR
                    United States Official Reporter
                    517 E Wisconsin Ave., Rm 200A,
                        Milwaukee, WI 53202
                   Susan_Armbruster@wied.uscourts.gov

67

 RA69

BRENDA KOEHLER, KELLY PARKER,
LAYLA BOLTEN, and GREGORY HANDLOSER,

    Plaintiffs,

           Case No. 13-cv-885-pp

  v.

INFOSYS TECHNOLOGIES LIMITED INC.,
and INFOSYS PUBLIC SERVICES INC.,

    Defendants.

---

**ORDER GRANTING DEFENDANT'S MOTION TO EXCLUDE EXPERT OPINIONS OF DAVID NEUMARK (DKT. NO. 97), DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 86), DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION TO CERTIFY CLASS (DKT. NO. 88), DENYING AS MOOT JOINT MOTION FOR HEARING (DKT. NO. 202) AND SETTING STATUS CONFERENCE**

---

The defendants—Infosys Technologies Limited, Inc. and its wholly-owned subsidiary Infosys Public Services, Inc. (collectively Infosys)—are an international IT company headquartered in India. The plaintiffs are Caucasian American nationals who claim they either were not hired, were not promoted, or were fired based on the defendants' "systematic pattern and practice of discriminating against non-South Asian employees and in many instances replacing them with South Asian employees." Dkt. No. 19 at ¶¶6, 96. The plaintiffs moved for class certification, and the parties filed cross-motions for summary judgment. After the plaintiffs filed their motion for partial summary judgment and their class certification motion, the defendant moved to exclude

the opinions of the plaintiff's expert witness, Dr. David Neumark, who analyzed

the defendant's demographic data relative to the plaintiffs' claims that Indians

and South Asians were overrepresented in the defendant's employee population

and were favored over non-Indians and non-South Asians in terms of hiring,

promotion and termination. Dkt. No. 97.

Because Dr. Neumark was not qualified to perform analyses to determine

employees' national origins, and because he used unreliable methodologies to

do so, the court will grant the motion to exclude his opinion.

## I.      Facts and Procedural History

### A.      The Plaintiffs' Allegations

In its order denying the defendants' motion to dismiss the second

amended complaint, the court described the plaintiffs' allegations:

> The four plaintiffs allege that they are Caucasian individuals of American national origin, against whom [Infosys] made adverse hiring or employment decisions on the basis of their race and national original. They seek to represent a class of similarly situated individuals. The complaint alleges that [the two entities that make up Infosys] are corporations organized and headquartered in India. The corporations have many offices located in the United States that are comprised predominately—or in some cases, entirely—of employees of the South Asian race and of Indian, Bangladeshi, and Nepalese national original. (Dkt. No. 19, ¶22.) The complaint contains allegations describing the defendants' discriminatory treatment of each of the plaintiffs, and describing the defendants' alleged employment practices that cause a disparate impact against Caucasians.

> \* \* \* \* \*

> In addition to the plaintiffs' individual experiences, the complaint contains allegations regarding the defendants' purported intent to discriminate on the basis of race. The complaint alleges that two [Infosys] executives, who are South Asian, explicitly encouraged recruiters to focus their efforts on recruiting Indian

candidates and dismissed complaints that highly qualified American candidates were being rejected in favor of Indian candidates. Id. ¶¶28-30. The complaint further alleges that an [Infosys] hiring manager stated: "There does exist an element of discrimination. We are advised to hire Indians because they will work off the clock without murmur and they can always be transferred across the nation without hesitation unlike [a] local workforce." Id., ¶3.

The plaintiffs allege that the defendants achieve their discriminatory objectives, at least in part, by their practice of setting annual "visa quotas" to support the growth of their United States offices, hiring South Asian workers in sufficient numbers to meet those quotas, and securing visas for foreign workers to enter and work in the U.S. Id., ¶¶31-35. They allege that [Infosys] sets annual growth targets for its U.S. offices, then budgets for the number (and expense) of additional foreign-worker visas [Infosys] will need to secure in order to bring foreign workers into the U.S. to meet its targets. Id., ¶33. The complaint alleges that this practice results in annual visa quotas of South Asian workers to be hired and "employed within the U.S., irrespective of the fact that qualified workers exist in the U.S. that Infosys could use to support its U.S. business." Id.

Dkt. No. 31 at 2-3, 4-5.

The court[1] concluded that the second amended complaint stated "causes of action for disparate treatment and disparate impact on the basis of race and national original in violation of Title VII, and for disparate treatment on the basis of race in violation of §1981." Id. at 17.

B.  Discovery

Discovery disputes began shortly after the scheduling conference and the court's issuance of the scheduling order. Three months after issuing the

---

[1] The case originally was assigned to Judge Charles N. Clevert, Jr. It was reassigned to this district judge in late December 2014, after the undersigned was appointed to the district court. By that time, the parties had briefed the motion to dismiss the second amended complaint; the undersigned ruled on that motion.

scheduling order, the court held a status conference at which the plaintiffs argued that the defendants were not willing to turn over information regarding employees working in the United States on visas, or information about the defendants' visa policies. Dkt. No. 38 at 1. The defense responded that they had data from two databases containing hundreds of thousands of records and containing information about employees hired in India and employees hired in the U.S. Id. The plaintiff asserted that the defendants were providing information on "base hires," and was defining that term in a way that excluded the information the plaintiffs needed. Id. The defense responded that it could not figure out what information the plaintiffs needed. Id. at 2. Eventually the court ordered the defendants to turn over information they indicated they had compiled and asked the plaintiffs to advise the court in writing of the amount of time they'd need to review the information. Id. Less than a month later, the plaintiffs requested a discovery hearing (in a fifty-six-page filing that included six exhibits). Dkt. No. 43. The parties briefed this request, and the court held another hearing. Dkt. No. 47. At the hearing, the plaintiffs alleged that the defendants were trying to control what they turned over and in what form, while the defense agreed that the data it had provided needed interpretation and suggested that perhaps bringing in a magistrate judge to assist in the exchange of data might help. Id. at 1-2. The court agreed to refer the discovery issues to a magistrate judge for mediation. Id. at 2.

The parties worked with Magistrate Judge Nancy Joseph for about four months—unsuccessfully; Judge Joseph reported that mediation had not

"resulted in resolution or settlement of all the discovery issues in this case."
Dkt. No. 55. This court held another status conference. Dkt. No. 57. The
plaintiffs' counsel listed four categories of information the plaintiffs still sought;
defense counsel indicated that the parties might be able to work through those
issues if they had more time to talk. Id. at 2. The court scheduled another
status conference. Id. at 3. It also referred the case to Magistrate Judge David
Jones, hoping that he could assist the parties in working through the discovery
issues.

Judge Jones worked with the parties regularly—often weekly—for over
two years, stopping only when he left the court.

### C.    The Defendants' Motion to Exclude Expert Opinions

The plaintiffs filed a motion for partial summary judgment. Dkt. Nos. 77,
86. The defendants filed their own motion for summary judgment. Dkt. No. 78.
The following day, the plaintiffs filed a motion under Federal Rule of Civil
Procedure 23 for certification of three classes. Dkt. Nos. 81, 88.[2] The motion
defined the classes as follows:

> A.    Hiring Class: All individuals who are not of South Asian race
> or Indian national origin who sought a position with Infosys in the
> United States and were not hired from August 1, 2009 through the
> date of class certification.

---

[2] The plaintiffs filed the motion for partial summary judgment and
attachments, dkt. no. 77, as well as the motion for class certification and
attachments, dkt. no. 81, as "restricted" from public view, but also filed
objections to the defendants' designation of many of the attachments as
confidential, dkt. no. 76. Three weeks later, the plaintiffs notified the court that
the defendants and a third party had agreed to withdraw certain confidentiality
designations, and that the plaintiffs would refile the motion for partial
summary judgment and the motion for class certification. Dkt. No. 85.

B.    Promotion Class: All individuals who are not of South Asian race or Indian national origin who were employed by Infosys in the United States between August 1, 2009 and the date of class certification for a period of at least 18 months and were not promoted.

C.    Termination Class: All individuals who are not of South Asian race or Indian national origin who were employed by Infosys in the United States between August 1, 2009 and the date of class certification and were terminated.

Dkt. No. 88 at 1.

The plaintiffs attached as an exhibit to both their motion for partial summary judgment and the motion for class certification a September 2016 expert report from Dr. David Neumark. Dkt. Nos. 77-2 (attachment to motion for partial summary judgment); 88-2 (attachment to motion for class certification). Neumark, a professor of economics at the University of California-Irvine, described himself as "a labor economist who ha[d] done extensive research on labor market discrimination, including methods for measuring and testing for discrimination that have been adopted by many other researchers." Id. at 4, ¶1. Neumark stated that the plaintiffs had hired him "as a statistical expert to evaluate claims of discrimination at Infosys Technologies Limited, Inc. . . . with respect to its hiring, promotions, and terminations in the United States." Id. at 4, ¶3. Specifically, Neumark said that the plaintiffs had asked him "to evaluate whether the data are consistent with discrimination against applicants and employees at Infosys who were non-South Asian or non-Indian (and, correspondingly, who were white, black, Hispanic, or other categories not in the South Asian or Indian groups)." Id. at 5, ¶3.

The defendants simultaneously filed a motion to exclude Neumark's opinion, dkt. no. 97, their brief in opposition to the plaintiffs' motion for partial summary judgment, dkt. no. 99, and their brief in opposition to the plaintiffs' motion to certify classes, dkt. no. 103. The defendants' brief in support of the motion to exclude Neumark's opinion asserted that the plaintiffs' motion for partial summary judgment and their motion for conditional class certification "depend entirely on the opinions of their statistics expert, Dr. David Neumark." Dkt. No. 98 at 8. The defendants argued that the court should strike Neumark's opinions and exclude them from the case because his opinions were based on "pseudoscience." Id. at 9.

The plaintiffs filed a brief in opposition to that motion. Dkt. No. 123. They argued that Neumark is a "highly-qualified professor who performed straightforward and reliable statistical analyses" and that his statistical findings "are relevant to proving Plaintiffs' *prima facie* case under the [*International Brotherhood of*] *Teamsters* [*v. United States*, 431 U.S. 324 (1977)] framework." Id. at 5. The plaintiffs explained that after seeing the defendants' "attacks" on Neumark's methodologies, Neumark "produced a short, supplemental report, addressing, among other things," what the plaintiffs characterized as "ancillary issues" raised by the defendants. Id. at 9. The plaintiffs attached to this motion a February 2017 supplemental expert report from Neumark. Dkt. No. 123-7.

The defendants replied that faced with their critique of Neumark's methodologies, the plaintiffs had shifted from asserting that Neumark's

statistics proved discrimination to arguing that Neumark had offered no opinion on causation and had opined only that the disparities he observed could not have occurred by chance. Dkt. No. 128 at 3.

On June 11, 2020, the court heard argument on the motion.[3] Dkt. Nos. 195 (audio recording of hearing), 196 (minutes), 204 (transcript). After advising the parties that it did not agree with either of their interpretations of Adams v. Ameritech Services, Inc., 231 F.3d 414 (7th Cir. 2000), dkt. no. 204 at 15, line 17 through 19, line 20, the court heard argument regarding Neumark's methodologies and analyses, dkt. no. 204 at 20, line 2 through 64, line 12. The court took the motion under advisement.

D.     The Other Pending Motions

As indicated, the defendants filed a motion for summary judgment. Dkt. No. 78. The parties have fully briefed that motion—the plaintiffs have filed their opposition materials, dkt. no. 93, and the defendants have filed a reply in support, dkt. no. 108.

A little over three weeks after the defendants filed their motion for summary judgment, the plaintiffs filed their motion for partial summary judgment. Dkt. No. 86. The parties have fully briefed that motion—the defendants have filed their opposition materials, dkt. no. 99, and the plaintiffs have filed a reply in support, dkt. no. 117.

---

[3] The court ruled on other motions at that hearing—a motion to join a plaintiff (Dkt. No. 157) and a motion to strike (Dkt. No. 177). Dkt. No. 204 at 7, lines 20-23. The court denied the motion to join a plaintiff. Id. 9, lines 19-20. It granted the motion to strike and asked the defendant to resubmit the documents that were the target of that motion. Id. at 12, lines 20-25.

The parties have more than fully briefed the plaintiffs' motion for Rule 23 class certification. Dkt. No. 88. The defendants filed opposition materials, dkt. no. 103, and the plaintiffs filed a reply, dkt. no. 116. The defendants then filed a sur-reply,[4] dkt. no. 125, and the plaintiffs filed what the court supposes is a sur-sur-reply,[5] dkt. no. 132.

Because of the court's extreme delay in addressing the motion to exclude Neumark's opinions, the parties filed a motion asking the court to schedule a telephonic status conference to discuss whether there was anything they could do to "facilitate the Court's consideration of the pending matters." Dkt. No. 202.

## II.   The Legal Posture of the Claims

Because the plaintiffs filed their motion for partial summary judgment and their class certification motion at the same time, and because the defendants based their motion to exclude Neumark's opinions on the arguments in the plaintiffs' motions, the parties' arguments on the motion to exclude Neumark's opinions often are intertwined with the substance of the plaintiffs' claims and the defendants' arguments in opposition to those claims. The parties reference their pleadings on the summary judgment and class certification motions when arguing the motion to exclude, and the plaintiffs

---

[4] Neither the federal rules nor this court's local rules allow sur-replies, but it appears that Magistrate Judge Jones allowed the defendants to do so. See Dkt. No. 120 at 2.

[5] The plaintiffs sought leave to file this document, dkt. no. 129, and Judge Jones granted it, dkt. no. 131 at 1-2.

sometimes conflate legal standards for class certification and for their burden of proving their *prima facie* case of discrimination with the law governing the admissibility of expert witness testimony. It is helpful (for the court, at any rate) to understand the plaintiffs' claims and the law governing them before turning to the admissibility of Neumark's opinions.

There are different types of employment discrimination. "Disparate treatment . . . is the most easily understood type of discrimination." <u>Teamsters</u>, 431 U.S. at 335 n.15. Disparate treatment occurs when "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." <u>Id.</u> When a plaintiff alleges disparate treatment, "[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." <u>Id.</u> Another type of employment discrimination is "disparate impact"— "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." <u>Id.</u> "Proof of discriminatory motive . . . is not required under a disparate-impact theory." <u>Id.</u> A third type of employment discrimination claim is a "pattern or practice" claim. "Pattern-or-practice claims, like [disparate treatment] claims, represent a theory of intentional discrimination." <u>Puffer v. Allstate Ins. Co.</u>, 675 F.3d 709, 716 (7th Cir. 2012) (citing <u>Council 31, Am. Fed'n of State, Cnty. & Mun. Emps, AFL-CIO v. Ward</u>, 978 F.2d 373, 378 (7th Cir. 1992)). A pattern or practice claim "require[s] a 'showing that an employer regularly and purposefully

discriminates against a protected group.'" <u>Id.</u> A plaintiff bringing a pattern-or-practice claim is required to prove "that discrimination 'was the company's standard operating procedure—the regular rather than the unusual practice.'" <u>Id.</u> (quoting <u>Teamsters</u>, 431 U.S. at 336).

The plaintiffs have alleged both disparate treatment, dkt. no. 19-2 at ¶¶130-139, and disparate impact, <u>id.</u> ¶¶140-142, and in their disparate treatment claims, they have alleged a pattern or practice of discrimination, <u>id.</u> at ¶¶130-139. To prevail on those claims at trial, the plaintiffs must prove by a preponderance of the evidence that the defendants engaged in intentional, purposeful discrimination and that that discrimination was their standard operating procedure.

"[T]he general principle [is] that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under" Title VII. <u>Teamsters</u>, 431 U.S. at 358. A plaintiff may do this in a few ways. An individual plaintiff seeking to prove intentional employment discrimination may use the burden-shifting framework articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), a "helpful way to evaluate evidence of discriminatory intent in employment discrimination claims." <u>Brooks v. Avancez</u>, 39 F.4th 424, 433-34 (7th Cir. 2022). For a plaintiff in a pattern-or-practice case, the

> initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers . . . At the initial, "liability" stage of a pattern-or-practice suit the [plaintiff] is not required to offer evidence that each

person for whom [the plaintiff] will ultimately seek relief was a victim of the employer's discriminatory policy. [The plaintiff's] burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiff's] proof is either inaccurate or insignificant.

Teamsters, 431 U.S. at 360.

So—having alleged pattern-or-practice claims, the plaintiffs first must prove a *prima facie* case, which requires them to prove by a preponderance of the evidence that the defendants had a system-wide policy or practice of discrimination. The plaintiffs' motion for partial summary judgment asserts that they have proven that *prima facie* case, based on the statistical disparities revealed in Neumark's work. Dkt. No. 86. They ask the court to find, as a matter of law, that they have proven the *prima facie* case, such that the burden must shift to the defendants to rebut the inference of discrimination at trial. Id. at 6. In their motion for class certification, the plaintiffs assert that they have satisfied all the elements of Fed. R. Civ. P. 23 for class certification, including showing that they have presented common evidence of discrimination in hiring, promotion and termination; some of the evidence they cite is Neumark's work. Dkt. No. 88.

In all the pending motions—the plaintiffs' motion for partial summary judgment, the defendants' motion for summary judgment, the plaintiffs' motion for class certification and the defendants' motion to exclude Neumark's opinions—the parties discuss the role of statistics in proving a *prima facie* case of discrimination in a pattern-or-practice case. They often talk past each other. The defendants assert, for example, that Neumark's opinions are not relevant

because they will not assist the trier of fact in deciding whether the defendants engaged in a pattern or practice of discrimination. The plaintiffs respond that Neumark's opinions "are relevant in proving Plaintiffs' *prima facie* case under the *Teamsters* framework." Dkt. No. 123 at 5. The defendants' argument, while couched in terms of relevance, really challenges the reliability of Neumark's assumptions and the methodologies he applies to test them. The plaintiffs' argument states the obvious.

The Seventh Circuit repeatedly has held that statistics play a significant role in proving a *prima facie* case of discrimination in a pattern-or-practice case. See, *e.g.*, Adams, 231 F.3d at 424 ("There is no presumption that statistical evidence has no useful role to play in disparate treatment employment discrimination cases—indeed, we are hard pressed to see how anyone could take such a position consistently with the Supreme Court's guidance on the matter and this court has not done so."); E.E.O.C. v. O&G Spring & Wire Forms Specialty Co., 38 F.3d 872, 876 (7th Cir. 1994) ("Appropriate statistical evidence can . . . be sufficient to establish a pattern and practice of discrimination . . . ."); E.E.O.C. v. Chi. Miniature Lamp Works, 947 F.2d 292, 297 (7th Cir. 1991) (stating that a *prima facie* case for a pattern or practice of disparate treatment can be established by statistical evidence showing "substantial disparities," shored up by evidence of general policies or specific incidents); Shidaker v. Tisch, 833 F.2d 627, 630 (7th Cir. 1986) (disparate impact case, but noting that "in order to make out a *prima facie* case of discrimination under a disparate treatment 'pattern and practice' theory, a

plaintiff must compare the percentage of minorities or women in the employer's workforce" with the people in the labor force who possess the relevant qualifications); <u>Coates v. Johnson & Johnson</u>, 756 F.2d 524, 532 (7th Cir. 1985) (in a pattern-or-practice case, "[t]he plaintiffs' prima facie case will thus usually consist of statistical evidence demonstrating substantial disparities in the application of employment actions as to minorities and the unprotected group, buttressed by evidence of general policies or specific instances of discrimination").

In their motion for partial summary judgment, the plaintiffs go further, explaining that the statistical analyses (Neumark's analyses) show such a gross disparity between the demographics of the defendants' hires, promotions and terminations and those in the relevant labor market that, standing alone, the statistics prove the plaintiffs' *prima facie* case. In support of this claim, the plaintiffs correctly state that the Supreme Court and the Seventh Circuit have stated that in the appropriate case, statistics alone can prove a *prima facie* case of discrimination in a pattern-or-practice case. The Supreme Court has held that "[w]here gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination." <u>Hazelwood Sch. Dist. v. United States</u>, 433 U.S. 299, 307-08 (1977) (citing <u>Teamsters</u>, 431 U.S. at 339). Likewise, the Seventh Circuit has explained that "[r]eliance on statistical evidence by no means diminishes the plaintiff's obligation to prove discriminatory intent—but in some cases, statistical disparities alone may prove intent." <u>O&G Spring</u>, 38 F.3d at 876.

But the issue the defendants have raised in the motion that is the subject of this order is not whether statistics play an important role in pattern-and-practice cases, or whether it is possible for statistics alone to suffice to prove a plaintiff's *prima facie* case in a pattern-and-practice case. The issue is whether *Dr. Neumark's* statistics are the kind of "appropriate statistical evidence" that suffice to prove—if not standing alone, then buttressed by other evidence—the plaintiffs' *prima facie* case that the defendants engaged in a pattern or practice of discrimination sufficient to allow the court to grant them partial summary judgment, or that the plaintiffs have met the Rule 23 standard for proceeding as a class action. "[S]tatistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." <u>Teamsters</u>, 431 U.S. at 340. "[S]trong statistics may prove a case on their own, while shaky statistics may be insufficient unless accompanied by additional evidence." <u>O&G Spring</u>, 38 F.3d at 876 (citing <u>Teamsters</u>, 431 U.S. at 340; <u>Chi. Miniature</u>, 947 F.2d at 300-01). Statistics have limited value; they "can only show a relationship between an employer's decisions and the affected employees' traits; they do not show causation." <u>Radue v. Kimberly-Clark Corp.</u>, 219 F.3d 612, 616 (7th Cir. 2000). Given the role statistics play in pattern-or-practice cases, the soundness of the statistical analyses matters. "The pattern-or-practice case starts with a stronger showing than the individual disparate treatment case; the 'prima facie case' under *McDonnell Douglas Corp. . . .,* supports only a weak inference of discrimination,

while the statistical showing in a pattern-or-practice case leaves a smaller possibility of race-neutral conduct." Mister v. Ill. Cent. Gulf. R.R. Co., 832 F.2d 1427, 1434 (7th Cir. 1987). And when a plaintiff relies on "statistically significant" disparities revealed by its statistical evidence, one must keep in mind that "the finer points of significance-testing are pertinent only if the analyst has formulated the hypothesis correctly and decided what pattern (if established) will confirm or refute that hypothesis." Id. at 1431.

The parties each have rooted through the Seventh Circuit's discrimination cases to find fact patterns that approximate the facts in this case. Many of those cases are not helpful because the lower courts addressed the statistical evidence in the context of summary judgment or at trial. The parties sifted through decisions from the Seventh Circuit and other courts to find sentences that support their respective positions; given the many cases on the subject, each was able to find sound bites that, taken in isolation, would mandate a ruling in their favor. Both parties succumbed to the temptation to try their cases; the plaintiffs repeatedly emphasized the dramatic disparities Neumark's analyses showed, while the defendants previewed how they might decimate his conclusions on cross-examination.

In most respects, these arguments were beside the point. In considering a challenge to the admissibility of an expert witness' opinions or testimony, the court's role is to ensure that the expert provides "[p]ertinent evidence based on scientifically valid principles." Daubert v. Merrell Dow Pharm., Inc., 509 U.S.

579, 597 (1993). The court concludes that Dr. Neumark's opinions and analyses do not fit this bill.

### III.    Dr. Neumark's Opinions

A.    <u>The September 2016 Report (Dkt. No. 88-2)</u>

1.    *Qualifications*

In the September 2016 report the plaintiffs attached to their motion for class certification, Dr. Neumark—a professor of economics at UC-Irvine and a labor economist who has "done extensive research on labor market discrimination, including methods for measuring and testing for discrimination" that he indicates "have been adopted by many other researchers"—indicated that he had published approximately twenty-five peer-reviewed journal publications "on discrimination based on race, ethnicity, sex, or age." Dkt. No. 88-2 at 4. He indicated that he had published studies in edited books and published his own book "on sex discrimination and sex differences in labor markets (based on [his own] papers)." <u>Id.</u> He explained that the goal of his research was "to better understand the role of discrimination versus other explanations of differences in labor market outcomes by race, ethnicity, sex, or age." <u>Id.</u>

Neumark recounted that he had held positions "at the Federal Reserve Board, the University of Pennsylvania, Michigan State University, and the Public Policy Institute of California." <u>Id.</u> He was, at the time of the report, a research associate with the National Bureau of Economic Research and a research fellow at the Institute for Study of Labor in Germany. <u>Id.</u> He indicated

that at UC-Irvine, he directed "the Economic Self-Sufficiency Policy Research Institute." Id.

Neumark explained that the plaintiffs were paying him $450 per hour for his work. Id. at 5. At the end of his introduction, he provided the following qualifier:

> It is important to note that this analysis is based on my best current understanding of the data we have on Infosys applicants and employees, and the other information with which I have been provided. It is possible that I will learn more about the Infosys data, company procedures, and other matters in the course of this case, which could lead to changes in the analysis and findings.

Id.

### 2. *Summary of Findings*

Neumark's September 2016 report is thirty-three pages long with forty-six pages of appendices. At the outset, he provided a summary of his findings:

> 6. First, analysis of Infosys and external benchmark data are strongly consistent with Infosys discriminating in favor of South Asians (and Indians) in hiring employees placed in United States-based positions. For example, from 2009 through 2015, 89.39% of Infosys' United States workforce was South Asian while only 11.45% of the United States' Computer Systems Design and Related Services industry was South Asian. Thus, the share of South Asian workers in Infosys' United States-based workforce, when compared to the relevant labor market, is 301.17 standard deviations higher, and the statistical likelihood that this disparity is due to chance—as opposed to a systematic difference in hiring favoring one group over the other—is less than 0.0000001%, or less than 1 in 1 billion (Table 1). When limiting the analysis or the relevant labor market to only those positions within the United States' Computer Systems Design and Related Services industry that are most common at Infosys, the share of South Asian workers is 20.28%, compared to 89.39% at Infosys. Based on this comparison, the share of South Asian workers in Infosys' United States-based workforce, when compared to the relevant labor market, is 201.88 standard deviations higher, and the statistical likelihood that this disparity is due to chance is less than 0.0000001%, or less than 1 in 1 billion. When doing the same

analysis for Indians and non-Indians in the Computer Systems Design and Related Services industry, and the positions most common at Infosys, the numbers are similarly stark. Respectively the standard deviations are 302.16 and 202.46 (Table 3).

7. Further, the data are strongly consistent with Infosys discriminating in shaping its own applicant pool in the United States to favor South Asians and Indians. And from this applicant pool, South Asians and Indians receive job offers at considerably higher rates that non-South Asians and non-Indians.

8. Second, analysis of Infosys' promotions data provides evidence that is strongly consistent with Infosys discriminating in favor of South Asians and Indians in promotions. While 57.74% of Infosys' Indian employees in the United States had job roles that ended in promotions to a higher job level, only 20.85% of its non-Indian employees were promoted to a higher job level—a difference of 53.45 standard deviations (Table 12). The statistical likelihood of obtain[ing] either of these results by chance is less than 0.0000001%, or less than 1 in 1 billion.

9. Third, analysis of Infosys' termination data provides evidence strongly consistent with Infosys discriminating against non-South Asians and non-Indians in termination decisions. Among all Indians whose employment with Infosys ended, 11.4% were asked by Infosys to leave, while among all non-Indians whose Infosys employment ended, 22.8% were asked to leave—a standard deviation difference of 11.57. The statistical likelihood that this result was obtained by chance is 0.0000001%, or less than 1 in 1 billion (Table 15).

10. To summarize, in the period covered by the complaint, Infosys employed 46,979 workers in 134,113 roles in the United States. Compared to the relevant labor market, the Infosys workforce was composed of a remarkably disproportionate share of South Asians, and similarly a remarkably disproportionate share of Indians (a slightly narrower group than South Asians). Across the different analyses this report covers, these percentages were approximately 89%, versus about 11%-20% in the relevant labor market. Infosys hires were also disproportionately South Asian or Indian to a remarkable degree—approximately 75%, versus approximately 11%-20% of employees in the relevant labor market. The applicants to Infosys were also highly disproportionately South Asian or Indian. Despite an employment share of about 11%-20% South Asian or Indian in the relevant labor market, Infosys' applicants were around 45% South Asian or Indian. And even when it received applicants who were not South Asian or Indian, Infosys was more likely to offer

jobs to applicants who were South Asian or Indian. The apparent favorable treatment of South Asians or Indians continued once employment commenced. Promotion rates for South Asian or Indian employees were about 58%, compared to around 21% for non-South Asian or non-Indian employees. Separation rates of non-South Asian or non-Indian employees were much higher—approximately 51% versus 8%—and in particular the rate of company-initiated separations was double for non-South Asians or non-Indians— about 23% versus 11% for South Asians or Indians. Along all of these dimensions I have examined, the statistical evidence is strongly consistent with Infosys discriminating against non-South Asians and non-Indians in hiring, recruitment, promotions, and terminations.

