**No. 25-2272**

# In the
# United States Court of Appeals
# for the Seventh Circuit

———————————

BRENDA KOEHLER, KELLY PARKER, LAYLA BOLTEN,
AND GREGORY HANDLOSER,

*Plaintiffs-Appellants,*

*v.*

INFOSYS TECHNOLOGIES LIMITED, INC. AND

INFOSYS PUBLIC SERVICES, INC.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court
for the Eastern District of Wisconsin
The Honorable Pamela Pepper
District Court No. 2:13-cv-00885-PP

———————————

**DEFENDANTS-APPELLEES' BRIEF**

———————————

Brian J. Paul
FAEGRE DRINKER BIDDLE &
REATH LLP
300 North Meridian Street,
Suite 2500
Indianapolis, IN 46204
(317) 237-0300

Samantha M. Rollins Murphy
FAEGRE DRINKER BIDDLE &
REATH LLP
90 South Seventh Street,
Suite 2200
Minneapolis, MN 55402
(612) 766-7000

*Attorneys for Defendants-Appellees*

Save As        Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2272

Short Caption: Koehler et al. v. Infosys Techs. Ltd ., Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Infosys Limited. f/k/a Infosys Technologies Limited; and Infosys Public Services, Inc.

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Faegre Drinker Biddle & Reath LLP

Morgan Lewis & Bockius LLP

(3) If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

Infosys Limited is the parent company of Infosys Public Services, Inc.

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None.

(4) Provide information required by FRAP 26.1(b)    Organizational Victims in Criminal Cases:

Not applicable.

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Not applicable.

Attorney's Signature: /s/ Brian J. Paul                Date: January 30, 2026

Attorney's Printed Name: Brian J. Paul

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑  No ☐

Address: 300 North Meridian Street, Suite 2500

Indianapolis. IN 46204

Phone Number: (317) 237-0300            Fax Number: (317) 237-1000

E-Mail Address: brian.paul@faegredrinker.com

rev. 12/19 AK

i

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2272

Short Caption: Koehler et al. v. Infosys Techs. Ltd ., Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Infosys Limited. f/k/a Infosys Technologies Limited; and Infosys Public Services, Inc.

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Faegre Drinker Biddle & Reath LLP

Morgan Lewis & Bockius LLP

(3)   If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

    Infosys Limited is the parent company of Infosys Public Services, Inc.

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None.

(4)   Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

    Not applicable.

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    Not applicable.

Attorney's Signature: /s/ Samantha M. Rollins Murphy     Date: January 30, 2026

Attorney's Printed Name: Samantha M. Rollins Murphy

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: 90 South Seventh Street, Suite 2200

    Minneapolis, MN 55402

Phone Number: (612) 766-7000     Fax Number: (612) 766-1600

E-Mail Address: samantha.murphy@faegredrinker.com

rev. 12/19 AK

ii

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 1

STATEMENT OF JURISDICTION ........................................................... 4

STATEMENT OF ISSUES ........................................................................ 5

STATEMENT OF THE CASE .................................................................... 7

    1.   Background facts .......................................................................... 7

        1.1  Infosys ................................................................................. 7

        1.2  Plaintiffs .............................................................................. 8

    2.   Procedural history ..................................................................... 10

        2.1  September 2013 class-action complaint .............................. 10

        2.2  September 2016 motions for summary judgment and class certification .................................................................. 11

        2.3  December 2016 Rule 702 motion and opposition to class certification .................................................................. 12

        2.4  January-to-May 2017 PeopleFluent discovery dispute ........ 14

    3.   The district court's rulings ........................................................ 17

        3.1  September 2022 exclusion of Neumark's testimony and denial of class certification .................................................. 17

        3.2  December 2022 denial of Plaintiffs' requests for more discovery, a new expert, and the chance to file another summary-judgment brief ...................................................... 18

        3.3  June 2025 summary-judgment ruling ................................. 19

SUMMARY OF ARGUMENT .................................................................. 21

STANDARD OF REVIEW ....................................................................... 25

ARGUMENT .......................................................................................... 26

    1.   The district court properly exercised its discretion in excluding the opinions of Plaintiffs' expert because he is unqualified to invent a name-matching analysis and because his testimony is unreliable. ....................................................... 26

        1.1  Failing to appreciate the extent of Neumark's lack of expertise and methodological flaws the first time around

does not entitle Plaintiffs to another bite at the *Daubert* apple. ...................................................................30

1.1.1 Plaintiffs waived any argument that the court excluded Neumark's employee analyses sua sponte and, in any case, fail to identify any abuse of discretion. ...............................................................30

1.1.2 The purported error in excluding Neumark's employee opinions was harmless. ...............................33

1.2 The district court properly excluded Neumark's opinions on the grounds that they rest on a name-matching racial-classification method that Neumark admits he was unqualified to invent. .................................................36

1.3 The district court properly excluded Neumark's opinions on the alternative ground that his name-based racial-classification methodology bears no hallmarks of reliability. ...........................................................................39

1.3.1 Plaintiffs cannot show error by blaming Neumark's reliability problems on PeopleFluent reports containing data they already had. ..................41

1.3.2 Plaintiffs waived their arguments that Neumark's deficiencies go to weight rather than admissibility, plus those arguments misunderstand Rule 702..........42

1.3.3 Plaintiffs cannot show error by defending a methodology Neumark did not use with arguments and evidence they did not present. ..............................44

2. Plaintiffs' individual discrimination claims fail as a matter of law. .................................................................................46

2.1 The district court properly denied Plaintiffs' oral request to file a supplemental summary-judgment brief five years after briefing ended and following their choice to reject earlier opportunities to do just that. ..........................46

2.2 The district court correctly ruled that Plaintiffs' individual discrimination claims fail as a matter of law. ....49

2.2.1 Handloser's disparate-treatment claim fails because unrebutted evidence shows he was discharged in a companywide reduction-in-force. ........ 50

2.2.2 Parker's disparate-treatment claims fail because nothing suggests her lack of technical qualifications or the expiration of Infosys's contract with her temporary staffing agency are pretexts for discrimination. .......................................... 54

2.2.3 Koehler's disparate-treatment claim fails because nothing suggests her lack of technical qualifications was a pretextual reason for not hiring her .................................................................. 59

2.2.4 Bolten's constructive-discharge claim fails because no objectively unbearable working condition forced her to quit. .................................................................. 61

2.2.5 The disparate-impact claims of Koehler and Parker fail as a matter of law. .................................... 64

2.3 Summary judgment on Plaintiffs' disparate-treatment claims should be affirmed irrespective of whether Neumark's opinions are admissible. .................................... 66

3. The denial of class certification should be affirmed because Plaintiffs do not claim to satisfy Rule 23 without Neumark's excluded testimony, their individual claims fail as a matter of law, and Neumark's crude statistics cannot prove that Infosys operates under any general policy of discrimination. .... 70

CONCLUSION .................................................................................. 77

# TABLE OF AUTHORITIES

**CASES**                                                                      **Page(s)**

*Abebe v. Health & Hosp. Corp. of Marion Cnty*,
   35 F.4th 601 (7th Cir. 2022) ....................................................... 60, 61

*Adams v. Ameritech Servs., Inc.*,
   231 F.3d 414 (7th Cir. 2000)...................................................... 74, 75

*Alioto v. Town of Lisbon*,
   651 F.3d 715 (7th Cir. 2011)............................................................47

*Ames v. Ohio Dep't of Youth Servs.*,
   605 U.S. 303 (2025)..........................................................................20

*Arnold v. United Airlines, Inc.*,
   142 F.4th 460 (7th Cir. 2025) ..................................................... 42, 46

*Berwick Grain Co., Inc. v. Ill. Dep't of Agric.*,
   116 F.3d 231 (7th Cir. 1997)............................................................44

*Bielskis v. Louisville Ladder, Inc.*,
   663 F.3d 887 (7th Cir. 2011)............................................................43

*Bolden v. Walsh Constr. Co.*,
   688 F.3d 893 (7th Cir. 2012)............................................................74

*Brewer v. Holder*,
   20 F. Supp. 3d 4 (D.D.C. 2013) ......................................................67

*Carpenter v. Bd. of Regents of Univ. of Wis. Sys.*,
   728 F.2d 911 (7th Cir. 1984)............................................................65

*Chapin v. Fort-Rohr Motors, Inc.*,
   621 F.3d 673 (7th Cir. 2010)............................................................64

*Cowan v. Glenbrook Sec. Servs., Inc.*,
   123 F.3d 438 (7th Cir. 1997)............................................................69

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)................................................................. *passim*

*Denisi v. Dominick's Finer Foods, Inc.*,
  99 F.3d 860 (7th Cir. 1996)...............................................................60

*Dorsch v. L.B. Foster Co.*,
  782 F.2d 1421 (7th Cir. 1986).........................................................56

*Dukes v. Wal-Mart Stores, Inc.*,
  603 F.3d 571 (9th Cir. 2010) (en banc),
  *rev'd*, 564 U.S. 338 (2011)................................................................73

*Duncan Place Owners Ass'n v. Danze, Inc.*,
  927 F.3d 970 (7th Cir. 2019)...........................................................31

*E. Tex. Motor Freight Sys., Inc. v. Rodriguez*,
  431 U.S. 395 (1977)..........................................................................71

*Equal Emp. Opportunity Comm'n v. Mgmt. Hosp. of Racine,
  Inc.*, 666 F.3d 422 (7th Cir. 2012)....................................................33

*Est. of Stuller v. United States*,
  811 F.3d 890 (7th Cir. 2016)............................................................37

*Ford v. Minteq Shapes & Servs., Inc.*,
  587 F.3d 845 (7th Cir. 2009).............................................................64

*Frazier v. Dovenmuehle Mortg., Inc.*,
  72 F.4th 769 (7th Cir. 2023) ............................................................47

*Fuesting v. Zimmer, Inc.*,
  421 F.3d 528 (7th Cir. 2005), *vacated in part on other
  grounds*, 448 F.3d 936 (7th Cir. 2006).........................................39, 44

*Gayton v. McCoy*,
  593 F.3d 610 (7th Cir. 2010)............................................................36

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)..........................................................................40

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982)..........................................................................72

*Gilty v. Vill. of Oak Park*,
  919 F.2d 1247 (7th Cir. 1990) ........................................................ 65

*Gopalratnam v. Hewlett-Packard Co.*,
  877 F.3d 771 (7th Cir. 2017) ...................................................... *passim*

*Greenbank v. Great Am. Assurance Co.*,
  47 F.4th (7th Cir. 2022) ............................................................... 60

*Gunville v. Walker*,
  583 F.3d 979 (7th Cir. 2009) ......................................................... 57

*Hall v. Flannery*,
  840 F.3d 922 (7th Cir. 2016) ......................................................... 34

*Int'l Bhd. of Teamsters v. United States*,
  431 U.S. 324 (1977) ................................................................... *passim*

*Jacks v. DirectSat USA, LLC*,
  118 F.4th 888 (7th Cir. 2024) ................................................... 25, 75

*Johnson v. Edward Orton, Jr. Ceramic Found.*,
  71 F.4th 601 (7th Cir. 2023) ......................................................... 44

*Kirstein v. Parks Corp.*,
  159 F.3d 1065 (7th Cir. 1998) ....................................................... 32

*Korte v. Exxonmobil Coal USA, Inc.*,
  164 F. App'x 553 (7th Cir. 2006) .................................................. 43

*Lesiv v. Ill. Cent. R.R. Co.*,
  39 F.4th 903 (7th Cir. 2022) ......................................................... 25

*Lukaszczyk v. Cook Cnty.*,
  137 F.4th 671 (7th Cir. 2025) ....................................................... 38

*Lyerla v. AMCO Ins. Co.*,
  536 F.3d 684 (7th Cir. 2008) ......................................................... 25

*McCann v. Badger Mining Corp.*,
  965 F.3d 578 (7th Cir. 2020) ......................................................... 53

*Melendez v. Ill. Bell Tel. Co.*,
  79 F.3d 661 (7th Cir. 1996)...............................................................65

*Mister v. Ill. Cent. Gulf R.R. Co.*,
  832 F.2d 1427 (7th Cir. 1987).........................................................42