Id. at 5-7.

### 3. *Methodology*

Neumark explained that he used a three-step analysis. Id. at 7. First, he indicated, it was "necessary to define the relevant labor market." Id. Second, it was necessary "to determine what Infosys' workforce would look like absent discrimination in favor of South Asians (and Indians);" he called this the "null hypothesis." Id. Finally, he stated that it was necessary to "compare the null hypothesis with the actual composition of Infosys' United States-based workforce, and determine the statistical strength of the magnitude of disparity between the two." Id. at 7-8. He measured this disparity in "standard deviations"—"the ratio of the estimate of the difference between the observed representation of South Asians (or Indians) and the representation under the null hypothesis (computed as the difference between what is observed at Infosys, and what is observed in the ACS[6] data), divided by the standard

---

[6] Later in the report, Neumark explained that "ACS" is the acronym for the American Community Survey. Dkt. No. 88-2 at 9.

deviation of that estimated difference." Id. at 8 n.2. He explained that "the more standard deviations from the null hypothesis the representation of South Asians (or Indians) at Infosys is, the less likely it is that a given result was due to chance, as opposed to a systematic difference in hiring," and that "[a] disparity of two standard deviations is generally sufficient to show that a result is extremely unlikely (less than a 5% probability) to be caused by chance." Id. at 8.

At step one, Neumark defined the "relevant labor market" as "the market for United States' computing workforce." Id. at 9. He said he defined that market broadly—"simply the industry—specifically, the Computer Systems Design and Related Services Industry in which Infosys operates"—and more narrowly—"the occupations within this industry that are the three most common occupations at Infosys: Computer and Information Systems Managers . . ., Computer Systems Analysists . . ., and Software Developers, applications and systems software . . . ." Id. He explained that using these three occupations to define the market was "appropriate" because they made up 98% of Infosys' U.S.-based workforce, thus providing "external benchmarks" against which to compare Infosys's own workforce; he also asserted that it was appropriate to compare Infosys' hires to its own applicant pool, and that these occupations provided an "internal benchmark" by which to do so. Id.

Neumark obtained his data on the U.S. computer workforce from the American Community Survey for the years 2009-2014. Id. He explained that the ACS provided "a large and detailed sample of the United States population,"

surveying 1% of the U.S. population annually, and he asserted that the sample sizes "are large enough to provide accurate estimates of the composition of the workforce by industry and occupation, for large industry and occupation categories." Id. He asserted that the ACS contained "detailed information on industry and occupation of employment, and on race, ethnicity, and birthplace." Id. He explained, however, that while both the ACS data and the Infosys data used the racial classification "Asian," neither used the classification "South Asian." Id. at 9 n.4. Neumark considered the ACS data only for adults aged 18 to 65. Id. at 9. Neumark also identified the Infosys-provided data he'd used for the analysis, explaining that a "new hire" was anyone with a date of hire after January 1, 2009. Id. at 10. He obtained data on *applicants*, as opposed to hires, from the two software systems Infosys uses to manage applications—one called "SAP" and one called "Kenexa." Id. The SAP data covered May 2010 through August 2013; the Kenexa data covered April 2013 through August 2015. Id.

Neumark then blended steps two and three of the analysis—comparing the "null hypothesis," or the percentages reflected in the relevant labor market under his broad and narrow definitions, with the percentages at Infosys. He started with the workforce and new hires. Using the broad definition of the labor market—the market for the United States' computing workforce—Neumark stated that the ACS data showed that the U.S. computer workforce consisted of 11.45% South Asians and 88.55% non-South Asians. Id. He explained that under the null hypothesis "of no discrimination based on

ethnicity," he would expect the Infosys United States-based workforce "to consist of approximately the same percentages of South Asian and non-South Asian workers as in the relevant labor market." Id. He said he'd also expect Infosys to hire for positions in the U.S. at about the same percentages of South Asians and non-South Asians as the relevant labor market. Id. at 10-11. Neumark reports, however, that his analysis showed that Infosys' U.S.-based workforce consisted of 89.39% South Asians and only 10.61% non-South Asians; he stated that the difference between the percentages at Infosys and the percentages in the broader U.S. market was 301.17 standard deviations. Id. at 11. Using the narrower definition of the relevant market—the three occupations Neumark had identified—Neumark stated that the U.S. workforce consisted of 20.28% South Asian individuals and 79.72% non-South Asians, 201.88 standard deviations from the Infosys percentages. Id. He stated that between January 1, 2009 and the end of 2015, 75.18% of Infosys' U.S. hires were South Asian, while the U.S. computer workforce consisted of 11.45% South Asians, a difference of 194.81 standard deviations. Id.

> In a footnote, Neumark stated the following:

> South Asian ethnicity was determined using birthplace from [a particular data set provided by Infosys]. South Asians include the following ethnicities: Indian, Sri Lankan, Bangladeshi, Pakistani, Burmese, Nepalese, and Afghan. If an Infosys employee was born outside of a South Asian country, then the list of South-Asian last names at Infosys was used to determine ethnicity, with potentially non-South-Asian names recoded as non-South-Asian.

Id. at 13, n.8. Similar footnotes appear throughout the report for different parts of the analysis.

Neumark conducted the same analyses regarding national origin, comparing the national origins (particularly, Indian) of Infosys' workforce with the broad and narrow definitions of the relevant labor market and finding standard deviations in the hundreds. Id. at 14-16.

Neumark also discussed "the external benchmarks and hiring of only U.S. citizens," stating, "[t]hat is, deputees are excluded." Id. at 18. In stating that the "share of Indians among Infosys hires of U.S. citizens [was] higher than in the external benchmarks from the ACS," Neumark dropped a footnote that said, "There are only 5 non-Indian South Asian Americans [sic] hires in the Infosys data. Due to the small sample size of applicants who are South Asian but not Indian, the results are virtually identical to the analysis using Indian applicants." Id. at 18 n.12. This information appears in other footnotes in other sections of the report. Neumark concluded that for the broader U.S. market, "the share Indian in the relevant labor market is 11.25%, and the share non-Indian is 88.75%," while "among U.S. citizens hired at Infosys, 26.98% are Indian, and 73.02% non-Indian," 28.69 standard deviations. Id. at 18. For the narrower market, "the percent Indian in the relevant labor market is 20.02% Indian and 79.98% non-Indian, compared to 26.98% Indian and 73.02% non-Indian among Infosys U.S. citizen hires," 9.78 standard deviations. Id. at 18-19.

Neumark then included a section titled "Shaping the Applicant Pool and Hiring from the Applicant Pool." Id. at 21. He explained that Infosys kept data on "applications by United States-based applicants for United States-based

positions." Id. He said that under the null hypothesis, he would expect Infosys'

applicant pool in the United States to closely mirror the relevant labor market.

Id. He concluded that the ACS data showed that 11.53% "of the United States'

Computer Systems Design and Related Services industry (all positions) is

Indian, while the share of Infosys' applicants that are Indian is 45.09%,"

183.94 standard deviations. Id. For the narrower definition of the relevant

market, 20.45% "[were] Indian—again, compared to 45.09% of Infosys

applicants." Id. In this part of the analysis, Neumark said he had reviewed

deposition transcripts and declarations, which led him to understand "that the

disparity in Infosys' applicant pool is apparently due at least in part to

deliberate efforts to include South Asians and Indians and to exclude non-

South Asians and non-Indians." Id. at 22 n.15. He cited to deposition

testimony and declarations from Samuel Marrero, a former recruiter with

Infosys who worked in its Plano, Texas office starting in October 2011, see dkt.

no. 94-44, and the declaration of Davina Linguist, an Infosys recruiter who

alleged that she had not received a raise or promotion when others of South

Asian race or Indian national origin had, see dkt. no. 94-5.

Neumark stated that "[e]ven accepting the flawed applicant pool," he

would expect under the null hypothesis that South Asian and Indian

applicants would "receive offers of employment at approximately equal rates as

non-South Asian and non-Indian applicants." Id. at 23. He indicated that the

Kenexa data (covering applicants between April 2013 and August 2015) showed

that Infosys made written offers to 4.14% of Indian applicants versus 3.58% of

non-Indian applicants, 5.67 standard deviations higher. Id. He stated that he reviewed the SAP date—covering applicants from May 2010 through August 2013—and found that Infosys made offers to 7.72% of Indian applicants versus 6.12% of non-Indian applicants, 8.63 standard deviations higher. Id. at 23-24. He stated that when he combined the Kenexa and SAP data, Infosys made offers to 5.28% of Indian applicants versus 4.44% of non-Indian applicants, 9.25 standard deviations higher. Id. at 24.

Having analyzed Infosys' hires, Neumark applied his three-step analysis to Infosys promotions. He explained that Infosys recorded employees' job history; each job (or role) that an employee had was "recorded with their job title, a beginning date, and an end date." Id. at 26. The data also included the job level, the "work stream in which it was located," and the employee's termination date. Id. Neumark explained how many employees and how many job roles were included in this data, nothing that on average, an employee held 2.9 roles. Id. He defined "promotions" as "a vertical move upward in job levels." Id. at 27. He explained how he'd coded for the job levels, based on the two ways Infosys had identified them during the relevant period. Id. at 27-28. He stated that "each change in role" was considered a "unique observation," and stated that he'd calculated that there was a "55.40% promotion rate when a role is changed." Id. at 28.

Turning to the definition of the relevant labor market, Neumark defined that market as "Infosys' workforce in the United States from August 1, 2009 to 2015," and asserted that it was an appropriate market "because promotions

occur only for those already employed at Infosys." Id. at 29. He then turned to the comparison of the null hypothesis with the data, and concluded that "[o]f all Indian employees who were employed at some point between 2009 and 2005, 57.74% were promoted when switching roles," compared to 20.85% "[f]or non-Indian employees," 53.45 standard deviations. Id.

Finally, Neumark applied his three-step analysis to employee terminations. He stated that the Infosys data codes indicated that 16.44% of employment separations were due to "Company Initiative," which he interpreted to mean involuntary termination or discharge. Id. at 30. Neumark opined that it was "likely . . . that this number understates the true number of involuntary terminations, as employees may be pressured to resign or may be given the option of resigning instead of being fired, and not coded as 'Company Initiative.'" Id. at 30-31.

He again defined the relevant labor market as Infosys' workforce in the U.S. between 2009 and 2015, "because separations of employment can only occur among Infosys employees." Id. Comparing the relevant workforce with the null hypothesis, Neumark concluded that "[o]f all Indian employees who were employed at some point between August 1, 2009 and 2015, 7.55% had separations of employment (3,169 employees)," while for non-Indian employees, "the separation rate was 50.64% (2,532 employees)," 88.21 standard deviations. Id. at 31. Looking specifically at separations coded as "Company Initiative," Neumark stated that 22.79% of non-Indians separated at "Company

Initiative," compared to 11.36% of Indians, 11.57 standard deviations. Id. at 32.

Neumark attached a nine-page appendix explaining how he matched Infosys and ACS data on "occupational structure." Id. at 34-42. He also provided a four-page appendix titled "Data on Ethnicity/National Origin." Id. at 43-46. This appendix explained that while ACS race data was coded into "broad categories of Asian, white, black, Hispanic, and other," it also provided "classifications of national origin, which allow[ed] [him] to identify Indians and South Asians." Id. at 43. Infosys data, however, coded employees as "white, Asian, Hispanic/Latino, black/African-American, American Indian, Native Hawiian/Pacific Islander, or two or more races." Id. The Infosys data coded race for 86% of employees; "the remainder do not report in which case they are excluded from the analysis by race/ethnicity." Id. Neumark explained:

> 3. The race, ethnicity classifications in the Infosys data do not differentiate between someone of Indian or Southeast Asian descent and someone of, for example, Chinese descent; both groups would be coded as Asian. There is information on which employees were born in India or other countries from [records provided by Infosys]. For these records, of course, it is straightforward to identify South Asians or, more narrowly, Indians. The challenge is identifying South Asians or Indians among applicants, and among employees not born in South Asian countries or in India.
>
> 4. To attempt to identify employees and applicants in these groups, I use data on Infosys employees born in South Asian countries or India (separately). In particular, I identify all surnames from the employee file . . . that are associated with an employee who was born in a South Asian country or in India, and use these names to identify South Asians or Indians among records on employees not born in those countries, or among records on applicants. This implies that I match 100% of South Asian or Indian employees born in a South Asian country or in India. However, it is possible to falsely identify South Asians or Indians among Infosys employees not born

in India, and among applicants. This is mot likely to happen if a name appears in the Infosys data for an employee born in a South Asian country or in India, but it is a more Western name.

5.      To reduce the changes of a false identification, I attempted to identify non-South Asian or non-Indian names that appear in the list of surnames associated with employees born in South Asian or in India. There are 21,093 unique surnames among Infosys employees. To look for misleading names, I restrict my search to surnames that are associated with two or more employees, and for which there is the potential for misclassification because there is at least one employee born in a South Asian country or in India, and at least one employee not born in a South Asian country or in India with that name. This led to a list of 1,273 surnames. Reading through this list, I identified names that do not appear to be Indian— specifically, identifying 63 surnames that potentially identify large numbers of non-South Asians or non-Indians and could lead to false identifications in the data. These surnames, along with their frequency at Infosys and the share of employees with that surname who were born in a South Asian country or in India, appear in Appendix Table 2.1. Note that the percentages are very high. But that is because, as documented below, South Asians and Indians are so strongly over-represented at Infosys.

Id. at 43-44. In reference to the sixty-three surnames that, in Neumark's view,

could lead to false identification, Neumark stated in a footnote, "These are

names that clearly appear to be non-South Asian/non-Indian. To be sure, this

list could be refined further, but the effects are likely to be extremely

negligible." Id. at 44 n.40.

Appendix Table 2.1 is titled "Non-Indian Surnames Held by Indian

Employees at Infosys." Id. at 45. The table is divided into three columns, titled

"Surname," "Share Indian" and "Frequency." Id. The highest "share Indian"

percentage is 95%—the names "Mathew" and "Sebastian." Id. The highest

"frequency" name is "Thomas." Id. Several names appear with 50% "Share

Indian" and 2 "Frequency"—Andrew, Benjamin, Carney, Clement, Dawson,

Gabriel, Grace, Newton, Norris, Raymond, Richard, Rubin, Souza, Stanley and Stone. <u>Id.</u> at 45-46.

In sum, Neumark considered an Infosys *employee* to be Indian or South Asian if (a) the employee was born in India or South Asia, or (b) the employee's last name matched the last name of another Infosys employee born in India or South Asia and was not one of the sixty-three "Western" names removed from the list. He considered an *applicant* to be Indian or South Asian if the applicant's last name matched the last name of an Infosys *employee* born in India or South Asia and was not one of the sixty-three "Western-sounding" names removed from the list. If an employee or applicant did not meet one of the preceding criteria, that employee or applicant was considered non-Indian or non-South Asian.

B.    <u>The February 2017 Report (Dkt. No. 123-7)</u>

In the February 2017 report Neumark prepared after seeing the defendants' critiques of his methodology, Neumark first said he'd "done the external benchmarks analysis state by state, based on the location at which Infosys employees spent the most time in the United States." Dkt. No. 123-7 at 3. He stated that he'd rank-ordered the observations by the number of Infosys employees, "so it is easy to look at the evidence for the states where Infosys has the largest presence." <u>Id.</u> He provided a chart that listed the state, the "Share of South Asian ACS respondents within Computer Systems Design and Related Service industry," the "Total ACS respondents within Computer Systems Design and Related Services industry," the "Share of South Asian Infosys

Employees," the "Total Infosys Employees" and the "Standard deviations." Id. at 4. (The chart does not include all fifty states; Neumark explained that he showed states only if "the number of observations multiplied by the shares South Asian and non-South Asian in both samples both exceed 5, so that the large-sample statistic applie[d]." Id.)

Next, as to promotions, Neumark said he'd modified his analysis "to exclude promotions that occurred outside the United States," and that he had included only individuals "employed at Infosys for a minimum of 18 months, consistent with the class definition." Id. at 5. He also "corrected for a coding issue that had resulted in a number of incorrectly classified promotions as a result of Infosys' September 2009 transition from letter job levels to number job levels." Id. And he provided a table "that looks only at promotions after September 2009 to avoid this transition issue altogether." Id.

For terminations, Neumark compared the rate of "Company Initiative" involuntary terminations "for base employees, relative to all base employees, for terminations occurring in the United States." Id. at 8. In a footnote, he indicates that when he prepared the initial report, he "did not know how to categorize employees as base or deputees," and that he was "unaware of data that distinguished between terminations occurring in the United States versus those that occurred elsewhere;" he indicated that he had corrected for these issues. Id. at 8 n.5.

He explained why he'd considered only written job offers and not verbal ones, in response to a criticism by the defendants' expert. Id. at 10.

Finally, he wrote:

10. [The defendant's expert] claims that my analysis of job offers reaches the wrong conclusion because my method of classifying applicants as non-South Asian based on names is flawed. In particular, he notes, correctly, that I do not require a last name in the applicant file to match the name of an employee born outside of the South Asian countries to classify them as non-South Asian. But [the defendants' expert] admits there is no perfect way to identify race using names. . . . However, there is a logic to the method I used. In particular, because Infosys employs relatively few non-South Asian employees, the list of non-South Asian names on which to match is quite restricted. It is also important to note that [the defendants' expert] significantly overstates the severity of the classification problem. In his Appendix B, he tabulates names of people who self-identify as Asian, and rank-orders the names in terms of their frequency for those who self-identify as Asian. Note that what he has done here, it appears, is two things: First, [he] also does matching to non-South Asian names to classify non-South Asians the same way I classified South Asians. He then lists the names of those not matched who self-identify as Asian. Then, in the third column, he lists the number with these names who do *not* self-identify as Asian. Unsurprisingly, since he has rank-ordered and selected these based on self-identification as Asian, the latter numbers are small.

11. In fact, it appears that my classification of applicants as South Asian or non-South Asian appears to work rather well. In Table 4.1, I show the rank-orderings by name frequency of applicants classified as non-South Asian, as in my report. This table suggests that the most common names of those classified as non-South Asian are indeed non-South Asian. Although "Manthri" does show up as the most common name (for which everyone self-identifies as Asian), after this, most of the names do not appear to be South Asian, even though many self-identify as Asian.

Id. at 10-11.

There follows a table (Table 4.1) titled "Unmatched or Matched Names in Applicant File, Classified as Non-South Asian, Top 50, Rank-Ordered by Frequency." Id. at 12. It lists columns title Last name, Total applicants, "Self-identify as Asian" and "Unmatched to employees born outside SA." Id. It shows

that there were 339 total applicants with the last name "Manthri," all of whom self-identified as "Asian;" the "Unmatched to employees born outside SA" column indicates "Unmatched." Id. A number of other names were unmatched despite having numeric significance in the "Total applicants" column and having most or all of the applicants with that name self-identifying as "Asian"— "bharadia," "araveeti," "m," "v," "venkatramanan," periyasamy," "sinharoy" and "maitreyan." Id.

## IV.   The Parties' Arguments

### A.   The Defendants' Opening Brief (Dkt. No. 98)

The defendants first challenge Neumark's assertion that he compared the racial composition of Infosys' workforce to that of the relevant labor market and his conclusion that the disparities he observed between racial groups could not have happened by chance. Dkt. No. 98 at 10. The defendants assert that Neumark aggregated any employee who worked in the United States for any time between August 1, 2009 and the end of 2015—both in and outside of India. Id. They maintain that Neumark ignored that "81% of the Infosys workforce population is composed of 'Deputees'—employees hired *in India*[7] and transferred to work in the United States on specific jobs for temporary periods of time."[8] Id. The defendants report that at his deposition, Neumark could not

---

[7] In every instance where quoted language from the defendants' brief is italicized, the emphasis is in the original. The defendants make generous use of italics.

[8] The defendants frequently reference and rely on their own expert, Bernard Siskin, Ph.D., director of specialty consulting firm BLDS, LLC and a former

"distinguish Deputees from 'Base Employees,' *i.e.*, employees hired in the United States to perform work in the U.S." Id. at 11. They maintain that "[t]his labor market error alone explains the disparity observed by Dr. Neumark." Id. They further argue that none of the studies Neumark conducted of the defendants' data "examine or control for a single explanatory variable that could account for the racial disparities that" he reported. Id.

The defendants then turn to Neumark's analysis of applicants, asserting that he "systematically mis-classifie[d] the race of job applicants." Id. They explain that "because Infosys does not determine whether job applicants are South Asian (or Indian)[9], Dr. Neumark invents a 'name matching' method, notwithstanding his complete lack of any expertise in such methodologies." Id. The defendants point out that Neumark "classifies as South Asian only those applicants whose surname matches that of a South Asian person *in Infosys's employee database* (and only if the applicant's surname does not sound non-South Asian to Dr. Neumark)." Id. at 11-12. They argue that applicants without matching surnames—"regardless of their self-identified race or South Asian names"—are not classified as South Asian, even though "*a majority* (54%) of the 245,972 total applications have a surname without any match." Id. at 12. The

tenured faculty member and chair of the Department of Statistics at Temple University in Philadelphia. See Dkt. No. 97-3.

[9] The defendants assert that this is "not surprising since Infosys' self-reported race categories follow those required by the OFCCP. 'South Asian' (or Indian) is not a recognized category." Id. at 11 n.4. OFCCP is the U.S. Department of Labor's Office of Federal Contract Compliance Programs. https://www.dol.gov/agencies/ofccp.

defendants maintain that rather than disregarding applicants with non-matching names, or finding some way to classify them, Neumark "mistakenly assumes that all un-identified applicants are non-South Asian," and they argue that this error renders any analysis that relies on his name-matching methodology unreliable. Id.

The defendants also assert that Neumark ignored the racial self-identification that Infosys collects for some applicants, arguing that he could have used it to test the reliability of his "novel methodology." Id. They explain that "self-reported race is generally available" in the Kenexa software system. Id. at 12 n.6. They say that 14% of the applicants "who self-reported a race *other than Asian* are classified by Dr. Neumark as Indian," and that "43% of employees who report their race and who Dr. Neumark classifies as non-South Asian self-identify as Asian." Id.

The defendants argue that Neumark failed to account for the "obvious effect of applicant preferences, including the 'greater preference by South Asians [relative to non-South Asians] in the U.S. labor market for an Indian employer." Id. at 12. They contend that Neumark failed "to account for minimum job qualifications, applicant job history, applicant preferences, or even *who actually applied for any particular job*, meaning his disparities do not reflect different treatment of *similarly situated* people." Id. at 12-13.

As for promotions, the defendants argue that Neumark did not compare "eligible, similarly situated employees who did and did not receive promotions." Id. at 13. They assert that Neumark instead relied "on a single data file . . . that

**RA104**

contains the 'role' history . . . for every Infosys employee who worked in the United States between August 1, 2009, and the end of 2015, *including roles those employees held overseas—i.e.,* roles and promotions with no conceivable relevance to this U.S. litigation." Id. The defendants characterize Neumark as having "gauge[d] the relative size of two groups of South Asians—employees who changed roles *with* promotions and employees who changed roles *without* promotions—and then compare[d] *that* facially meaningless ratio to the proportion of *non*-South Asians who changed role with and without promotions." Id. They assert that Neumark analyzed the promotions of South Asian employees "*in India* (*i.e.,* promotions of Deputees before they transferred to the U.S.) to conclude that Infosys discriminated when promoting South Asians *in the United States,*" maintaining that "*over half of the promotions [Neumark] observes* in his promotions study occurred in India." Id. at 13-14. They also note that the plaintiffs defined the promotions class as "non-South Asian employees not promoted *after 18 months of working in the United States,*" but that Neumark did not account for this time limitation. Id. at 14.

The defendants allege that in analyzing terminations, one of Neumark's analyses included voluntary terminations and that he classified as not terminated "the thousands of Deputees whose employment ended after the termination of their United States work and return to India (reflecting Infosys' standard practice of transferring Deputees to India before formally terminating them)." Id. As to Neumark's analysis of company-initiated terminations, the defendants assert that Neumark "compares the relative size of two groups of

South Asians—employees who leave Infosys voluntarily and involuntarily—and measures that arbitrary ratio against another one: the proportion of *non*-South Asians who left voluntarily versus involuntarily." Id. The defendants argue that this approach is illogical:

> Assume, for example, that a company employs 10,000 Indian and 10,000 non-Indian employees, and terminates (at the company's initiative) 100 Indian and 100 non-Indian employees. At the same time, 900 Indian employees decide to leave voluntarily, while only 400 non-Indian employees do so. Though Indian and non-Indian employees are terminated at precisely the same rate, Dr. Neumark would report that Infosys discharged only 10% of the departing Indian employees whereas it discharged 20% of the departing non-Indians—an observation that has nothing to do with discrimination in terminations.

Id. at 14-15.

The defendants assert that Neumark did not consider "any of the obvious explanations (such as performance, tenure, business unit, etc.) for the disparities he observes, despite Dr. Neumark's access to the necessary information." Id. at 15.

After discussing these purported flaws, the defendants turn to their legal argument. They begin by asserting that the court should not wait until after it decides the class certification motion to decide whether to exclude Neumark's opinions. Id. at 15. Citing Am. Honda Motor Co. v. Allen, 600 F.3d 813, 815-16 (7th Cir. 2010), the defendants argue that if an expert's report is critical to class certification, the court "must" rule on the expert's qualifications or submissions before ruling on the class certification motion. Id. They maintain that the plaintiffs' reliance on Neumark's opinion is critical to class certification and indicate that the plaintiffs have acknowledged as much. Id. at 16.

The defendants then turn to the factors courts must use in evaluating expert testimony—the factors described in, <u>Daubert</u>, 509 U.S. at 589-90, and Federal Rule of Evidence 702. <u>Id.</u> at 16-17. They argue that Neumark's opinion is not admissible because it is not relevant, linking this to the requirement that an expert's opinion must assist the trier of fact. <u>Id.</u> at 18. The defendants explain that in a Title VII employment discrimination case, this means "that the evidence must suggest that the protected class was subject to adverse action for discriminatory reasons." <u>Id.</u> (citing <u>Mozee v. Am. Comm. Marine Serv. Co.</u>, 940 F.2d 1036, 1045 (7th Cir. 1991); <u>Radue</u>, 219 F.3d at 616-17). They indicate that in another case, Neumark himself explained that the way an expert typically makes such a showing is "through a regression analysis, in which potential causal variables other than discrimination are studied." <u>Id.</u> They quote Neumark as saying that the "large body of research on discrimination in labor markets" proceeds by "estimating the effects of membership in a protected group, controlling for other factors that might affect the outcome in question." <u>Id.</u> at 19.[10] The defendants assert that while, given this, one would have expected Neumark to control for explanatory non-discriminatory factors in this case, he testified at his deposition that there

---

[10] The defendants cite "Neumark Dep. Ex. 13, at 17-18 (citing Rodgers, William M. III, ed., 2006, HANDBOOK ON THE ECONOMICS OF DISCRIMINATION, Cheltenham, UK: Edward Elgar)" as the source of this quote. Dkt. No. 98 at 19. They do not provide a record cite for Neumark's deposition; it is at Dkt. No. 97-1. Exhibit 13 to that deposition is an expert witness report by Neumark dated September 25, 2008 in <u>Svyerson, et al. v. IBM</u>; the quoted language appears at Dkt. No. 97-1 at 144-45.

could be non-discriminatory explanations that he had not explored. <u>Id.</u> at 19 (citing, *e.g.,* Dkt. No. 97-1 at 63).

The defendants assert that Neumark's admissions that there were non-discriminatory explanations he didn't consider and that he did not try to understand the factors that might underlie promotion and termination decisions are "fatal to any claim of relevance." <u>Id.</u> at 20. They argue that Neumark did not consider any variables other than race—that he did not eliminate any alternative explanations for the disparities he observed and did not control for factors as obvious as, among others, work history or job performance when analyzing termination data. <u>Id.</u> at 20-21. The defendants contend that this flaw renders Neumark's opinions incapable of assisting the trier of fact in determining whether Infosys discriminates in favor of South Asians and therefore renders them inadmissible. <u>Id.</u> at 22.