*Morris v. BNSF Ry. Co.*,
  969 F.3d 753 (7th Cir. 2020)...........................................................49

*Murphy v. Eddie Murphy Prods., Inc.*,
  611 F.3d 322 (7th Cir. 2010)...........................................................48

*Ollison v. Gossett*,
  136 F.4th 729 (7th Cir. 2025) .........................................................25

*Ontiveros v. Exxon Mobil Corp.*,
  148 F.4th 521 (7th Cir. 2025) .........................................................58

*Paluck v. Gooding Rubber Co.*,
  221 F.3d 1003 (7th Cir. 2000).........................................................54

*Patterson v. Ind. Newspapers, Inc.*,
  589 F.3d 357 (7th Cir. 2009)...........................................................62

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
  507 U.S. 380 (1993)...........................................................46, 47, 48

*Sauzek v. Exxon Coal USA, Inc.*,
  202 F.3d 913 (7th Cir. 2000)...........................................................51

*Schlemm v. Pizzala*,
  94 F.4th 688 (7th Cir. 2024) ...........................................................46

*Smith v. Firestone Tire & Rubber Co.*,
  875 F.2d 1325 (7th Cir. 1989).........................................................69

*Springer v. Durflinger*,
  518 F.3d 479 (7th Cir. 2008)...........................................................66

*Stamey v. Forest River, Inc.*,
  37 F.4th 1220 (7th Cir. 2022) .........................................................64

*Steimel v. Wernert,*
    823 F.3d 902 (7th Cir. 2016)............................................................. 71

*Stollings v. Ryobi Techs., Inc.,*
    725 F.3d 753 (7th Cir. 2013)............................................................. 43

*Thiessen v. Gen. Elec. Corp.,*
    267 F.3d 1095 (10th Cir. 2001).........................................................67

*Troupe v. May Dep't Stores Co.,*
    20 F.3d 734 (7th Cir. 1994)........................................................ 48, 49

*United States v. Beaufils,*
    160 F.4th 1147 (11th Cir. 2025) .......................................................48

*United States v. City of N.Y.,*
    717 F.3d 72 (2d Cir. 2013) ...............................................................70

*United States v. Truitt,*
    938 F.3d 885 (7th Cir. 2019).............................................................37

*UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.,*
    870 F.3d 856 (8th Cir. 2017).............................................................31

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011).................................................................. *passim*

*Watson v. Fort Worth Bank & Tr.,*
    487 U.S. 977 (1988)..........................................................................65

*Winters v. Frucon,*
    498 F.3d 734 (7th Cir. 2007).............................................................33

*Wright v. Ill. Dep't of Child. & Fam. Servs.,*
    798 F.3d 513 (7th Cir. 2015).............................................................62

STATUTES, RULES, & REGULATIONS

§ 1981 of the Civil Rights Act of 1866........................................ 10, 22, 49

Title VII of the Civil Rights Act of 1964 ............................. 10, 22, 49, 65

Fed. R. Civ. P. 6(b) .......................................................................... 46, 47

Fed. R. Civ. P. 6(b)(1)(B) .................................................................... 47

Fed. R. Civ. P. 16(b) ............................................................................ 47

Fed. R. Civ. P. 23 ...................................................................... 6, 23, 70

Fed. R. Civ. P. 23(a) ....................................................................... 13, 72

Fed. R. Civ. P. 23(b)(3) ......................................................................... 1

Fed. R. Civ. P. 23(c)(4) ....................................................................... 12

Fed. R. Civ. P. 30(b)(6) ....................................................................... 60

Fed. R. Civ. P. 61 ................................................................................ 33

Fed. R. Evid. 702 ......................................................................... *passim*

Fed. R. Evid. 1006 .............................................................................. 53

## INTRODUCTION

This is the incredible shrinking lawsuit. It began with claims that Infosys—a global information-technology company headquartered in India—engaged in a "systemic pattern and practice of discriminating against" non-South Asians and non-Indians across the hundreds of locations where it provides IT services to American customers. The appealing plaintiffs, four Caucasian Americans, sought to represent a nationwide class of more than 91,000 non-South Asians who had been denied jobs, promotions, or continued employment by Infosys since 2009. To bind their disparate claims together, Plaintiffs offered the opinions of an economist, Dr. David Neumark, and moved to certify a Rule 23(b)(3) class on the theory that Neumark's "statistical data indicat[ed] a systematic, company-wide policy of discrimination," describing the odds of "obtaining [his statistical] result[s] absent discrimination" as "less than 1 in 1 billion." Dkt. 88 at 11, 19.

Now jump forward to Plaintiffs' opposition to motions to exclude Neumark's testimony and for summary judgment. Gone was any Neumark opinion about discrimination or causation; having controlled for no explanatory variables, the most Neumark could say was that his

demographic disparities resulted from something other than chance. Gone, too, was any claim that Neumark was qualified to devise the racial-classification methodology that underpins his disparities; Neumark admitted he had invented a surname-based methodology for identifying "South Asian" and Indian job applicants and employees without any relevant expertise or experience and that he had used his self-made, litigation-driven methodology without any indication that it worked. And missing was any evidence connecting what happened to the named Plaintiffs and their status as Caucasian Americans: two failed technical job interviews, one met the objective criteria for a companywide reduction-in-force, and the last quit after working just five months.

That the case was tossed out on this record should be unsurprising. Plaintiffs challenge the district court's exclusion of Neumark's testimony as inadmissible, but nowhere do they defend his qualifications to invent a name-based racial-classification methodology. And their effort to prove that methodology reliable rests on arguments and evidence outside the record. Plaintiffs likewise challenge the court's denial of class certification, but they make no claim that certification is warranted without Neumark's excluded opinions. Finally, Plaintiffs seek to overturn summary-

2

judgment rulings on Plaintiffs' individual claims, but they identify no evidence that Infosys's reasons for its employment decisions are anything but true.

Nowhere, in short, do Plaintiffs identify any error in the district court's assessment of the record. What they offer instead—mostly waived arguments and pleas to submit more Neumark opinions and summary-judgment briefs—is a futile effort to restart their putative pattern-or-practice class action twelve years after it began.

The Court should affirm.

# STATEMENT OF JURISDICTION

Plaintiffs' jurisdictional statement is complete and correct.

## STATEMENT OF ISSUES

1. Were Plaintiffs entitled to a specific warning that deficiencies in their expert's qualifications and racial-classification methodology undermined not just his demographic analyses of Infosys job applicants, but also his analyses of Infosys employees, and did Plaintiffs preserve the issue despite repeated failures to raise it with the district court?

2. Did Plaintiffs satisfy their burden to show the "denied" opportunity to rehabilitate their expert's employee studies was a non-harmless error where their proposed additional evidence relates to promotion claims that no plaintiff asserts and a termination analysis that their expert no longer defends?

3. Did the district court properly exercise its discretion in its role as a Rule 702 gatekeeper by excluding the testimony of Plaintiffs' expert because (a) his opinions all rest on a name-matching racial-classification methodology that he admits he was unqualified to invent, or, alternatively, (b) his methodology bears no hallmarks of reliability?

4. Did the district court properly exercise its discretion when it denied Plaintiffs' oral request to file a supplemental summary-judgment

brief five years after briefing ended and following Plaintiffs' repeated rejection of earlier opportunities to do exactly that?

5. Did the district court correctly grant summary judgment on the named Plaintiffs' disparate-treatment claims because no reasonable juror could find Infosys's legitimate explanations for its treatment of Handloser, Parker, and Koehler pretextual, or that Bolten's work environment was objectively unbearable?

6. Did the district court correctly grant summary judgment on Koehler's and Parker's disparate-impact claims because they presented no statistical evidence suggesting that Caucasian or American job applicants were disadvantaged and no evidence that any specific policy or practice prevented Koehler or Parker from being hired?

7. Should the denial of class certification be affirmed because (a) Plaintiffs do not claim to satisfy their Rule 23 burden without the excluded testimony of their expert, (b) Plaintiffs' individual disparate-treatment claims fail as a matter of law, or (c) their expert's crude statistics are worlds away from the "convincing proof" necessary to show that Infosys operates under any general policy of discrimination?

## STATEMENT OF THE CASE

### 1.    Background facts

#### 1.1    Infosys

This is a reverse-discrimination case against an India-based consulting company that provides IT services in over 30 countries. Dkt. 78-1 ¶ 3; INFAPP50 ¶¶ 1–2. In 2016, Defendants Infosys Technologies Limited Inc. and Infosys Public Services, Inc. (together, "Infosys") employed over 198,000 employees worldwide, including about 21,000 employees in the United States. Dkt. 78-1 ¶ 3; INFAPP50 ¶¶ 1–2. Those U.S. employees fall into two categories: (1) "base employees" hired in the U.S. to perform work here, and (2) "Deputees" employed in India who temporarily transfer to the U.S. to work on customer projects for specified periods. RA102–03; INFAPP102–03; *see also* Dkt. 109 at 2–3. During the time period for which data was produced (approximately 2009 to 2015), about 81% of Infosys employees in the U.S. were Deputees, working through H-1B or other visas, and 19% were locally hired "base employees." RA109; INFAPP117; SA5–6; Dkt. 98 at 10. Common among Indian technology companies, this ability to deploy high-performing employees to local projects reflects the abundance of educated labor in India, which has supplied about 67% of the IT employees in the U.S. Dkt. 103-2 at 10.

Notwithstanding its use of visa-holding Deputees, Infosys ordinarily disqualifies Deputees from jobs advertised to U.S. candidates. *See, e.g.*, INFAPP21, 23, 53. Infosys also maintains policies that strictly prohibit discrimination based on race and national origin, and it trains all employees involved in recruiting or hiring to follow its non-discrimination polices. Dkt. 78-1 ¶ 5; 78-3 ¶ 13; INFAPP50 ¶ 4; INFAPP52 ¶ 13.

### 1.2   Plaintiffs

Plaintiffs are four Caucasian Americans who either worked, sought to work, or stopped working in different Infosys jobs, at different locations, involving different managers and demographic conditions. RA70; Dkt. 19 ¶¶ 8–11; INFAPP53–54 ¶¶ 21, 30; INFAPP60, 64 ¶¶ 49, 71–73; INFAPP76 ¶¶ 120–21; INFAPP84 ¶ 169.

Gregory Handloser spent over eight years with Infosys in its Automotive Industry Unit in Florida as a sales manager. RA205–06; Dkt. 78-16 at 4, 41:1–17, 10, 73:9–22; INFAPP84, 89 ¶¶ 169–70, 194. He lost his job when a companywide reduction-in-force (or RIF) targeted employees with low performance ratings in the April-to-September 2012 appraisal cycle. RA207–08; Dkt. 78-2 ¶¶ 6–8; INFAPP89 ¶¶ 192–94. Of the 50

employees discharged in that RIF, more than half were Asian—29 in all. INFAPP12–13 ¶¶ 29–30; INFAPP89 ¶ 195.

Brenda Koehler, in contrast, never worked for Infosys. Failing her technical job interview, Koehler was one of the 113 job applicants (including 40 who Neumark concluded had South Asian-sounding surnames) that Infosys rejected for its Lead VMware/Windows Administrator position in Milwaukee around April 2012. RA195; INFAPP5 ¶ 7; INFAPP54, 56 ¶¶ 30, 36–37, 39.

Infosys rejected Kelly Parker for the position of systems engineer at Harley-Davidson's Tomahawk, Wisconsin facility around the time it began providing IT services there. RA197; Dkt. 78-1 ¶¶ 10–11; INFAPP 6–7 ¶ 13; INFAPP64–65 ¶¶ 71, 73, 76. Though Infosys hired mostly Caucasian (and no Asian) systems engineers in 2012 for the Harley-Davidson account, it rejected Parker because she failed to demonstrate the necessary technical skills when interviewed. INFAPP64–65 ¶¶ 76, 80–83.

Finally, citing a handful of complaints about her work environment, Layla Bolten quit her job as a test analyst in Washington, D.C. after working at Infosys for only five months. RA200, 204–05; INFAPP38 at

9

91:14–23; INFAPP45 at 162:7–163:20; INFAPP77 ¶ 128; INFAPP82 ¶¶156–57.