The defendants also argue that even if they are "incrementally" relevant, Neumark's opinions are unreliable. <u>Id.</u> They reiterate that his opinions are scientifically unreliable because they did not consider any variables other than race or national origin. <u>Id.</u> at 23. They then assert that his opinions are unreliable because Neumark did not base them on "the proper labor market." <u>Id.</u> at 25. The defendants explain:

> Dr. Neumark says that the relevant labor market is "the market for United States' computing workforce. Neumark Rpt. 6. But while Dr. Neumark purported to limit his analysis to employees and employment actions in the United States, that is not what he actually did. Rather, Dr. Neumark includes Deputees—employees from India who are temporarily transferred to assignments in the United States—in his workforce snapshot, hiring, promotion, and termination analyses. Admittedly unaware of the difference between

Deputees and Base Employees (Neumark Dep. 57:17-20), Neumark counts a Deputee hired in India as hired domestically. Siskin Rpt. 22 (nothing less than half the "hires" Dr. Neumark includes in his study occurred in the United States). He treats promotions that occurred in India before and after Deputees work in the United States as promotions occurring in the United States for purposes of this case. *Id.* at 51-52 (explaining less than half the promotions Neumark includes in his study occurred in the United States). Yet he treats Deputees who were transferred back to India (and many of whom were terminated there) as employees in the U.S. workforce whose United States-based employment was never terminated. *Id.* at 58. In other words, Dr. Neumark selectively includes Deputees in his studies—and employment actions that occur with respect to them—without any rational basis for doing so or not doing so, and only when the inclusion of this information results in greater disparities in favor of South Asians.

Id. at 26.

The defendants reiterate that 81% of Infosys' employees working in the U.S. are deputees hired in India and assert that Neumark did not consider the Indian labor market "that is qualified to (and actually does) comprise Infosys' workforce." Id. at 26-27. They say that because 81% of Infosys' workforce "(at any point in time) is from India, even if all of Infosys' domestic hires during the timeframe Dr. Neumark studies had been non-South Asian, Dr. Neumark would still have observed a statistically significant disparity between the Infosys workforce and the United States labor market." Id. at 27. Similarly, they argue that Neumark includes positive employment actions (hires and promotions) that occur with respect to deputees while they are working overseas, but ignores adverse employment actions (terminations) that occur overseas. Id. They assert that "in no event can Dr. Neumark rationally maintain that the relevant labor market is limited to just the United States while simultaneously *including* employment decisions that occurred in India to the

extent it helps Plaintiffs' position." Id. at 27-28. And they argue that Neumark provides no justification for limiting the labor market to the United States. Id. at 28.

The defendants say that Neumark's name recognition methodology is flawed and unreliable. Id. at 29. They describe his methodology as "novel," noting that it identifies every individual in Infosys' employee database who says that he or she was born in India or South Asia, assumes that each of them are of South Asian race, develops a list of unique surnames from that group, then compares that list with a list of surnames of all applicants "and assumes all applicants with surnames that match a name on the list as Indian or South Asian—*unless* the applicant [h]as a surname he subjectively identifies to sound 'Western.'" Id. And, they say, Neumark treats "*anyone* with a non-matching name as non-South Asian and non-Indian." Id. The defendants argue that the result is that Neumark "materially inflates the number of unsuccessful applicants who are deemed to be non-South Asian, and, consequently supposedly harmed by not being hired by Infosys." Id.

The defendants use the surname "Manthri" as an example. Id. They explain that the applicant data contained almost 340 applicants with that surname, and that the surname did not match any surname on Neumark's list, so Neumark treated every one of them as non-South Asian and non-Indian, without identifying any basis for doing so. Id. And they argue that he disregarded the self-identification data that Infosys did collect. Id. at 30. They report that in his deposition, Neumark admitted that he did not have any

expertise in name recognition. Id. They assert that Neumark's approach "ignores the obvious fact that a person's surname is not necessarily indicative of his national origin," citing a Fifth Circuit case criticizing the use of "Spanish-surname registration" as problematic. Id. at 30 n.17 (citing Rodriguez v. Bexar Cnty., Tex., 385 F.3d 853, 866 n.18 (5th Cir. 2004)).

The defendants argue that the court cannot determine the error rate for Neumark's name-matching methodology because it does not have one—the methodology was created for this case. Id. at 30-31. They contend that even without a known error rate, the method is unreliable because Neumark based his list on the names that show up in Infosys' employee data, not on a census of Indian or South Asian names. Id. at 31. They state that "Dr. Neumark's apparent conclusion that a list of surnames based on 46,979 employees with 21,093 unique surnames at a single company (many of whom are not Indian or South Asian) reasonably reflects the universe of surnames originating from a country of 1.2 billion people is facially absurd." Id. They argue that Neumark's method leads to "irrational results"—Indians who were not hired but did not have a surname that matched the list would be treated as non-Indians who were not hired, employees who self-reported their race as non-Asian were treated as Indian. Id. And the defendants characterize Neumark's exclusion of people whom he subjectively determined to have Western-sounding surnames as arbitrary. Id. at 32.

Finally, the defendants asserted that Neumark's individual analyses were based on flawed assumptions. Id. They say his applicant analysis treats all

applicants as if they applied for the same job, rather than factoring in the fact that applicants applied for a variety of jobs in different locations and with different qualification requirements. Id. Accordingly, they argue that he did not compare similarly situated persons. Id. at 33. He did not consider whether the applicants were qualified for the jobs they sought. Id.

The defendants criticize his promotion analysis because Neumark assumed that the only time an employee could be promoted is when that employee's role changed, without any evidence that that was the case. Id. at 34. (They compare an employee whose role draws to its natural conclusion with one who is promoted out of an active role and whose position is backfilled. Id.) They assert that Neumark did not consider the race of the employees who actually were under consideration for promotions, instead comparing the race of employees who entered new job roles but were not competing for promotions with those who entered new job roles because of promotions. Id. at 35.

The defendants criticize Neumark's termination analysis because he disregarded termination decisions that occurred in India. Id. They assert that in looking at "Company Initiative" terminations and assuming them to be involuntary, Neumark did not look at whether Indians were involuntarily terminated at higher rates than non-Indians, "which is the statistic that actually matters." Id. at 36. They point to Neumark's speculation that a downward trend in an employee's ratings could be the result of Infosys manipulating the ratings to justify the termination, asserting that there is no evidence to support this speculation. Id.

B. The Plaintiffs' Opposition Brief (Dkt. No. 123)

The plaintiffs explain that when they asked Infosys to produce "documents related to 'the demographics or statistics of Infosys' United States work force,'" a discovery dispute ensued. Dkt. No. 123 at 5. They recount that at one hearing, defense counsel told the court that Infosys had a "barn yard" of data to produce. Id. And, the plaintiffs say, Infosys *did* produce a "vast quantity of data" to the plaintiffs. Id. at 6. The plaintiffs explain that the way the data was organized made it difficult to analyze—it was hard to define promotions, difficult to track which promotions happened in the U.S. versus in India, hard to distinguish visa holders from non-visa holders, etc. Id. The plaintiffs recount that the parties had engaged in several meet-and-confers, during which the defendants told the plaintiffs that they did not have any additional documents or data about the demographics or statistics of their U.S. workforce, other than what they'd already produced. Id. The plaintiffs maintain that this representation was false, because as a contractor for the federal government, the defendants are required to "conduct affirmative action analyses." Id. at 6-7. They argue that to do this, Infosys supplies data to "PeopleFluent,"[11] which analyzes the data and annually provides Infosys with "statistical reports concerning Infosys' United States workforce and its hiring, promotion, and

---

[11] The plaintiff's opposition brief does not explain what "PeopleFluent" is. The company's website says that "[a]s a market leader in integrated talent management and learning solutions, PeopleFluent helps companies hire, develop, and advance a skilled and motivated workforce." It says that PeopleFluent provides "best-of-breed talent management software and learning solutions that help you realize the full value of your workforce." https://www.peoplefluent.com/why-peoplefluent/about-peoplefluent/.

termination practices—the very issues that are the subject of Dr. Neumark's analysis." Id. at 7.

The plaintiffs reiterate Neumark's qualifications and assert that the defendants haven't challenged them. Id. They indicate that they retained Neumark "to evaluate the data produced by Infosys in discovery to determine whether the data was consistent with discrimination by Infosys in hiring, promotions, and terminations," and they recount his conclusions. Id. at 7-8. The plaintiffs assert that many of the defendants' criticisms of Neumark's opinions "center on ancillary issues that relate to a subset of Dr. Neumark's analyses and that stem from the complexity of the data Infosys produced in discovery." Id. at 8. They note that Neumark produced a "short, supplemental report addressing, among other things, these ancillary issues," and they argue that Neumark's supplemental analyses are "consistent with his initial analyses, and continue to demonstrate strong statistical disparities in the hiring, promotion, and termination rates for South Asians versus non-South Asians (as well as Indians versus non-Indians)." Id. at 9.

The plaintiffs then explain that they served a third-party subpoena on PeopleFluent. Id. In a footnote, they state that "[d]espite repeated requests," PeopleFluent did not respond to the subpoena for six months. Id. at 9 n.12. PeopleFluent eventually did respond, producing in two batches "a variety of analyses of Infosys' demographic data to Plaintiffs, including analyses of Infosys' hiring, promotion, and termination practices." Id. at 9. (The plaintiffs assert that the first batch of information PeopleFluent provided "was

incomplete and contained over 75 corrupt and unusable files," and that it did not provide "a more robust set of data and analyses" until a month after the first production—three weeks prior to the plaintiffs' deadline for filing their replies in support of their partial summary judgment and class certification motions. Id. at 9 n.12.) The plaintiffs assert that Infosys did not "share these analyses with its own experts, misrepresentied to Plaintiffs that these analyses did not exist, and cannot attack the analyses as a product of 'misunderstanding' Infosys' data, as it does with Dr. Neumark." Id. at 9-10.

In a footnote, the plaintiffs state:

The PeopleFluent data is simpler, considerably less burdensome, and more probative than the "barn yard" of data Infosys produced in discovery (after objecting to the burden of its production). If Infosys had produced the PeopleFluent data at the outset of discovery, Plaintiffs would, in all likelihood, have promptly moved for class certification and partial summary judgment, thereby shortening the case. Production of the data would also have fundamentally altered the focus of discovery, as Plaintiffs would have requested the search of different document custodians using different search terms than those upon which the parties ultimately agreed. Thus, Infosys' withholding of the data has prolonged this case, irrevocably affected the focus of discovery and evidence to be presented to a jury, and has led to unnecessary expert analyses and briefing. At this juncture, there is no way to cure the prejudice to the Plaintiffs, putative class members, and the Court from Infosys electing not to disclose the data.

Id. at 10 n.13.

The plaintiffs then summarize what they say the PeopleFluent analyses demonstrated: that Infosys consistently employed "a 93% Asian workforce in the United States," that in 2011 it promoted 14.94% of its Asian employees compared to 5.89% of non-Asian employees, in 2014 it promoted 4.97 % of its Asian workforce and only 0.11% of non-Asians, that Infosys involuntarily

terminated between 6.67% and 12.54% of is non-Asian employees and just 0.54% to 0.75% of Asians. <u>Id.</u> at 10-11. The plaintiffs say that PeopleFluent's analyses "use the EEO racial category 'Asian,'" which, they say, "encompasses South Asian, and the vast majority of Infosys' Asian employees are South Asian." <u>Id.</u> at 10 n.14. They support the last part of this assertion—that the vast majority of Infosys' Asian employees are South Asian—by citing Dr. Neumark's report. <u>Id.</u>

The plaintiffs next address the defendants' argument that the court must decide the motion to exclude Neumark's opinions before it decides the motion for class certification. <u>Id.</u> at 12. Although they agree that the court must conduct a full <u>Daubert</u> analysis on an expert's opinions if those opinions are critical to class certification or summary judgment, the plaintiffs state that "Plaintiffs initially relied on Dr. Neumark's testimony, after which the PeopleFluent analyses were produced." <u>Id.</u> at 12. The plaintiffs state, "Because the PeopleFluent analyses provide statistical support of a pattern of discrimination, the Court can decide Plaintiffs' class certification and partial summary judgment motions based on this evidence alone." <u>Id.</u> at 12-13.

Despite this assertion, the plaintiffs go on to argue that Neumark's methodology is relevant and reliable. <u>Id.</u> at 13. They cite <u>Adams</u>, 231 F.3d at 424 and <u>Casteneda v. Partida</u>, 430 U.S. 482, 496 n.17 (1977) for the proposition that Neumark used the same methodology "typically" used in employment discrimination cases and accepted by the Supreme Court and the Seventh Circuit. <u>Id.</u> They explain that Neumark first defined the relevant labor

market (as the U.S. computing workforce for his hiring analysis and as Infosys' own workforce for the promotion and termination analyses). Id. He then asked what the results for hiring, promotion and termination would be absent discrimination, found significant disparities and calculated the likelihood of those disparities occurring by chance. Id. From the results, he drew the inference that Infosys' practices were not race-neutral. Id. at 13-14.

The plaintiffs argue that Neumark's opinion that the disparities could not have occurred by chance is relevant "[i]n a pattern or practice case brought under *Teamsters*." Id. at 14. They assert that "the Seventh Circuit has consistently found that expert testimony regarding a statistical disparity is relevant, even if the expert's analysis did not include a multiple regression analysis accounting for factors other than race." Id. (citing Adams, 231 F.3d at 427-28; and Mister, 832 F.2d at 1431). They assert that Neumark's finding that there was a "dramatic disparity" between Infosys' hiring, promotion and termination practices as to South Asians or Indians compared to non-South Asians or Indians, combined with "other evidence," satisfies the plaintiffs' *prima facie* burden under Teamsters. Id. at 15.

The plaintiffs urge the court to look at what Neumark did, rather than what he or any other expert might have done. Id. They assert that what Neumark did was perform a statistical analysis showing that the disparities he observed could not have occurred by chance, and that he "was not required to perform regression analyses to exclude the hypothetical possibility that unknown non-discriminatory factors caused the disparity." Id. at 16 (citing

<u>Adams</u>, 231 F.3d at 427; <u>Mister</u>, 832 F.2d at 1431). In response to Infosys'
argument that non-discriminatory factors might account for some of the
disparities, the plaintiffs assert that Neumark's opinion is relevant to helping
them establish their *prima facie* case, and assert that Infosys had a burden to
produce evidence of the non-discriminatory reasons and "failed to carry its
burden." <u>Id.</u>

The plaintiffs then turn to the defendants' argument that Neumark's
opinions are unreliable. <u>Id.</u> at 18. They assert that the defendants do not, "and
cannot—argue that Dr. Neumark used flawed or unreliable methodology in
determining the likelihood that random chance could account for the gross
statistical disparities in Infosys' hiring, promotions, and terminations, or in
calculating standard deviations," maintaining that Neumark's opinions "are
based on standard and reliable statistical analyses." <u>Id.</u> They deny that
Neumark offered any opinion on causation or discrimination, asserting that he
simply "determined that the statistical likelihood of Infosys achieving it[s] rates
of hiring, promotions, and terminations favoring South Asians by chance was
less than 1 in 1 billion—a finding strongly consistent with discrimination." <u>Id.</u>
They assert that because Neumark did not offer any opinions on causation, "he
does not need to live up to the scientific standards for offering such an
opinion," and return to their argument that regression analysis is not
mandatory. <u>Id.</u> at 19.

The plaintiffs disagree that Neumark improperly defined the relevant
labor market. <u>Id.</u> at 20. They say that the market he defined—"the market for

United States' computing workforce"—is "the market in which the labor is conducted and is thus the appropriate market to assess." <u>Id.</u> The plaintiffs say that the fact that "visa workers from India enter the United States labor market to fill positions does not broaden the geographic scope of the labor market, as Infosys argues." <u>Id.</u>

The plaintiffs explain that a "potential employee overseas" has to go through the time-consuming and expensive process of applying for and receiving a work visa before entering the U.S. labor force, that there is a cap on the number of foreign workers who may fill U.S. positions and that the government uses a lottery system to award visas "against the cap." <u>Id.</u> at 20-21. The plaintiffs claim that these "barriers to entry ensure that potential employees in other countries are not readily substitutable for potential employees in the United States, rendering foreign labor markets separate and distinct from a U.S. labor market." <u>Id.</u> at 21. They accuse Infosys of "confront[ing]" the congressionally mandated labor market entry barriers by "investing in and creating an 'inventory' of visa holders who can fill positions in the U.S. on a moment's notice." <u>Id.</u> The plaintiffs argue that this "inventory" "does not render all potential employees in India—or other countries—readily substitutable for U.S. employees," and assert that the "inventory" is "a product of fraud in which Infosys goes through the time consuming and expensive process of competing for and securing visas for individuals ***before positions even exist***." <u>Id.</u> at 21-22 (emphasis in original). The plaintiffs claim that the defendants' own expert has admitted that this process is illegal. <u>Id.</u> at 22. The

plaintiffs contend that "[t]o suggest that Infosys' conduct somehow broadens the world into a single labor market is to ignore the economic and regulatory barriers in place to ensure foreign workers—except those in Infosys' inventory—cannot simply travel to the U.S. to fill a job," and they reiterate the statement that the U.S. labor market is separate and distinct from foreign markets. Id. The plaintiffs also assert that the defendants' arguments in this regard are foreclosed by the Seventh Circuit's decision in Mister. Id.

As for the defendants' argument that Neumark failed to distinguish between deputees and base employees, the plaintiffs indicate that Neumark corrected for that in his supplemental report, and they argue that his "inclusion of deputee promotions and terminations occurring in the United States is consistent with PeopleFluent's analyses." Id.

Turning to what they identify as Neumark's "name recognition methodology," the plaintiffs argue that while Neumark's analysis may be "imperfect," it was "reasonably accurate and Infosys substantially overstates the effect of the limited number of misclassifications." Id. at 23. Again, the plaintiffs state that Neumark's findings "are consistent with PeopleFluent's analyses." Id. They assert that Infosys "itself recognizes that it hires a proportion of South Asians within the United States that far exceeds the relevant labor market," citing a statement by Infosys' EEO/Diversity & Inclusion Team. Id.

The plaintiffs contend that Infosys has the burden to "identify a non-discriminatory explanation for the gross statistical disparities Dr. Neumark

demonstrates in Infosys' hiring practices," and thus dismiss the defendants' argument that Neumark failed to compare similarly situated individuals. Id. at 24. They say that Neumark "was not required to look at each individual applicant's qualifications," asserting in footnotes that at Phase II of the class certification process, the defendants "will be free to" challenge the qualifications of any individual class member. Id. at 24, nn.31, 32.

As for Neumark's promotions analysis, the plaintiffs describe the defendants' assertion that there is no evidence that a role change is the only way to receive a promotion as "false." Id. at 25. And they characterize Neumark's supplemental report as "simply ignor[ing] role changes, and look[ing] only to job levels." Id. They indicate that in his supplemental report, Neumark corrected for the fact that he had not included the minimum employment period of eighteen months contained in the class description. Id. at 26. And they say that while the defendants accuse Neumark of ignoring the pool of applicants who "competed" for promotions, there is no evidence that employees at Infosys "competed" for promotions. Id.

The plaintiffs assert that Neumark's supplemental report also corrects for errors in his termination analysis, focusing only on the termination rates among base hire employees. Id. at 27. They maintain that the supplemental report moots the defendants' criticism that Neumark improperly compared termination rates for Indians versus non-Indians by comparing the rate of termination for South Asian and non-South Asians "relative to all other base employees." Id. at 28. They assert that Neumark never claimed that downward

trends in performances of terminated individuals was evidence of discrimination, arguing that "[s]ubstantial evidence exists that Infosys manipulates CRR scores[12] to favor its South Asian workforce." Id. They argue that Neumark's table showing a decline in performance ratings prior to termination "does not itself prove discrimination (and Dr. Neumark does not claim that it does), it is consistent with Infosys' practice of manipulating data to pretextually justify its discrimination aims." Id. at 29 (citing Dkt. No. 88-2 at 62).

      C.     The Defendants' Reply Brief (Dkt. No. 128)

The defendants reply that after weeks of asserting Dr. Neumark's report showed "overwhelming statistical evidence" of discrimination, the plaintiffs have shifted tactics, arguing that he did not offer any opinions on discrimination or causation and thus that he need not meet the Daubert standard for offering an expert opinion. Dkt. No. 128 at 2-3. They assert that the plaintiffs now claim that no Daubert analysis is necessary because the court can rely on the PeopleFluent reports to decide the plaintiffs' summary judgment and class certification motions. Id. at 3. The defendants conclude that the plaintiffs have conceded that Neumark's opinions are irrelevant and unreliable. And they accuse the plaintiffs of trying to substitute their own "'expert' opinions about the uninformative reports of an Affirmative Action

_____

[12] Appendix 5 to Neumark's September 2016 report explains that Infosys conducts bi-annual performance reviews and "assigns each employee a Consolidated Relative Ranking ("CRR") score of between 1E or 1+ to 4, with 1E and 1+ being the best and 4 being the worst." Dkt. No. 88-2 at 58.

consultant." Id. (They refer the court to their sur-reply in opposition to the plaintiff's motion for class certification for their explanation of why the PeopleFluent documents are irrelevant and inadmissible. Id. at 3 n.2.)

The defendants dispute the plaintiffs' recitation of the chronology of discovery that led to the plaintiffs' claim that the defendant did not turn over PeopleFluent data and analysis. Id. at 3. They argue that all the data given to PeopleFluent, and more, had been given to the plaintiffs during discovery. Id. at 4. They assert that when the plaintiffs indicated that the data Infosys had produced was difficult to understand, Infosys "creat[ed] (at its own expense) charts identifying each spreadsheet by name and category, a data dictionary defining all 407 data fields, and 'look up tables' defining certain activity codes." Id. They assert that defense counsel "created exemplars to illustrate how the data could be used and later met with Plaintiffs' counsel *for hours* to explain how data could be linked, organized, and analyzed." Id.

The defendants indicate that, in contrast, the information provided to PeopleFluent "included no data on time in job level or role, performance evaluations, or other variables that would allow meaningful statistical analysis of alleged discrimination." Id. at 4-5. They note that PeopleFluent's analysis did not distinguish "South Asians" from "Asians." Id. at 5. They argue that the PeopleFluent reports "ignore all explanatory variables" and "do not (unlike even the simplistic analyses performed by Neumark) provide any benchmark or point of demographic comparison." Id.

The defendants assert that Neumark's "supplemental" February 2017 report "only confirms fundamental errors in Neumark's original studies." Id. at 5. They say that the "workforce populations study merely disaggregates the alleged unexamined disparities [Neumark] previously observed by state—a revision that proves companywide disparities do not hold across locations and employment groups." Id. They assert that the supplement corrects some of the errors in the promotion and termination analyses, but that it doesn't correct the most egregious ones, does not control for variables and "*concede[s] that his original analysis examined the wrong data.*" Id. And, they say, "Neumark self-approves a name-matching methodology without any scientific basis that likely distorts his results by several orders of magnitude." Id.

As to the plaintiffs' argument that the court can decide the class certification motion based on the PeopleFluent data, the defendants assert that these documents do not provide statistical support for a pattern of discrimination because they do not contain any statistical analysis at all; they argue that the PeopleFluent reports are neither admissible nor probative. Id. at 6. The defendants argue that the plaintiffs have the case law backward—that the Seventh Circuit has "consistently" concluded that expert opinions that do not control for variables are entitled to no weight. Id. at 6-7 (citing People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205, 111 F.3d 528, 537-38 (7th Cir. 1997); Schultz v. Akzo Nobel Paints, LLC, 721 F.3d 425, 433 (7th Cir. 2013); Sheehan v. Daily Racing Form, Inc., 104 F.3d 940, 942 (7th Cir. 1997)). The defendants distinguish Adams and Mister. Id. at 7.

The defendants challenge the plaintiffs' reliance on <u>Teamsters</u> for the assertion that Infosys must identify non-discriminatory explanations for the racial disparities, asserting that <u>Teamsters</u> governs the burden of proof at trial, while <u>Daubert</u> governs the admissibility of expert opinions. <u>Id.</u> at 8.

The defendants assert that "[s]tripped of their elaborate (and erroneous) legal justifications, Neumark's opinions boil down to just: 1) the obvious statement that a workforce largely composed (at any one time) of employees temporarily transferred from India does not mirror the U.S. labor market; and 2) his observations of non-random disparities in Infosys hiring, termination, and promotions that admittedly could be attributable to *anything*." <u>Id.</u> at 8-9. The defendants say that the plaintiffs now have admitted that Neumark did not control for qualifications in his promotions analysis, asserting that they "purport to defend what Neumark did as an entirely conventional attempt to eliminate the role of chance in a statistical opinion." <u>Id.</u> at 9. Arguing that that is not what Neumark did, the defendants assert that

> [s]aying the composition of Infosys's workforce is inconsistent with "chance" is like opining players on a basketball team are unusually tall: it states the obvious. In comparing the South Asian representation in Infosys's nationwide workforce to the U.S. labor market, Neumark ignores the elephant-sized reason that Infosys's workforce looks different: Deputees. At any given time, about 81% of Infosys's workforce is composed of Deputees temporarily transferred from its operations in India (usually where they worked for the same client). In other words, Neumark has effectively opined that a workforce with large numbers of employees from a foreign labor market does not reflect the racial demographics of the United States labor market—an observation that does not even qualify as expert opinion. *See* Fed. R. Evid. Rule 702. And while defending that opinion, Plaintiffs nowhere acknowledge—let alone rebut—the finding that comparing Infosys's workers hired in the United States

to applicants for those jobs yields <u>no</u> disparity favoring South Asian hires. *See* Siskin Nov. Rpt. 26-32 & Tables 5-9 (Dkt. No. 103-4).

<u>Id.</u> So, the defendants argue, Neumark's opinion is irrelevant and unreliable "*even under the erroneous, burden-shifting test advocated by Plaintiffs.*" <u>Id.</u> at 10.

The defendants assert that excluding deputees does not "rehabilitate" Neumark's analyses. <u>Id.</u> They argue that deputees "*play no part in external hiring at Infosys*;" that deputees are transferred from India, that they are not transferred into the same jobs that are available to "external" candidates and that they did not receive any job sought by representative plaintiffs Koehler and Parker. <u>Id.</u> They state that, "[a]t best, Neumark's opinion could relate to a claim that Deputees make external hiring unnecessary; but Title VII does not obligate Infosys to *create* jobs." <u>Id.</u> at 10-11.

The defendants assert that the plaintiffs "cannot restore Neumark to relevance with bald accusations that Infosys uses Deputees 'to further its discriminatory objective of filling U.S. positions with its preferred race of employees.'" <u>Id.</u> at 11. The defendants say that the plaintiffs attempt to equate "(unsupported) allegations that Infosys has exceeded its fair share of H1-B visas with discriminatory motives," and the defendants argue that these are different concepts. <u>Id.</u> They maintain that visa limits protect the domestic labor force from competition from foreign workers entering the U.S. market— arguably a practice non-discriminatory to U.S. workers—and say that the plaintiffs' "assumption that race is the *only* reason Infosys could want to

temporarily staff U.S. projects with existing, skilled, trained and high-performing employees from India is, itself, a race-based assumption." Id. at 11-12.

The defendants say the plaintiffs are left with arguing only that Neumark "provides a significant step in the proof when he opines chance cannot explain aggregate racial disparities in hiring, promotions, and terminations at Infosys." Id. at 12. The defendants argue that even this pared-down defense of Neumark's work does not make it relevant, reiterating that the name-matching methodology is unreliable and the failure to control for other variables is fatal. Id. They argue that the unreliability of the name-matching methodology is material, with the potential to misidentify hundreds of names. Id. at 13. They assert that Neumark's own opinion that he thinks his method works "rather well" is "say-so," not science. Id. They reiterate that failure to control for non-discriminatory variables leaves the plaintiffs with nothing but a statistical disparity that could not have occurred by chance. Id. at 13-14. They assert that the plaintiffs did not address their argument that Neumark failed to compare applicants for the same jobs (and thus failed to compare similarly situated individuals). Id. at 14.

As for promotions and terminations, the defendants assert that Neumark's adjustment to his report amounts to a concession that Neumark based the original analyses on the wrong data, and that "[d]isparities that supposedly showed company-wide discrimination falsely assumed Infosys almost never terminates Deputees." Id. at 14-15. They reiterate that Neumark

failed to control for any variable other than race. <u>Id.</u> at 15-16. And they assert that by breaking the termination data down by state, Neumark showed that his earlier analyses aggregating the data was flawed, because the state-by-state data showed little meaningful disparity in termination for one-third of the states he examined, while the aggregate showed much higher standard deviation. <u>Id.</u> at 16.