## 2. Procedural history

### 2.1 September 2013 class-action complaint

Plaintiff Koehler sued Infosys in August 2013, and later amended the complaint, adding Handloser, Parker, and Bolten. Dkts. 1, 4, 19. They alleged Infosys violated Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act of 1866 by making adverse hiring, termination, and promotion decisions based on their race (non-South Asian) and national origin (non-Indian). Dkt. 19. Koehler and Parker also brought hiring-based disparate impact claims under Title VII. *Id.* Claiming further that Infosys engaged in a "pattern and practice" of reverse discrimination across all jobs and locations, Plaintiffs asserted putative class claims on behalf of "[a]ll individuals who are not of South Asian race or Indian national origin" who were fired, not hired after seeking a U.S. job, or not promoted after working at least 18 months since August 1, 2009. Dkt. 19 ¶ 121; RA74–75 (quoting Dkt. 88 at 1).[1]

---

[1] Plaintiffs also purported to assert class-wide disparate-impact claims but abandoned their class claims after moving for class certification. Dkt. 88 at 18 n.42; Dkt. 116.

10

### 2.2 September 2016 motions for summary judgment and class certification

After extensive discovery (including the collection of 2.7 million e-mails and production of over 800,000 pages of documents), Infosys moved for summary judgment in September 2016, arguing that its legitimate reasons for all adverse employment decisions were undisputed and that Bolten's work environment was not objectively "unbearable," as required to prove constructive discharge. Dkt. 136 at 1–2; Dkt. 80; RA184. Infosys also argued that Plaintiffs' individual claims raised no triable issues under the framework applied to certified pattern-or-practice classes, as established in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). Dkt. 80 at 35–38. Challenging the disparate-impact claims of Koehler and Parker as well, Infosys argued that Plaintiffs had failed to establish that either plaintiff was qualified for the job they sought, RA215, 225; Dkt. 80 at 7, 14; INFAPP55–56 ¶ 36; INFAPP66 ¶ 79, identified no specific employment practice that affected either, *see* RA240; Dkt. 80 at 39–40, 43; INFAPP75 ¶ 118, and provided no statistical support of the kind required to prove disparate impact, *see* RA241; Dkt. 80 at 5.

11

Moving for class certification the next day, Plaintiffs proposed three companywide classes under their "pattern or practice" theory of disparate treatment: (1) a hiring class represented by Koehler and Parker; (2) a termination class represented by Handloser; and (3) a promotions class also represented by Handloser (despite his failure to assert any promotion claim in the complaint). *See* RA74–75; Dkt. 88 at 1, 24. In support of their request for certification under Rule 23(b)(3) and 23(c)(4), Plaintiffs offered anecdotal evidence relating to Infosys's recruiting practices. *See generally* Dkt. 88 at 4–7. But their primary evidence consisted of the statistical findings of their economist, Dr. David Neumark. RA75–76; Dkt. 88. Neumark purported to find companywide statistical disparities favoring South Asians and Indians in hiring, termination, and promotion practices that were "strongly consistent" with discrimination. RA87–88; SA 170–71.

### 2.3   December 2016 Rule 702 motion and opposition to class certification

Infosys responded to Plaintiffs' class-certification motion by moving to exclude Neumark's testimony as inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). RA76; Dkts. 97, 98. In that December 2016 motion, Infosys

argued that Neumark's statistics were irrelevant and unreliable because Neumark controlled for no explanatory variables, aggregated the employment decisions of different managers relating to different jobs in different places, and examined the wrong labor markets and termination data (which did not include data on Deputee terminations in India). *See* RA102–06; Dkt. 98 at 16–22, 25–26. Infosys noted that by his own admission, Neumark was unable to opine about discrimination or causation, and could give no probability that discrimination caused any disparity he observed. *See* RA107–08; Dkt. 98 at 11–13. Addressing the racial-classification methodology used in all Neumark's studies, Infosys also urged the court to find Neumark's hiring statistics inadmissible because they depend on an untested and unreliable name-recognition methodology that Neumark was unqualified to invent. *See* RA111; Dkt. 98 at 22–25.

Infosys opposed class certification on similar grounds. It contended that Plaintiffs could not satisfy their Rule 23(a) burden to prove commonality without Neumark's inadmissible statistics, and it argued that Neumark's disparities, even if taken at face value, were incapable of providing "significant" evidence that Infosys operated under any general policy of discrimination, as required to support a nationwide pattern-or-practice

13

class under *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). *See* RA131–32; Dkt. 103 at 1–4. In addressing Plaintiffs' "anecdotal" evidence, Infosys pointed out that Plaintiffs relied almost exclusively on the uncorroborated accusations of a single employee—a former recruiter fired for misconduct. *See* RA94; Dkt. 103 at 6, 19–20. Finally, Infosys presented the opinions of its own economist, Dr. Bernard Siskin, who showed that Neumark's inadequate termination data caused him to ignore terminations among all Deputees—the South Asian majority of Infosys's workforce. *See* RA102–03; Dkt. 103 at 12 (citing INFAPP156–61). Infosys also offered Siskin's opinions that the hiring disparities observed by Neumark disappeared when errors in his name-matching methodology were fixed and when Siskin simply controlled for candidates who applied for the same job. Dkt. 103 at 27.

### 2.4   January-to-May 2017 PeopleFluent discovery dispute

Before briefing on Neumark's testimony, class certification, and summary judgment had concluded, Plaintiffs complained during a January 30, 2017, status conference that Infosys had not produced documents created by its third-party vendor, PeopleFluent. INFAPP190. After hearing both sides, the magistrate judge overseeing discovery directed the

14

parties to propose a plan to address Plaintiffs' concerns. INFAPP190–91; Dkt. 112 at 2. But a week later, without proposing any plan or seeking any further relief, Plaintiffs filed their reply brief in support of class certification. INFAPP191; Dkt. 116.

Plaintiffs again raised their concerns about access to PeopleFluent documents during a February 10, 2017, status conference. INFAPP191; Dkt. 138. And once again, the magistrate judge directed Plaintiffs to make a specific request, advising them to consider whether they had actually been harmed by the content or timing of Infosys's discovery responses, and, if so, how they proposed to remedy the supposed harm. Dkt. 138 at 23:2–7. "What are you proposing?" the magistrate asked. *Id.* at 23:6–7. "Do you think you need to file some surreply or some additional brief . . . either in opposition to a *Daubert* motion or in opposition to summary judgment?" *Id.* at 23:7–9. And for a second time, Plaintiffs declined to seek any specific relief, including leave to file another brief, explaining that "the last thing we want to do is slow anything down." *Id.* at 14:4–6. Still having made no proposal to remedy any perceived harm, Plaintiffs filed their *Daubert* reply six days later. INFAPP193; Dkt. 123.

15

In May 2017, months after summary-judgment briefing concluded, Plaintiffs moved for sanctions and to compel additional discovery, claiming that Infosys had failed to timely produce the PeopleFluent documents. Dkts. 134, 135 at 10. When the motion was heard on June 2, 2017, Plaintiffs objected that they did not timely receive PeopleFluent's documents, but they could identify no underlying data that Infosys had not already produced two years earlier, and Infosys confirmed that none existed.[2] *See generally* Dkt. 143. Nonetheless, the magistrate judge—for a third time—asked Plaintiffs what relief they wanted; again, Plaintiffs declined to seek leave for any additional briefing: "[W]e don't want the existing motions to be delayed." *Id.* at 27:14–15. The judge then denied Plaintiffs' sanctions motion without prejudice, eliciting no disagreement from Plaintiffs and no appeal to the district court. *Id.* at 3:23–4:16; Dkt. 142 at 1.

---

[2] Infosys produced *more* data than was provided to PeopleFluent, including data for over 145,000 applicants and all U.S.-based employees on dates of employment, compensation, race/ethnicity where available, position, project assignment, Deputee status, termination reason, and more. Dkt. 136-2 at 1–2 ¶¶ 4–5.

16

**3.    The district court's rulings**

### 3.1    September 2022 exclusion of Neumark's testimony and denial of class certification

On September 14, 2022, the district court issued a 104-page ruling granting Infosys's motion to exclude Neumark's expert testimony. RA70. The court agreed that Neumark's statistical analyses failed to consider any variable but race. RA151. It agreed further that "Neumark did not follow the procedure that he said the 'large body of research on discrimination in labor markets' followed." *Id*. Giving Neumark wide berth, however, the court concluded those methodological flaws did not render Neumark's opinions "so unreliable that the statistical evidence is irrelevant on that basis alone." RA164.

What made Neumark's opinions inadmissible, the court concluded, was their foundation in a self-invented, litigation-specific race-identification methodology that did "not pass muster." RA170–71. First, the court found Neumark unqualified to invent a classification methodology based on employee and job applicant surnames. RA143–44. "Underlying each of Neumark's" disparities, the court reasoned, "is [Neumark's] conclusion about how many employees or applicants were of Indian national origin or South Asian race/ethnicity, and he drew that conclusion using name

17

recognition—an endeavor for which he admittedly had no expertise." RA143.

"In an abundance of caution," the court then examined whether Neumark's race-classification methodology had been tested or bore any other hallmark of reliability. RA145. Finding none, it excluded Neumark's opinions on the alternative ground that they failed to satisfy the reliability and relevance requirements of Rule 702. RA170–72.

The court also denied Plaintiffs' motion for class certification without prejudice. RA172. It observed that Plaintiffs' motion "explicitly relies on Neumark's analysis to show numerosity and predominance, and it likely ought to have done so for commonality." RA171–72. The court advised the parties that it would set a November status conference to discuss next steps, after the parties had "digest[ed] this decision." RA172–73.

### 3.2  December 2022 denial of Plaintiffs' requests for more discovery, a new expert, and the chance to file another summary-judgment brief

In December 2022, the district court denied oral requests made by Plaintiffs during the November status conference to reopen discovery, name a new expert, and file a supplemental summary-judgment brief.

Dkt. 210; INFAPP206–07. The court reasoned that Plaintiffs had forfeited their chance to ask for supplemental summary-judgment briefing by repeatedly declining opportunities to do so, explaining:

> [The magistrate judge] several times asked the plaintiffs whether or not they wanted to . . . supplement their filings with regard to the summary judgment, if they wanted . . . another round of responding or opposing summary judgment, if they needed to file some additional findings of fact [relating to] Plaintiffs' [complaints about the PeopleFluent analyses].
>
> And the plaintiffs rejected all of those arguments. . . . They briefed the motions despite the fact that they knew that they had gotten the People Fluent information after the close of discovery and despite their argument that they hadn't been able to fully incorporate it into their pleadings . . . .

INFAPP205. The district court declined Plaintiffs' requests to reopen discovery and name a new expert as unduly prejudicial. INFAPP188–89.

### 3.3   June 2025 summary-judgment ruling

In June 2025, the court granted summary judgment to Infosys on all individual discrimination claims. RA 242. It concluded that plaintiffs Handloser, Koehler, and Parker had provided no evidence that Infosys's legitimate reasons for its adverse employment decisions were pretexts for race or national origin discrimination. RA222–23; RA229; RA237. The court also found Bolten's constructive-discharge claim unsupported, reasoning that no evidence indicated that her work environment had become

objectively "unbearable." RA235–36. Finally, the court granted summary judgment on the disparate impact claims of Koehler and Parker because Plaintiffs failed to present "statistical evidence of a kind and degree sufficient to show" that job applicants were excluded because of their national origin or race. RA240–42 (cleaned up). In its supplemental opinion on June 30, 2025, the court clarified that its disparate-treatment rulings were unchanged by *Ames v. Ohio Department of Youth Services*, 605 U.S. 303 (2025), which eliminated the "background circumstances" test in reverse-discrimination cases, because Plaintiffs presented no evidence that Infosys's explanation for its decisions is pretextual. SA242–45.

On June 30, 2025, the court entered final judgment in favor of Infosys and against all Plaintiffs. Dkt. 219. Plaintiffs timely filed their notice of appeal on July 28, 2025. Dkt. 224.