## V.     The Timing of Deciding the *Daubert* Motion

At the hearing on the motion to exclude Neumark's testimony, the court told the parties that "putting the expert testimony motion on for a hearing today is step one in being able to address the class certification motion and summary judgment motions." Dkt. No. 204 at 5, lines 16-18. The court first stated that under two Seventh Circuit cases—<u>Am. Honda</u>, 600 F.3d at 815-16 and <u>Messner v. N. Shore Univ. HealthSystem</u>, 669 F.3d 802, 812 (7th Cir. 2012)— it was required to decide the motion to exclude Neumark's testimony before deciding the class certification motion if his testimony was critical to that motion. <u>Id.</u> at 13, lines 12-23. It observed that the plaintiffs had argued Neumark's testimony was not critical because they were relying on different evidence. <u>Id.</u> at 14, lines 10-15. The court found, however, that "the plaintiffs have, in fact, in numerous places in the class certification motion referred to Dr. Neumark's opinion." <u>Id.</u> at lines 21-23. The court concluded:

> So the idea that well, you know, we're not relying on him for class certification anymore, Dr. Neumark being him, is belied by the pleadings themselves. Dr. Neumark is all over the class certification proceedings. And so simply on that basis, I think that it is critical— Dr. Neumark's testimony is critical to the class certification motion or even at a lower level, there is certainly some question as to

whether it's critical. And under *Messner*, that means I should decide it.

Id. at 15, lines 9-16. The following puts flesh on that bony conclusion.

"Before deciding whether to allow a case to proceed as a class action . . . a judge should make whatever factual and legal inquiries are necessary under Rule 23." Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 676 (7th Cir. 2001). "And if some of the considerations under Rule 23(b)(3) . . . overlap the merits . . . then the judge must make a preliminary inquiry into the merits." Id. Plaintiffs cannot obtain class certification "just by hiring a competent expert," and a district judge "may not duck hard questions by observing that each side has some support, or that considerations relevant to class certification also may affect the decision on the merits." West v. Prudential Sec., Inc., 282 F.3d 935, 938 (7th Cir. 2002). "Tough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives." Id.

Consequently, the Seventh Circuit has held that "when an expert's report or testimony is critical to class certification . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion. That is, the district court must perform a full *Daubert* analysis before certifying the class if the situation warrants." Am. Honda 600 F.3d at 815-16. "The court must . . . resolve any challenge to the reliability of information provided by an expert if that information is relevant to establishing any of the Rule 23 requirements for class certification." Id. at 816. See also Howard v. Cook Cty. Sheriff's Office,

989 F.3d 587, 601 (7th Cir. 2021) (finding district court's reliance on excluded expert's opinions in analyzing commonality requirement of Rule 23 "improper" and citing <u>Am. Honda</u>). "If a district court has doubts about whether an expert's opinions may be critical for a class certification decision, the court should make an explicit *Daubert* ruling." <u>Messner</u>, 669 F.3d at 812. "An erroneous *Daubert* ruling excluding non-critical expert testimony would result, at worst, in the exclusion of expert testimony that did not matter. Failure to conduct such an analysis when necessary, however, would mean that the unreliable testimony remains in the record, a result that could easily lead to reversal on appeal." <u>Id.</u>

Rule 23(a) allows a member of a class to sue as a representative of that class only if:

> (1)  the class is so numerous that joinder of all members is impracticable;
> (2)  there are questions of law or fact common to the class;
> (3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4)  the representative parties will fairly and adequately protect the interests of the class.

In addition, Rule 23(b) requires that for a case to proceed as a class action, one of three circumstances must exist; one of which is where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The plaintiffs' class certification motion states that they seek class

certification for the determination of "whether Infosys engaged in a pattern or practice of discrimination; and the availability of punitive damages and injunctive relief." Dkt. No. 88 at 7-8. It states that to prove the pattern or practice of discrimination, the plaintiffs will "rely partly on statistical evidence of discrimination, which is common to the class." Id. The plaintiffs cite Neumark's report twenty-six times in the opening brief in support of the class certification motion. Specifically, they cite his report in support of their assertion that they meet the Rule 23(a)(1) numerosity requirement, id. at 21-22; and in support of their Rule 23(b)(3) argument that common questions predominate over individual issues, id. at 25-26 (citing analysis in Section II of the facts common to the class, which repeatedly cites from Neumark's September 2016 report).

To be allowed to represent the class, the plaintiffs must prove numerosity (among other things). For the case to proceed as a class action, the plaintiffs must prove that common questions predominate over individual ones. In their opening brief, the plaintiffs relied heavily on Neumark's opinions to argue these Rule 23 prerequisites. Neumark's opinion was relevant—arguably critical—to their ability to prove those prerequisites.

The defendants argued in their opposition to the motion to certify the class that the court should deny the class certification motion because the plaintiffs could not demonstrate under Rule 23(a) that there are common questions of law or fact. Dkt. No. 103 at 9. Citing Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011), the defendants argue that the plaintiffs cannot

provide convincing proof of a pattern or practice of discrimination and assert that Neumark's statistical evidence is the kind of evidence the <u>Dukes</u> Court rejected as insufficient for that purpose. <u>Id.</u> at 10-12. Whether the defendants are correct that <u>Dukes</u> mandates denial of the class certification motion, they are correct that in a case where the plaintiffs have alleged a pattern or practice of discrimination, the commonality question overlaps with the merits of the claims. <u>Dukes</u>, 564 U.S. at 352. They also are correct that in concluding that the plaintiffs in <u>Dukes</u> had not proved commonality, the Supreme Court found lacking regression analyses that showed significant statistical disparities between Wal-Mart's workforce and the allegedly relevant workforce and concluded that they could be explained only by gender discrimination. <u>Id.</u> at 356. Under <u>Dukes</u>, the plaintiffs in this pattern-or-practice suit—who are alleging that Infosys had a pattern or practice of discriminating in thousands of hiring, promotion and firing decisions—must present evidence of "some glue holding the alleged *reasons* for all those decisions together," or "it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." <u>Id.</u> at 352. Neumark's analysis is part of the evidence the plaintiffs cite, so it is part of the evidence the court would be required to consider in ruling on the Rule 23(a)(2) commonality factor.

The plaintiffs opposed the motion to exclude Neumark's opinions by arguing that PeopleFluent did not timely respond to their third-party subpoena; they argue that the defendants' failure to produce in discovery the information

the plaintiffs subpoenaed and obtained from PeopleFluent caused the plaintiffs to delay in filing the class certification motion and their motion for partial summary judgment. This argument has nothing to do with whether the court must conduct a <u>Daubert</u> analysis of Neumark's opinions before deciding the class certification motion. If PeopleFluent did not timely respond to the plaintiffs' third-party subpoena, they could have raised that with Judge Jones (and perhaps they did). They could have filed a motion to compel. They could have sought an extension of the deadline for filing the motion to certify the class (although they explained at the motion hearing that they did not want to "slow down a decision on class certification"). Dkt. No. 204 at 51, lines 23-24.

The plaintiffs have not stated that they would not have retained Neumark, or that they would not have relied on his opinions in the class certification motion, if they'd had the PeopleFluent information. On the contrary—at the motion hearing, the plaintiffs said that by discussing the PeopleFluent data in the reply brief, "we did not mean to suggest that we should withdraw Dr. Neumark's analysis and substitute it with PeopleFluent's analysis," dkt. no. 204 at 44, lines 11-14; they asserted that "of course" they thought Neumark's analyses were "relevant in order for class certification," dkt. no. 204 at 51, lines 20-21.

The plaintiffs' assertion in the reply brief that the court need not conduct a <u>Daubert</u> analysis of Neumark's opinions because it can decide the class certification and partial summary judgment motions based on the PeopleFluent data also misses the mark. As the court explained at the hearing and again in

this order, the class certification motion relies on Neumark's opinion, not the PeopleFluent data. (The plaintiffs' motion for partial summary judgment also relies heavily on Neumark's September 2016 opinions. Dkt. No. 86.)

The court must conduct a <u>Daubert</u> analysis of Neumark's work before it rules on the class certification motion (and on the plaintiffs' motion for partial summary judgment).

## VI.   <u>**Daubert**</u> **Analysis**

### A.    <u>Applicable Law</u>

Federal Rule of Evidence 702 and <u>Daubert</u> govern the admissibility of expert testimony. Rule 702 says that a witness "may" testify as an expert if the witness is "an expert by knowledge, skill, experience, training, or education;" the expert's knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue;" the expert's testimony is "based on sufficient facts or data" and is "the product of reliable principles and methods;" and the expert "has reliably applied the principles and methods to the facts of the case." This rule "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." <u>Daubert</u>, 509 U.S. at 597. "*Daubert* and Rule 702 apply 'to social science experts,' just as they apply 'to experts in the hard sciences.'" <u>Howard</u>, 989 F.3d at 601 (quoting <u>Tyus v. Urban Search Mgmt.</u>, 102 F.3d 256, 263 (7th Cir. 1996)).

Under Rule 702 and <u>Daubert</u>, a court must engage in a three-step inquiry before it admits expert witness testimony. <u>Gopalratnam v. Hewlett-Packard Co.</u>, 877 F.3d 771, 779 (7th Cir. 2017).

> In performing its gatekeeper role under Rule 702 and *Daubert*, "the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue." In other words, the district court must evaluate: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony.

<u>Id.</u> (emphasis in original) (internal citations omitted).

The party seeking to introduce expert witness testimony bears the burden of showing by a preponderance of the evidence that the witness' testimony satisfies the <u>Daubert</u> standard. <u>Id.</u> at 782.

### 1. *Qualifications*

Rule 702 states that an expert witness may be qualified as an expert "by knowledge, skill, experience, training or education." The fact that an expert may offer opinions that are not based on firsthand knowledge or observation "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." <u>Daubert</u>, 509 U.S. at 592. An expert need not have particular academic credentials to be qualified; "anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." <u>Tuf Racing Prods, Inc. v. Am. Suzuki Motor Corp.</u>, 223 F.3d 585, 591 (7th Cir. 2000). "The question [the court] must ask is not whether an expert witness is qualified in

general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'" <u>Gayton v. McCoy</u>, 593 F.3d 610, 617 (7th Cir. 2010) (quoting <u>Berry v. City of Detroit</u>, 25 F.3d 1342, 1351 (6th Cir. 1994)). The court must look at each of the expert's conclusions individually "to see if he has the adequate education, skill, and training to reach them." <u>Id.</u> "[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." <u>Smith v. Ford Motor Co.</u>, 215 F.3d 713, 718 (7th Cir. 2000).

> 2. *Reliability*

In <u>Gopalratnam</u>, the Seventh Circuit discussed in depth the reliability requirement:

> According to our circuit's precedent, courts should evaluate the reliability of a qualified expert's testimony by considering, amongst other factors: "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Krik [v. Exxon Mobil Corp.],* 870 F.3d [669,]at 674 [(7th Cir. 2017)] (quoting *Baugh v. Cuprum S.A. de C.V.,* 845 F.3d 838, 844 (7th Cir. 2017)). In addition, the Rule 702 advisory committee's note to the 2000 amendment outlines other benchmarks relevant in assessing an expert's reliability:
>
>> (5) whether "maintenance standards and controls" exist; (6) whether the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation," or developed "expressly for purposes of testifying"; (7) "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (8) "[w]hether the expert has adequately accounted for obvious alternative explanations"; (9) "[w]hether the expert is being as careful as he would be in his regular professional work

outside his paid litigation consulting"; and (10) "[w]hether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give."

*Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534–35 (7th Cir. 2005), *opinion vacated in part on reh'g*, 448 F.3d 936 (7th Cir. 2006) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).

"Importantly, this list is neither exhaustive nor mandatory." *[C.W. ex rel. Wood v.] Textron*, 807 F.3d [827,]at 835 [(7th Cir. 2015)]; *see also Kumho Tire [v. Carmichael]*, 526 U.S. [137,] at 150, 119 S.Ct. 1167 [(1999)] ("*Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.'" (quoting *Daubert*, 509 U.S. at 593, 113 S. Ct. 2786)); *Krik*, 870 F.3d at 674 ("Despite the list, we have repeatedly emphasized that 'no single factor is either required in the analysis or dispositive as to its outcome.'" (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000))); *United States v. Cruz-Velasco*, 224 F.3d 654, 660 (7th Cir. 2000) ("Although the *Daubert* Court identified a number of factors to be considered when evaluating the admissibility of expert testimony … these factors do not establish a definitive checklist."). Instead, "a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability." *Kumho Tire*, 526 U.S. at 141, 119 S. Ct. 1167.

Ultimately, "there are many different kinds of experts, and many different kinds of expertise." *Id.* at 150, 119 S. Ct. 1167. The test of reliability, therefore, "is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 141, 119 S. Ct. 1167 (quoting *Daubert*, 509 U.S. at 594, 113 S. Ct. 2786); *see also Textron*, 807 F.3d at 835 ("Ultimately, reliability is determined on a case-by-case basis."). Rather, "[t]he district court may apply these factors flexibly as the case requires." *Krik*, 870 F.3d at 674; *see also Kumho Tire,* 526 U.S. at 142, 119 S. Ct. 1167 ("[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."). In the end, "the gatekeeping inquiry must be 'tied to the facts' of a particular 'case,'" *Kumho Tire,* 526 U.S. at 150, 119 S. Ct. 1167 (quoting *Daubert*, 509 U.S. at 591, 113 S. Ct. 2786), and "the reliability analysis should be geared toward the precise sort of testimony at issue and not any fixed evaluative factors." *Lees [v.*

*Carthage College]*, 714 F.3d [516,] at 521 [(7th Cir. 2013)].

At the same time, this flexibility is not without limit. "[T]he district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony. ... The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) (citations omitted). Rather, "Rule 702's reliability elements require the district judge to determine only that the expert is providing testimony that is based on a correct application of a reliable *methodology* and that the expert considered sufficient data to employ the methodology." *Id.* at 766 (emphasis added). This examination "does not ordinarily extend to the reliability of the *conclusions* those methods produce—that is, whether the conclusions are unimpeachable." *Id.* at 765 (emphasis added). In other words, "[a]n expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt." *Id.* at 766.

The focus, therefore, "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595, 113 S. Ct. 2786; *see also Ford Motor Co.*, 215 F.3d at 718 ("[W]e emphasize that the court's gatekeeping function focuses on an examination of the expert's methodology."). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or where appropriate, on summary judgment." *Ford Motor Co.*, 215 F.3d at 718; *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("Reliability ... is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced."). "The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower*, 732 F.3d at 806.

"This is not to say that an expert may rely on data that has no quantitative or qualitative connection to the methodology employed." *Id.* at 808. Indeed, Rule 702 explicitly requires that expert testimony be "based on sufficient facts or data." Fed. R. Evid. 702. In the "quantitative" sense, "'sufficient facts or data' means 'that the expert considered sufficient data to employ the methodology'"; "an opinion about an average gross sales price," for

example, "could not be reliably supported by evidence relating to sales to only one customer 'because a single observation does not provide a sufficient basis for calculating an average.'" *Manpower*, 732 F.3d at 808 (quoting *Stollings*, 725 F.3d at 766). To be "qualitatively" adequate, "an expert must employ 'those kinds of facts or data' on which experts in the field would reasonably rely." *Id.* at 809 (quoting Fed. R. Evid. 703).

We have recognized that the line between conclusions and methodology "is not always an easy line to draw." *Id.* at 806. "[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L.Ed.2d 508 (1997). Nevertheless, "[t]he critical inquiry is whether there is a *connection* between the data employed and the opinion offered; it is the opinion connected to existing data 'only by the *ipse dixit* of the expert' that is properly excluded under Rule 702." *Manpower*, 732 F.3d at 806 (quoting *Joiner*, 522 U.S. at 146, 118 S.Ct. 512) (first emphasis added). Said another way, there must be a "rational connection between the data and the opinion." *Id.* at 809.

Gopalratnam, 877 F.3d at 779–81.

### 3. *Relevance*

Relevant evidence is "that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Daubert, 509 U.S. at 587 (quoting Fed. R. Evid. 401). Rule 702's "basic standard of relevance thus is a liberal one." Id. The Rule 702 requirement that the expert's evidence or testimony must "assist the trier of fact to understand the evidence or determine a fact in issue" "goes primarily to relevance." Id. at 591.

B.  Analysis

1.  *Dr. Neumark's Qualifications*

As the court noted at the hearing, the defendants have not challenged Neumark's general qualifications. Dkt. No. 204 at 20, lines 5-13; 23, lines 5-7. They do not dispute that he is a professor of economics at UC-Irvine or his assertion that he has done "extensive research on labor market discrimination, including methods for measuring and testing for discrimination that have been adopted by many other researchers." Dkt. No. 88-2 at 4. They do not dispute his prior positions on the Federal Reserve Board, the University of Pennsylvania, Michigan State University or the Public Policy Institute of California. Id. They do not dispute his extensive publications (the listing of which consumes nine pages of his report). Id. at 66-75. In his extensive deposition, the defendants did not enquire into Neumark's qualifications as a labor economist, a scholar or a researcher. Dkt. No. 97-1.

Rather, the defendants argue that Neumark is not qualified to identify the race or ethnicity of an employee or applicant based on name. Dkt. No. 204 at 23, lines 8-9 ("we do dispute that he is qualified to perform a name matching analysis"). At Neumark's deposition, the following exchange occurred:

Q.:  Have you ever used name-matching in any other case?
A.:  No.
Q.:  Do you have any expertise in what may sound like an Indian name?
A.:  No. That's why I—that's why I did what I did and didn't do what you're suggesting here. Because I didn't have to rely on what sounds like an Indian name.
Q.:  Well, you did it with respect to other kinds of names. I mean, you don't—you don't have any expertise in name recognition at all, correct?

A.:     I don't have any expertise in it, no.

Dkt. No. 97-1 at 38, Tr. Page 143, lines 7-20.

When asked whether it would be significant if fourteen percent of the

Kenexa applicants he identified as Indian self-identified as non-Asian,

Neumark replied:

> Yeah. I mean, these are—these are different ways you can define ethnicity as we discussed. I'm doing it based on names. It's not perfect. I don't know—I have not studied the self-identification data and how often it's reported. I have no—you know, if I was—if you guys asked about Chinese calling themselves non-Asian, I'd probably be a little more—that would seem weirder. I just don't know. I'm in complete ignorance here about if Indians self-identify as—as Asian ethnicity. I—I just don't know.

Dkt. No. 97-1 at 37, Tr. Page 140, lines 1-10.

This lack of expertise is a problem under Daubert.

Neumark's comparisons of Infosys' employee and applicant demographic

compositions with what he defined as the relevant labor market depended on

an accurate representation of Infosys' employee demographic composition and

an accurate representation of the demographic composition of Infosys'

applicant pool. Neumark did not have data sufficient to allow him to accurately

determine those demographic compositions.

Neumark compared data from the ACS, which provides national origins

classifications and thus allows people to identify as South Asian or Indian, with

data from Infosys, which his report said[13] provided only the broad classification

of "Asian," and did not "differentiate between someone of Indian or Southeast

[13] The defendants assert that for applicants managed in the Kenexa software, there was self-identified race information. Dkt. No. 98 at 12.

Asian descent and someone of, for example, Chinese descent; both groups would be coded as Asian." Dkt. No. 88-2 at 43. Although the Infosys data identified Infosys employees who reported being born in India or in countries Neumark considered to be South Asian, it did not identify employees of Indian or South Asian descent not born in India or in a country Neumark considered South Asian, and it did not identify some applicants of Indian or South Asian descent. Id.

Because Neumark did not have the data that would have allowed him to accurately determine the Infosys employee and applicant demographic compositions, he created a methodology for identifying people of Indian and South Asian descent: he looked at the last names of Infosys employees who reported being born in India or one of the countries he considered to be South Asian[14] and "use[d] these names to identify South Asians or Indians among records on employees not born in these countries, or among records on applicants." Id. He then made a list of last names associated with at least two Infosys employees, where at least one employee was born in India or a country he identified as South Asian and at least one employee was not born in a South

[14]Neumark also based his conclusions about the percentages of South Asian employees or applicants on the assumption that "South Asians include the following ethnicities: Indian, Sri Lankan, Bangladeshi, Pakistani, Burmese, Nepalese, and Afghan." Dkt. No. 88-2 at 13 n.8. The second amended complaint does not define "South Asian," although it initially defined the proposed class as individuals who were not "of South Asian race or Indian, Bangladeshi, or Nepalese origin" who were not hired, not promoted or fired. Dkt. No. 19-2 at ¶121. Neumark did not explain why he included other countries—Sri Lanka, Pakistan, Burma or Afghanistan—in his definition of "South Asian," or how he determined that the countries he listed were "South Asian" and that others were not.

Asian country or India. Id. at 44. From *that* list, he "identified surnames that [did] not appear to be Indian." Id. And he quantified how many of the employees with those surnames were born in India or countries he considered to be South Asian. Id.

Despite his education, experience and expertise in labor economics, Neumark has no expertise in name recognition. There is no evidence that he was qualified to create a method for determining whether someone is or is not Indian or South Asian based on surname. Yet he not only did so, but he used that method to determine the percentage of Infosys' United States-based workforce that purportedly consisted of South Asians, dkt. no. 88-2 at 11; the percentage of Infosys' hires in the United States that purportedly were South Asian, id. at 11-12; the percentage of Infosys' hires in the United States that purportedly were Indian, id. at 12-13; the percentage of Infosys' United States-based workforce that purportedly consisted of Indians, id. at 14-15; the percentages of promotions that purportedly went to Indian employees, id. at 29; and the percentage of terminations of purportedly Indian/South Asian employees, id. at 31. Underlying each of Neumark's comparisons is his conclusion about how many employees or applicants were of Indian national origin or South Asian race/ethnicity, and he drew that conclusion using name recognition—an endeavor for which he admittedly had no expertise.

The plaintiffs did not address this aspect of Neumark's qualifications—or, more accurately, this aspect of his lack of qualifications. Instead, they asserted that there "is no perfect way to identify South Asians from the data," cited

Neumark's report for his explanation of what he had done, and asserted that his analysis, "though imperfect, is reasonably accurate." Dkt. No. 123 at 23. That does not address Neumark's lack of qualifications; those assertions go to the reliability of his methodology. The plaintiffs have presented no evidence that Neumark was qualified to identify an employee's or applicant's race by name.

The plaintiffs' reply argument that because Neumark did not opine on causation his analyses need not meet the requirements of Daubert is a non-starter. Neumark's report says that Infosys "Disproportionately Hired South Asians and Indians," dkt. no. 88-2 at 7, that it disproportionately promoted South Asians and Indians, id. at 26, and that it disproportionately terminated non-South Asians and non-Indians, id. at 30. These are conclusions—opinions. In the motions for class certification and partial summary judgment, the plaintiffs refer repeatedly to Neumark's "expert" report. Neumark himself says the plaintiffs hired him "as a statistical expert" to evaluate whether the data were consistent with discrimination. Dkt. No. 88-2 at 4-5. The plaintiffs retained and presented Neumark as an expert and, until the defendants criticized his opinions, relied on him as an expert. His opinions and methods must pass muster under Rule 702 and Daubert, and he must be qualified as an expert under Rule 702 and Daubert. In the area of identifying an individual's race by name, his method does not pass muster and he is not qualified as an expert.

**RA144**

Arguably, this conclusion could end the analysis. But the plaintiffs claim that "[m]any of Infosys' criticisms center on ancillary issues that relate to a subset of Dr. Neumark's analyses and that stem from the complexity of the data Infosys produced in discovery." Dkt. No. 123 at 8. The court does not know whether the plaintiffs consider Neumark's race identification methodology to be "ancillary" (although the court does not). And the plaintiffs argued at the motion hearing that "to exclude our expert and allow [the defendants] to go forward without our expert performing statistical disparities showing the statistical disparities to the jury would not be right. It's not fair." Dkt. No. 204 at 45, lines 13-16. In an abundance of caution, the court will address the remaining <u>Daubert</u> factors—reliability and relevance.

### 2. *Reliability*

In 2000, Fed. R. Evid. 702 was amended in the wake of <u>Daubert</u> and the cases that that had applied it. The Committee Notes that accompanied that amendment reiterate the <u>Daubert</u> Court's caution that its list of factors for trial courts to use in assessing reliability—whether the expert's theory or methodology has been tested, whether the theory or methodology has been peer reviewed, whether the theory or methodology has been evaluated for error rates and whether the theory or methodology has been accepted in the relevant scientific community—was not exhaustive. The Committee Notes explained that before and after <u>Daubert</u>, courts had found factors other than those listed in <u>Daubert</u> "relevant in determining whether expert testimony is sufficiently

reliable to be considered by the trier of fact." Among these "other factors," the

Rules Committee listed:

> (3)     Whether the expert has adequately accounted for obvious alternative explanations. *See Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiff's condition). *Compare Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996) (the possibility of some uneliminated causes presents a question of weight, so long as the most obvious causes have been considered and reasonably ruled out by the expert).

> and

> (4)     Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997). *See Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1176 (1999) (*Daubert* requires the trial court to assure itself that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

The defendants argue that Neumark's opinions are unreliable because he did not control for non-discriminatory variables, dkt. no. 98 at 23-25; because he did not use the proper labor market for comparison, id. 25-29; because his race definition method is "irrational, arbitrary, and unscientific," id. at 29-32; because his analysis is based on faulty assumptions, id. at 32-33; because his promotion analysis does not consider similarly situated employees, id. at 34-35; and because his termination analysis lacks evidentiary support, id. at 35-37.

In determining whether the expert's opinion or testimony is reliable, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. "'[T]he key to the

gate [over which the district court plays the role of gatekeeper] is not the ultimate correctness of the expert's conclusions,' but rather 'the soundness and care with which the expert arrived at [his] opinion.'" <u>Burton v. E.I. du Pont de Nemours & Co., Inc.</u>, 994 F.3d 791, 826 (7th Cir. 2021) (quoting <u>Schultz</u>, 721 F.3d at 431). "'So long as the principles and methodology reflect reliable scientific practice, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."'" <u>Id.</u> (quoting <u>Schultz</u>, 721 F.3d at 431, which quoted <u>Daubert</u>, 509 U.S. at 596).

The Seventh Circuit has acknowledged that it can be hard to draw the line between conclusions and methodology. <u>Gopalratnam</u>, 877 F.3d at 781 (quoting <u>Manpower, Inc.</u>, 732 F.3d at 806). It is difficult to draw that line here, but it seems to the court that all but two of the defendants' criticisms go to the weight that a factfinder might give Neumark's conclusions at trial, rather than challenges to the reliability of his methodology. The defendants' criticisms that Neumark incorrectly defined the relevant labor market for comparison purposes,[15] that he based his analyses on faulty assumptions and that his

_____

[15] In <u>Hazelwood</u>, the Supreme Court found that the district court had erred in its statistical analysis of the relevant labor market. <u>Hazelwood</u>, 433 U.S. at 308. In <u>Chi. Miniature</u>, the Seventh Circuit said that a "central task for the district court was to define the relevant labor market." <u>Chi. Miniature</u>, 947 F.2d at 295. These cases discussed the trial court's determinations regarding the relevant labor market in the context of trial, not in the context of analyzing expert opinions and testimony under <u>Daubert</u>. The Seventh Circuit has held that the determination of the proper labor market for comparison purposes is "a question of fact for the trial court to consider." <u>Adams</u>, 231 F.3d at 423 (citing <u>Hazelwood</u>, 433 U.S. at 310-12).

promotion and termination analyses were flawed are topics that, if the case were to go to trial and Neumark were to testify, might be fertile ground for testing through the "vigorous cross examination" and "presentation of contrary evidence" (such as the testimony of the defendants' own expert) that the Daubert Court characterized as appropriate, but not criticisms that warrant exclusion of his opinions. That leaves Neumark's failure to control for variables that may have demonstrated non-discriminatory bases for disparities and his race definition methodology.

          a.      Failure to Consider Variables Other Than Race

Neumark admitted at his deposition that he did not consider any variables other than race. He admitted that he had not considered the role of performance ratings in his promotion and termination analyses, indicating that he'd been asked only to "look at the patterns in employment hiring, termination, and promotions." Dkt. No. 97-1 at 12, Tr. Page 39, line 25-Tr. Page 40, lines 1-11. He testified that he had not "looked at kind of the characteristics of people, deputees or otherwise, that might be influenced in the outcomes. I've simply look[ed] at the descriptive evidence on the outcomes and what the patterns looked like." Id. at 15, Tr. Page 51 at lines 12-16. He testified that he had not "gone into the institutional details of how [the defendants]— how they do their recruiting and hiring in much detail at all," testifying that he simply "focused on the data, who works there, who's been hired, and what the statistical patterns are in those data." Id. at 17, Tr. Page 58 at lines 12-16. He testified that "for the analysis that's in [the September 2016] report, none of

that—none of the figuring out what qualifications matter and incorporating it into the analysis was done." Id. at 26, Tr. Page 96 at lines 11-14. He testified that he did not "look at the ethnic identification information from the applicant data." Id. at 38, Tr. Page 141 at lines 16-18. Neumark testified that he did not conduct "an analysis of factors that could explain the difference in promotion rates. I was documenting the differences in promotion rates." Id. at 43-44, Tr. Page 164 at lines 24-25 to Tr. Page 165 at lines 1-2. He did not look at the factors determining promotion. Id. at 48, Tr. Page 181 at lines 20-21. He testified that he was asked "to look at the patterns of the outcomes by Indian, non-Indian, South Asian, non-South Asian and restricted to that." Id. at 62, Tr. Page 239 at lines 2-4.