## SUMMARY OF ARGUMENT

1. The district court properly excluded the testimony of Plaintiffs' economist, Dr. David Neumark, because Plaintiffs presented no evidence that Neumark satisfied the qualifications and reliability requirements of Rule 702. Neumark admits he has no expertise in any method for identifying race or national origin from a person's name. Even so, to analyze the demographic consequences of employment practices at Infosys, Neumark invented and used a name-based racial-classification methodology without making any effort to test or otherwise ensure its reliability.

Plaintiffs point to no contrary evidence on appeal. Instead, Plaintiffs primarily object that the court excluded Neumark's analyses of employees, rather than of just job applicants, "sua sponte." But Plaintiffs waived that argument by failing to raise it during the three years of litigation that followed the court's *Daubert* ruling. And regardless, (a) the district court merely applied arguments that had been made by Infosys, (b) courts may exclude expert testimony sua sponte in circumstances present here, and (c) any error would be harmless because the statistical analyses at issue have either been repudiated by Neumark or relate to an issue—promotions—no longer part of the case.

21

As to the merits, Plaintiffs do not dispute that Neumark is unqualified to devise his name-matching racial-classification methodology—itself a sufficient basis for excluding his testimony. Nor do they offer evidence that Neumark's methodology bears any hallmarks of reliability. Rather, Plaintiffs attempt to rehabilitate Neumark's methods with waived arguments and academic articles outside the record. Plaintiffs therefore fail to establish any manifest error in the court's determination that Neumark's opinions do not satisfy the reliability requirement of Rule 702.

2. The district court also correctly ruled that Plaintiffs' individual reverse-discrimination claims under Title VII and Section 1981 fail as a matter of law. Plaintiffs object that the court denied their oral request to file a supplemental summary-judgment brief five years after briefing had ended and following their decision to decline several earlier opportunities to do just that. But they never claimed that their "delay" resulted from "excusable neglect," and so waived the objection. Regardless, Plaintiffs' tactical decisions to refuse multiple opportunities to file supplemental briefing could never qualify as neglect, let alone excusable neglect.

Plaintiffs also identify no evidence that Infosys's legitimate reasons for employment decisions relating to Handloser, Parker, and Koehler were pretexts for discrimination, or that Bolten's work environment was objectively hostile. Plaintiffs similarly identify no statistical or other evidence that any Infosys hiring policy or practice had a disparate impact on Caucasian Americans in general or Koehler or Parker in particular. This lack of evidence supports summary judgment even under the *Teamsters* framework, which the district court properly declined to apply as having no bearing on individual  claims outside a certified class action.

3. The district court likewise properly denied class certification. Plaintiffs do not claim to satisfy Rule 23 without Neumark's excluded testimony. And while the court did not reach the issue, its ruling can also be upheld because Plaintiffs' individual disparate-treatment claims fail as a matter of law, leaving the proposed classes without any adequate representative. And finally, Plaintiffs failed to satisfy their burden to prove commonality. Neumark's crude statistics could not, even if admissible, prove that Infosys operates under any general policy of discrimination. Plaintiffs instead propose the kind of sprawling, pattern-or-practice

23

class action that the Supreme Court extinguished in *Wal-Mart Stores,*

*Inc. v. Dukes*, 564 U.S. 338 (2011).

The Court should affirm in all respects.

## STANDARD OF REVIEW

This Court reviews a district court's decision to exclude expert testimony for abuse of discretion, which requires a showing that the ruling was "manifestly erroneous." *Ollison v. Gossett*, 136 F.4th 729, 742 (7th Cir. 2025). Denial of Plaintiffs' motion to file supplemental summary-judgment briefing is also reviewed for abuse of discretion, *see Lyerla v. AMCO Ins. Co.*, 536 F.3d 684, 693 (7th Cir. 2008), as is the court's denial of class certification, *Jacks v. DirectSat USA, LLC*, 118 F.4th 888, 894 (7th Cir. 2024). A district court's grant of summary judgment is reviewed de novo. *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022).

## ARGUMENT

1. **The district court properly exercised its discretion in excluding the opinions of Plaintiffs' expert because he is unqualified to invent a name-matching analysis and because his testimony is unreliable.**

This appeal challenges the district court's discretionary decision to exclude expert testimony unsupported by any evidence of reliability or the expert's qualifications to provide it. The expert, Dr. David Neumark, opined about demographic discrimination favoring Indians and South Asians at Infosys. RA71; SA170. Neumark defined "South Asians" to include Indian, Sri Lankan, Bangladeshi, Pakistani, Burmese, Nepalese, and Afghan people. RA142; SA178 n.8. (Why he excluded other South Asian ethnicities he did not say. *See* RA142; SA178 n.8.) Neumark is a labor economist, not a linguist; he acknowledges he has no expertise or experience in any method for identifying race or national origin from a person's name. RA143; Dkt. 123 at 19. Undeterred, Neumark invented and used a name-based racial-classification method to analyze the demographic consequences of employment practices at Infosys, and without making any effort to test or otherwise ensure the method's reliability. RA166; Dkt. 98 at 4–5.

26

The mechanics of Neumark's methodology are undisputed. First, he compiled a list of South Asian surnames. RA97; SA208. As described in his report, Neumark began with the 21,093 unique names of about 40,000 Infosys employees with known national origins—essentially, the Deputees who ordinarily work for Infosys in India and temporarily assist customers in the United States. *See* RA98; SA171; SA209. (In contrast, the record contains no evidence that Infosys ordinarily collected national-origin information for employees hired inside the United States. Dkt. 98 at 22.) Neumark then focused on names shared by at least one employee *not* born in a South Asian country and removed the 63 such names that struck him as Western. *See* RA98; SA209.

Next, Neumark used the remaining list of names to classify the race and national origin of Infosys job applicants and all employees without a known birthplace. RA92; SA178. As to job applicants, Neumark classified anyone with an unmatched name as non-Indian and non-South Asian, regardless of a person's self-reported race—information that was generally available in Infosys's records. *See* RA101–02, 104; INFAPP110; Dkt. 98 at 5 n.6. This meant, among other things, that 42.7% of applicants who reported their race as Asian were reclassified by Neumark as non-

27

South Asian and non-Indian, and that job applicants classified by Neumark as non-South Asian included some 340 people named "Manthri." RA101–02; INFAPP112. Neumark also applied his name-matching method to employees who self-reported their race as "Asian." RA101–02; INFAPP112. Again, this required reclassifying any employee with self-reported Asian identity—but no matching name—as non-South Asian and non-Indian. INFAPP108. And while Neumark accepted the self-reported race of non-Asian employees, he simply excluded the 14% of Infosys employees with no self-reported race from his analysis altogether. RA141 (citing Dkt. 97-1 at 140:1–10).

Last, Neumark used these classifications to look for racial disparities in aggregate hirings, firings, and promotions across Infosys. No effort to gauge the accuracy of Neumark's classifications preceded that analysis, nor did Neumark try to calculate a classification-based error rate for his statistical studies. Relying instead on his own sense of "reasonabl[e] accura[cy]," Neumark based all his opinions about demographic disparities on a self-invented methodology for classifying South Asians and Indians that treats just 21,093 unique surnames as a census of all

28

surnames in a country with more than 1.4 billion people. Dkt. 123 at 23; SA209; RA33–34.

Contrary to Plaintiffs' theory here, nothing required the district court to accept Neumark's self-invented analysis. Federal Rule of Evidence 702 and *Daubert* require courts to act as evidentiary gatekeepers: they must ensure both that "the witness is qualified" and that his "methodology is scientifically reliable" before admitting expert testimony. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (cleaned up). As reflected in its 104-page opinion, the court could find no indication that Neumark was qualified to invent his name-based racial-classification methodology. And it found no indication—no testing, no error rates, no standards, no nothing—that his self-invented methodology was reliable.

Plaintiffs fail to confront these problems. Their opening brief instead offers assurances about what Neumark *could* have said, blaming the district court for denying him the chance to prove his employee analyses reliable. In support of these assurances, Plaintiffs spend over ten pages citing academic articles presented for the first time in this appeal and offer a handful of arguments abandoned or never made below.

29

Appellants' Br. 35–45. This does not come close to establishing an abuse of discretion. Presented with no evidence that Neumark's racial-classification methodology was reliable or that Neumark was qualified to devise it, the district court properly found Neumark's testimony inadmissible under Rule 702.

### 1.1 Failing to appreciate the extent of Neumark's lack of expertise and methodological flaws the first time around does not entitle Plaintiffs to another bite at the *Daubert* apple.

#### 1.1.1 Plaintiffs waived any argument that the court excluded Neumark's employee analyses sua sponte and, in any case, fail to identify any abuse of discretion.

Plaintiffs' initial challenge to the court's exclusion of Neumark's opinions about Infosys terminations and promotions is procedural. They object to the court's "sua sponte" conclusion that deficiencies in Neumark's name-based methodology for classifying the race and national origins of Infosys job *applicants*—including his lack of qualifications to devise any such method—also applied to Neumark's classifications and analyses of Infosys *employees*. Appellants' Br. 26. But far from supporting reversal, this request for another bite at the *Daubert* apple—made nearly a decade after Neumark produced his original reports—fails at every turn.

First, the argument is waived. The court disclosed its reasons for excluding Neumark's opinions in its September 2022 order and told the parties it would schedule a follow-on status conference in November 2022 to give the parties time to "digest [its] decision." RA134–72; Dkt. 205. Not only did Plaintiffs fail to file a motion to reconsider, they didn't say a word about the issue when given the opportunity at the subsequent status conference; instead of raising any objection to the application of the court's ruling to employee studies, they asked to name a new expert altogether. INFAPP206; Dkt. 209. These failures to object then—and also during the some two-and-a-half years of litigation that followed—prevent Plaintiffs from crying foul now. *See Duncan Place Owners Ass'n v. Danze, Inc.,* 927 F.3d 970, 974–75 (7th Cir. 2019) (recognizing that waiver precludes review of a sua sponte decision unless "the appellate brief is the first opportunity to discuss it"); *see also UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 867 (8th Cir. 2017) (finding party waived opposition to sua sponte entry of summary judgment by not alerting the court to the issue while the case was still pending).

Regardless, Plaintiffs *were* heard. As they concede, a district court that applies the correct legal framework is "entitled to rule on expert

31

admissibility sua sponte" so long as it "has given the parties an opportunity to be heard." Appellants' Br. 19 (cleaned up); *see also Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998) (noting the court has "upheld a judge's sua sponte consideration of the admissibility of expert testimony"). Plaintiffs had their say in 25 pages of *Daubert* briefing with 561 pages of exhibits, and a nearly two-hour argument where the court expressed particular interest in hearing about why Plaintiffs believed Neumark's naming method was reliable. *See* Dkt 123; RA1; RA23–24. They cite no authority—and offer no reason—to suggest they were entitled to anything more.

Nor was the district court's decision even sua sponte. The court rejected Neumark's use of name-matching as applied to employees for the same reason it rejected his use of name-matching as applied to job applicants: it found the methodology unreliable and Neumark unqualified to invent it. RA169–70. The court did so in response to a motion that discredited Neumark's name-matching methodology *and* his qualifications, and so sought to exclude all Neumark's opinions on both of those bases. RA102–12; Dkt. 97, 98. As the proponent of the expert testimony, it was Plaintiffs—not the court and not Infosys—who bore the burden of proving

32

that Neumark's qualifications and methodology satisfied Rule 702. *See Gopalratnam*, 877 F.3d at 782. By choosing to defend Neumark with arguments and evidence outside the record, Plaintiffs all but concede that their effort to carry this burden failed. *See, e.g.*, *Winters v. Frucon*, 498 F.3d 734, 743 (7th Cir. 2007) (attributing party's "inability to produce admissible expert testimony [to] the failure of his proposed experts to test their alternatives" because litigation includes no "dress rehearsal or practice run" (citation modified)).

### 1.1.2 The purported error in excluding Neumark's employee opinions was harmless.

Finally, Plaintiffs' sua sponte argument fails to establish any non-harmless error. Under Federal Rule of Civil Procedure 61, "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground . . . for vacating, modifying, or otherwise disturbing a judgment or order." The rule goes on: "At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Reversal under Rule 61 thus requires "a significant chance" that an error affected the outcome of the case. *Equal Emp. Opportunity Comm'n v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012) (citation omitted) (internal

33

quotation marks omitted); *see also Hall v. Flannery*, 840 F.3d 922, 926–27 (7th Cir. 2016). Plaintiffs' sua sponte arguments do not meet this standard.