The defendants attack Neumark's failure to consider variables other than race in a couple of ways. First, they argue that by failing to consider variables other than race, Neumark acted contrary to principles he'd approved in his scholarly writing and about which he'd testified in at least one other case. Arguably, like the defendants' criticisms of Neumark's definition of the relevant labor market, their assertion that he relied on faulty assumptions, and their claims that his promotion and termination analyses were faulty, this argument could go to the weight a factfinder ought to give Neumark's conclusions. But the Seventh Circuit has twice concluded that statistical evidence was inadmissible under Daubert because the expert had not used the same care in his litigation work as he used in his non-litigation professional work.

In <u>Sheehan</u>, 104 F.3d 940, authored by Judge Posner with Judges Eschbach and Evans rounding out the panel, Judge Posner cited <u>Daubert</u> in offering the following criticism of the statistician who authored the affidavit the plaintiff presented to show a *prima facie* case of age discrimination:

> The expert's failure to make any adjustment for variables bearing on the decision whether to discharge or retain a person on the list other than age—his equating a simple statistical correlation to a causal relation ("of course, if age had no role in termination, we should expect that equal proportions of older and younger employees would be terminated"—true only if no other factor relevant to termination is correlated with age)—indicates a failure to exercise the degree of care that a statistician would use in his scientific work, outside of the context of litigation.

<u>Sheehan</u>, 104 F.3d at 942.

<u>People Who Care</u>, 111 F.3d 528, is another Judge Posner-authored decision, issued only three months after <u>Sheehan</u>; Judges Bauer and Kanne made up the panel. Judge Posner opined that an achievement gap study prepared for a desegregation case "did not attempt to quantify the causes of the gap and was in any event inadmissible under the *Daubert* test." <u>Id.</u> at 537. As he had in <u>Sheehan</u>, Judge Posner stated that the <u>Daubert</u> analysis requires "that the methods used by the expert to derive his opinion satisfy the standards for scientific methodology that his profession would require of his out-of-court research." <u>Id.</u> (citing <u>Sheehan</u>, 104 F.3d at 942; <u>Braun v. Lorillard Inc.</u>, 84 F.3d 230, 235 (7th Cir. 1996); <u>Raynor v. Merrell Pharm., Inc.</u>, 104 F.3d 1371, 1375 (D.C. Cir. 1997)). After pointing out that the study did not measure poverty, the educational attainments of a student's parents or the extent of parents' involvement in their upbringing, Judge Posner concluded:

> A statistical study is not inadmissible merely because it is unable to exclude all possible causal factors other than the one of interest. But a statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as a causal explanation and is therefore inadmissible in a federal court.

Id. at 357-58.

In both cases Judge Posner deemed inadmissible statistical evidence where the experts did not control for variables other than age (in Sheehan) and race (in People Who Care) on the basis that the expert did not exercise the degree of care that that a professional should use in his scientific work outside the litigation context. Neumark did not control for any variables other than race (although it appears the plaintiffs may have asked him not to; during his deposition, Neumark said more than once that he was not asked to do anything more than compare the Infosys data with the relevant labor market and look for patterns). Neumark did not follow the procedure that he said the "large body of research on discrimination in labor markets" followed: "estimating the effects of membership in a protected group, controlling for other factors that might affect the outcome in question." Dkt. No. 97-1 at 145. Following Judge Posner's terse reasoning, the court could conclude on this basis that Neumark's analyses were so unreliable as to be inadmissible. On the other hand, if Neumark's analyses were otherwise reliable, his inconsistency would seem to go more to the weight the trier of fact should accord his analyses than to their admissibility. The court concludes that, standing alone, Neumark's failure to follow methods he previously espoused renders his analyses so unreliable that they should not be admitted.

The defendants also assert that Neumark's failure to consider alternative explanations for the disparities he observed—regardless of whether he used the standard of care he would have used outside the litigation context—renders his opinions so unreliable as to make them inadmissible. This is one of several issues where both parties claim that the Seventh Circuit "consistently" has ruled in favor of their diametrically opposing views; the defendants state in their reply brief that:

> Plaintiffs argue that "the Seventh Circuit has *consistently* found that expert testimony regarding a statistical disparity is relevant, even if the expert's analysis did not include a multiple regression analysis accounting for factors other than race." Pls.' Resp. Br. 10 (emphasis added), *citing Adams v. Ameritech Services Inc.*, 231 F.3d 414, 427-28 (7th Cir. 2000); *Mister v. Ill. Central Gulf R.R. Co.*, 832 F.2d 1427, 1431 (7th Cir. 1987). This is precisely backwards: the Seventh Circuit has "consistently" found expert opinions that fail to control for relevant variables entitled to no weight. *People Who Care v. Rockford Bd. of Educ. Sch. Dist. No. 205*, 111 F.3d 528, 537-38 (7th Cir. 1997); *see also Schultz v. Akzo Nobel Paints LLC*, 721 F.3d 426, 433 (7th Cir. 2013) (noting an expert opinion that "[d]oes not rule in any causes of [the basis for the claim], nor . . . rule out anything" is not probative of anything and unreliable); *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (holding expert report that failed "to make any adjustment for variables bearing on the decision whether to discharge or retain a person on the list other than [alleged discrimination]" was not "admissible under the standard of *Daubert*").

Dkt. No. 128 at 6-7.

Again, the parties talk past each other. The *plaintiffs* maintain that the Seventh Circuit has found expert analyses "relevant" even if the expert did not consider variables other than the salient factor. Evidence is "relevant" if it has "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. Under Daubert, reliability is a prerequisite for

relevance; to decide whether expert testimony will "assist the trier of fact to understand or determine a fact in issue," the court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." <u>Daubert</u>, 509 U.S. at 592-93.

The *defendants* maintain that the Seventh Circuit has held that expert analyses that do not consider variables other than the salient factor are "entitled to no weight." Dkt. No. 128 at 6. Under Fed. R. Evid. 403, a court may exclude relevant evidence "if its probative value is substantially outweighed" by a risk of unfair prejudice, confusion or cumulativeness. Even if the expert's methodology was scientifically valid and could properly be applied to the facts at issue, a judge may exclude it for the reasons listed in Rule 403. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." <u>Daubert</u>, 509 U.S. at 595 (quoting J. Weinstein, RULE 702 OF THE FEDERAL RULES OF EVIDENCE IS SOUND; IT SHOULD NOT BE AMENDED, 138 F.R.D. 631, 632 (1991)).

Both arguments beg the question—have the Supreme Court and the Seventh Circuit "consistently" held that statistical evidence resulting from analyses that do not consider variables other than the salient characteristic are *per se* unreliable under <u>Daubert</u>—particularly in the context of pattern-or-practice discrimination cases? The answer is no.

In <u>Bazemore v. Friday</u>, the plaintiffs had alleged that a state agricultural extension service had engaged in a pattern or practice of employment discrimination based on race, and after a "lengthy trial," the district court had ruled in favor of the extension service. <u>Bazemore v. </u>Friday, 478 U.S. 385, 386 (1986) (per curiam). At trial, the plaintiffs had "relied heavily on multiple regression analyses designed to demonstrate that blacks were paid less than similarly situated whites." <u>Id.</u> at 398 (Brennan, J. concurring in part). Some of the regressions "used four independent variables—race, education, tenure, and job title." <u>Id.</u> Both the trial court and the appeals court had excluded those analyses because they did not include "all measurable variables thought to have an effect on salary level." <u>Id.</u> at 400 (citing the Court of Appeals). The Supreme Court disagreed:

> The Court of Appeals erred in stating that petitioners' regression analyses were "unacceptable as evidence of discrimination," because they did not include "all measurable variables thought to have an effect on salary level." The court's view of the evidentiary value of the regression analyses was plainly incorrect. While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors "must be considered unacceptable as evidence of discrimination." . . . Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.

<u>Id.</u> In a footnote, the Court said, "There may, of course, be some regressions so incomplete as to be inadmissible as irrelevant; but such was clearly not the case here." <u>Id.</u> at n.10. <u>Bazemore</u> did not address the reliability of statistical analyses that did not include *any* variables other than the salient factor, but it

left open the possibility that such an analysis might be inadmissible "as irrelevant." Id.

The following year, the Seventh Circuit addressed an appeal in a class action alleging that the defendant railroad had violated Title VII by discriminating in hiring based on race. In Mister, 832 F.2d at 1429, the district court had found in favor of the defendant, concluding that "the class had established a prima facie case of discrimination under both disparate treatment and disparate impact approaches, but that the [defendant] had demonstrated that a neutral rule—the desire to hire laborers who lived close to work—not only accounted for the disparity but also was supported by business necessity (a requirement in the disparate impact portion of the case)." Id. The district court had based its conclusion that the class had proved its *prima facie* case on several kinds of evidence, including expert witness testimony that there was less than one chance in a million that the disparity in hiring between white and Black applicants was consistent with race-neutral hiring. Id. On appeal, the defendant challenged the statistical evidence "on two grounds: bad data and inaccurate assumptions about the labor market." Id. at 1430. The court quickly disposed of the bad data argument, finding that "[t]he plaintiffs' expert used the best data available; that the data were not better is [the defendant's] fault, and we agree with the district court that the data at hand were good enough even though imperfect." Id.

As to the expert's inaccurate assumptions about the labor market, the court concluded that the plaintiff had "made out a presumptive case of

disparate treatment." Id. at 1431. The plaintiffs characterize this as support for their contention that "expert testimony regarding a statistical disparity is relevant, even if the expert's analysis did not include a multiple regression analysis accounting for factors other than race." Dkt. No. 123 at 14. It is not clear that Mister supports such a broad and general proposition. In fact, the Mister court criticized the experts' failure to consider variables other than race:

> The plaintiffs' expert used no independent variables other than race. He assumed, in other words, that all applicants are identical in every respect except race. This is not necessarily true. For laborers' jobs, other variables matter—physical condition (for which age and a weight/height ratio may be proxies) and employment history (has the person been fired from other jobs or convicted of job-related offenses?) are important to any employer. The omission of these variables weakens the plaintiffs' case by leaving open the possibility that important, non-racial variables account for the hiring decisions.

Id. at 1431.

Despite these criticisms, the Seventh Circuit observed that the defendant had not suggested that any of these variables accounted for its hiring patterns—the defendant's expert had "replicated the findings of the plaintiffs' expert," and the defendant's only explanation for the "startling disparity" in hiring rates was "distance from work." Id. Given that, the court said, "We are not about to discount the plaintiffs' statistical work on grounds that the employer, with the best access to data, chose not to raise," and it agreed with the district court that the plaintiffs had made out their *prima facie* case. Id.

The Mister court did not cite Daubert. It did not refer to Rule 702 or the Daubert factors when considering the expert's methods. It did not state that the expert's opinions were "relevant." Despite the deficiencies it found with the

statistical evidence, the Seventh Circuit refused to disturb the district court's

conclusion that the plaintiffs' statistical evidence had proven the plaintiff's

*prima facie* case at trial given the defendant's failure to rebut it. But it stated

the obvious—that an expert's failure to consider variables other than the

salient characteristic "weakens" the plaintiffs' case (in other words, entitles the

statistical evidence to less weight).

In Mozee, 940 F.2d at 1042  the plaintiffs produced at trial "statistical

evidence of disparate promotion discipline practices . . . which was probative of

. . . a pattern or practice of disparate treatment." Like Mister, Mozee does not

mention Rule 702 or Daubert and the court did not analyze the expert's

methods or opinions under either. Like the Mister court, the Mozee court

considered the statistical evidence in the post-trial context; the defendant

argued on appeal that the "pool" against which its workforce had been

compared did not account for the qualifications for the particular position to

which the plaintiffs alleged they'd been unlawfully denied promotion. Id. at

1045. The Seventh Circuit said that

> "[n]ormally, failure to include variables will affect the analysis'
> probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S.
> 385, 400 . . . (1986). We have ourselves understood this principle to
> require that plaintiffs eliminate "'the most common non-
> discriminatory reasons'" for any suggested disparity. *Coates* [*v.
> Johnson & Johnson*], 756 F.2d [524,] at 541 [(7th Cir. 1985)] (quoting
> *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 . . .
> (1981)).

Id. at 1045. Mozee again stated the obvious—that failure to account for

variables other than the salient characteristic reduces the probative value of

the statistical evidence (entitles it to less weight) and that it is, if not a requirement, then a "best practice" that a plaintiff's expert account for at least the most common non-discriminatory variables.

In <u>Sheehan</u> and <u>People Who Care</u>, Judge Posner *did* analyze the statistical evidence under the <u>Daubert</u> standard. He equated a statistician's failure to account for variables other than the salient characteristic with a "failure to exercise the degree of care that a statistician would use in his scientific work, outside of the context of litigation," <u>Sheehan</u>, 104 F.3d at 942, which he concluded rendered the analyses inadmissible.

That brings the court to <u>Adams</u>—a pattern-or-practice case of alleged age discrimination that each party claims supports its position. In <u>Adams</u>, the Seventh Circuit reversed the district court's grant of summary judgment, concluding that "the plaintiffs presented enough evidence to withstand the defendants' motions." <u>Adams</u>, 231 F.3d at 417.

The <u>Adams</u> court applied the <u>Daubert</u> factors to the statistical evidence the plaintiffs had proffered. <u>Id.</u> at 423. The defendants had "questioned whether statistical evidence as a whole can ever be useful in a case alleging disparate treatment or a discriminatory pattern or practice, as opposed to a disparate impact case." <u>Id.</u> The court answered that question in the affirmative, explaining that "statistical evidence can be very useful to prove discrimination in either or both of those two kinds of cases, but it will likely not be sufficient in itself." <u>Id.</u> (citation omitted). It observed that the Supreme Court had used such evidence in <u>Hazelwood</u>, approving the use of statistics "to help show that

the school district was discriminating on the basis of race in its faulty hiring decisions," but underscoring "the importance of looking to the proper 'community' or group when making statistical comparisons." <u>Id.</u> (citing <u>Hazelwood</u>, 433 U.S. at 307, 310-12). The <u>Adams</u> court noted that in <u>Hazelwood</u>, the Court had held that the defendant "was entitled to an opportunity to rebut any inference of discrimination raised by the plaintiffs' statistical showing." <u>Id.</u> (citing <u>Hazelwood</u>, 433 U.S. at 309-10). It also quoted the <u>Bazemore</u> Court's holding that "'[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility,'" and recounted the <u>Bazemore</u> Court's reminder that courts must evaluate statistical evidence in light of the remaining record evidence. <u>Id.</u> (quoting <u>Bazemore</u>, 478 U.S at 400).

The <u>Adams</u> court then turned to its own decisions considering the use of statistical evidence, particularly <u>Radue</u>. <u>Id.</u> The court explained that in <u>Radue</u>, it had upheld a grant of summary judgment in favor of the employer in an ADEA case "where the employee's *prima facie* case was primarily composed of statistics that showed that older employees were treated less favorably than younger employees in various RIFs [reductions in force] the employer had carried out." <u>Id.</u> The court explained, however, that

> those statistics were flawed in a number of ways, and the plaintiff had little else with which to support his case. For one thing, the statistics looked at a completely different part of the company from the one in which the plaintiff worked and they involved an earlier RIF, not the one in which the plaintiff lost his job. [*Radue*, 219 F.3d] at 616. For another, the statistics failed to address the essence of the plaintiff's claim: he did not allege that the RIF was age-based; he claimed instead that the transfers awarded in the wake of the RIFS were given preferentially to younger employees. *Id.* Finally, the court noted that the statistics standing alone could not prove causation;

they could only show a relation between the employer's decisions and the affected employees' traits. *Id.* See also *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988) ("Correlation is not causation.").

Id. at 423-24.

The Adams court also discussed Mister, recounting the process of conducting a study in employment discrimination cases (defining the relevant labor market, finding the null hypothesis results, then comparing the defendant's results to the null hypothesis and determining the extent of any disparities); the court stated that "[t]wo standard deviations is normally enough to show that it is extremely unlikely (that is, there is less than a 5% probability) that the disparity is due to chance, giving rise to a reasonable inference that the hiring was not race-neutral; the more standard deviations away, the less likely the factor in question played no role in the decisionmaking process." Id. at 424 (citations omitted).

The court observed that "*Mister* . . . noted the importance of making sure that any testing adequately accounts for the real variables that the employer took into account." Id. The court explained that "[t]he plaintiffs' evidence [in Mister] was wanting because it assumed that the job applicants were identical in every respect except for race, even though other factors like physical condition, employment history, or other non-racial variables might have entered into the employer's calculus." Id. (citing Mister, 832 F.2d at 1431). The Seventh Circuit qualified, however, that

> it was [the defendant] that had the responsibility of offering alternative explanations. The only one it actually advanced was that it was concerned about the distance its employees had to travel to

get to the job site; for reasons pointed out in the opinion, this was singularly unpersuasive. (It is also important to note that *Mister* reached this court after a full trial on the merits; nothing in the opinion suggests that the plaintiffs' statistical showing was so weak that summary judgment for the defendant would have been appropriate.)

Id. at 424-25.

Given this history, the Adams court rejected the defendants' argument that statistical evidence never could be useful in a case alleging disparate treatment discrimination, indicating that it was "hard pressed" to understand that position given the Supreme Court's rulings. Id. at 424. Having laid that foundation, the court turned to the issue before this court: "whether, under the *Daubert* standards, the statistical evidence plaintiffs have offered . . . (coupled with the other evidence they presented) was sound enough methodologically (*i.e.*, reliable enough) and relevant, such that the district court should have taken it into account in evaluating their claim." Id. at 425. It explained that its task was to determine "whether the criticisms of the [expert's] reports and the plaintiffs' other statistical evidence affected the admissibility of those materials, or only, as the Supreme Court put it in *Bazemore*, their 'probativeness' or weight." Id.

The court seems to have answered that question by concluding that the defendants' criticisms went more to the "probativeness," or weight, of the expert's opinions. The Adams court observed that its task in conducting a *de novo* review of a summary judgment ruling was not to determine which party's expert report was more persuasive, but whether, "taking the facts in the light

most favorable to the plaintiffs, a trier of fact should be permitted to make that choice." Id. Buried in the parties' debate over the relative merits of each of their experts were some factual issues, including the question of how the statistical expert should have aggregated, or disaggregated, the defendants' workforce. Id. The court explained what the expert had done, then noted what he had *not* done: "run a multiple-regression analysis that would have isolated the relevance of age as a factor in the companies' decisions." Id. The court stated, "While this omission strikes us as odd, we are not prepared to hold as a matter of law that nothing but regression analyses can produce evidence that passes the *Daubert* and *Kumho Tire* thresholds." Id. The court explained:

> Statisticians might have good reasons to look at data in different ways. (For example, as additional variables are introduced into a regression, the less likely it is that any of them will be statistically significant, a fact that causes its own problems.) We thus evaluate here what [the expert] did, rather than hypothetical tests that he or another expert might have done.

Id.

The court detailed how the expert had conducted his study and how he had analyzed his findings. Id. at 425-27. It also explained why the district court had declared the expert's reports inadmissible:

> (1) the underlying information about the RIF programs was not reliable; (2) the reports only showed that the differences in treatment between the over and under 40 aged individuals was not due to chance, but they did not affirmatively indicate what caused that difference; (3) the analysis did not take into account or control for other non-age related variables; (4) [the expert] relied on the plaintiffs' description of the RIF and did not himself become familiar with the procedures used; and (5) the jury would find the reports so confusing that they should be excluded under Rule 403.

Id. at 427.

Unlike the district court, the Seventh Circuit saw no problem with the expert relying on data that ultimately had come from the defendants, or with how he familiarized himself with the procedures the defendants had used to reduce the workforce. Id. It characterized as "more serious," however, the defendants' second and third objections, describing as their "theme" that the expert's analysis "standing alone, was not enough to show that age was the reason why [the defendants] took the actions that they did." Id. The court agreed; it said that "the statistical analyses were enough to rule out chance, but the real reason for the decisions may have been age or it may have been some other factor or factors positively correlated with both advancing age and the likelihood of termination." Id.

But, the court stated, "ruling out chance was an important step in the plaintiffs' proof, even if it was not a single leap from the starting line to the finish line." Id. The court said that if the statistical analysis had been "all the plaintiffs had introduced, we would agree with the district court that the record would have supported summary judgment against them." Id. But it concluded that statistical analyses were not the only evidence the plaintiffs had produced; "in our view the other items of evidence, if believed by a jury, could have done the rest of the job: that is, it could have ruled out factors other than age." Id. at 427-28.

The court concluded by reiterating that it was reviewing a grant of summary judgment; it stated, "[w]e hold only that [the statistical] evidence met the standards of admissibility set by the Federal Rules of Evidence and thus

should have been counted on plaintiffs' side for summary judgment purposes." Id. at 428.

This review indicates that the statements in Sheehan and People Who Care that an expert's failure to consider variables other than the salient characteristic renders his opinions inadmissible are outliers. There are some common themes in the cases: statistics play an important role in a plaintiffs' ability to make a *prima facie* case of pattern-or-practice discrimination; experts should carefully formulate their initial hypotheses; experts should consider variables other than the salient characteristic and their failure to do so weakens and renders less probative their conclusions. But particularly when plaintiffs have other evidence (such as individual testimony about personal experiences of discrimination), the weight of decision seems to treat failure to consider other variables as a factor going to the weight of the statistical evidence and not as a factor that renders the evidence inadmissible. The court concludes that Neumark's failure to follow what the Seventh Circuit appears to deem "best practices" by failing to consider variables other than the salient factor of race does not render his opinions so unreliable that the statistical evidence is irrelevant on that basis alone. The court concludes that if the only flaw in Neumark's methodology had been his failure to account for variables other than race, the evidence would have been relevant to the plaintiffs' allegations that Infosys discriminated under Rule 401's "liberal," basic standard of relevance, Daubert, 509 U.S. at 587, and the defendants' criticisms

would go to the probative value, or weight, that the trier of fact should give that evidence.[16]

Before leaving this topic, the court addresses the plaintiffs' argument that Neumark was not required to consider alternative variables because the burden is on Infosys, not the plaintiffs, to prove a race-neutral reason for the disparities the statistics revealed, and that Infosys "failed to carry its burden." Dkt. No. 123 at 16. As the defendants have observed, this argument confuses the plaintiffs' burden of proof at trial under the Teamsters framework with the reliability requirement of Daubert. The plaintiffs are correct that under Teamsters, if the plaintiffs prove their *prima facie* case of a widespread pattern or practice of discrimination, the burden will shift to Infosys to demonstrate race-neutral explanations for the disparities. But to prove that *prima facie* case, the plaintiffs must present competent statistical evidence that proves by a preponderance of the evidence that there was a systemwide pattern or practice of discrimination. Because the only evidence upon which the plaintiffs rely to carry that burden is Neumark's statistical analyses, those analyses must pass scrutiny under Daubert—they must be based on reliable methodology. The

[16] The plaintiffs also argue that Neumark's general methodology was both relevant and reliable because he followed the steps the Seventh Circuit has outlined in Adams and Mister: he defined the relevant labor market, then asked what the result would be for the salient variable absent discrimination, then compared that result with the defendants' data and computed the standard deviations from the null hypothesis. Dkt. No. 123 at 13-14 (quoting Adams, 231 F.3d at 424). That methodology is reliable only if the expert's determination of the salient variable is reliable. Neumark's was not.

question of whether the expert considered alternative variables is a component in determining whether he utilized reliable methodology.

          b.      Race Identification Methodology

While Neumark's failure to consider alternate variables does not render his analyses and opinions unreliable, Neumark's race identification methodology bears none of the hallmarks of reliability. "Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." Daubert, 509 U.S. at 593. Neumark's method of name-matching and exclusion to determine whether someone is Indian or South Asian has not been tested. Perhaps one could come up with an empirical test to determine whether Neumark's method was accurate, but the plaintiffs have not argued as much nor identified such a test. Neumark's methodology has not "been subjected to peer review and publication." Id. There is no evidence of "the known or potential rate of error" of his methodology, or of "the existence and maintenance of standards controlling" the methodology. Id. at 594. There is no evidence that the methodology is generally accepted in a "relevant scientific community." Id. (quoting United States v. Downing, 753 F.2d 1224, 1238 (3d Cir. 1985)). The race recognition methodology did not arise naturally and directly out of research Neumark conducted independent of the litigation, see Daubert v. Merrell Dow Pharm., 43 F.3d 1311, 1317 (9th Cir. 1995); Neumark and the plaintiffs admit that Neumark devised the methodology for this case. Neumark has not even extrapolated from an "accepted premise to an

unfounded conclusion," Committee Notes, 2000 Amendment to Fed. R. Evid. 702; see Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); his "premise" for determining which names are likely to be Indian or South Asian versus "Western" is not founded.

The plaintiffs try to address this problem in several ways. They argued in their brief and at the hearing that there is no "perfect" way to determine someone's race when the data do not include that information.[17] They are correct that the issue is not whether Neumark's method was perfect, but the fact that the method Neumark used need not be perfect does not address whether the method he used was *reliable*. The plaintiffs asserted in their brief that Neumark's race-identification methodology was "reasonably accurate," but provided no support for that assertion. Dkt. No. 123 at 2. The plaintiffs argued in the brief that Neumark's findings are consistent with the PeopleFluent "analyses." Id. Setting aside the defendants' extensive arguments that the "computations and affirmative action goals assembled by PeopleFluent" are not evidence of discrimination, are not admissible and do not constitute expert

---

[17] It appears that there are experts in "surname analysis" and that there are methodologies for making the kind of determination Neumark tried to make here. See, *e.g.* U.S. v. Johnson, 122 F. Supp. 3d 272, 338-39 (M.D.N.C. 2015); NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist., 462 F. Supp. 3d 368, 382 (S.D.N.Y. 2020) (discussing "Bayesian Improved Surname Geocoding (BISG)," a "methodology that uses individual-level data, including a voter's surname, geographic location, and the racial composition of the voter's census tract or block to generate the probability that an individual belongs to a particular group where self-reported information is not available"); M. Elliott, A. Fremont, P. Morrison, P. Pantoja and N. Lurie, A NEW METHOD FOR ESTIMATING RACE/ETHNICITY AND ASSOCIATED DISPARITIES WHERE ADMINISTRATIVE RECORDS LACK SELF-REPORTED RACE/ETHNICITY, Health Serv. Research Oct. 2008, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2653886/.

opinions, dkt. no. 125 at 3-9, the fact that something or someone else reached a similar conclusion to Neumark does not mean that the method he used to reach his conclusions was reliable. The court's focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. The plaintiffs argue in their brief that Infosys "substantially overstates the effect of the limited number of misclassifications." Dkt. No. 123 at 23. It is not clear how the plaintiffs can make this assertion, particularly regarding Neumark's classification of applicants for whom there is no nationality or racial data.

Finally, the plaintiffs argued at the motion hearing that "name analysis" had "been done" in Teamsters, asserting that "[i]n Teamsters, they use surnames to identify individuals of Hispanic d[escent]." Dkt. No. 204 at 48, lines 11-13. As the court tried—unsuccessfully—to point out at the hearing, this is an inaccurate characterization. The government alleged in Teamsters that the defendants had engaged in a pattern or practice of discrimination against "Spanish-surnamed Americans," Teamsters, 431 U.S. at 328—people who had "Spanish" last names. As the court stated at the hearing, a person with a "Spanish" surname is not necessarily a person of "Hispanic descent." More to the point, the plaintiff in Teamsters did not allege that the employer had discriminated against people with Spanish surnames because of their race (though it did allege that the employer had discriminated against Black people on that basis), and the Teamsters Court was not asked to resolve a dispute

about how the plaintiff's expert decided whether a person had a "Spanish" surname or whether a particular surname was "Spanish."

Given the plaintiffs' insistence that Neumark's race identification methodology was reliable, one is tempted to analyze weaknesses in the base assumptions underlying that methodology—that every person born in India and South Asia is racially Indian or South Asian; that surnames always correlate to race and never to marriage or adoption; that someone not born in India or not of South Asian race may have a surname that is common in India or South Asia that does not appear on the Infosys employee roster. If Neumark had used reliable methodology in reaching his conclusions, those weaknesses might have gone to the weight a factfinder would give the conclusions, but he did not use a reliable methodology and the plaintiffs have not come close to demonstrating that he did.