As to Plaintiffs' employee-promotion claims, no significant error can arise because those claims have been abandoned. Not a single named plaintiff asserts a failure-to-promote claim now, and so no named plaintiff could adequately represent a failure-to-promote class. RA237; Dkt. 116 at 23–24; Appellants' Br. 80. Any error relating to Neumark's promotions analysis therefore is harmless.

As to their employee-termination claims, Plaintiffs' claim of error is equally inconsequential. Plaintiffs fault the district court for denying Neumark a chance to rehabilitate his termination studies by incorporating new evidence that over 85% of Infosys employees are India-born. Appellants' Br. 30. But not only is there no such evidence in the record, the 85% statistic largely corresponds to the 81% of Infosys employees who were *Deputees*—that is, Indian nationals on temporary assignments for U.S. clients. RA109; Dkt. 98 at 3–4 (citing INFAPP102–07, INFAPP116). That matters because Neumark repudiated his original termination studies, conceding that he did not consider Deputee terminations in India

34

where most occurred. RA123–24; Dkt. 123-7 at 6; INFAPP106. And Neumark's remaining termination studies exclude Deputees—the portion of the employee population that overwhelmingly drives the 85% Indian-born calculation—by design. Dkt. 123-7 at 6; *see also* INFAPP103. Plaintiffs therefore seek to overturn the district court's exclusion of Neumark's opinions as to the employee population based on new evidence *purposely* excluded from the only termination study that Neumark defends.

Plaintiffs' insistence that racial-classification errors only understate racial disparities—an argument that is based on Neumark's opinions in sealed records from another case—makes no sense. *See* Appellants' Br. 32. As the district court recognized, the effect of misclassifying South Asian employees depends on *which* employees are misclassified, not on any general statistical rule. *See* RA84–85. How, for example, could misclassifying terminated South Asian employees as non-South Asian possibly understate the termination rate for non-South Asians?

Not preserved, not supported, and not even material, Plaintiffs' objections to a sua sponte ruling provide no basis for reversal. Failing to fully appreciate Neumark's deficiencies the first time around does not entitle Plaintiffs to another try.

35

**1.2  The district court properly excluded Neumark's opinions on the grounds that they rest on a name-matching racial-classification method that Neumark admits he was unqualified to invent.**

Left to defend Neumark's opinions on the merits, Plaintiffs have little to say about the court's finding that Neumark was "not qualified as an expert." RA144. For good reason. Rule 702 permits expert testimony only when "knowledge, skill, experience, training, or education" qualify the witness as an expert. Courts applying that standard must ask "not whether an expert witness is qualified in general, but whether his qualifications provide a foundation . . . to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (cleaned up). The specific question here was whether Neumark was qualified to create and apply a name-matching methodology. He wasn't. Neumark admitted this: "I don't have any expertise in [name matching]," he said, "no." RA140–41; IN-FAPP97. Neumark also disclaimed expertise in using the self-reported race of Asians, conceding "complete ignorance . . . about if Indians self-identify . . . as Asian ethnicity." RA141; INFAPP96.

As the district court recognized, that posed a serious "problem" for his testimony. RA141. Despite lacking any expertise or experience "[i]n the area of identifying an individual's race by name," RA144, Neumark

36

had both devised his own name-matching method for classifying Infosys job applicants and employees by race and national origin, RA166; SA208–09, and had used that method in all his statistical analyses to classify applicants and employees as South Asian and Indian, *see* RA170–71; SA208–09. Neumark in turn applied his name-matching method to determine the percentage of South Asians and Indians in Infosys's United States-based workforce that had been hired, promoted, and terminated. RA143–44. This leads to only one possible conclusion: that, as the district court concluded, Neumark hinged his entire analysis on a methodology he was not qualified to invent or use. RA144; *see, e.g.*, *United States v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019) (finding psychologist with general expertise evaluating competence of criminal defendants lacked experience to testify about the psychology of charismatic groups); *Est. of Stuller v. United States*, 811 F.3d 890, 895 (7th Cir. 2016) (finding horse trainer unqualified to testify about financial aspects of horse-breeding business).

Unable to show otherwise, Plaintiffs quibble over Neumark's competence to perform some of the tasks required by his methodology. They argue for the first time, for example, that Neumark was qualified to do

things like recognize "obvious Western names," cross-reference names by algorithm, and run his statistics. Appellants' Br. 47–48 (citation omitted) (internal quotation marks omitted). But even had this argument been preserved—and it was not, *see, e.g.*, *Lukaszczyk v. Cook Cnty.*, 137 F.4th 671, 674 (7th Cir. 2025)—Plaintiffs provide no defense of Neumark's qualifications to devise the methodology itself. What, for instance, qualified Neumark to use a list of 21,093 employee surnames to reflect the universe of surnames in a country of 1.4 billion people? And what qualified him to use that list to discard the self-reported race of "Asian" job applicants and employees? Plaintiffs never say.

The closest they come to defending Neumark's qualifications is by referring to his experience with name-matching in other cases. But this is more record-revisionism. Asked when deposed whether he had "ever used name-matching in any other case," Neumark said he had not. RA140 (quoting INFAPP97).

That Plaintiffs attempt only a half-defense of Neumark's qualifications—all of it waived—concedes the court's primary and independently sufficient basis for excluding Neumark's opinions. Its *Daubert* ruling can be affirmed for this reason alone.

38

**1.3 The district court properly excluded Neumark's opinions on the alternative ground that his name-based racial-classification methodology bears no hallmarks of reliability.**

The district court's ruling can be affirmed for the independent reason that the court properly found Neumark's testimony unreliable. To ensure that expert testimony is not just relevant but also reliable, courts must scrutinize the expert's methodology through a non-exclusive, non-mandatory list of "*Daubert* factors," ranging from considerations like whether the expert's theory has been accepted or published to whether the expert's opinions were developed solely for litigation. *See Gopalratnam*, 877 F.3d at 779–80, 783 (citing *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534–35 (7th Cir. 2005), *vacated in part on other grounds*, 448 F.3d 936 (7th Cir. 2006)). Applying those factors here, the district court determined that Plaintiffs provided no evidence that Neumark's racial-classification methodology satisfied Rule 702's minimum standard. RA166–70. Its holding applies the uncontroversial principle that an expert's reliability cannot rest on the mere say-so of the expert himself.[3] *See* RA127.

---

[3] Having found Neumark unqualified and his opinions unreliable, the court also found those opinions irrelevant. RA170–71.

Once again, Plaintiffs challenge the court's ruling without identifying any evidence that could rehabilitate Neumark. They point to no evidence that Neumark's name-based racial-classification method:

- had ever been tested, subjected to peer review, or published;
- was supported by controlling standards or known or potential error rates;
- was generally accepted in a "relevant scientific community;"
- arose out of research conducted independent of the litigation; or
- was extrapolated from any "accepted premise."

RA166 (internal quotation marks omitted) (first quoting *Daubert*, 509 U.S. at 593, and then quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). They nowhere dispute that Neumark used this methodology on both job applicants and employees—that is, "to determine which incumbent Infosys *employees* were 'South Asian,' not just which *applicants* were likely to be 'South Asian.'" RA170. And they point to no evidence that Neumark's use of this method to determine percentages of Indians and South Asians in all his statistical analyses produced only immaterial errors. *See* RA143.

And again, that failure to present any evidence capable of satisfying their Rule 702 burden precludes Plaintiffs from establishing district-

court error. Challenging the court's ruling anyway, Plaintiffs go through the motions of defending Neumark with claims about insufficient data, efforts to recharacterize admissibility issues as going to weight, and never-before-presented academic articles. Appellants' Br. 33–35. But their arguments either distort the record or rest on evidence entirely outside it—providing no basis for second-guessing the broad discretion of the district court.

### 1.3.1 Plaintiffs cannot show error by blaming Neumark's reliability problems on PeopleFluent reports containing data they already had.

Blaming Neumark's deficiencies on Infosys, Plaintiffs argue first that Neumark cannot be faulted for relying "on the data that Infosys produced" because it "withheld" data assembled by its third-party vendor, PeopleFluent. Appellants' Br. 34. This conclusory claim is unsupported in three different ways. First, Plaintiffs conceded below (and the record confirms) that PeopleFluent used the same data to compile its demographic tables that Infosys produced to Plaintiffs.[4] In other words, Plaintiffs had the very information they claim they never got. Second,

---

[4] *See, e.g.*, INF150 n.26 (describing Infosys's data production); Dkt. 123 at 6 n.13 (same); INF177–205 (cataloging opportunities).

41

Plaintiffs declined the court's repeated invitations to ask for relief that would allow Neumark to incorporate PeopleFluent reports into his opinions. INFAPP177–205. And third, Plaintiffs identify no additional data that Infosys had an obligation to collect.

No additional data limitation could rehabilitate Neumark anyway. What made Neumark's opinions inadmissible was his use of a methodology that was unreliable. By contrast, the only authority cited by Plaintiffs approved an expert's use of "the best data available" in the context of disparities that were tantamount to "an announcement of discrimination" and a methodology that *was* reliable. *See Mister v. Ill. Cent. Gulf R.R. Co.*, 832 F.2d 1427, 1430–31 (7th Cir. 1987).

### 1.3.2 Plaintiffs waived their arguments that Neumark's deficiencies go to weight rather than admissibility, plus those arguments misunderstand Rule 702.

Plaintiffs next announce that flaws in Neumark's name-matching methodology go to weight rather admissibility, an argument they waived by never making it to the district court. *See Arnold v. United Airlines, Inc.*, 142 F.4th 460, 474 (7th Cir. 2025). The claim also misunderstands Rule 702. According to Plaintiffs, labeling the outputs of Neumark's racial classification methodology as "[i]nputs" for his statistical analyses

42

shields his classification methodology from scrutiny. Appellants' Br. 33–34. Rule 702, however, specifically requires experts to base their testimony "on sufficient facts or data." RA134 (internal quotation marks omitted) (quoting Fed. R. Evid. 702). Rejecting arguments like Plaintiffs', this Court has repeatedly concluded that whether the expert appropriately relied "on the test that he administered and upon the sources of information which he employed" is a proper subject of *Daubert* review. *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 896 (7th Cir. 2011) (cleaned up); *see also Korte v. Exxonmobil Coal USA, Inc.*, 164 F. App'x 553, 557 (7th Cir. 2006) (affirming exclusion of expert opinion where the expert "formed his opinion without sufficient scientific evidence confirming the validity of [his] premise"); *Gopalratnam*, 877 F.3d at 783 (similar); *cf. Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766–67 (7th Cir. 2013) (reversing exclusion of opinions developed through valid method where "clear" that error from estimated inputs would not alter the expert's conclusions) (cited by Plaintiffs).

Plaintiffs' related claim—that Neumark could prove that naming errors understate disparities—fails because it lacks any foundation in the record. What Neumark *might* say in other, future proceedings or said

43

in another, different (sealed) case is not evidence in this one. *See Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 611 n.12 (7th Cir. 2023) (holding evidence not presented to district court is outside appellate record).

### 1.3.3 Plaintiffs cannot show error by defending a methodology Neumark did not use with arguments and evidence they did not present.

Plaintiffs' last attempts to salvage Neumark's opinions are their least plausible. In Plaintiffs' telling, the court "overlooked" that name-matching has been generally accepted, peer-reviewed, and published; and is supported by a standard methodology and sufficiently tested to establish a low error-rate. Appellants' Br. 39–45. But Plaintiffs made none of those arguments—and cited none of those academic articles—in the district court. *See* RA113–22; Dkt. 123. The result is a wrinkle in time. Plaintiffs cannot blame the court for rejecting arguments and evidence offered only *after* it entered final judgment. *See, e.g.*, *Johnson*, 71 F.4th at 611 n.12 (identifying limit of appellate record); *see also Berwick Grain Co., Inc. v. Ill. Dep't of Agric.*, 116 F.3d 231, 234 (7th Cir. 1997) (similar); *Fuesting*, 421 F.3d at 533–34 (noting that appellate briefs must contain fair citations to the record).