Interestingly, the defendants argue that Neumark's race classification methodology "in his applicant studies . . . is irrational, arbitrary and unscientific," dkt. no. 98 at 29, implying that the methodology was reliable for Neumark's other studies. It is not clear why Neumark's methodology would be flawed only with regard to the applicant studies. Neumark used his matching and excluding methodology to determine race—specifically, South Asian descent—and in the promotion and termination studies he did so not only for applicants but for incumbent employees. Because the Infosys data did not contain self-reported information about whether an employee considered himself or herself to be South Asian, Neumark was required to use his

methodology—created for this litigation, not tested, not peer-reviewed, with no known history of error rates—to determine which incumbent Infosys *employees* were "South Asian," not just which *applicants* were likely to be "South Asian."

The court cannot conclude that Neumark's race identification methodology was reliable. He used that methodology to determine the race of incumbent employees and applicants and used the results to conduct the comparative studies that resulted in the disparities he identified in his report and upon which the plaintiffs rely.

### 3. *Relevance*

Having determined that Neumark was not qualified to determine the race of Infosys employees or applicants by surnames and that the methodology he used to do so was unreliable, the court must conclude that his analyses are not relevant under Daubert. The plaintiffs repeatedly have asserted that statistics showing disparities in hiring, promotion and termination are relevant to their *prima facie* case that Infosys had a pattern or practice of discrimination against non-Indian and non-South Asian employees and applicants. That is true only if those statistics would "assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 702(a). "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Daubert, 509 U.S. at 591-92. Neumark's statistical analyses are based on racial identifications that he was not qualified to make and that he made using unreliable methodology. Because they lack that "valid scientific connection" to the pertinent inquiry—were the people he

**RA170**

classified as Indian or South Asian actually Indian or South Asian?—Neumark's analyses are not relevant.

The court is mindful that proving a *prima facie* case of a pattern or practice of discrimination in a company the size of the defendants' is expensive. Plaintiffs may not be in a position to retain a "name analysis," or "race identification," expert *and* a statistical expert *and* a labor economist, and some cases may not call for it. Dr. Neumark is an experienced scholar and prolific writer whose credentials in the field of labor economics the defendants have not challenged. The named plaintiffs have described incidents and experiences which range from unpleasant and uncomfortable to frightening. The court's conclusion that Neumark's report must be excluded because it does not pass muster under <u>Daubert</u> is not a condemnation of the plaintiffs' case or of Neumark, nor is it a prediction of how a trier of fact might ultimately decide the plaintiffs' claims.

The court will grant the defendants' motion to exclude Neumark's expert opinions; it deems both the September 2016 and February 2017 reports and the analyses and opinions contained in them inadmissible.

## VII. The Remaining Motions

The plaintiffs' motion for partial summary judgment is based entirely on Neumark's analyses. Dkt. No. 86. The court will deny that motion without prejudice.

The plaintiffs' motion for class certification explicitly relies on Neumark's analysis to show numerosity and predominance, and it likely ought to have

done so for commonality. Dkt. No. 88. The court will deny that motion without prejudice.

The court's extreme delay in ruling on the motion to exclude Neumark's opinions caused the parties to seek a hearing for the purpose of determining whether they could do anything to assist the court in making its decision. Dkt. No. 202. This ruling renders that motion moot.

The plaintiffs' brief in opposition to the defendants' motion for summary judgment (Dkt. No. 93) and its combined additional proposed findings of fact and response to the defendants' proposed findings of fact (Dkt. No. 94) rely on and are replete with reference to Neumark's analyses.

Given the court's delay in ruling on the <u>Daubert</u> motion and the impact this ruling has on the plaintiffs' case, the court will give the parties an opportunity to digest this decision. The court will schedule a status conference to discuss with the parties proposed next steps.

## VIII. Conclusion

The court **GRANTS** the defendants' motion to exclude the expert opinions of David Neumark. Dkt. No. 97.

The court **DENIES WITHOUT PREJUDICE** the plaintiffs' motion for partial summary judgment. Dkt. No. 86.

The court **DENIES WITHOUT PREJUDICE** the plaintiffs' motion for class certification. Dkt. No. 88.

The court **DENIES AS MOOT** the parties' joint motion for status conference. Dkt. No. 202.

The court **ORDERS** that the parties must appear for a telephonic status conference on **November 10, 2022 at 1:30 PM**. The parties are to appear by calling the court' s conference line at 888-557-8511 and entering access code 4893665#.

Dated in Milwaukee, Wisconsin this 14th day of September, 2022.

BY THE COURT:

**HON. PAMELA PEPPER**
**Chief United States District Judge**

**RA173**

Court Minutes and Order

DATE:          June 24, 2025
JUDGE:         Pamela Pepper
CASE NO:       2013-cv-885
CASE NAME:  Brenda Koehler, et al. v. Infosys Technologies Limited Incorporated
NATURE OF HEARING:          Defendant's motion for summary judgment
APPEARANCES:                Daniel Kotchen – Attorney for the plaintiffs
                            Lindsey Grunert – Attorney for the plaintiffs
                            Cheryl Orr – Attorney for the defendant
                            Samantha Murphy – Attorney for the defendant
COURTROOM DEPUTY:     Kristine Wrobel
TIME:                       10:04 a.m. – 12:04 p.m.

## AUDIO OF THIS HEARING AT DKT. NO. 216

The court apologized for the time it had taken to address the motion. The court explained it did not need further argument from the parties and that it was prepared to issue an oral ruling.

The court explained that it would post the recording of today's hearing on the docket, and that it would explain at the end of the hearing how the parties could obtain a copy of the recording on a thumb drive or order a transcript. The court then issued a detailed oral ruling, granting Infosys Technologies Limited Incorporated's motion for summary judgment and explaining its reasoning for doing so.

At the end of the ruling, the court advised the parties that it would put the recording of the ruling on the docket, and they could listen to it from their own computers. It explained that if they wanted the recording on a thumb drive, they could contact the clerk's office and make that request. If the parties wanted a transcript of the hearing and oral ruling, they could find a transcript order form on the court's website.

Defense counsel disclosed to the court that on June 5, 2025, the U.S. Supreme Court had issued a decision in Ames v. Ohio Dep't of Youth Servs., 145 S. Ct. 1540, 1547–48 (2025), discrediting the "background circumstances" doctrine. Counsel explained that although she did not think that decision would impact the court's ruling in this case, she was obligated as an officer of the court to disclose it.

The court advised the parties that it would review the Ames decision; if it wanted to have the parties brief any issues further it would let the parties know. The court stated that if the parties reviewed the decision and felt that more briefing was necessary, they could make that request.

For reasons stated in detail on the record, the court **GRANTS** Infosys Technologies Limited Incorporated's motion for summary judgment. Dkt. No. 78.

The court **ORDERS** that this case is **DISMISSED WITH PREJUDICE.**

The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 24th day of June, 2025.

**BY THE COURT:**

_____

**HON. PAMELA PEPPER**
**Chief United States District Judge**

**RA175**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

----------------------------------------------------------------

)
BRENDA KOEHLER, et al.,                 )
                                        )
                  Plaintiffs,  )  Case No. 2013-CV-885
                                        )
     vs.                       )  Milwaukee, Wisconsin
                                        )
INFOSYS TECHNOLOGIES LIMITED,  )
INCORPORATED,                  )  June 24, 2025
                                        )
                  Defendant.  )  10:04 a.m.
                                        )

----------------------------------------------------------------


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE PAMELA PEPPER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs          Kotchen & Low, LLP
                            By:  MR. DANIEL A. KOTCHEN
                            and MS. LINDSEY M. GRUNERT
                            1918 New Hampshire Avenue NW
                            Washington, DC 20009
                            Ph:  202-468-4014
                            dkotchen@kotchen.com
                            lgrunert@kotchen.com



For the Defendant           Faegre Drinker Biddle & Reath, LLP
                            By:  MS. SAMANTHA ROLLINS MURPHY
                            801 Grand Avenue
                            33rd Floor
                            Des Moines, Iowa 50309
                            Ph:  612-766-8146
                            samantha.murphy@faegredrinker.com



                            Drinker Biddle & Reath, LLP
                            By:  MS. CHERYL D. ORR
                            4 Embarcadero Center
                            27th Floor
                            San Francisco, California 94111

**RA176**

Ph: 415-591-7503
cheryl.orr@faegredrinker.com

U.S. Official Transcriber:  THOMAS A. MALKIEWICZ, RMR, CRR
Proceedings recorded by electronic recording, transcript
produced by computer aided transcription.

TRANSCRIPT ORDERS:  Thomas_Malkiewicz@wied.uscourts.gov

2
**RA177**

TRANSCRIPT OF PROCEEDINGS

(Transcribed From Audio Recording)

THE CLERK: The court calls civil case 2013-CV-885, Brenda Koehler, et al., versus Infosys Technologies Limited, Incorporated.

Please state your appearances starting with the attorneys for the plaintiffs.

MR. KOTCHEN: Good morning. For the plaintiffs you have Daniel Kotchen and Lindsey Grunert from Kotchen & Low.

THE CLERK: And for the defendants?

MS. ROLLINS MURPHY: Good morning, Your Honor. Samantha Rollins Murphy and my partner, Cheryl Orr, with Faegre, Drinker for the defendants, and we are joined today by Rosalynn Hochele Britain (phonetic), assistant general counsel at Infosys.

THE CLERK: Okay.

THE COURT: Good morning to everyone. We scheduled this hearing -- I scheduled this hearing this morning to finally give you a ruling on the defendant's motion for summary judgment, which as you all know has been pending for a very long time, and I'm going to lay out for you what the procedure will be that I intend to follow, then give you a brief opportunity if you want to to ask any questions, and then I'm going to give you the ruling.

I plan to explain to you a little bit about the delay, but

then to move directly into the oral ruling. I'm not asking you all for argument. I think after all that's been filed in this case and all the water that's passed under the bridge, I have a fairly good sense of what the arguments are and I don't need additional argument.

So I'm going to deliver the oral ruling, it will be a little bit extensive, and so it will take some time, and I want to encourage you if you need to to put your phones on mute so that if you need to take care of something else while you are listening, you should feel free to do that. And the reason I feel comfortable telling you to do that is because as we have with prior hearings in this case, I'm going to be recording the hearing.

At the end of the hearing, we'll be posting the recording on the docket so you can listen to it directly from the docket if you choose to do that. I'll also tell you at the end of the hearing how you can get it in different formats, I think I've done that before in other hearings, but I'll repeat it. Just in the event that that's helpful to you. And then when I'm finished with the ruling, I will give you an opportunity to ask questions or to address anything else that you may want to address.

So with that, let me turn to you all and see if you all have any questions or any issues. Mr. Kotchen, I'll start with you.

4

MR. KOTCHEN: No questions, Your Honor. Thank you.

THE COURT: Okay. And Miss Rollins Murphy, any questions from the defense?

MS. ROLLINS MURPHY: No questions, Your Honor. Thank you.

THE COURT: All right. Thank you. So I'll go ahead and get started. As -- As you all know, the motion, the defendant's motion for summary judgment was briefed as of January 17th of 2017, that is a relatively horrifying 8.5 years ago. I'll note a couple things about that, however. First of all, after the defendants filed their motion for summary judgment, in fact, I think after the entire motion had been briefed, the defendants challenged the plaintiffs' expert, Dr. Neumark, by filing a Daubert motion, and we suspended any decision on -- or I should say I suspended any decision on the summary judgment motion until I could resolve the Daubert challenge because a good deal of the plaintiffs' argument relied on Dr. Neumark's opinions.

In addition, the plaintiff had -- plaintiffs had filed a class certification motion, which also relied in a great part on Dr. Neumark's opinion. And so it took me longer than it should've, but it took awhile to get through the Daubert issues.

I finally issued a decision, and I did exclude Dr. Neumark and Dr. Neumark's opinions on September 14th of 2022. And so

at that point it looked to me as if we were perhaps ready to move on to the summary judgment motions -- motion.  Singular.

I did have a couple of hearings as I'm sure you all are aware with regard to the plaintiffs' request to identify a new expert as well as to reopen discovery, and in the end I declined both of those requests and did not allow the plaintiffs to identify a new expert or to reopen discovery. That decision, which was oral, was issued on December 22nd of 2022, so that's about two and a half years ago, and since then the only thing really that has been pending for me to resolve is this motion for summary judgment.

In terms of the fact that it's taken that two and a half years for me to get this decision to you today, on the one hand I don't have any excuses other than the usual caseload, but I will point out a handful of things that certainly impacted the amount of time that it took us, and by "us" I mean my law clerks, my paralegal, me to -- to get to this point.

The filings in this case, to say that they've been voluminous would be an understatement.  Just in connection with the motion for summary judgment, there were 197 exhibits filed between the two parties, 2,179 pages of exhibits.  There were 128 pages of briefing and 445 pages of proposed facts or responses to proposed facts.

The defendant in support of the motion for summary judgment filed a brief that was, I think, 49 or 50 pages long

with 201 proposed findings of fact. The plaintiffs' brief was somewhat shorter and proposed only 61 additional findings of fact.

However, both parties violated, significantly violated, this Court's civil local Rule 56(b), as in boy, (1)(c), as in Charles. That rule states that a motion for summary judgment or a brief in opposition to summary judgment should be accompanied by a statement of proposed material facts, but it goes on to say that those facts should be presented in short numbered paragraphs, each paragraph containing a single material fact.

And I noted that the defendant filed 201, I think, proposed findings of fact, however, many of those proposed findings contained multiple findings of fact within a single numbered paragraph, and I'll give you just one example. Docket number 79 at page 38 is the defendant's proposed findings of fact. Paragraph 186 contains, by my count, conservatively, eight proposed findings of fact. It includes as many as 10 proposed findings of fact. It is a paragraph that covers in excess of a half a page. So although there were 201 digits in front of the paragraphs, the defendants filed far more than 201 proposed findings of fact.

It wasn't just the defendants. The plaintiffs in their response combined their own additional proposed findings of fact with their responses to the defendant's proposed findings

of fact. That document is at docket number 94. If one looks on page three of that document, which is part of the plaintiffs' own proposed additional findings of fact, you can look at paragraph six and see that that paragraph, I think, conservatively contains seven proposed factual findings, and in addition two footnotes, which also contain citations, but citations that are, number one, should've been included alongside the fact that they supported, and number two, in some cases provide additional findings of fact.

I realized because I went back and, as I did before our last hearing, reviewed some of the proceedings in front of Judge Jones. As I told you all before, I was not a part of those early discovery hearings of which there were many, and so I suspected perhaps that you all had had some discussions with Judge Jones about whether or not you could file oversized briefs or have extended deadlines or things of that nature.

I did find at docket number 75 a hearing from September 22nd of 2016, and on that date defense counsel explained to Judge Jones that they were teetering on the brink of filing the motion for summary judgment, but they asked Judge Jones about the page length restriction, advising him that they had 50 pages of briefing already completed and 250 findings of fact, and they wondered whether or not they could get an exception from the page restrictions in our local rules to file that oversized brief and the additional findings of fact.

The court minutes reflect that Judge Jones said that he would run it by me and he would let the parties know. However, I don't see anything in the docket that reflects whether or not he answered that question for the defense, and only a short time later, in fact, I think it was a day later on September 23rd of 2016, the defendants went ahead, filed their motion for summary judgment, filed the oversized brief, filed the additional proposed findings of fact.

So I can't tell whether or not defense had -- the defense had permission to do that. Perhaps they did, and if they did, I don't want to cast aspersions, but the point that I guess I'm trying to make is that if we were in a more casual setting I would use different phrasing, but in this setting I will say that you all filed a boatload of stuff here, a good deal of it as it turns out after extensive review by me and my law clerks, a good deal of it not really relevant to the -- to the issues at hand.

Now, I will acknowledge that when you all briefed the summary judgment motion, the class certification motion was also pending. There were some other moving parts and pieces. The plaintiffs believed that they had an expert witness, and so nobody went back and modified the briefing after I made the ruling on Dr. Neumark's opinion and after I excluded that opinion and his report.

And so part of the reason that there is what is now

9

irrelevant information on the docket is because it became irrelevant once I made a ruling on the certification motion and on the exclusion of Dr. Neumark's opinion and report.

But I raise all this to say that this kind of, I hate to use a term that could be construed as political, but this kind of flooding the zone type litigation tends in my view to be counterproductive. Filing as much as you possibly can perhaps may make a client feel better, perhaps sometimes it even makes counsel feel better that you've covered every single possible point that you could cover, but it severely hinders the Court in being able to give you both a timely and a thorough decision.

I have a colleague who over the years has been a judge much longer than I have and has experimented with various methods to try to cut down on the sheer number of documents and the sheer pages of documentation that parties in civil litigation file in summary judgment proceedings. He's gone so far sometimes as to tell the parties that if they don't agree on a document, they can't file it, et cetera. I think some of those efforts have been more successful than others.

I've resisted that because I've always wanted to give the parties an opportunity to litigate their own case. It's your case, you know it. You know what's important and what's not. But in a circumstance like this, I occasionally revisit that notion because in this case I -- I don't believe, I know that

the amount of documentation that was filed was detrimental to us being able to get you a decision as quickly as we would've liked to do, and at bottom, as it turns out, after rooting through all of the documentation, the issues here at the summary judgment level were not that terribly complex, and had we realized that sooner, had it taken us less time to plow through all of the material, I think you would've gotten a decision much sooner.

So with that, let me turn to the -- to the substance. First of all, as I've already touched on a little bit of the procedural history, I'm not going to go through it extensively because I did that in my ruling on the Daubert motion, which is at page -- I mean, at docket number 205, but just to kind of sum it up, at the close of discovery the plaintiffs moved for class certification and then the parties filed cross motions for summary judgment. The plaintiffs filed a partial motion for summary judgment in December of 2016. That was the same time they filed that class certification motion, and after that had happened as I've already explained the defendant moved to exclude the opinions of the plaintiffs' expert witness, who was Dr. David Neumark.

Dr. Neumark had analyzed the defendant's demographic data relative to the plaintiffs' claims that Indians and South Asians were overrepresented in the defendant's employee population and were favored over non-Indians and non-South

Asians in terms of hiring, promotion, and termination. Docket number 97.

I did, as I've said, grant the motion to exclude Dr. Neumark's opinions. I found that he was not qualified to perform analyses to determine employees' national origins. And I also found that he had used unreliable methodologies in doing so. I issued that December -- decision December 14th of 2022, and as I mentioned earlier, it's at docket number 205.

And because both the plaintiffs' motions for partial summary judgment and the motion for class certification relied very heavily on Dr. Neumark's analysis, I denied both of those motions without prejudice.

On November 10th of 2022, I held a status conference, and that's the conference at which as I mentioned earlier the plaintiffs orally moved to name a new expert and to reopen discovery, or in the alternative, they asked for leave to revise their response to the defendant's motion for summary judgment which had been pending at that point for a little while. That's at docket number 210.

I denied those requests at a hearing on December 22nd, 2022, for the reasons that I explained in the oral decision of that date. That's at docket number 214. And I said at the end of that hearing that the only thing that remained was for me to rule on the defendant's summary judgment motion based on the materials that I had in front of me at that time.

So as to summary judgment, the summary judgment motions are filed on behalf of the defendants as to the claims of individual plaintiffs Koehler, Parker, Bolten, and Handloser -- or Handloser. And just for the record defendant Koehler has a disparate treatment claim in the form of a failure to hire claim, defendant Parker has a disparate treatment claim for a 2012 failure to hire claim and a 2013 discriminatory discharge claim, defendant Bolten has a disparate treatment claim in the form of a failure to hire as a test lead and failure to promote as a test lead. Bolten also has a constructive discharge claim. Defendant -- I mean, I'm sorry, plaintiff Handloser has a disparate treatment claim in the form of discriminatory discharge, and then plaintiffs Koehler and Parker also brought a disparate impact claim.

And I'll go through each of those, but I just wanted to summarize the claims at the front end. I think I may have misspoken and called some of those folks defendants. Of course they are plaintiffs and individual plaintiffs.

I'm going to go through the facts now as they relate to those plaintiffs, but I need to make a clarification to avoid some confusion. I have included for the most part, unless I say otherwise, facts that appear to be undisputed. I say appear to be because I can't always fully tell.

Docket number 94 is a document that I referred to earlier. It's the plaintiffs' statement of additional facts requiring

13
RA188

denial of summary judgment, that's what they call it, and the plaintiffs' response to Infosys' statement of undisputed material facts. The plaintiffs combined those two things into one document, and to further confuse matters, when they were stating their own proposed additional facts, the plaintiffs started at fact number one, and then when they were stating their responses to Infosys' proposed facts, they started over at paragraph number one. So this document contains two paragraphs number one, two paragraphs number two, two paragraphs number three, et cetera.

I generally, when I am trying to determine what facts are undisputed, look at the nonmoving party's response to the moving party's proposed facts, because by comparing the proposed facts and the response to it, I can determine whether the fact is admitted or not. And I did do that here, but in many instances the defendant would state a proposed fact, the plaintiff would then state disputed, and then go on to say something that sounded eerily like an agreement. While it is true that Infosys did X. to Parker, and then they would explain a reason why they thought it happened. It wasn't really a dispute, it was an explanation.

And so it -- it made it difficult for me and -- and for my law clerks to work through where it was exactly that the plaintiff was disagreeing with the actual fact that was stated by the defendant and where it was that the plaintiff was

instead simply giving an explanation for that fact, which happened, I would say, more frequently than not, although the plaintiff called it a dispute.

So the first thing I want to clarify is that there are some places in the recitation I'm about to give you where I believe generally there was an agreement even though the plaintiff may have responded and said they disputed it because they thought that the rationale was different; and number two, I'm going to be citing from docket number 94 as to all of these findings, but it is the section of docket number 94 that starts on page 34, and that is the plaintiffs' responses to the defendant's proposed findings of fact.

There is a paragraph one on page 34 of docket number 94, that is the defendant's paragraph one proposed findings of fact, and then the plaintiffs' response to it. So every time I cite to a paragraph in docket number 94, you will find that paragraph somewhere between pages 34 and 160 of docket number 94.

The defendants are Infosys Technologies Limited, Inc. and its wholly owned subsidiary, Infosys Public Services, Inc., which I'm just going to call Infosys because that's what the parties do.

The defendants provide consulting systems integration and business I.T. services in more than 30 countries. Docket number 94 at paragraph one. And, again, that's the paragraph

one on page -- starting on page 34. I won't say that every time from here on out, but I just want to make sure that we're clear on that.

The defendants are based in Bengaluru, India. They have some technical disputes over exactly how many employees the defendants had, the parties have some technical disputes over exactly how many employees the parties had as of the date of briefing, but if you look at those technical disputes, it seems clear that both parties agree that the defendants employed over 190,000 employees worldwide and over 19,000 in the United States. That's paragraph two, docket number 94.

The employees outside of India primarily were engaged in sales or revenue generating work, such as providing consulting services to the defendant's clients. Paragraph three of docket number 94.

The defendants explained that they characterize the positions, their job positions, by, quote, "job level", close quote, and that goes from level two to level nine, and those level reflect -- levels reflect a position's place in the company's overall structure. And then they also characterize job positions by, quote, "career stream", close quote, such as project management. This is paragraphs five and six of docket number 94.

Within the project management career stream, the lowest level role is called systems engineer. That's classified as a

job level three.  The next highest role is a technology analyst.  That's classified as a job level four.  And the next higher after that is technology lead, L-E-A-D, which is classified as a job level five.  Paragraph six of docket number 94.

The defendant's external hiring process starts with the creation of an approved job opening, and they call an improved job opening a, quote, "requisition", close quote.  That approved job opening is posted on various websites, paragraphs seven and eight of docket number 94.

Applicants can apply to these open positions through the defendant's portal, but the plaintiffs assert that in some situations the defendants also were willing to accept informal applications and in some case situations the defendants directly recruited individuals for open positions.  Paragraph nine of docket number 94.

After conducting a resume' review, the defendants would invite selected candidates to interview either by phone or in person, and this is during a 2013, 2014 period, paragraphs 10 through 11 of docket number 94.

Sometimes they would follow a second phone interview with the technical advisers who would be assessing the applicant's skill set.  That's paragraph 12 of docket number 94.

In 2012 the defendants and Harley-Davidson entered into a five-year contract for I.T. services that included application

management, infrastructure support, and hosting services. Paragraph 15 of docket number 94. As part of that project, the defendants hired several people to work at various Harley-Davidson locations. Paragraph 17 of docket number 94.

The parties dispute the demographic makeup of those hires. The defendants say that they hired 54 people in the Milwaukee area, 77 -- for the Harley-Davidson project, I should say -- 77.8 percent of whom were non-Asian. Paragraph 19 of docket number 94.

The plaintiffs disagree. They say that Infosys' own data show that employees were, quote, "allocated", close quote, to the Harley-Davidson project in Milwaukee. There were 156 who were allocated to that project, 93 of whom were Asian, and so the plaintiffs calculate that 61.5 percent of those allocated to the project in Milwaukee were Asian. I think the way the plaintiffs put it is they say that 61.5 percent of Harley-Davidson's Milwaukee, quote, "workforce", close quote, was Asian. In any event, the parties dispute exactly the demographic makeup there, and those disputes can be found at paragraphs 17 and 19 of docket number 94.

One position that the defendants wanted to fill for the Harley-Davidson contract was the position of lead VMware, slash, Windows administrator. This is paragraph 23 of docket number 94. This was a highly skilled position that required several years of relevant experience. Paragraph 25.

18
RA193

Individual plaintiff Brenda Koehler, who was a Caucasian woman of American national origin, applied for the position in April, 2012. Docket number 94 at paragraphs 21 and 30.

The defendants invited Ms. Koehler to participate in a first round telephonic interview. Docket number 94 at paragraph 32. At some point before the interview Ms. Koehler got an E-mail changing the phone number that she was to use for the interview. The defendants say it was about an hour before the interview, Miss Koehler said it was only 10 minutes before the interview.

There's some disagreement about whether Miss Koehler was supposed to contact the defendants or if the defendants were supposed to contact Miss Koehler. One way or the other, the contact information for the interview everyone seems to agree changed shortly before the interview. Again, docket number 94 at paragraph 32.

On April 24th of 2012, two of the defendant's lead consultants did telephonically interview Miss Koehler for that lead VMware/Windows administrator position, and the interview lasted about a half an hour, about 30 minutes. Paragraph 33 of docket number 94.

During the interview Miss Koehler was asked questions that addressed Microsoft's active directory, group policies, and matters like how to set up users. Paragraph 34 of docket number 94. I should note that Ms. Koehler characterized some

of the questions she was asked as -- as surprising or things that she didn't think were relevant to the position.

The defendants say that based on Koehler's interview responses, they decided that she didn't have sufficient active directory experience nor the required technical skills for the position. Paragraphs 36 through 37 of docket number 94.

The plaintiffs, of course, dispute this. They argue that Miss Koehler had 17 years of active directory experience, although she did admit in her deposition that she was a little rusty on active directory at the time of the interview. Paragraph 35 of docket number 94, citing docket number 78-6 at 16, transcript page 232, lines 16 through 20.

In the end, the defendants say that they didn't hire any of the 113 applicants who applied for that particular position. Docket number 94 at paragraph 39. They explained that they then posted another job opening similar to the position that Ms. Koehler had applied -- for which she'd applied, but under a different requisition and with a different job description. Paragraph 41 of docket number 94.

The parties do agree that in July, 2012, the defendants ultimately hired Fazlul Halim, a U.S. citizen originally from Bangladesh as a job level four technology analyst. Paragraph 43 at docket number 94. The position Koehler had applied for was posted as a job level six technology architect. Paragraph 30 of docket number 94.

RA195

Fazlul Halim had a bachelor's degree in computer systems engineering and a master's degree in computer science and previously had worked as a senior systems VMware administrator. That's docket number 94 at paragraph 44.

The defendants assert that they hired Halim because of his technical skills. The plaintiffs argued that they hired Halim as part of their discriminatory preference for South Asian employees. That's paragraph 45 of docket number 94.

Halim resigned about two months later after he was hired. The defendant replaced Halim with Mike Recknagel, a Caucasian U.S. citizen, as a job level five technology lead. Recknagel, R-E-C-K-N-A-G-E-L. That's at paragraphs 46 and 48 of docket number 94.

Another individual plaintiff is Kelly Parker. Kelly Parker is a Caucasian woman of American national origin. Paragraph 49 of docket number 94. While she was in the process of getting her associate's degree, she started working in the I.T. field in 2010 as a help desk analyst and intern for a company called Packaging Corporation of America. Paragraphs 49 and 51 of docket number 94. In February, 2012, she began working as an I.T. intern at Harley-Davidson through a staffing agency called Enterforce, E-N-T-E-R-F-O-R-C-E, paragraphs 53 through 56 of docket number 94.

In this role Miss Parker didn't perform any coding or scripting, and she didn't conduct testing other than doing

troubleshooting for the help desk. Paragraph 57 of docket number 94.

Parker still was working as an intern performing help desk duties when the defendants took over responsibility for Harley-Davidson's I.T. functions. Paragraph 60 of docket number 94.