44

These new arguments and evidence are not capable of rehabilitating Neumark in any event. Plaintiffs' opening brief spends four subsections defending the generic method of "name-matching," but the court never doubted that reliable name-matching methods exist. Quite the opposite. RA167. What it found unreliable was *Neumark's* particular innovation—a methodology that discards self-reported race data to treat about 21,000 employee surnames as a census of surnames in countries with more than a billion people. *See* RA98, 169–70. None of Plaintiffs' sources defend *that* methodology. And the PeopleFluent data (which uses a different methodology altogether—raw counting) makes no distinction between local workers and temporarily placed Deputees (or between Asians and South Asians), and remain unexamined by Neumark or any expert in the case. Dkt. 123-9.

Ending where it began, Plaintiffs' effort to rehabilitate Neumark reveals no evidence that his methodology is reliable, because it isn't reliable. The district court's ruling excluding Neumark's testimony reflects watchful gatekeeping. It should be affirmed. *See Gopalratnam*, 877 F.3d at 782 (affirming expert exclusion on reliability grounds and describing manifest error as a serious error of judgment or irrational decision).

**2.    Plaintiffs' individual discrimination claims fail as a matter of law.**

**2.1    The district court properly denied Plaintiffs' oral request to file a supplemental summary-judgment brief five years after briefing ended and following their choice to reject earlier opportunities to do just that.**

As with their *Daubert* appeal, Plaintiffs' initial challenge to summary judgment is a procedure-based demand for a do-over: they contend that the court erred by denying their November 2022 request to file another summary-judgment brief. Here, too, the argument is waived. Plaintiffs criticize the court for failing to consider whether certain "*Pioneer* factors" entitled them to relief under the "excusable neglect" standard in Rule 6(b). Appellants' Br. 50. But the record reflects only a bare oral request for another brief, INFAPP206; Dkt. 210—a request that contains no mention of Rule 6(b) or excusable neglect, or how Plaintiffs satisfied any of the factors discussed in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380 (1993). The result is predictable: there is no preserved claim of error, never mind any actual error. General arguments do not allow parties to "make a specific argument for the first time on appeal." *Arnold*, 142 F.4th at 474 (citation omitted) (internal quotation marks omitted); *see also Schlemm v. Pizzala*, 94 F.4th 688, 690 (7th Cir. 2024) (applying principle).

46

Even were it preserved, Plaintiffs' argument that Rule 6(b) entitled them to reopen summary-judgment briefing fails many times over. First, Plaintiffs never establish that Rule 6(b) even applies. That rule provides that "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). But having filed a timely summary-judgment response, Plaintiffs are seeking a mulligan, not relief from a missed deadline. And regardless, Rule 16(b) required plaintiffs to show "good cause" to deviate from the court's scheduling order—something they do not claim to have done. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 719–20 (7th Cir. 2011); *Frazier v. Dovenmuehle Mortg., Inc.*, 72 F.4th 769, 778 (7th Cir. 2023).

Second, Plaintiffs cannot show excusable neglect. *Pioneer* merely extended the Rule 6(b) standard beyond omissions caused by circumstances outside the movant's control to include inadvertent delays. 507 U.S. at 382–83. There was no omission outside Plaintiffs' control, and there was no inadvertent delay. Plaintiffs asked for supplemental briefing to address PeopleFluent materials they had known about for five years; and they did so after declining repeated offers to propose just that.

47

Dkt. 143 at 27:7–15; INFAPP202–05. This makes Plaintiffs' delay tactical, not neglectful—especially so if they were waiting to see if Neumark's testimony would be excluded. Nothing in *Pioneer* required the court "to give [Plaintiffs] an opportunity to modify their [summary-judgment] response [when] they had that opportunity and did not take it." INFAPP206; *see also United States v. Beaufils*, 160 F.4th 1147, 1171 (11th Cir. 2025) (holding the decision to forgo moving for a new trial fell outside *Pioneer*'s definition of neglect).

Third, even assuming they apply, the *Pioneer* factors weigh against Plaintiffs' request. Re-briefing summary judgment after five years would plainly have prejudiced Infosys, delaying as it would the proceedings even longer, and it would have done so despite Plaintiffs' failure to show any good-faith reason for their delay or any circumstances that placed that delay outside their "reasonable control." *Pioneer*, 507 U.S. at 395; *see also Murphy v. Eddie Murphy Prods., Inc.*, 611 F.3d 322, 324 (7th Cir. 2010) (finding prejudice to defendants from 60-day delay). Plaintiffs' complaints about their own prejudice both disregard their possession of the underlying PeopleFluent data and misread *Troupe v. May Dep't Stores Co.*, 20 F.3d 734 (7th Cir. 1994). Whereas that case addressed the

48

potential relevance to individual discrimination claims of statistical analyses of "employees similarly situated to the plaintiff," *id.* at 736, PeopleFluent's demographic comparisons (the equivalent of pie charts) take no account of who was similarly situated to whom, *see* Dkt. 123-9.

Measured by any standard, then, Plaintiffs' oral request in November 2022 to file a supplemental brief five years after briefing had ended cannot possibly justify overturning the court's summary-judgment ruling now. The court's proper exercise of its broad case-management authority should be affirmed.

### 2.2 The district court correctly ruled that Plaintiffs' individual discrimination claims fail as a matter of law.

Plaintiffs also fail to identify any basis for overturning the court's judgment on the merits. Plaintiffs Handloser, Parker, Koehler, and Bolten assert Title VII and Section 1981 claims on the theory that Infosys treated them adversely because they are Caucasian and American. But as the district court found, no "reasonable factfinder" viewing the record as a whole could conclude that Infosys's legitimate reasons for its actions are pretexts for discrimination. *See Morris v. BNSF Ry. Co.*, 969 F.3d 753, 758 (7th Cir. 2020) (reciting Title VII and Section 1981 standard). Neither could a reasonable factfinder conclude that any Infosys hiring

49

policy or practice disparately impacted Caucasian Americans in general or Koehler or Parker in particular.

### 2.2.1 Handloser's disparate-treatment claim fails because unrebutted evidence shows he was discharged in a companywide reduction-in-force.

Summary judgment on Handloser's discrimination claim can be affirmed because Infosys's explanation for his discharge is unrebutted: Handloser lost his job in a RIF that targeted all employees at his level who received the same performance rating in the latest review cycle. RA207–08; Dkt. 78-2 ¶¶ 6–8; INFAPP89 ¶¶ 192–94. Plaintiffs have scoured the record for minor discrepancies and disagreements, but nothing remotely suggests that Infosys's account of what happened—a 50-person RIF that included 29 Asian employees, INFAPP12–13 ¶¶ 29–30—was a pretext for discrimination.

Plaintiffs' primary evidence of pretext is Handloser's past performance—his good ratings in earlier review periods and a promotion recommendation from his manager. *See* Appellants' Br. 65. But however probative in other circumstances, past performance has little to say about a RIF based on a later appraisal cycle. Making past performance less relevant still, Handloser *agreed* with his most recent low rating. As his

manager, Sudip Singh, explained at the time, while Handloser had "performed satisfactorily over the past 12–18 months," Dkt. 95-50 at 5, his "performance in the [April through September] appraisal cycle in question was Not [sic] up to the mark," leading Handloser to give "himself a low PI (2.05) while [Singh] appraised him also with a low PI (2.20)," *id.* at 3. Nor were these scores based on subjective appraisals. Lowering his scores on the two weightiest indicators of Sales Manager performance, Handloser had come in $400,000 below an agreed-upon New Revenue target and had zero of the targeted New Accounts Opened. Dkt. 78-17 at 19; INFAPP87; *see Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 916–17, 921–22 (7th Cir. 2000) (affirming judgment for employer where the evidence showed that, as part of a RIF, the employer discharged employees with the lowest performance ranking "from the previous year").

Turning to Handloser's companywide rating, Plaintiffs next claim that senior executives, including Sanjay Jalona, secretly changed Handloser's score from the "3" recommended by Singh to the "4" that subjected him to Infosys's RIF. Appellants' Br. 65–66. But those scores reflect standard procedures, not any executive-level conspiracy. While Handloser received a supervisor-recommended rating of 3, Dkt. 95-47 at 5, his

51

final score was generated through an automated process in which weighted individual performance ratings "across the sales manager universe [were] rolled up by the system, and then . . . put into a bell curve," Dkt. 78-17 at 12, 132:20–22. Lacking contrary evidence, they assert that Handloser is protected by an adverse inference from their accusation that Infosys destroyed documents. But those accusations have no bearing on summary judgment. Outside the relevant record, they come from a later-filed sanctions motion that the court denied. Dkt. 135; SA231.

Unable to challenge Handloser's low ratings, Plaintiffs offer a handful of conclusory assertions that purport to cast doubt on the RIF itself. But none survive the broader record:

- Plaintiffs, for example, suggest the RIF did not happen because Handloser knew nothing about it. But Handloser conceded that he never received the performance improvement plan that Infosys policy would require absent a RIF, *id.* at 230, SA151–56 ¶ 194.

- Plaintiffs announce, without argument or explanation, that Infosys data disproves that "employees with an appraisal score of 4 were subject to the RIF." Appellants' Br. 68–69. But this conclusory claim relies on consolidated relative rating scores for periods outside the

relevant six-month period in 2012. *See* Dkt. 95-25 ¶ 11; *see also* Dkt. 97-5 at 281:20–283:4.

- And Plaintiffs object that Infosys failed to prove the RIF through specific documents. But they ignore both the personal knowledge of the Infosys declarant who implemented the RIF and that Federal Rule of Evidence 1006 permits use of "a summary . . . to prove the content of voluminous admissible writings." Dkt. 109 at 235–37.

Unlike cases where post hoc or unsubstantiated explanations cast the employer's honesty into doubt, no reasonable juror could infer that Infosys lied about a companywide RIF here. *See McCann v. Badger Mining Corp.*, 965 F.3d 578, 590 (7th Cir. 2020) (explaining that, when showing an employer's explanations had shifted, "[i]t is not enough that an employer's word choice or phraseology change over time").

No more helpful to Plaintiffs, their final argument presents a warning that Handloser might file suit as an admission that Handloser has a meritorious claim. It isn't. In the cited e-mail, Singh simply reported the possibility that Handloser would "potentially create a lot of noise in the system quoting his earlier performances" even though his "performance in the . . . latest Appraisal cycle . . . has undoubtedly been poor." Dkt. 95-

50 at 3, 6. Notably absent in Singh's e-mail is anything connecting this anticipated "noise" to any prior discrimination. *See id.*

\* \* \*

None of Handloser's disagreements with Infosys's decision-making protect his claims against summary judgment. The undisputed evidence establishes that Handloser lost his job because of a 50-person RIF that included 29 Asian employees—not because of discrimination against Caucasian or American employees. RA207–08; Dkt. 78-2 ¶¶ 6–8; IN-FAPP89 ¶¶ 192–94; *see also Brooks*, 39 F.4th at 437 (affirming summary judgment where there was no evidence that employer's reason for discharging plaintiff was pretextual); *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000) (explaining that plaintiff must prove "that the reduction in force was an excuse to get rid of workers belonging to the protected group").

### 2.2.2 Parker's disparate-treatment claims fail because nothing suggests her lack of technical qualifications or the expiration of Infosys's contract with her temporary staffing agency are pretexts for discrimination.

Nothing indicates that Parker's lack of technical qualifications—Infosys's stated reason for not hiring her—is a pretext for discrimination.

54

Infosys interviewed Parker for a technical position in September 2012, around the time it began providing IT services to Harley-Davidson's facility in Tomahawk, Wisconsin. RA197; Dkt. 78-1 ¶¶ 11, 13; INFAPP64 ¶¶ 71–74, n.2. It is undisputed that this interview was designed to assess Parker's technical skills. RA225; Dkt. 78-8 at 2, 33:10–15; INFAPP64. Also undisputed is the fact that Parker's interviewers found her "technically not competent for the role requirements." RA225 (citation omitted) (internal quotation marks omitted); Dkt. 78-1 at 11; INFAPP65 ¶ 76. That is unsurprising: at the time of her interview, Parker's relevant education consisted of a two-year associates degree, she had done little testing and no computer coding, and her primary experience was interning at Harley-Davidson's help desk through a temporary staffing agency. RA196–97; Dkt. 78-10 at 54–56; INFAPP60–61 ¶¶ 49–57.