In the summer of 2012, Miss Parker learned that because of the defendant's taking over Harley's I.T. work, her intern position was going to conclude by October of 2012. Paragraph 71 of docket number 94.

In September of 2012, Parker interviewed for a permanent position as a systems engineer with the defendants. That's paragraph 73 of docket number 94. The plaintiffs disagree with that. The plaintiffs say that it wasn't a systems engineer position, that she was interviewing for a permanent role in the same help desk role that she had been holding.

In any event, the defendants assert that they didn't hire Parker for the position because they found her desktop technical skills were lacking and -- and generally she didn't have the skills required for the job. Paragraph 60 -- I'm sorry, paragraph 76 of docket number 94.

On November 2nd, 2012, Parker was aware that she hadn't been given an offer by the defendants and that there were no open positions for her, so she E-mailed a staffing agency to ask about positions. She stated that, quote, her "current

RA197

contract will end on December 31st of 2012, and at this time there are no open permanent positions for me," close quote. Paragraph 78 at docket number 94, quoting docket number 78-10, page 52.

However, for whatever reason Parker continued working in the same role past the end of the contract date, and on June 1, 2013, she accepted a written employment offer with the company called SoftHQ. SoftHQ was the defendant's new staffing service provider for the Harley-Davidson project.

This offer advised Miss Parker that the position she was being offered would end when the desktop system -- desktop support specialist job ended. This is at paragraphs 85 through 86 of docket number 94. Miss Parker disputes this, saying that she thought this was a permanent position.

Two months later SoftHQ informed Miss Parker that her contract would end on September 15th of 2013. Paragraph 108 of docket number 94.

Ms. Parker worked at the site in Tomahawk, Wisconsin, and she did not apply for either of the system engineer positions open in Tomahawk, that's paragraph 103 of docket number 94, and she didn't apply for any Infosys positions in 2013 and didn't look on Infosys' website for available positions. Docket number 94 at paragraph 109.

The defendants assert that in 2012 and 2013 they hired 37 systems engineers and senior systems engineers for the Harley

project and that only one of the successful applicants was Asian. Paragraph 104 at docket number 94. The job posting for these positions included language stating that the applicants must already be authorized to work in the United States without employer sponsorship for a visa. That's paragraphs 90 and 96 of docket number 94.

One of the defendant's already employed technology analysts, Kapil Kulkarni, was assigned to the Harley project some time in 2012. There's some disagreement about how that happened, but no disagreement about the time and the fact that Kulkarni was assigned to the Harley project. That's paragraph 62 at docket number 94.

Kulkarni had started working for the defendants in September, 2008, after he finished his bachelor's degree in electrical engineering. Paragraph 63, docket number 94.

Kulkarni transferred to the Tomahawk, Wisconsin location in September of 2013. Paragraph 110 at docket number 94. Parker asserts that she showed Kulkarni what she did and all of her documentation in her work. Actually she puts it that she trained Kulkarni for her position. Paragraph 113 at docket number 94.

The parties dispute the extent to which Kulkarni performed more advanced applications in support and software administration than Parker did when Parker had the role. Paragraphs 114 and 116 through 17 of docket number 94.

RA199

The next plaintiff is Layla Bolden -- I'm sorry, Bolten, B-O-L-T-E-N -- and in November of 2012, a recruiter for the defendants contacted Miss Bolten, who is a Caucasian woman of Russian national origin, about a test analyst opening with the defendants in the Washington D.C. area at job level four.  This is paragraphs 121 and 123 of docket number 94.  Bolten applied, and in January, 2013, the defendants offered Bolten the position, and she accepted.  Paragraph 128 of docket number 94.

The plaintiffs assert that although Bolten was hired for the test analyst position, it was her understanding that she was soon going to be promoted to a test lead role, which is something like a supervisor role as I understand it.  Paragraph 133 of docket number 94.

When Bolten first showed up to work on-site in February, 2013, her supervisor was Geeta Kulkarni.  This is a different Kulkarni and a different office than was involved with Miss Parker.  Paragraph 135 at docket number 94.  Geeta Kulkarni's testing team included two other test analysts in addition to Bolten, Petal Wong, a Chinese man, and then an Indian man.  Docket number one -- paragraph 136 of docket number 94.

During the approximately two-month period that Bolten was reporting to Kulkarni, Kulkarni made two comments about Bolten being an American.  Paragraph 138 at docket number 94.  First, Bolten once heard Kulkarni say something to the effect of, or

25

kind of like, quote, "stupid Americans", unquote, are lucky that they can take sick days, and this comment apparently happened after Miss Bolten had taken a sick day.  Paragraph 138 of docket number 94.

Second, there was a group meeting, there were several test analysts that were sharing their experiences at that meeting. Miss Bolten said that Kulkarni didn't let her talk about her background and said that she was here for, quote, "American experience", close quote.  Again, docket number 94 at paragraph 138.

The plaintiffs also assert that Kulkarni made other unspecified jokes and comments about stupid Americans, but they don't specifically identify them.  Again, paragraph 138 of docket number 94.

There was one other incident that Miss Bolten described, although it's not specifically related to Kulkarni, but she said that after the terrorist bombing of the Boston Marathon, she showed up at work and a coworker said that he had heard from the news that the person who had conducted the bombing was from Russia and said that Miss Bolten was Russian too, said something like Russian, Russian, you're Russian too, while pointing a finger or fingers at her.  Paragraph 139 of docket number 94.

In April, 2013, Bolten E-mailed two supervisors to inform them of her performance testing experience and she wrote,

quote, "please see my resume' just in case if you want to use my skills for the DCASPerformance testing," close quote. Paragraph 143 of docket number 94.

Bolten did not receive a response to this E-mail. She considered that harassing because she believed that all E-mails were required to be responded to. And she wasn't selected for the performance testing team which she believed was discriminatory, and that's at paragraphs 143 through 44 of docket number 94.

Bolten alleges that Kulkarni did not always speak English when talking about the project that they were working on and that Kulkarni and the other Indian tester would often speak, quote, "their language", close quote, or another language around Bolten. Bolten thought that when Kulkarni and the test worker were speaking this other language that they were saying, quote, "something nasty about her", close quote, and that they were trying to exclude her by speaking a language she didn't understand. That's paragraphs 140 through 141 of docket number 94.

Bolten concedes, however, that this did not interfere with her work performance, which she described as, quote, "great", close quote. Paragraph 142 at docket number 94.

Around May of 2013 Bolten spoke with a manager named John Santuchi, S-A-N-T-U-C-H-I, to complain about her coworkers' use of Hindi in the workplace. She asserted that everybody needed

RA202

to speak English so that she could understand when the team was discussing the projects that they were working on.  Paragraph 146 of docket number 94.  Santuchi responded that the use of Hindi was not right, they shouldn't be doing that, and that he would talk to his supervisor.  Paragraph 147 of docket number 94.

Bolten, however, asked Santuchi to keep her name, quote, "incognito", close quote, because she was worried, quote, "the harassment", close quote, would get worse, and Santuchi did agree to keep her name incognito.  Paragraph 147 of docket number 94.

At some point in time after Bolten spoke with Santuchi, Ajeet Mohanty asked Bolten to report to work at 8:30 a.m.  That is paragraph 148 of docket number 94.  Bolten says that she was the only tester who was required to come in at 8:30.  Same paragraph.  This is the only other harassing conduct or allegedly harassing conduct that Bolten alleged.  Docket number 94 at paragraph 151.

Around April or May of 2013, Bolten was moved to another testing team supervised by a different test lead, paragraphs 149 through 150 of docket number 94.  She also reached out to some other test leads to ask if they might need her help.  That's paragraph 152 at docket number 94.

After Bolten performed -- Bolten performed some work for other test leads, Ajeet Mohanty called her into his office to

ask her why she had eight hours a day charged on her time sheet. Paragraph 153 of docket number 94. Once Bolten explained that she had worked for other test leads to write test cases, Mohanty said it was good that she was being proactive. Again, paragraph 153.

Bolten alleges or perceives that this comment was insincere and that Mohanty was trying to fabricate a reason to get rid of her or to fire her. Again, paragraph 153 at docket number 94.

On June 3rd, 2013, Bolten E-mailed Mohanty expressing interest in working with the Selenium Automation Testing tool. Paragraph 154 of docket number 94. Mohanty never responded, and similar to the previous situation where Miss Bolten had E-mailed test leads and didn't get a response, she construed the failure, Mohanty's failure to respond, as harassing, and she wasn't selected for the Selenium Automation Testing tool project which she construed as discriminatory. Paragraph 154 of docket number 94.

At that same week Bolten was assigned to a new group, paragraph 155 of docket number 94, and then on June 10th of 2013, she was asked to move to another work station. Paragraph 156 of docket number 94. And it's alleged in the -- in the factual statements that this was maybe the third time or the fourth time that she had been asked to move, that Bolten had been asked to move work stations.

When she began setting up her belongings at the new station, another test analyst informed Miss Bolten that the station was the test analyst station and that Bolten's station would be another one around the corner. Paragraph 156. Frustrated, Bolten immediately wrote her resignation letter and left. Paragraph 157 of docket number 94.

Bolten told the defendants that she was leaving because she didn't like the commute and she wanted to leave as soon as possible. Paragraph 158 at docket number 94. And, by the way, her commute was some 90 minutes each way on some days given the fact that she was working in DC.

The plaintiffs dispute this. They say that Bolten later told human resources that she was quitting due to harassment and because her coworkers wouldn't speak English when discussing the work project. Again, paragraph 158 of docket number 94.

No one ever told Bolten that they had any concerns with the quality of her work or that her job was in jeopardy. Paragraph 162 of docket number 94. And because Bolten only had been employed for approximately five months at the time she left, she did not receive a formal performance review during the time that she was employed. Paragraph 162 of docket number 94.

Finally, the last individual plaintiff is Gregory Handloser, H-A-N-D-L-O-S-E-R. In August of 2004 Handloser, who

is Caucasian and of American national origin, started his employment with Infosys as a sales manager. Paragraph 169 of docket number 94. Handloser was responsible for acquiring new clients, which are called apparently logos, L-O-G-O-S, in company parlance. That's paragraph 171 of docket number 94.

The defendants appraise sales manager performance every six months based on certain key performance indicators like the number of new client accounts that are opened. Paragraphs 175 through 76 of docket number 94.

At the beginning of each performance appraisal cycle, the sales manager learns the targets for each of these key performance indicators for the upcoming cycle, paragraph 177 of docket number 94, and then during the appraisal process at the end of the performance appraisal cycle, the sales manager and the supervisor, quote, "enter their understandings of", close quote, the sales manager's performance to goal. Paragraph 179 of docket number 94.

The system eventually after several steps then generates a sales manager's consolidated relative rating, or CRR score, based on a bell curve of all sales managers' performances for that cycle. Paragraph 181 at docket number 94. Plaintiffs dispute that it's a bell curve; there's some argument about how it's calculated.

The highest available CRR score is a one plus, and the lowest score is a four. Paragraph 181 of docket number 94. A

RA206

four reflects that the employee did not meet expectations and the defendants state that this score generally is reserved for people whose performance placed them in the bottom 15 percent of their peer group.  Paragraph 181 of docket number 94.

Some time around the middle of 2011, Handloser began reporting to Sudip Singh, who was then the head of new sales for manufacturing for North and South America.  Paragraph 174 of docket number 94.  Singh completed Handloser's performance appraisal form for the April 1, 2012, to September 30, 2012, cycle.  Paragraph 182, docket number 94.

Singh determined that Handloser didn't meet his new revenue or his new contract opening targets, paragraphs 185 through 186 of docket number 94, and on this appraisal Handloser received a CRR score of four for that April 1 to September 30th, 2012, cycle.  Paragraph 189 of docket number 94.

The defendants say that in the fall of 2012 they conducted a reduction in force, an RIF, that led to the termination of employees.  Paragraph 192 of docket number 94.  They say that the RIF targeted employees who had received a CRR score of four in the most recent performance cycle.  Plaintiffs dispute that. The plaintiffs allege that 14 of the 50 terminated employees terminated in December, 2012, had CRR scores above four. Paragraph 193 of docket number 94.

Handloser was one of the people who was terminated during

that December, 2012, termination group. He was terminated on December 19th of 2012, paragraph 194, docket number 94. Although Handloser alleges that he was terminated around -- around 2000 --

I'm sorry. Although Handloser alleges that around 2011 the defendant made an effort to, quote, "purge", close quote, non-South Asian employees in the United States, the defendants claim that they hired more non-Asian employees in 2011 and 2012 than they had in prior years. That's paragraphs 200 through 201 of docket number 94.

So those are the pertinent facts with regard to the individual plaintiffs.

The summary judgment standard is one that you're all familiar with. Quote, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," close quote. Federal Rule of Civil Procedure 56(a).

Quote, "material facts", close quote, are those that, under applicable substantive law, quote, "might affect the outcome of the suit," close quote. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 at 248, 1986. A dispute over a material fact is, quote, "genuine", close quote, quote, "if the parties -- if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," close quote. Again,

Anderson at page 248.

A moving party, quote, is "entitled to a judgment as a matter of law", close quote, when, quote, "the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof," close quote. Celotex Corp. v. Catrett, 477 U.S. 317 at 323, 1986.

Still, quote, "A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact," close quote. Again, Celotex at page 323, internal quotation marks omitted.

To decide whether a genuine issue of material fact exists, a court must review the record construing all the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's, the nonmoving party's, favor. See among others Heft v. Moore, 351 F.3d 278 at 282, a Seventh Circuit decision from 2003, citing Liberty Lobby, 477 U.S. at 255.

Quote, "However, the court's favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture", close quote. Fitzgerald v.

Santoro, 707 F.3d 725 at 730, Seventh Circuit, 2013, quoting Harper v. C.R. Engineering, Inc., 687 F.3d 297 at 306, Seventh Circuit, 2012.

In other words, quote, "To survive summary judgment, the nonmoving party must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor," close quote. Fitzgerald, 707 F.3d at 730, quoting Makowski v. SmithAmundsen, LLC, 662 F.3d 818 at 822, Seventh Circuit, 2011.

So I'm going to start by addressing the disparate treatment claims, and to do that, I need to talk about the applicable legal and analytical frameworks.

So the first thing that I have to do is determine what legal analytical framework applies to the plaintiffs' disparate treatment claims. Is it the framework under Teamsters -- or The International Brotherhood of Teamsters v. the United States, 431 U.S. 324, 1977, or is it the legal analytical framework under McDonnell-Douglas Corporation v. Green? 411 U.S. 792, 1973.

The plaintiffs start their opposition brief by asserting that, quote, "The vast majority of Infosys' analysis applies the wrong framework," close quote. Because the defendant allegedly improperly argued that the plaintiffs failed to carry their burden of proof under the McDonnell-Douglas framework. That's docket number 93 at eight.

The plaintiffs assert that this was not an individual case, but a class action, and that because Koehler, Parker, and Handloser advanced pattern and practice claims, the McDonnell-Douglas framework was inapplicable and it was the Teamsters framework that applied. Again, docket number 93 at pages eight through 10, citing Teamsters 431 U.S. at 361 through 362.

This is an example of some of the confusion I think that was caused by the fact that the briefing for the summary judgment motion happened before I ruled on the plaintiffs' motion for certification. Because as we now know, this is not a class action. After defendants moved for summary judgment, I denied the plaintiffs' motion for class certification. Docket number 205.

And that's critical because the Supreme Court has explained that, quote, "The crucial difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination is manifest," close quote. Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867 at 876 from 1984.

Quote, "The inquiry regarding an individual's claim is the reason for a particular employment decision, while at the liability stage of a pattern or practice trial, the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decision making," close quote. Again, Cooper at

page 876 quoting Teamsters, 431 U.S. at 360, note 46.

For those reasons a plaintiff can maintain a pattern and practice case and use that method of proof only on behalf of a certified class. See King v. General Electric Corporation, 960 F.2d 617 at 622, Seventh Circuit, 1992, Gilty versus -- G-I-L-T-Y v. Village of Oak Park, 919 F.2d 1247 at 1252, Seventh Circuit, 1990. See also Davis v. Coca-Cola Bottling Company Consolidated, 56 F.3d 955, 967 through 69, Eleventh Circuit, 2008, affirming a grant of summary judgment for an employer and stating that the plaintiffs could not prosecute a pattern or practice claim absent a certified class.

Chin v. Port Authority of New York and New Jersey, 685 F.3d 135 at 149 through 150, Second Circuit, 2012. Quote, "All of our sister circuits to consider the question have held that the pattern or practice method of proof is not available to private nonclass plaintiffs," close quote. Brotherhood of Maintenance of Way Employees Division of the International Brotherhood of Teamsters v. Indiana Harbor Belt Railroad Company, case number 2:13 CV 18-PPS-APR, 2014 Westlaw 4987972 at asterisk number two, Northern District of Indiana, October 7th, 2014, acknowledging, quote, "that an individual can't pursue pattern or practice claims in the absence of class certification," quote, because, quote, "pattern or practice claims generally involve claims of classwide discrimination that a single individual or a small group of individuals cannot

37

**RA212**

readily prove," close quote.

So because there is no certified class in this case, I'll analyze the plaintiff's disparate treatment claims under the McDonnell-Douglas framework. But I'll remind us all that, quote, "Although there are many tests in rubrics for viewing discrimination claims, it is important to recall that at the end of the day, they are all merely convenient ways to organize our thoughts as we answer the only question that matters. When looking at the evidence as a whole, whether the evidence would permit a reasonable fact finder to conclude that the plaintiff's race caused the adverse employment action," close quote. Brooks v. Avancez, 39 F.4th 424 at 433, Seventh Circuit, 2022, quoting Ortiz v. Werner Enterprises, Inc., 834 F.3d 760 at 765, Seventh Circuit, 2016.

So that being said, and having decided that the McDonnell-Douglas framework is the framework that applies, I also have to acknowledge that a slight alteration to or modification of the McDonnell-Douglas framework is necessary given the allegations in this particular case. Here, the plaintiffs are white United States citizens and all of them but Bolten are United States nationals. This is typically called, of course, a reverse discrimination case.

And in reverse discrimination cases, the Seventh Circuit has modified the traditional McDonnell-Douglas burden shifting framework to require evidence of, quote, "background

circumstances", unquote, that demonstrate that, quote, "the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something fishy about the facts at hand," close quote.  Dunlevy v. Langfelder, 52 F.4th 349 at 353, Seventh Circuit, 2022, quoting Bless v. Cook County Sheriff's Office, 9 F.4th 565, 574, a Seventh Circuit decision from 2021.

The same reverse discrimination principles, quote, "apply in the context of a 1981 action," close quote.  Hague v. Thompson Distribution Company, 436 F.3d 816, 821 through 822, Seventh Circuit, 2006, citing Bennett v. Roberts, 295 F.3d 687 at 697, Seventh Circuit from 2002.  See also Morris v. BN -- B., as in boy, N. as in nickel, S., as in Sam, F., as in Frank -- Railway Company, 969 F.3d 753 at 758, Seventh Circuit, 2020, explaining the Title VII and Section 1981 claims have the same liability standards.

So a plaintiff in a reverse discrimination case must show, quote, number one, "background circumstances exist to show an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something fishy about the facts at hand."

Two, "he", meaning the plaintiff, "was meeting his employer's legitimate performance standards."

Three, "he suffered an adverse employment action."

And, four, "he was treated less favorably than similarly

situated individuals who were not members of his protected class," close quote. Formella v. Brennan, 817 F.3d 503 at 511, Seventh Circuit, 2016, quoting Ballance, B-A, as in boy, A-L-L-A-N-C-E, v. City of Springfield, 424 F.3d 614 at 617, Seventh Circuit, 2005.

As under the original McDonnell-Douglas framework, if the plaintiff, quote, "establishes the prima facie case, then the burden shifts to the defendants to offer a legitimate nondiscriminatory reason for the adverse employment decision," close quote. Bless, 9 F.4th at 574, quoting Formella, 817 F.3d at 511.

Quote, "And if the defendants make that showing, the burden shifts back to the plaintiff to demonstrate that the reason is pretext for race discrimination," close quote. Again, Bless, 9 F.4th at 574.

So with that framework in mind, turn to plaintiff Koehler. Koehler asserts that defendants discriminated against her by failing to hire her in April, 2012, for the lead VMware/Windows administrator position. The defendants argue that Koehler's claim must fail because there are no background circumstances suggesting discrimination and because Koehler was not qualified for the position. Docket number 80 at pages 19 through 22.

They also argue that they did not end up filling the position that Koehler applied for, so there's no inference that she was passed over for a non-white candidate. Docket number

80 at pages 22 through 24.

The plaintiffs respond that Koehler was qualified because she had extensive experience with Active Discovery [sic], Microsoft DNS, and VMware.  Docket number 93 at 23.  They contend that the defendants recruited and hired a South Asian candidate, Fazlul Halim, to fill the position that Koehler applied for, which the plaintiffs argue suggest discriminatory intent.  Docket number 93 at pages 21 through 22.

The defendants reply that Halim was hired from a different pool of applicants in July, 2012, months after Koehler had applied.  Docket number 108 at 15 through 16.  They also assert that they interviewed over a hundred other applicants, including 40 South Asian applicants, when Koehler first applied.  Page 16 of docket number 108.

The defendants maintain that they could've hired any one of those 40 South Asian applicants if they were simply seeking to fill the position with a South Asian employee.  Page 16 at docket number 108.

To prove her failure to hire claim, Koehler needed to show, quote, "background circumstances", close quote, that suggested there was discrimination against white applicants, that she was qualified for the position, and that she was treated less favorably than similarly situated individuals who are not white Americans.  Formella, 817 F.3d at 511.

Koehler asserts that the circumstances of her phone

41

interview for the lead VMware/Windows administrator position, quote, "suggested that she was never being seriously considered for the job," close quote. Docket number 93 at 21.

She says this is because the defendants changed the conference call information for her interview 10 minutes before the interview. As I've discussed, again, there's a dispute about whether it was an hour before the interview or 10 minutes before and whether the defendants were supposed to call Miss Koehler or Miss Koehler was supposed to call the defendants.

Miss Koehler describes the interview as, quote, "perfunctory", close quote, and she says that the interviewer was dismissive of her qualifications and experience. Again, docket number 93, pages 23 through 24.

Quote, "The contours of what constitutes a background circumstance are not precise." Mills v. Healthcare Services Corporation, 171 F.3d 450 at 455, Seventh Circuit, 1999. The Seventh Circuit has suggested, quote, "that a gross disparity in qualifications might be such evidence," close quote. Bless, 9 F.4th at 574, quoting Preston v. Wisconsin Health Fund, 397 F.3d 539 at 542, Seventh Circuit, 2005.

Other courts have, quote, "held that background circumstances could include situations in which the person ultimately hired was clearly less qualified than the plaintiff, the hiring authority expressed intense interest in hiring a

woman, and there was a pattern of hiring women in the past," close quote, or they have found that, quote, "the plaintiff successfully showed background circumstances where she was the only white employee in the department and nearly all of the decision makers were Hispanic," close quote. That's Mills, 171 F.3d at 455.

Although the last minute, whether it be last hour or last 10-minute change to the interview contact information for the phone interview and the interview questions that Koehler thought were irrelevant to the job may have been unexpected and they may have been frustrating, they do not suggest racial discrimination. As the defendants argue, quote, "No evidence suggests Infosys spared South Asian candidates the same questions or circumstance, nor could these minor complaints otherwise suggest Infosys' reasons for rejecting Koehler or any of the other 112 unsuccessful applicants are phony," close quote. Docket number 80 at 24, citing Helzing v. Loyola University of Chicago, case number 02 C 9408, 2004 Westlaw 1881780 at asterisk nine, Northern District of Illinois, August 16th, 2004. Quote, "rejecting argument in reverse discrimination case the interview process was bizarre and strange because courts cannot dictate how employers conduct interviews or select hiring criteria," close quote.

Even assuming the defendants hired Halim for the same job that Koehler applied for and, of course, they argue that they

didn't, Halim was not, quote, "grossly", close quote, or even, quote, "clearly", close quote, less qualified for the position than Koehler.  Halim had just worked as a senior VMware engineer in charge of VMware, while Koehler had never overseen VMware, and Halim had supported active directory on which Koehler had extensive experience but also admitted during the interview that her skills were a bit rusty.  Docket number 94 at paragraphs 31, 35, and 44.

And even aside from all of that, Koehler's claim can't survive summary judgment because she hasn't demonstrated that the defendant's legitimate non-discriminatory reason for not hiring her was a pretext for discrimination.  See Keeton v. Morningstar, Inc., 667 F.3d 877 and 885, a Seventh Circuit decision from 2012.

Quote, "Although the question of pretext normally arises only after the plaintiff has established a prima facie case of discrimination and the employer has countered with a legitimate nondiscriminatory reason for the adverse action, we may skip over the initial burden-shifting of the indirect method and focus on the question of pretext," close quote.  That direct/indirect business is gone as we know under Ortiz, it's an older case.

The defendant's reason for not hiring Koehler is that she was unqualified for the position.  Docket number 80 at 22. Koehler's interviewers noted on her post interview evaluation

44

form that she, quote, "was lacking in average and advanced technical fundamentals," close quote.  That's from docket number 78-7 at paragraphs 12 through 13.

That's a declaration of Amol Vyawahare, who was one of the technical interviewers.  Also averred in the declaration that based on Koehler's work history and, quote, "inability to answer certain technical questions posed of her," close quote, it was, quote, "clear", close quote, that Koehler, quote, "had insufficient active directory experience to fulfill the duties of the position," close quote.  Paragraph 11 of docket 78-7.

He further averred that Koehler's, quote, "application was rejected because she lacked the average and advanced technical skills required for the -- or requisite for the job and was not qualified for the job," close quote.  Paragraph 14 of docket number 78-7.

When, quote, "the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual, the question is simply whether the evidence would permit a reasonable fact finder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action," close quote.  That's Abebe v. Health & Hospital Corporation of Marion County, 35 F.4th 601 at 606, Seventh Circuit, 2022, quoting Ortiz, 834 F.3d at 765.

Quote, "A plaintiff may show a genuine dispute of fact on

pretext by identifying such weaknesses, implausibilities, inconsistencies, or contradictions in a stated reason that a reasonable trier of fact would find it unworthy of credence," close quote. Liu, L-I-U, v. Cook County, 817 F.3d 307 at 316, Seventh Circuit, 2016, quoting Harper v. C.R. England, Inc., 687 F.3d 297, 311, Seventh Circuit, 2012.

Quote, "It is not the court's task, however, to evaluate whether the employer's purported reason for the adverse employment action was correct, justified, or even if it was fair. We look only to see if the employer honestly believed those reasons," close quote. Haley v. Urban Outfitters, Inc., 2023 Westlaw 1775670 at asterisk number three, Seventh Circuit, February 6, 2023, citing Igasaki v. Illinois Department of Financial & Procurement Regulation, 988 F.3d 948 at 958, Seventh Circuit, 2021.

Quote, "Pretext is a lie, specifically a phony reason for some action, not just faulty reasoning or mistaken judgment on the part of the employer," close quote. Bragg v. Munster Medical Research Foundation, Inc., 58 F.4th 265, 271, Seventh Circuit decision from 2023, quoting Barnes v. Board of Trustees of the University of Illinois, 946 F.3d 384, 389 through 90, Seventh Circuit, 2020.

Koehler has not met her burden to identify evidence that the defendant's reason was pretextual. The closest she comes is asserting that, quote, "Infosys' shifting contradictory and

illogical positions at a minimum place its explanation in doubt and warrant a denial of summary judgment," close quote. Docket number 93 at 22.

Shifting or inconsistent explanations may be evidence of pretext, Parker v. Brooks Life Science, Inc., 39 F.4th 931 at 938, Seventh Circuit, 2022, as can post-hoc rationalizations, Bragg, 58 F.4th at 72. But that's not the case here. The defendants produced an E-mail dated April 24th, 2012, in which the interviewers rejected Koehler at the, quote, "technical level", close quote, because they found her, quote, "lacking in average and advanced technical fundamentals," close quote. Again, that is the Vyawhare declaration, docket number 78-7 at paragraphs 10 through 11 and 13.

The defendants consistently have presented Koehler's lack of qualifications as the reason that they didn't hire her. Koehler has presented no evidence suggesting that that reason is phony or that the defendants didn't honestly believe that she was not sufficiently qualified for the position.

The defendants have generally throughout the litigation asserted their overarching position that Koehler showed preference to people of southeast Asian origin and that that was discriminatory, but that general assertion is not enough to show that the reason that Koehler gave -- I mean, I'm sorry, I mean that Infosys gave for not hiring Koehler was pretextual.

Koehler's presented no evidence that the defendant's

explanation for not hiring her is a pretext for race discrimination. And so I'm going to grant the defendant's motion for summary judgment as to Koehler's claim in this regard. And that's, again, her disparate treatment claim.