Turning those facts inside out, Plaintiffs insist Parker *had* to be qualified because she was interviewing "for a role that she had been performing, and for which she trained her replacement." Appellants' Br. 70. But why would Infosys—a global leader in IT services—replicate the exact roles filled by a temporary staffing agency? Parker concedes that the position she interviewed for had a different name than her original

55

position; and while she claims that the work was the same, Dkt. 78-10 at 20, 163:22–24, there is no evidence showing she would have had personal knowledge of who filled the new role or what that person did.

And even if those roles (systems engineer versus help-desk intern) had been identical, their qualifications were not. *See* RA225–26; IN-FAPP8 ¶ 17 n.8; INFAPP68 ¶ 89. Nowhere does Parker dispute that Infosys required applicants for the position she sought to demonstrate certain technical proficiencies. Nor does Parker dispute that she failed to do so. These facts alone entitle Infosys to judgment as a matter of law. *See Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1427 (7th Cir. 1986) ("A subjective qualification assessment does not convert an otherwise legitimate reason into an illegitimate one.").

Neither do Parker's allegations about training her replacement suggest anything different. Contradicted by the record, Parker speculates that Kapil Kulkarni, a Deputee with a four-year engineering degree and five years of experience with Infosys, was placed in the position she sought. RA229; INFAPP62–63 ¶¶ 63–67; SA23–24 ¶¶ 41–43. But even if Kulkarni *had* replaced Parker, that would merely confirm both that she lacked the qualifications that Infosys required for the job and that Infosys

56

found someone with far superior qualifications. Either way, Parker raises no issue of pretext. The only "implausible explanation" for Infosys's decision not to hire Parker is the one she herself offers. Appellants' Br. 70.

As the district court also recognized, there is no evidence that Infosys—rather than the temporary staffing agency—was Parker's employer to begin with. RA226–27. And in any event, Plaintiffs failed to rebut the legitimate reason that Parker's "employment" ended: the contract between Infosys and the staffing agency that employed Parker (Soft HQ) expired. *Id.* Citing statements by unspecified people, they assert that Parker had been led to believe that her role would be permanent, SA22 ¶ 39; SA105–06 ¶¶ 107–08, and that she was told that her discharge resulted from being late to work once and failing to keep her work area "tidy," SA24 ¶ 44. But unlike the words and actions of employees acting within the scope of their employment, statements by anonymous speakers are not evidence of anything. *See generally Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (explaining that inadmissible hearsay cannot overcome a motion for summary judgment).

Equally insufficient, Plaintiffs try to extract pretextual motives from the fact that Vikram Vallala signed a Task Order relating to

57

Parker's temporary services at the end of its fixed term (September 4, 2013), rather than at the beginning. Appellants' Br. 71–72; Dkt. 95-22 at 6; Dkt. 94-32, at 48. But the record is undisputed that:

- The SoftHQ contract that Parker signed on June 1, 2013, warned that her "employment with SoftHQ, [would] end as soon as the Desktop Support Specialist role with Infosys at Harley Davidson in Tomahawk, WI ends with our client." RA198; Dkt. 94-32 at 31–32; INFAPP68 ¶ 86.

- The Task Order memorializing Parker's assignment with Infosys explicitly stated that the contract between Infosys and SoftHQ would end effective September 15, 2013. RA227; Dkt. 78-1 ¶ 15, 42–46; Dkt. 79 ¶ 107.

- And SoftHQ informed Parker in August 2013 that her employment would end because SoftHQ's work for Infosys would be ending on September 15, 2013. RA227; Dkt. 78-14 ¶ 7; INFAPP73 ¶ 108.

As the district court recognized, one signature date and two anonymous statements cannot entitle Parker to bring her discrimination claims to a jury. *See* RA226–29. Like her failure-to-hire claim, Parker's termination claim fails as a matter of law. *See Ontiveros v. Exxon Mobil*

*Corp.*, 148 F.4th 521, 528–29 (7th Cir. 2025) (affirming summary judgment for employer where employee could not show that the employer's "stated reason for terminating her . . . was a lie").

### 2.2.3 Koehler's disparate-treatment claim fails because nothing suggests her lack of technical qualifications was a pretextual reason for not hiring her.

The district court properly granted summary judgment on Koehler's failure-to-hire claim because no evidence suggests that her lack of technical qualifications was a pretext for discrimination. Like Parker, Koehler failed a "technical" job interview for its Lead VMware/Windows Administrator job because she "was [found] lacking in average and advanced technical fundamentals" required for the job. Dkt. 78-7 ¶¶ 11, 13 (internal quotation marks omitted); RA219–20; INFAPP55–56 ¶ 36. That decision put Koehler on the same footing as about 100 other applicants, including some 40 Asian candidates, who interviewed unsuccessfully for the same job around April 2012. RA216; INFAPP5 ¶ 7; INFAPP56 ¶ 39.

It is beside the point that Koehler personally believes she had sufficient educational qualifications and was "able to discuss [the relevant software] areas competently" during her interview. Appellants' Br. 75–76 (citing SA19 ¶ 32). As this Court has explained, a plaintiff's self-

assessment raises no issue for trial. *See Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 865 (7th Cir. 1996).

Plaintiffs' attempt to impugn Infosys's honesty by pointing to confusion in the interview process gets them nowhere either. Specifically, they point to last-minute changes to the interview's call-in procedure and interview questions about software programs not specifically listed in the posting for the job. Appellants' Br. 75. But as the district court observed, these are minor frustrations, not evidence of discrimination. RA218. No "reasonable fact finder [could] conclude" from this evidence that the real reason for Koehler's rejection was her nationality or race. *Abebe v. Health & Hosp. Corp. of Marion Cnty*, 35 F.4th 601, 606 (7th Cir. 2022) (citation modified).

Plaintiffs' claim that Infosys "offer[ed] a declaration that contradicted Infosys' own Rule 30(b)(6) deposition testimony," Appellants' Br. 74, is also insufficient to raise any issue on appeal if only because it is conclusory. *See, e.g.*, *Greenbank v. Great Am. Assurance Co.,* 47 F.4th, 618, 629 (7th Cir. 2022). In any case, general statements by Infosys's Rule 30(b)(6) witness (Megan Groves) did not contradict the more detailed

recollections or notes of Infosys interviewer Amol Vyawahare. RA221–22; Dkt. 78-7 ¶¶ 4, 11; Dkt. 95-9 at 7, 30:12–37:15.

Plaintiffs are similarly unable to squeeze any ulterior motive from purportedly "shifting" accounts of which job was filled during the July hiring round by South Asian-American job applicant Fazlul Halim. Plaintiffs do not even contend that Koehler was more qualified than Halim. Appellants' Br. 76. And what matters, in any event, is Infosys's unchanging explanation for not hiring Koehler: her lack of technical qualifications. Because no reasonable factfinder could find that reason phony—let alone a pretext for discrimination—summary judgment for Infosys should be affirmed. *See Abebe*, 35 F.4th at 606.

### 2.2.4 Bolten's constructive-discharge claim fails because no objectively unbearable working condition forced her to quit.

The district court was also right to grant summary judgment on the constructive-discharge claim of Layla Bolten—a former Infosys Public Services employee who quit after only five months on the job. RA200, 204–05; INFAPP12 ¶ 33; INFAPP38 at 91:14–23; INFAPP45 at 162:7–163:20; INFAPP77 ¶ 128; INFAPP82 ¶¶ 156–57. A constructive discharge arises in two situations: (1) where a discriminatory work

environment is even more egregious than a hostile work environment; and (2) where the employer's discriminatory conduct would communicate to a reasonable employee that she will be terminated. *Wright v. Ill. Dep't of Child. & Fam. Servs.*, 798 F.3d 513, 527 (7th Cir. 2015). In both situations, the working conditions must be objectively "unbearable." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 366 (7th Cir. 2009). Failing that standard here, Bolten bases her claim on a handful of ordinary setbacks and perceived slights that remain (with a single exception) unconnected to her national origin and race.

Plaintiffs' summary of Bolten's complaints only confirms her inability to prove a discriminatory work environment. They offer just three pieces of evidence: (1) Bolten's testimony that someone referred to her as a "stupid American," RA201; INFAPP46 at 264:16–25; INFAPP78–79 ¶ 138, (2) her claim that unspecified co-workers engaged in unspecified harassment even after she complained to a supervisor, RA202; Dkt. 78-15 at 15–16, 92:2–94:16; INFAPP79–80 ¶ 143, and (3) speculation that colleagues spoke Hindi at work to prevent her from participating in her assigned project, RA202–03; INFAPP39 at 127:10–128:11; Dkt. 78-15 at

16, 93:13–20. Bolten's theory that Infosys communicated an intent to fire her apparently rests on her additional allegations that:

- a promised promotion was followed by gradually diminishing duties until she was assigned little work, *see* Appellants' Br. 79; IN-FAPP40 at 131:1–21;

- someone once told Bolten to pack up her workstation and "sit in the corner," Appellants' Br. 79 (internal quotation marks omitted); IN-FAPP45 at 163:1–8; and

- a manager's erroneous accusations that Bolten misreported her time and needed to work more, RA203–04; INFAPP40 at 132:5–24.

Taken together, these incidents are not severe or pervasive enough to establish a hostile work environment, much less an unbearable one. Indeed, Bolten offers just one remark ("stupid American") that even mentions nationality or race. Undercutting her claims further, Bolten concedes that what little Hindi she heard had no effect on her job performance, RA230; INFAPP39 at 127:10–128:14; INFAPP79 ¶ 142, that no manager promised her a promotion, INFAPP35 at 78:20–79:12; IN-FAPP77 ¶ 132, and that she continued to receive new work less than two

weeks before she quit, RA203–04; INFAPP42 at 151:16–152:13; IN-FAPP80–82 ¶¶ 149–54, 156.

As the district court ruled, "no one could conclude" that Bolten's experience gave her any "reason to believe that she was likely to be terminated or that the working conditions were intolerable." RA236. At bottom, Bolten's claims mistake federal anti-discrimination statutes for civility codes, and in so doing raise no issue for trial. *See Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845, 848 (7th Cir. 2009) (distinguishing severe or pervasive conduct from incivility); *Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225 (7th Cir. 2022) (describing harassment-based constructive discharge as "a high hurdle" to clear); *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (finding mere prospect of discharge insufficient to support constructive discharge).

### 2.2.5 The disparate-impact claims of Koehler and Parker fail as a matter of law.

Koehler and Parker's disparate-impact claims fare no better. For one, they make no argument that these claims survive the exclusion of Neumark's testimony or the absence of PeopleFluent's reports. That should be the end of the analysis.

64

Allowing Plaintiffs to rely on Neumark or PeopleFluent would make no difference. A disparate-impact claim under Title VII requires proof "that a facially neutral test or employment practice [falls] more harshly upon a protected group than upon others." *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1254 (7th Cir. 1990) (citation omitted) (internal quotation marks omitted). That proof, as the district court explained, must include statistical evidence assessing "the number of *eligible* candidates [in relation to] the number of people hired for the position, not just the mere disparity in the actual workforce." RA241 (emphasis added) (quoting *Gilty*, 919 F.2d at 1254). Neumark (who controlled for no variables) and PeopleFluent (which offered no statistics) provide no such analysis.

Plaintiffs' disparate-impact claims also fail because Parker and Koehler cannot show they were qualified job applicants, as necessary to prove injury. *See Gilty*, 919 F.2d at 1251, 1254–55; *Carpenter v. Bd. of Regents of Univ. of Wis. Sys.*, 728 F.2d 911, 915 (7th Cir. 1984); *see also, e.g., Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 668 (7th Cir. 1996) (applying principle). Nor do they identify a "specific" facially neutral test or practice that prevented them from being hired. *See Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988). The only "practices" that Plaintiffs

65

allege are a visa "inventory" scheme and supposed instructions that the Talent Acquisition unit should favor South Asians. Appellants' Br. 61. But even if true, neither affected Koehler or Parker specifically; the record is undisputed that neither sought jobs that were given to visa-holders—that is, Deputees. *See* RA198–99; Dkt. 78-6 at 19; INFAPP53 ¶ 24. And both received interviews irrespective of any conduct by the Talent Acquisition unit. RA194; Dkt. 78-7 ¶ 4; INFAPP55 ¶ 33; RA197; Dkt. 78-1 ¶¶ 10–11; INFAPP64 ¶ 73.