Next is Parker. Parker raises two disparate treatment claims as I mentioned at the outset. First, the defendant's failure to hire her for a permanent position in September, 2012; and, second, their decision to terminate her contract in 2013.

So I'll start with the failure to hire claim. Parker alleges that the defendants discriminated against her by rejecting her for a systems engineer position in 2012. The defendant's first argue that Parker's failure to hire claim is time-barred because she didn't file an administrative charge discrimination within 300 days after learning of the decision not to hire her. That's docket number 80 at 25.

The defendants argue that Parker knew of the decision not to hire her by at least November 2nd of 2012, which is the date on which she sent that E-mail to the staffing agency stating that her contract was ending and there weren't any open positions for her. Page 26 of docket number 80.

The defendants assert that Parker had then until August 29th of 2013 by which to timely file a charge of discrimination arising out of the failure to hire but that she didn't file that charge until November 22nd of 2013. Page 26

of docket number 80.

The plaintiffs respond that Parker could, quote, "piggyback", close quote, off of Koehler's charge of discrimination which Koehler filed on October 18th of 2012 because Parker's claim arises out of the same discriminatory conduct during the hiring process.  That's docket number 93 at 27.

That piggybacking argument from the plaintiffs is misplaced.  Although the Seventh Circuit has approved that approach in class actions, it expressly has rejected its application in a two-complainant case.  Horton v. Jackson County Board of County Commissioners, 343 F.3d 897 at 900 through 901, Seventh Circuit, 2003.  Again, there is no certified class here, so Parker can't piggyback off of Koehler's timely filed charge, and that means that Parker's Title VII claim arising out of the 2012 failure to hire is time-barred.

But let's set that aside for a moment.  Even if Parker timely had filed that claim, it fails on the merits.  Because like Koehler, Parker has not presented background circumstances suggesting discrimination or evidence that the defendant's reason for not hiring her was pretextual.  The defendants assert that most of the employees hired for the Harley-Davidson project in Milwaukee were non-Asian, and that out of the 37 systems engineer and senior systems engineer positions filled

RA224

in '12 and 2013, only one went to an Asian applicant, docket number 80 at 27. They contend that Parker wasn't hired because she didn't have the technical skills needed for the systems engineer position. Pages 28 through 30 of docket number 80.

The plaintiffs dispute this. They argue that Parker interviewed for a help desk desktop support position, which was pretty much what she was doing as an intern, not a more technical systems engineer position. Docket number 93 at 27.

The plaintiffs also assert that the defendants transferred existing South Asian employees to work on the Harley-Davidson project, skewing their hiring numbers. Page 28 of docket number 93.

Setting aside the disputes over who the defendants hired to staff the project, even assuming that Parker could establish a prima facie case of discrimination, her claim fails at the pretext stage because like Koehler, she's not met her burden to submit evidence that the defendant's reason is false. Parker's interviewers rejected Parker for the position, quote, "on technical grounds", close quote, because she was, quote, "technically not competent for the role requirements", close quote, and, quote, "not suitable for their requirement", close quote. Docket numbers 94-47 at 2 and 78-1 at paragraphs 11 and 15.

Parker may believe that she was qualified for the role, but she hasn't presented any evidence that the defendants

didn't honestly believe that she lacked the required qualifications. So not only is her claim untimely, but Parker's provided no evidence that the defendant's explanation for not hiring her was pretext for race discrimination, and I'll grant the defendant's motion for summary judgment as to that claim.

The other claim Parker brings is the 2013 discriminatory discharge claim. And the defendants argue that that claim must fail as well because they didn't discharge Parker. That's docket number 80 at page 30. The defendants assert that they merely allowed their contact with Parker's employer, which if you recall was the staffing agency, SoftHQ, that the defendants had hired for the Harley-Davidson project, they just allowed that contract to expire at the end of its term. Page 20 of docket number 80.

Parker argues that this is incorrect, because she was under the impression that she had a contract for a long term position. Docket number 93 at page 28.

Again, Parker has not met her burden to demonstrate that the reason that the defendants had given is pretext for race discrimination. That's Bless, 9 F.4th at 574. Even if the employment action at issue is considered a discharge, and I'm not at all sure that it is because it seems fairly clear that the defendants simply allowed the SoftHQ contract to lapse and Ms. Parker had been hired through SoftHQ, but even if that

action was a discharge, the expiration of the staffing contract is a legitimate reason for the end of Parker's employment.

The June 1, 2013, offer of employment letter that Parker signed states specifically that her employment would, quote, "end as soon as the desktop support specialist role with Infosys at Harley-Davidson in Tomahawk, Wisconsin ends with SoftHQ's client," close quote. Docket number 94-32 at 31, and that is the docket location of that letter.

A task order between SoftHQ and the defendant dated September 4th, 2013, states that the term of services provided under the order commenced on June 25th, 2013, and would, quote, "be completed, slash, expire", close quote, on September 15th, 2013. Docket number 95-22 at pages two and six.

On August 13th, 2013, SoftHQ informed Parker that her, quote, "project with Harley-Davidson," close quote, was, quote, "soon coming to an end and therefore her employment with SoftHQ would be terminated," close quote, on September 15th of 2013. Docket numbers 94-32 at 48 and 78-14 at paragraph seven.

The plaintiffs assert that the defendants have presented shifting reasons for Parker's termination, which they say suggests pretext. Docket number 94 at 105. And Parker claims that the defendants informed her that she was being terminated because her desk in the I.T. area were not, quote, "tidy", close quote, and because she had been late to work on one occasion. Docket number 93 at 28.

Quote, "A plaintiff may show a genuine dispute of fact on pretext by identifying weaknesses, implausibilities, inconsistencies, or contradictions in a stated reason," close quote. Liu, 817 F.3d at 316 quoting Harper, 687 F.3d at 311. But Parker's suggestion of a phony reason for her discharge does not rise above the mere speculation that such -- doesn't rise above mere speculation such that a, quote, "reasonable trier of fact could find it unworthy of credence," close quote. Liu, again, 817 F.3d at 316.

And as the defendants point out as an aside, the references, quote, "to neatness and punctuality are inadmissible hearsay, they're statements by an unnamed person," close quote, that Parker reports. Docket number 108 at 21, citing Hebert v. J.P. Morgan Chase Bank N.A., number 13 C. 4358, 2016 Westlaw 245570 asterisk six, Northern District of Illinois, January 21, 2016.

Quote, holding statements about what -- I'm sorry. "Holding statements about what, quote, 'another loan officer', close quote, told the plaintiff would be inadmissible hearsay, particularly because it didn't name the out of court declarant or give a basis for the knowledge."

So Parker's assertion that she was told that her desk was untidy and she was told that she had been late to work on one occasion are not sufficient to raise a genuine issue of material fact as to the defendant's stated reason for

53
**RA228**

terminating her, which was that the contract under which she was hired, SoftHQ contract, expired and she had been hired through SoftHQ.

Further, the employee that the plaintiffs argue, quote, unquote, replaced Parker was clearly more qualified. Kulkarni had a four-year engineering degree and years of I.T. experience, including five years with the defendants. Parker had a two-year degree and only a few years of experience as an I.T. intern.

So Parker has provided no evidence of the defendant's explanation for her termination, again, that the staffing contract with its SoftHQ expired is a pretext for race discrimination. Parker's disparate treatment claim regarding her discharge in 2013 must fail as a matter of law, and I will grant summary judgment as to that claim.

That takes us to Bolten. I will note that in their response brief the plaintiffs assert only a constructive discharge claim on behalf of Bolten. That's at docket number 93 at pages 45 through 50.

So as best I can tell, the plaintiffs have abandoned any claims arising out of the defendant's alleged failure to hire Bolten as a test lead or to promote her. Because the plaintiffs have not argued those claims, they're either waived or forfeited, and I'm going to grant summary judgment for the defendants to the extent that Bolten was asserting a claim

RA229

based on the failure to hire as a test lead or the failure to promote her.

That leaves only the constructive discharge claim. The plaintiffs argue that Bolten was denied a promotion, isolated by her coworkers because they were speaking another language, presumably Hindi, was subject to taunts and insults about her Russian-American status, and that her workload was unfairly reduced. That's docket number 93 at pages 45 through 49.

The plaintiffs say that those circumstances in combination, quote, "communicate to a reasonable employee that she will be terminated," close quote. Page 49 of docket number 93.

The defendants respond that Bolten was regularly receiving work and that she testified that her coworkers' use of Hindi didn't affect her performance. Docket number 108 at page 34. They also argue that the circumstances didn't rise to the level of a hostile work environment and that Bolten was subject to only, quote, "sporadic and minor annoyances," close quote. Docket number 108 at pages 34 through 35.

Quote, "Constructive discharge for Title VII claims require proof that the employer's discriminatory conduct forced the plaintiff to resign because her working conditions from the standpoint of a reasonable employee had become unbearable," close quote. Patterson v. Indiana Newspapers, Inc., 589 F.3d 357 at 366, Seventh Circuit, 2009. Quoting Fischer v. Avanade,

Inc., 519 F.3d 393 at 409, Seventh Circuit, 2008.

The Seventh Circuit has recognized two different forms of constructive discharge, but both of those forms require a plaintiff to show, quote, "that the work environment had become intolerable," close quote. Chapin v. Fort-Rohr Motors, Inc., 621 F.3d 673 at 679, Seventh Circuit, 2010; and Wright v. Illinois Department of Children & Family Services, 798 F.3d 513, 527, Seventh Circuit, 2015.

Quote, "In the first form of constructive discharge, an employee resigns due to alleged discriminatory harassment," close quote. Wright, 798 F.3d at 527, quoting Chapin, 621 F.3d at 679. Quote, "A plaintiff proceeding under this theory must demonstrate a work environment that is even more egregious than that needed for a hostile work environment," close quote. Thompson v. Memorial Hospital of Carbondale, 625 F.3d 394 at 401 through 402, Seventh Circuit, 2010, citation omitted.

And, quote, "Egregious working conditions alone are not enough to prevail on a constructive discharge claim," close quote. Again, Thompson at pages 401 through 402. Quote, "The law requires the employee to go further, by showing that seeking redress from the employer would be futile," close quote. Again, Thompson, 625 F.3d at 401 through 402, citing Boumehdi v. Plastag Holdings, LLC, 489 F.3d 781 at 790, Seventh Circuit, 2007.

The second form of constructive discharge, quote, "occurs

56
**RA231**

when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated," close quote. Chapin, 621 F.3d at 679, quoting EEOC v. University of Chicago Hosps, 276 F.3d 326 at 332, Seventh Circuit, 2002.

Quote, "This form of constructive discharge, however, does not eliminate the need for the plaintiff to show that his working conditions had become intolerable," close quote. Again, page 679 of Chapin. Quote, "And a working condition does not become intolerable or unbearably -- or unbearable merely because a prospect of discharge lurks in the background," close quote. Chapin, 621 F.3d at 679, quoting Cigan v. Chippewa Falls School District, and 388 F.3d 331 at 333, Seventh Circuit, 2004.

Even viewing the facts in the light most favorable to the plaintiffs, Bolten has not established evidence of constructive discharge under either of these forms sufficient to survive summary judgment. She has not provided sufficient evidence to, quote, "demonstrate a work environment that is even more egregious than that needed for a hostile work environment," close quote. Thompson, 625 F.3d at 401 through 402, citation omitted.

Quote, "To rise to the level of a hostile work environment, conduct must be sufficiently severe or pervasive -- or persuasive to alter the conditions of employment such that it creates an abusive relationship," close

57

quote.  Huri v. Office of the Chief Judge of the Circuit Court of Cook County, 804 F.3d 826 at 834, Seventh Circuit, 2015. And the word "abusive" that I emphasized was emphasized in the original.

This standard is not met if a plaintiff demonstrates a work environment that's simply unpleasant.  Simpson v. DeJoy, case number 19-CV-789, 2021 Westlaw 793893 at asterisk three, Eastern District of Wisconsin, March 2nd, 2021, citing Huri, 804 F.3d at 834.  Going further than a claim of a hostile work environment to prove constructive discharge via discriminatory harassment, quote, "is a high hurdle for plaintiffs to clear," close quote.  Stamey, 37 F.4th at 1225.

And, quote, "Title VII is not a general civility code and courts will not find liability based on the sporadic use of abusive language," close quote.  Ford v. Minteq Shapes & Services, Inc., 587 F.3d 845 at 848, Seventh Circuit, 2009, quoting Faragher v. City of Boca Raton, 524 U.S. 775 at 788, 988 -- 1998.

Quote, "A handful of comments spread over months is insufficient to demonstrate severe or pervasive harassment as a matter of law", close quote.  Johnson v. Advocate Health & Hospitals Corporation, 892 F.3d 887, 908 through 909, Seventh Circuit, 2019, Judge Manion concurring.  Citing Baskerville v. Culligan International Corporation, 50 F.3d 428 at 431, Seventh Circuit, 1995, and Patt v. Family Health Systems, Inc., 280

F.3d 749 at 754, Seventh Circuit, 2002.

Although alleging, quote, "frequent taunts and rude remarks," close quote, docket number 93 at 47, Bolten has not identified -- has identified, excuse me, only two specific incidents. The first one is when -- I actually think there are three specific incidents. The first one is when Bolten overheard Geeta Kulkarni comment that, quote, "those stupid Americans are lucky because they can take sick days", close quote.

The second was that meeting where testers were kind of talking about their experiences and allegedly Kulkarni told Bolten that she couldn't talk about hers and that she was just there for the American experience.

And then finally there's this kind of amorphous incident that occurred the day after the Boston Marathon bombings where some employee said to Ms. Bolten something like, Russian, Russian, and the guy who did this was Russian, and you're Russian too, and pointed at her. Ms. Bolten speculates that during the time that she heard her coworkers speaking in a language she didn't understand, they may have been making other rude comments or saying, as she put it, nasty things about her, but she also admits that she doesn't know that, she can't know that for sure because she didn't understand the language that they were speaking.

These few incidents over the course of the months that she

**RA234**

was there do not rise to the level of demonstrating, quote, "a work environment that is even more egregious than that needed for a hostile work environment," close quote. Thompson, 625 F.3d at 401 through 402, citation omitted.

Ms. Bolten has not met the requirements for a claim of constructive discharge through discriminatory harassment, nor does the evidence that she's provided sufficiently establish that the defendants, quote, "acted in a manner so as to have communicated to a reasonable employee that she will be terminated," close quote. Chapin, 621 F.3d at 679, quoting University of Chicago Hospitals, 276 F.3d at 332.

As I've already said, this second form of constructive discharge, quote, "does not eliminate the need for the plaintiff to show that her working conditions had become intolerable," close quote. Chapin, 621 F.3d at 679. Quote, "And a working condition does not become intolerable or unbearable merely because a prospect of discharge lurks in the background," close quote. Chapin, 621 F.3d at 679, quoting Cigan, 388 F.3d at 333.

I've already explained that the facts that Miss Bolten has pointed to as evidence of her constructive discharge even construed in the light most favorable to her simply do not rise to the level of intolerable or unbearable, it is -- there is not any way that a reasonable fact finder could conclude that because of the couple of comments that she's identified, one

from -- one or two from Kulkarni and one from this other coworker. And the fact that there was a language being spoken sometimes that she did not understand, no one could conclude that those incidents would give her some reason to believe that she was likely to be terminated or that the working conditions were intolerable.

So I'll grant the defendant's motion for summary judgment and I will dismiss Bolten's constructive discharge claim.

Takes us to Handloser. Handloser asserts that the defendants terminated him for discriminatory reasons and the defendants respond that Handloser was terminated due to poor performance as part of the company-wide reduction in force. That's docket number 80 at 41. Handloser's claim, as Koehler's and Parker's did, fails because he hasn't established that this reason was pretextual.

The defendants provided a declaration from Patricia Cramer. Miss Cramer avers that in the fall of 2012 the defendants conducted a reduction in force that, quote, "targeted those who received a CRR rating of four in the most recent performance appraisal cycle," close quote. Docket number 78-2 at paragraph seven. Handloser was one of those people. He received a CRR rating of four on his most recent performance appraisal, which brought him within the ambit of the RIF.

Handloser argues that one single declaration is not enough

evidence to prove that the RIF existed.  He provides no citation for that, and the summary judgment standard, of course, simply says that the person who's making a statement of fact must support that statement of fact with evidence.  A declaration, a sworn affidavit, or an attestation is, in fact, evidence.  He's also presented no evidence of his own contradicting Cramer's declaration.

Handloser's presented no evidence that the defendant's explanation for terminating him, his low performance score and the fact that that put him in the group of people that were caught up in the RIF, is false or a pretext for race discrimination.  So Handloser's disparate treatment claim fails as a matter of law, and I will grant the defendant's motion for summary judgment as to that claim.

I do want to say that -- or address briefly the fact that in their opposition brief the plaintiffs say that Handloser also asserted a claim for failure to promote.  Docket number 93 at page 24.  Handloser argues that, quote, "Infosys does not even address Mr. Handloser's promotion claim precluding judgment," close quote.  Page 31 of docket number 93.

But the defendants correctly point out the second amended complaint, which is the operative complaint in the case, did not plead any failure to promote claim for Handloser.  That's at docket number 19, and Handloser's allegations are at paragraphs 96 through 111.

So I'm not going to consider an unpled failure to promote claim at the summary judgment stage. If it was not included in the second amended complaint, then there's no need for the defendants to have addressed it and there's no need for me to rule at summary judgment.

What that leaves us with is the disparate impact claim. Koehler and Parker are the two individual defendants -- or, I mean, plaintiffs, sorry -- who argue that the defendant's, quote, "hiring practices result in a disparate impact on non-South Asian and non-Indian applicants," close quote. Docket number 93 at 34. Quote, "Disparate impact claims may be based on any employment policy, not just a facially neutral policy," close quote. Adams, 743 F.3d at 731 through 32, quoting Watson v. Forth Worth Bank & Trust, 487 U.S. 977 at 990 through 91, 1988.

But, quote, "A plaintiff must first show that the employment practice had an adverse impact on employees with a protected characteristic, such as race," close quote. Downing v. Abbott Labs, 48 F.4th 793 at 815, Seventh Circuit, 2022, citing Ernst v. City of Chicago, 837 F.3d 788 at 796, Seventh Circuit, 2010.

Quote, "To satisfy this burden, the plaintiff is responsible for isolating and identifying the specific employment practice that is a response -- allegedly responsible for any observed statistical disparities," close quote. Puffer

v. Allstate Insurance Company, 675 F.3d 709 at 717, Seventh Circuit, 2012, quoting Watson, 487 U.S. at 994. Quote, "Isolated and singular incidents generally are insufficient to constitute a specific employment practice," close quote. Bennett, 295 F.3d at 698, citation omitted.

Quote, "Second, the plaintiff must establish a causal connection between the employment practice and the statistical disparity," close quote. Again, Bennett, 295 F.3d at 698. The plaintiff must, quote, "establish causation by offering statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group," close quote. Puffer, 675 F.3d at 717, quoting Watson, 487 F.3d at 994 through 95.

Quote, "Disparate impact plaintiffs are permitted to rely on a variety of statistical methods and comparisons to support their claims," close quote. Chaidez v. Ford Motor Company, 937 F.3d 998 at 1007, Seventh Circuit, 2019, citing Adams, 742 F.3d at 733.

Quote, "If the employee makes such a showing, then the burden shifts to the employer to show its employment practice is job related for the employee's position and consistent with business necessity," close quote. Downing, 48 F.4th at 815, quoting 42 U.S.C. 2000e-2(k)(1)(A)(i). Quote, "If the employer satisfies this requirement, the burden shifts back to the

64
RA239

plaintiff to show that an equally valid and less discriminatory practice was available that the employer refused to use," close quote. Puffer, 675 at 717, citing Adams v. City of Chicago, 469 F.3d 609 at 613, Seventh Circuit, 2006.

So to try to establish the prima facie case for disparate impact, Koehler and Parker identified two specific employment policies allegedly responsible for causing a disparate impact. First, a visa scheme to create a, quote, "inventory", close quote, of South Asian workers in India standing ready to fill positions in the U.S. on short notice rather than requiring the defendant to hire non-South Asians.

And, second, managers instructing the U.S. based talent acquisition unit to favor South Asians in recruiting and hiring within the United States. Docket number 93 at 35 through 36.

The plaintiffs have not, however, satisfied the, quote, "robust causality requirement", close quote. Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc., 576 U.S. 519 at 542 from 2015.

I've already explained that the plaintiffs must, quote, "establish causation with statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group," close quote. Chicago Teachers Union v. Board of Education in the City of Chicago, 14 F.4th 650 at 655, Seventh Circuit, 2021, quoting

Puffer, 675 F.3d at 717.

The plaintiffs rely on Dr. Neumark's report and the exhibits accompanying it to establish a statistical disparity, but, of course as I've explained multiple times now, after the parties have briefed the defendant's motion for summary judgment, I granted the defendant's motion to exclude Dr. Neumark's expert opinions. Docket number 205 is that decision.

Excluding the statistics that rely on Dr. Neumark's opinions, the plaintiffs have provided statistics that focus on underrepresentation. The Seventh Circuit has held that, quote, "Underrepresentation statistics cannot make out a prima facie case of disparate impact," close quote. That's Gilty v. Village of Oak Park, 919 F.2d at 1247, page 1254, Seventh Circuit, 1990, citing Cox v. City of Chicago, 878 -- I'm sorry, 868 F.2d 217 at 220 through 223, Seventh Circuit, 1989.

See also Perry v. Johnson, case number 07-C-767, Westlaw 10711151 at asterisk seven through eight, Eastern District of Wisconsin, December 28th, 2009, citing Gilty for the principle that, quote, "There must be statistics that show the number of eligible candidates against the number of people hired for the position, not just the mere disparity in the actual workforce," close quote. Quote, "In disparate impact cases, it is eligibility rate, not underrepresentation, that is telling," close quote. Gilty, 919 F.2d at 1254.

The plaintiffs' assertions that South Asian workers are overrepresented in the defendant's workforce compared to the demographics in the United States as a whole cannot satisfy the causation requirement and cannot make out a prima facie case of disparate impact. Quote, "Disparate impact cases because of their emphasis on consequences necessarily require a focus on statistical evidence," close quote. Gilty, 919 F.2d at 1254.

Without an expert or any eligibility rate statistics, rather than simply underrepresentation statistics, the plaintiffs have not established a causal connection. The plaintiffs have not offered, quote, "statistical evidence of a kind and degree sufficient to show that the," unquote, identified employment practices caused the exclusion of Koehler and Parker from the jobs they sought, quote, "because of", unquote, their race. Puffer, 675 F.3d at 717, quoting Watson, 487 F.3d at 994 through 95.

Koehler and Parker have not established prima facie cases of disparate impact and cannot survive summary judgment, and so I'm granting the defendant's motion for summary judgment as to the disparate impact claims.

And what that means is that I have granted summary judgment in its entirety in favor of the defendants. I am granting the motion at docket number 78 with regard to all of the individual plaintiffs, and I'm ordering that the case be dismissed with prejudice.

67

**RA242**

What that also means is that some of the rulings that I had made denying certain motions without prejudice, like the motion for class certification, and I have kind of said, you know, depending on how things unfold, those can come back perhaps and be reviewed at a later time. Those now have been mooted because I am dismissing the case with prejudice.

Assuming that you all are still here and awake, I'll turn back to you in just a moment, but I did want to do what I said I would do at the beginning. First of all, to tell you that this recording will be posted on the docket, probably in the next 24 to 48 hours. So you will be able to listen to it from your computers if you choose to do that.

If you would prefer to have a copy of the recording on a thumb drive, the best thing to do is to call the clerk's office. They can give you instructions on how to get the recording on a thumb drive or other device.

And then, finally, if you want to just go directly to ordering a transcript, you can do that from our website. There is a transcript order form on the website, and you simply fill it out and submit it, make arrangements for payment, I think you all have done that in the past with regard to other oral rulings I've made, so you likely know how to do that, but I just wanted to remind you of that as well.

So with that, I will turn to you all and ask if there are any questions or any other issues that you think we ought to

RA243

try to address during what is now this afternoon?

Mr. Kotchen, I'll turn to you first.

MR. KOTCHEN:  None that I can think of, Your Honor.

THE COURT:  All right.  Thank you.  And Ms. Rollins Murphy?

MS. ROLLINS MURPHY:  Your Honor, I -- I do have one issue that I need to raise, and I apologize for the somewhat awkward timing of this, but in -- in preparing for this hearing, we became aware of a very recent Supreme Court case, and I can give you the name and citation for that, it is Ames v. Ohio Department of Youth Services, case number 23-1039. It came out on June 5th, 2025, and it essentially invalidated the background circumstances rule, which Your Honor cited in reading the previous ruling.

I can --  I'll read you just a very brief sentence from the opinion that kind of outlines the basis for the ruling.  It says, "Our case law thus makes clear that the standard for proving disparate treatment under Title VII does not vary based on whether the plaintiff is a member of a majority group," and then I'll skip the internal citations, and it continues, "the, quote, 'background circumstances', end quote, rule quells that basic principle."  And that's at page six of the split opinion.

It's a --  It's a short opinion, it's about nine pages, and I was listening very closely to Your Honor's very thorough ruling, and I believe that there are independently sufficient

**RA244**

grounds to uphold your ruling granting summary judgment for each plaintiff and for every claim that was asserted, but I think that our duty of candor to the tribunal requires us to notify you of that, and so I wanted to bring that to your attention.

THE COURT: Thank you, Miss Rollins Murphy. I agree with you, you do have a duty to bring it to my attention, and I think what I'd like to do, rather than sort of immediately and knee-jerk ask everybody to -- to kill more trees and -- and file more briefs, I'd like to take a look at the decision. I -- I had not seen it as you probably correctly surmised, and so I want to take a look at that, and then if I feel like I'd like comment from each of you, brief comment from each of you on how that ruling may or may not impact the decision that I just gave you, I'll come back to you all and let you know.

I should also say for the benefit of, I guess, the plaintiffs and the defendants that if -- if the plaintiffs take a look at this decision and somehow think that they need to come back and get a word in with regard to this decision, you can always ask, but I'm going to take a look at it myself as well; and I think let's just, if I feel like I need feedback from you all, I will let you know. If you all think that you need to address any of my rulings in light of the Ames decision, then you all can reach out and ask me for that opportunity.

But I very much appreciate your -- your raising it.  The timing's awkward, but it's better than not raising it at all, so thank you, Miss Rollins Murphy.

MS. ROLLINS MURPHY:  Thank you, Your Honor.

THE COURT:  All right.  So --  So with that, let's all step back and take a deep breath and we can take a look at that decision, and if I hear from you all, I will respond; and if you hear from me, hopefully you will.  And if none of us hear from each other, then that means we've all decided that we're going to leave it where it is.

So thank you, everyone, and try to stay cool and enjoy the rest of your day.

MS. ROLLINS MURPHY:  Thank you, Your Honor.

MR. KOTCHEN:  Bye-bye.

THE COURT:  Bye.

(At 12:04 p.m. the hearing ended.)

**RA246**

C E R T I F I C A T E

I, THOMAS A. MALKIEWICZ, RPR, RMR, CRR, an Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing is a true and correct transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.

Dated this 27th day of August, 2025.

Milwaukee, Wisconsin.

Thomas A. Malkiewicz, RPR, RMR, CRR
United States Official Court Reporter
517 East Wisconsin Avenue, Room 236
Milwaukee, WI 53202

Thomas_Malkiewicz@wied.uscourts.gov

ELECTRONICALLY SIGNED BY THOMAS A. MALKIEWICZ
Official U.S. Reporter, RPR, RMR, CRR
_____

72

**RA247**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

BRENDA KOEHLER, KELLY PARKER,
LAYLA BOLTEN and GREGORY HANDLOSER,

       Plaintiffs,

    v.

INFOSYS TECHNOLOGIES LIMITED, INC.
and INFOSYS PUBLIC SERVICES, INC.,

       Defendants.

**JUDGMENT IN A CIVIL CASE**

Case No. 13-cv-885-pp

---

☐    **Jury Verdict.** This case came before the court for a trial by jury. The parties have tried the issues, and the jury has rendered its verdict.

☑    **Decision by Court.** This case came before the court, the court has decided the issues, and the court has rendered a decision.

    **THE COURT ORDERS AND ADJUDGES** that the plaintiffs' complaint is **DISMISSED**

    **THE COURT ORDERS** that the defendants' motion for summary judgment is **GRANTED**.

    **THE COURT ORDERS** that this case is **DISMISSED WITH PREJUDICE**.

    Approved and dated in Milwaukee, Wisconsin this 30th day of June, 2025.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**

GINA M. COLLETTI
Clerk of Court

s/ *Cary Biskupic*
(by) Deputy Clerk

**RA248**