At the "put up or shut up moment in [the] lawsuit," *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citation modified), Plaintiffs' disparate-impact claims—like their other individual claims—remained entirely unsupported. The record entitled Infosys to judgment as a matter of law.

### 2.3　Summary judgment on Plaintiffs' disparate-treatment claims should be affirmed irrespective of whether Neumark's opinions are admissible.

Plaintiffs' final effort to undo summary judgment is both contingent on the admissibility of Neumark's opinions and futile regardless. Insisting that Neumark's testimony was erroneously excluded, Plaintiffs fault the court for deciding their disparate-treatment claims without applying

the *Teamsters* framework, 431 U.S. at 362–63, which by its terms applies only once a certified class establishes a prima facie case of pattern-or-practice discrimination. But the outcome is the same either way. Even if Plaintiffs could satisfy their prima facie burden under *Teamsters* (and they cannot, Dkt. 80 at 36), the resulting presumption that Infosys operates under a general policy of discrimination would be rebuttable. For each individual claim, Infosys could still prove that the plaintiff "was denied an employment opportunity for lawful reasons," not a policy of discrimination. *Id.* at 362; *see also Thiessen v. Gen. Elec. Corp.*, 267 F.3d 1095, 1109 (10th Cir. 2001) (acknowledging this potential framework for individual motions); *Brewer v. Holder*, 20 F. Supp. 3d 4, 15 (D.D.C. 2013) (applying this framework). And in moving for summary judgment, that is exactly what Infosys did.

First, Infosys rebutted any inference arising from Neumark's statistics. Plaintiffs concede that their "proof" of companywide discrimination rests on the aggregate demographic disparities reported by Neumark. *See* RA127; Dkt. 88 at 19; RA47. Yet Neumark's disparities—which purport to show only non-random variation, *see* Dkt. 128 at 14–16—do not map onto the circumstances affecting the named plaintiffs:

67

- In the Milwaukee location where Koehler interviewed for an administrator job, non-Asians accounted for 77.8% of the job applicants hired by Infosys the same year. RA193; INFAPP6 ¶ 11; INFAPP52 ¶ 19.

- At the Tomahawk location where Parker interviewed for a systems engineer position in 2012, Infosys hired no South Asian systems engineers in that year, INFAPP7 ¶ 16; INFAPP67 ¶ 83, hired only Caucasian systems engineers in 2013, INFAPP9 ¶¶ 18, 21; INFAPP69–70 ¶¶ 91–92, 99, and hired only one Asian applicant when filling 37 systems-engineer and senior-systems-engineer positions for all of 2012 and 2013, RA198–99; INFAPP11 ¶ 26; INFAPP72 ¶ 104.

- And in the RIF that ended Handloser's employment, 29 of the 50 discharged U.S. employees were Asian. INFAPP12–13 ¶¶ 29–30; INFAPP26; INFAPP89 ¶ 195.

Neumark's aggregate disparities thus are no more relevant to the experiences of Koehler, Parker, and Handloser—whose "adverse" treatment is, as already discussed, explained by legitimate reasons and objective criteria—than to whether Bolten's work environment was objectively

unbearable. No reasonable juror could infer that *these* plaintiffs were "denied an employment opportunity" based on a general policy of discrimination, rather than the "lawful reasons" given by Infosys. *See Teamsters*, 431 U.S. at 362.

Plaintiffs' "extensive anecdotal evidence" of companywide discrimination does not change the analysis. Appellants' Br. 61. According to them, Infosys's Talent Acquisition department was instructed to favor South Asians in recruiting and hiring, but the record establishes no connection between that recruiting department and Infosys's decisions about the hiring or termination of the plaintiffs here. *Id.* at 4. Besides, this anecdotal evidence comes down to an accusation that *one* hiring manager told *one* recruiter that "Americans don't know shit," SA11; Dkt. 94-4 ¶ 8—the kind of "stray remark[]" that is generally insufficient "to demonstrate that the employer relied on illegitimate criteria." *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 444 (7th Cir. 1997) (quoting *Smith v. Firestone Tire & Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir. 1989)).

Plaintiffs also contend that Infosys used its visa practices to discriminate against Caucasians and Americans. But as discussed, general visa practices say nothing about what happened to Koehler and Parker

69

in particular, because they sought jobs closed to and not filled by visa-holding Deputees. Dkt. 78-6 at 19; INFAPP53 ¶ 24; INFAPP21; INFAPP69 ¶ 90.

The bottom line is this: Plaintiffs cannot shield their individual claims from summary judgment on the theory that *Teamsters* may entitle a certified class to a presumption of companywide discrimination. With or without that presumption—and with or without Neumark's opinions—no reasonable juror could conclude that Infosys's facially legitimate reasons for its treatment of Parker, Koehler, Handloser, and Bolten were mere pretexts for discrimination. *See generally United States v. City of N.Y.*, 717 F.3d 72, 85–91 (2d Cir. 2013).

**3.    The denial of class certification should be affirmed because Plaintiffs do not claim to satisfy Rule 23 without Neumark's excluded testimony, their individual claims fail as a matter of law, and Neumark's crude statistics cannot prove that Infosys operates under any general policy of discrimination.**

The court's denial of class certification[5] can be affirmed because Plaintiffs barely contest it. They challenge the court's ruling only insofar

---

[5] Plaintiffs forfeited any class claims relating to disparate impact by failing to defend them here.

as it rests on the exclusion of Neumark's testimony. Because that exclusion was proper, class certification was properly denied.

Two alternate grounds, neither addressed, also support the court's decision. First, the failure of all individual claims at summary judgment makes Plaintiffs' motion futile. Class claims cannot go forward where, as here, putative class representatives "suffered no injury as a result of the alleged discriminatory practices." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403–04 (1977). At minimum, the failure to appeal any promotion claims precludes certification of a promotions-based class. *See generally Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016) (noting denial of class certification may be affirmed "on any basis that fairly appears in the record").

Second, Plaintiffs propose the very kind of sprawling, across-the-board class action that the Supreme Court did away with in *Dukes,* 564 U.S. 338. Unacknowledged in their brief, Plaintiffs seek to combine the putative hiring claims of more than 75,000 non-South Asian candidates who applied for different jobs, with different qualifications, through different managers, in different Infosys work sites across the country—and beyond that, to assert disparate-treatment claims on behalf of thousands

71

of employees who were fired or not promoted anywhere in the U.S. since 2009. As *Dukes* teaches, a conceptually "wide gap" separates any one person's discrimination claim from the existence of a class of people with the same alleged injury. 564 U.S. at 352–53 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). Bridging that gap requires "[s]ignificant proof that an employer operated under a general policy of discrimination." *Id.* (alteration in original) (quoting *Falcon*, 457 U.S. at 159 n.15). Otherwise, a disparate treatment class lacks "commonality." Absent a general policy of discrimination, no issue central to each individual claim can be resolved by adjudicating at least one contention common to all. *See Dukes*, 546 U.S. at 353–54 (applying Rule 23(a)).

Plaintiffs cannot prove any general policy of discrimination here for the same reasons that no companywide pattern or practice of sex discrimination could be established in *Dukes*. As in that case, none of the corporate policies at issue here are discriminatory, and all of Infosys's formal policies expressly forbid discrimination. Dkt. 78-1 ¶ 5; 78-3 ¶ 13; INFAPP50 ¶ 4; INFAPP52 ¶ 13. Here, too, Plaintiffs' anecdotal evidence is far too weak to raise any inference that all personnel decisions are discriminatory—even Plaintiffs concede they need more. *See generally* Dkt.

72

88 at 4–7. And here, too, Plaintiffs' statistical analyses cannot establish "the uniform . . . disparity upon which [their] theory of commonality depends." *Dukes*, 546 U.S. at 357. Statistics like Neumark's, even if taken at face value, are incapable of proving any common policy at all. *See id*.

The threshold problem is that Neumark lumps different kinds of employment decisions across different workplaces together. His hiring analysis, for example, treats all job applicants as if they applied for the same job in the same location under the same manager across all of Infosys. Aggregate disparities *assume* rather than *prove* that any disparate treatment is uniform. Without a common policy, the national and regional disparities in *Dukes* could not prove "the existence of disparities at individual stores, let alone raise the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level." 564 U.S. at 356–57 (quoting *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 637 (9th Cir. 2010) (en banc) (Ikuta, J., dissenting), *rev'd*, 564 U.S. 338 (2011)). So, too, are Neumark's aggregate disparities incapable of proving uniform disparities across Infosys, much less that this national company with hundreds of work sites follows any standard procedure of discrimination. Indeed, Infosys's expert eliminated

73

hiring disparities just by controlling for applicants who applied for the same job. INFAPP136–38. *See Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 896–97 (7th Cir. 2012) (reasoning that statistics that aggregate outcomes across a company's worksites assume, rather than demonstrate, that discrimination is common to each); *cf. Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 422–25 (7th Cir. 2000) (examining statistics as support for the contention that disparities were deliberately caused but only as to formal RIF policies).[6]

And making them less useful still, Neumark's disparities do nothing more than rule out chance. What *Dukes* found insufficient were "regression analyses that showed significant statistical disparities between Wal-Mart's workforce and the allegedly relevant workforce and concluded that they could be explained only by gender discrimination." RA132 (citing 564 U.S. at 356). By his own admission, Neumark ignored all obvious reasons for hiring, firing, and promotions decisions, contrary to procedures in the "large body of research on discrimination in labor

---

[6] To be sure, Neumark's supplemental reports on termination and hiring disaggregate his statistics for certain states, but those reports only confirm the lack of uniformity: almost one third of states yield no meaningful disparities in terminations. Dkt. 125 at 9–10; Dkt. 116-31 at 8–9.

74

markets." RA151 (quoting Dkt. 97-1 at 145). All that Neumark claims to find is non-random variation; he concedes he is unable to opine on the probability that any reported disparity resulted from any discrimination against non-South Asians. RA148; Dkt. 97-1 at 63, 242:6–18. Offering less than *Dukes*, Plaintiffs therefore purport to glue together more than 75,000 individual claims of disparate treatment with Neumark-reported disparities that not even Neumark is willing to call evidence of discrimination. *Cf. Adams*, 231 F.3d at 427 (finding statistics that eliminated chance probative of intent behind formal RIF policies where other evidence addressed alternative explanations for disparities).

With or without Neumark, then, Plaintiffs' evidence remains worlds away from "convincing proof" that Infosys operates under a companywide policy of discrimination against Caucasians or Americans. Because classes require commonality—and Neumark establishes none—the court's denial of class certification should be affirmed. *See generally Jacks*, 118 F.4th at 899 (affirming denial of class certification on alternate ground that proceeding to trial would not be "superior to other available methods for fairly and efficiently adjudicating the controversy").

75

The district court did not abuse its discretion in denying Plaintiffs'

bid for class certification.

# CONCLUSION

The judgment of the district court should be affirmed.

Respectfully Submitted,

*/s/ Brian J. Paul*

Brian J. Paul
FAEGRE DRINKER BIDDLE & REATH LLP
300 North Meridian Street, Suite 2500
Indianapolis, IN 46204
T: (317) 237-0300
F: (317) 237-1000
E: brian.paul@faegredrinker.com

Samantha M. Rollins Murphy
FAEGRE DRINKER BIDDLE & REATH LLP
90 South Seventh Street, Suite 2200
Minneapolis, MN 55402
T: (612) 766-8146
F: (612) 766-1600
E: samantha.murphy@faegredrinker.com

JANUARY 30, 2026

77

# CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7)(b)(i) and Circuit Rule 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,994 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32(b) because this document has been prepared using Microsoft Word for Office 365 in a proportionally spaced typeface using Century Schoolbook size 14 font.

*/s/ Brian J. Paul*

# CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2026, I caused this document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Brian J. Paul*

79