No. 25-2272

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

BRENDA KOEHLER, KELLY PARKER, LAYLA BOLTEN,
and GREGORY HANDLOSER,

*Plaintiffs-Appellants*,

v.

INFOSYS TECHNOLOGIES LIMITED INC.,
AND INFOSYS PUBLIC SERVICES, INC.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of Wisconsin
District Court No: 2:13-cv-00885-PP

**APPELLANTS' REPLY BRIEF**

Daniel Kotchen
Daniel Low
KOTCHEN & LOW LLP
1918 New Hampshire Ave. NW
Washington, DC 20009
dkotchen@kotchen.com
dlow@kotchen.com

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................... 1

ARGUMENT ........................................................................................ 1

I. The District Court Erred in Excluding Neumark's Name-Matching Methodology .......................................................... 2

    A. Plaintiffs Didn't Waive Their Objection to the District Court's Sua Sponte Rejection of Neumark's Employee Analysis. ........................................................................ 3

    B. Infosys Doesn't Dispute That Extensive Peer-Reviewed Publications Establish That Neumark Followed Well-Accepted Methodology with a Known Error Rate. ........ 6

    C. The Exclusion of Neumark's Employee Opinions Wasn't Harmless. ........................................................... 9

    D. As a Statistician, Neumark Was Qualified to Apply Name-Matching Methodology. ..................................... 12

    E. Neumark's Reliance on Standard Peer-Reviewed Methodology Bears Hallmarks of Reliability. ............. 15

    F. Plaintiffs Didn't Waive the Argument That Purported Deficiencies Go to Weight, Not Admissibility .............. 17

    G. Neumark's Opinions Are Based on Sufficient Facts and Data. .......................................................................... 18

II. The District Court Abused Its Discretion in Denying Class Certification ................................................................... 19

III.  The District Court Abused Its Discretion in Refusing to Consider the PeopleFluent Analyses on Summary Judgment. ...................................................................................21

IV.  The District Court Erred in Granting Summary Judgment. ...................................................................................25

     A.  Summary Judgment Cannot Be Affirmed on Alternative Grounds Under *Teamsters*.........................25

     B.  Gregory Handloser..........................................................26

     C.  Kelly Parker ...................................................................29

     D.  Brenda Koehler .............................................................32

     E.  Layla Bolten ..................................................................35

     F.  Disparate Impact Claims of Koehler and Parker.........37

# TABLE OF AUTHORITIES

## Cases

*Abebe v. Health & Hosp. of Marion Cnty.*, 35 F.4th 601 (7th Cir. 2022)34

*Bell v. EPA*, 232 F.3d 546 (7th Cir. 2000) ..............................................24

*Buchanan v. Tata Consultancy Servs.*, No. 15-cv-01696, 2017 U.S. Dist. LEXIS 212170 (N.D. Cal. Dec. 27, 2017).......................6, 20, 21, 25

*Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673 (7th Cir. 2010) ...........37

*Christensen v. Weiss*, 145 F.4th 743 (7th Cir. 2025) ..............................22

*Colindres v. Quietflex Mfg.*, No. H-01-4319, 2004 U.S. Dist. LEXIS 27981 (S.D. Tex. Mar. 23, 2004) ............................................20, 26

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .................15

*Downing v. Abbott Lab'ys*, 48 F.4th 793 (7th Cir. 2022).........................24

*EEOC v. Paramount Staffing, Inc.*, No. 02:06-cv-2624, 2010 U.S. Dist. LEXIS 49042 (W.D. Tenn. May 17, 2010) .....................................13

*English v. Cowell*, 10 F.3d 434 (7th Cir. 1993) ........................................3

*F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997)....28

*Gerlib v. R.R. Donnelley & Sons Co.*, No.-95-C-7401, 2001 U.S. Dist. LEXIS 17879 (N.D. Ill. Oct. 30, 2001) ...........................................17

*Gunville v. Walker*, 583 F.3d 979 (7th Cir. 2009)...................................32

*Hibbert v. Bellmawr Park Mut. Hous. Corp.*, No. 10-5386, 2013 U.S. Dist. LEXIS 108040 (D.N.J. Aug. 1, 2013)....................................23

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977) ..............................................................................20, 25

*Kirstein v. Parks Corp.*, 159 F.3d 1065 (7th Cir. 1998)............................4

*Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796 (7th Cir. 2013).......15, 18

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) ......................35

*Mister v. Ill. Central Gulf R.R. Co.*, 832 F.2d 1427 (7th Cir. 1987) .......38

*O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994) ...4

*Orlowski v. Milwaukee Cnty.*, 872 F.3d 417 (7th Cir. 2017)...................36

*Palmer v. Cognizant Tech. Sols. Corp.*, No. CV 17-6848, 2022 U.S. Dist. LEXIS 198737 (C.D. Cal. Oct. 27, 2022) ............................. 6, 10, 21

*Palmer v. Cognizant Tech. Sols. Corp.*, No. CV 17-6848, 2025 U.S. Dist. LEXIS 252049 (C.D. Cal. Dec. 5, 2025) ......................................... 11

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380 (1993) ...................................................................................... 22, 23

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002 (7th Cir. 2021) ................................................................. 7

*Puffer v. Union Pac. R.R. Co.*, No. 17-cv-1222, 2020 U.S. Dist. LEXIS 217868 (C.D. Ill. Nov. 20, 2020) ................................................. 8

*Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913 (7th Cir. 2000) .............. 28

*Simstad v. Scheub*, No. 2:07-cv-407, 2014 U.S. Dist. LEXIS 144312 (N.D. Ind. Oct. 10, 2014 ................................................................ 22

*Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000) ........................... 2

*Snapp v. United Transp. Union*, 889 F.3d 1088 (9th Cir. 2018) ............ 34

*Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753 (7th Cir. 2013)............ 16, 17

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014)................ 21

*Thiessen v. GE Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001) .............. 26

*Thomsen v. Budget Rent a Car Corp.*, No. 92C1320, 1995 U.S. Dist. LEXIS 14101 (N.D. Ill. Sept. 26, 1995) ......................................... 29

*United Health Grp. Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856 (8th Cir. 2017)............................................................................... 3

*United States v. Chicago*, 853 F.2d 572 (7th Cir. 1988)........................ 26

*Walker v. Soo Line R.R.*, 208 F.3d 581 (7th Cir. 2000) ............................ 9

**Rules**

Fed. R. App. P. 10 ..................................................................................... 7

Fed. R. Civ. P. 16 .................................................................................... 23

Fed. R. Civ. P. 56 .................................................................................... 30

Fed. R. Civ. P. 61 ..............................................................................9

Fed. R. Civ. P. 6 ..............................................................................23

Fed. R. Evid. 702.........................................................................18, 20

Fed. R. Evid. 703...........................................................................18

Rule. Fed. R. Evid. 1006.................................................................30

## Treatises

Pablo Mateos, *Names, Ethnicity and Populations* (2014).......8, 13, 14, 19

## Other Authorities

Fed. R. Civ. P. 16(b) Adv. Cmte. Notes (1983 amendment) ...................23

## INTRODUCTION

Plaintiffs' opening brief contained extensive citations to cases accepting name-matching, and to peer-reviewed literature and studies demonstrating that the name-matching methodology Dr. Neumark followed is generally accepted and has a relatively low error rate. Infosys' opposition failed to identify any contradictory case law or literature, and Infosys does not claim that Neumark failed to follow the steps of the standard name-matching methodology. Neumark's exclusion should be reversed, at least for the sua sponte exclusion of his employee analyses. And because the denial of class certification and grant of summary judgment depended on the exclusion of Neumark, those rulings should also be reversed or vacated. Finally, each Plaintiff presented evidence creating genuine issues of material fact.

## ARGUMENT

The district court's decision should be vacated or reversed because: (1) the district court improperly excluded Neumark's opinions; (2) the denial of class certification was based on the improper exclusion of Neumark's opinions; (3) Plaintiffs should have been allowed to submit a supplemental summary judgment brief regarding the PeopleFluent

documents based on excusable neglect; and (4) the grant of summary judgment was based partly on the improper exclusion of Neumark's opinions, the improper refusal to consider the PeopleFluent documents, and the improper denial of class certification, and each Plaintiff presented evidence creating genuine issues of material fact.

## I.    The District Court Erred in Excluding Neumark's Name-Matching Methodology.

"The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury…." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000). "The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Id.*

The district court abused its discretion in excluding Neumark's name-matching opinions because: (A) Plaintiffs didn't waive their objections to the sua sponte ruling; (B) Neumark's analysis is consistent with peer-reviewed methodology and has a known error rate; (C) exclusion wasn't harmless; (D) Neumark is qualified to perform name-matching; (E) Neumark's methodology bears hallmarks of reliability; (F)

Plaintiffs didn't waive the argument that purported deficiencies go to weight, not admissibility; and (G) Neumark's opinions are based on sufficient facts or data.

### A. Plaintiffs Didn't Waive Their Objection to the District Court's Sua Sponte Rejection of Neumark's Employee Analysis.

Infosys argues that Plaintiffs waived their objection to the *sua sponte* rejection of Neumark's employee analysis because they didn't seek reconsideration or formally object below. But where the court was aware of Plaintiffs' position that Neumark shouldn't be excluded, "the failure of counsel to enter a formal objection to the *sua sponte* ruling of the district court … does not amount to a waiver." *Stone v. Morris*, 546 F.2d 730, 736 (7th Cir. 1976). Similarly, failure to seek reconsideration or otherwise object to a sua sponte ruling doesn't result in waiver. *English v. Cowell*, 10 F.3d 434, 438 (7th Cir. 1993) (vacating and remanding because the court improperly dismissed sua sponte, where plaintiff didn't make arguments on the issue in "a prior or subsequent motion, such as a motion to reconsider or for relief from judgment"). Infosys' citation to an Eighth Circuit decision in *United Health Group Inc. v. Executive Risk Specialty Insurance Co.*, 870 F.3d 856 (8th Cir. 2017) is unpersuasive, as it is

3

contrary to this Circuit's precedent in *English*, and Infosys cannot identify any Seventh Circuit decision following it. Defendants-Appellees' Brief ("Infosys.Br.") 31.

If Infosys were correct that a sua sponte order itself provides the requisite notice, and an opportunity to file a motion for reconsideration provides an opportunity to be heard, then sua sponte rulings by the district court would never be reversible error.

Infosys cites *Duncan Place Owner's Association v. Danze, Inc.*, but there, the district court provided notice, and at the court's request, appellant made three responsive filings, and there were two subsequent hearings related to the issue. 927 F.3d 970, 974-75 (7th Cir. 2019).

Infosys also cites *Kirstein v. Parks Corp.*, in which the court observed in dicta that this court had previously upheld sua sponte consideration of expert admissibility. 159 F.3d 1065, 1067 (7th Cir. 1998) (citing *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994)). But *O'Conner* involved "*reconsidering* the issue of [expert] admissibility … sua sponte," after prior briefing on the issue. 13 F.3d at 1094 (emphasis added).

Here, it is undisputed that the district court failed to provide notice before the September 2022 order sua sponte excluding Neumark's employee analysis (and not just his applicant analysis). Infosys.Br.31. The district court didn't issue a tentative order or otherwise offer Plaintiffs an opportunity to respond. While Infosys points to a subsequent status conference (Infosys.Br.31), the district court didn't invite the parties to reargue the already-decided motion at the status conference.

Infosys argues that the order wasn't sua sponte because it excluded the employee analysis on the same grounds as the applicant analysis. But as Plaintiffs explained, even if Neumark's name-matching were excluded, Neumark's conclusions for *employees* would have remained the same, given that only a small fraction of employees' races were classified by name, and any misclassifications would have *understated* disparities, such that exclusion of the *employee* analysis was inappropriate. Appellants' Opening Br. ("OB") 31-32.

Plaintiffs didn't have the same incentive to defend Neumark's applicant analysis as they did his core employee analysis, which is the heart of Plaintiffs' claims, and an employee termination class was more likely to be certified. *Cf. Palmer v. Cognizant Tech. Sols. Corp.*, No. CV

17-6848, 2022 U.S. Dist. LEXIS 198737, at *107-08 (C.D. Cal. Oct. 27, 2022) (certifying non-South Asian terminations class but not applicant class); *Buchanan v. Tata Consultancy Servs.*, No. 15-cv-01696, 2017 U.S. Dist. LEXIS 212170, at *67 (N.D. Cal. Dec. 27, 2017) (same). If Plaintiffs had known that both the employee and applicant analyses were at issue, Plaintiffs could have offered a more robust response and cited more of the authorities cited on appeal, some of which were specific to an employee / terminations analysis.

**B.     Infosys Doesn't Dispute That Extensive Peer-Reviewed Publications Establish That Neumark Followed Well-Accepted Methodology with a Known Error Rate.**

Plaintiffs' Opening Brief established that Neumark's methodology is consistent with well-established peer-reviewed techniques with a known and low error rate and is often used for analyzing statistical disparities by race. OB35-45. Infosys doesn't dispute this. Infosys.Br.44.

Instead, Infosys argues that Plaintiffs didn't present this argument or authorities below. *Id.* But Infosys ignores that Plaintiffs opposed the *Daubert* motion below on the grounds that his methodology had been accepted by courts, and was probative, accurate, and reliable. RA50-51; Dkt. 123 at 19-20.

6

Infosys suggests that Plaintiffs' argument that the district court "overlooked that name-matching *has* been subject to peer review and publication" is misleading (OB39) because Plaintiffs cite authorities on appeal that weren't cited below. Infosys.Br.44. But Plaintiffs never represented otherwise.

Infosys implies that it was inappropriate to cite authorities that weren't cited below because they are not part of the appellate record. *Id.* But the "general rule" under Rule 10 is that this Court "will not consider *evidence* on appeal that wasn't before the district court." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1013 (7th Cir. 2021) (emphasis added) (citing Fed. R. App. P. 10). Rule 10 doesn't prohibit citation to cases, articles, books, and other authorities outside the record, especially where some didn't exist at the time Plaintiffs filed their *Daubert* opposition (Dkt. 123) in February 2017.

Infosys argues that Plaintiffs' cited authorities establish only that name-matching is generally admissible, not Neumark's application of name-matching. Infosys ignores that Plaintiffs explained in detail how Neumark followed the accepted peer-reviewed methodology. OB40-42 (discussing steps of standard methodology and Neumark's methodology

in establishing that "Neumark followed the accepted name-matching methodology."); *cf. Puffer v. Union Pac. R.R. Co.*, No. 17-cv-1222, 2020 U.S. Dist. LEXIS 217868, at *10 (C.D. Ill. Nov. 20, 2020) ("it would be unreasonable to expect doctors to publish peer-reviewed articles or conduct in-depth scientific studies on every ailment he or she encounters, before rendering a diagnosis").

Infosys argues that Neumark improperly "discards self-reported race data." Infosys.Br.45. But Neumark properly relied on country of birth to code the vast majority of employees and was unable to rely on the available race data because it didn't demonstrate whether any individual was South Asian. OB7, 42. This is consistent with standard methodology. OB41 (citing Pablo Mateos, *Names, Ethnicity and Populations* at 126 (2014), *available at* bit.ly/44ggieZ).

While Infosys asserts that Neumark's methodology is unreliable, Infosys doesn't address the numerous studies finding that his methodology has a low error rate. Infosys.Br.45.

**C.     The Exclusion of Neumark's Employee Opinions Wasn't Harmless.**

Infosys argues that any error in excluding Neumark's terminations analysis was harmless because it didn't affect Plaintiffs' substantial rights. Infosys.Br.33 (citing Fed. R. Civ. P. 61). But the district court denied certification because it excluded Neumark's opinions. RA171-72. Without a certified class, the district court applied the *McDonnell Douglas* framework on summary judgment instead of *Teamsters* and entered judgment against Plaintiffs. RA213 38:2-4, 15-16, 40:16-62:14. The exclusion of Neumark's opinions was dispositive of the critical issues in this litigation and wasn't harmless. *See Walker v. Soo Line R.R.*, 208 F.3d 581, 592 (7th Cir. 2000) (exclusion of expert testimony not harmless where it severely curtailed plaintiff's ability to present case).[1]

Infosys argues that, even if Plaintiffs had been allowed to brief the potential exclusion of Neumark's terminations analysis based on his

---

[1] Infosys points out that none of the named Plaintiffs asserts a failure-to-promote claim. Infosys.Br.34. If Neumark's promotions analysis had not been excluded, Plaintiffs presumably would have sought leave to amend to clarify that they were asserting failure-to-promote claims.

9

name-matching methodology, the district court would have ruled against those unmade arguments. Infosys.Br.34-35. But this is mere speculation, as the arguments haven't been fully identified or developed. Infosys also argues that "there is no such evidence in the record" of the percentage of Indian-born Infosys employees. Infosys.Br.34. But there is evidence that Infosys' U.S.-based workforce was "approximately 93% Indian," Dkt. 95-16, and additional evidence isn't in the record because the sua sponte nature of the ruling prevented Plaintiffs from submitting it.

Infosys argues that the district court would have found it irrelevant that over 85% of Infosys' U.S.-based workforce was born in India because most were "deputees" who were Infosys employees in India before transferring to the U.S. on work visas. Infosys.Br.34. Infosys argues that it was inappropriate for Neumark to include deputees from India in his original analysis, *id.* at 34-35, and Infosys similarly argues that the PeopleFluent data is flawed because it includes deputees. *Id.* at 45. But at least one other court and a jury in a very similar case accepted that deputees from India were appropriately considered in a terminations analysis. *Palmer*, 2022 U.S. Dist. LEXIS 198737, at *48-49 (denying *Daubert* motion and rejecting argument that expert improperly included

10

deputees transferred from India in his analysis of racial disparities in terminations); Verdict, Dkt. 666, *Palmer*, No. CV 17-6848; *Palmer v. Cognizant Tech. Sols. Corp.*, No. CV 17-6848, 2025 U.S. Dist. LEXIS 252049, at *17 (C.D. Cal. Dec. 5, 2025) (finding disparate impact based on policies favoring Indian and South Asian visa workers in the U.S.). And it is telling that Infosys' own vendor—PeopleFluent—included deputees in its analyses. Dkt. 116-25.

In a supplemental report, in response to this criticism regarding including deputees, Neumark prepared an alternative analysis and found that the statistical disparity in termination rates remained the same even if deputees were excluded. Dkt. 123-7 at 6-7 & n.5. But Plaintiffs and Neumark didn't "repudiate" the analysis that includes deputees as Infosys argues, Infosys.Br.34, and it is appropriate to include deputees because they compete with local hires for jobs in the U.S. and must seek and obtain U.S. visas before entering the U.S. workforce. RA47-49.

Infosys speculates that if Neumark had been allowed to present the opinion that he articulated in another case, that any racial-classification errors in name-matching analysis understate disparities, the district court would have rejected Neumark's opinion. Infosys.Br.35. Infosys

11

argues that the district would have accepted its rebuttal, unsupported by any authority, that the court should ignore "general statistical rule[s]" relied on by Neumark, and focused on the specific misclassified employees, who Infosys doesn't identify. *Id.* But expert statistical analysis is inherently based on "statistical rule[s]." And the only non-random statistical impact of misclassification of race by name would be non-Indians with Indian names being terminated at lower rates because of bias towards those with Indian names, which would itself support a claim of discrimination. OB44-45.

### D. As a Statistician, Neumark Was Qualified to Apply Name-Matching Methodology.

Infosys argues that Neumark isn't qualified to "create" or "apply" name-matching methodology. Infosys.Br.36. But Neumark didn't "invent" or "create" name-matching. *Id.* at 36-37. Rather, he followed the standard methodology used in the relevant scientific community. *See* Section I(B), *supra.*

Neumark is amply qualified to apply the methodology. As experts in the field have recognized, name-matching methodologies can reliably be used by experts in statistics and other fields. Mateos, *Names,*

12

*Ethnicity, and Population* at 118. Neumark is a labor economist with expertise in statistics and economics and has performed extensive research on labor market discrimination. SA169¶1. Neumark mainly relied on "automatic" name-matching methodology, which doesn't require any exercise of discretion in classifying names. *Id.* at 128-29. Neumark performed "manual" name-matching for only 1.8% of the most obviously Western names, and Infosys doesn't dispute the accuracy of those classifications or the case law cited by Plaintiffs that linguistic expertise isn't required for manual name matching. OB47-48 (citing *EEOC v. Paramount Staffing, Inc.*, No. 02:06-cv-2624, 2010 U.S. Dist. LEXIS 49042, at *33 (W.D. Tenn. May 17, 2010)).

Infosys argues that Neumark lacked expertise to decide "to discard the self-reported race of 'Asian.'" Infosys.Br.38. But Neumark "has done extensive research on labor market discrimination, including methods for measuring and testing for discrimination that have been adopted by many other researchers." Dkt. 123 at 3. He is qualified to offer the opinion that it's inappropriate to rely on self-reported race data where it doesn't identify the race at issue, i.e., "South Asian" (or "Indian"). Infosys also questions how Neumark was qualified to choose Infosys' employee list of

46,979 employees with 21,093 unique surnames to perform name matching. Infosys.Br.38. But that was the only relevant surname list available from Infosys, and reliance on such data from available "administrative files" was consistent with standard methodology. Mateos, *Names, Ethnicity and Populations*, at 126 (reference lists are created from "datasets of individuals' personal data that are usually sourced from *population administrative files*, health registers or surveys"). Name matching has been developed in the field of statistics (among others), *id.* at 118, making Neumark's qualifications as a statistician relevant.

While Infosys suggests that 21,093 unique surnames is inadequate, published peer-reviewed studies of South Asian name-matching have involved substantially fewer names, e.g., 2,995 or 9,422. *Id.* at 126. Five other studies analyzed by Mateos had reference lists of "between 427 and 25,276 unique surnames." *Id.*

Infosys argues that Plaintiffs "waived" their defense of Neumark's qualifications (Infosys.Br.38), but they defended the adequacy of his "extensive qualifications" in their *Daubert* opposition. Dkt. 123 at 3 & n.6.

14

**E.    Neumark's Reliance on Standard Peer-Reviewed Methodology Bears Hallmarks of Reliability.**

Infosys argues that Neumark's name-matching was unreliable. "Reliability … is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013).

Factors in determining the reliability of an expert's methodology include: whether the methodology "can be (and has been) tested"; whether the methodology "has been subjected to peer review and publication"; the "known or potential rate of error"; and whether the methodology is generally accepted. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993).

Infosys ignores Neumark's familiarity with academic name-matching literature from his non-litigation research and his use of standard name-matching methodology. The name-matching methodology used by Neumark is:

- peer reviewed;
- published;
- tested;
- has known error rates;

15

- is generally accepted in a relevant scientific community;
- wasn't developed solely for use in litigation; and
- has been accepted by numerous courts.

OB35-45. Infosys doesn't cite any cases rejecting name-matching or any evidence disputing or contradicting the extensive peer-reviewed literature on name-matching methodology cited by Plaintiffs.

Infosys appears to be arguing that Neumark's specific *application* of name-matching hasn't been proven reliable through publication or testing, but that isn't the standard. Rather, expert opinion is reliable if it is based on a "correct application of a reliable methodology" and is based on "sufficient data." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013).

Infosys argues that Plaintiffs haven't presented evidence that any employee name-matching misclassifications would have been immaterial. Infosys.Br.40. But the employee analysis was excluded sua sponte without notice, so Plaintiffs lacked the opportunity to present such evidence.

Nonetheless, Plaintiffs have identified evidence that would be submitted, including that over 85% of employees were classified based on nation of birth, and that any misclassifications by name of the remaining

15% of employees would cause an *understatement* of termination disparities favoring Infosys. OB30-31. On remand, Plaintiffs anticipate bolstering this evidence with an affidavit from Neumark about why any misclassifications wouldn't be material given the extreme disparities that he found. *Cf. Stollings*, 725 F.3d at 766 (reversing exclusion of expert where he relied on a "rough estimate" as an input, but his opinion wouldn't have changed even if the estimate was lowered by 40 percentage points).

### F.    Plaintiffs Didn't Waive the Argument That Purported Deficiencies Go to Weight, Not Admissibility.

Infosys argues that Plaintiffs waived the argument that purported deficiencies in Neumark's report go to weight, not admissibility. But Plaintiffs preserved the argument, arguing below that Neumark's analysis "is reasonably accurate," that Infosys "substantially overstates the effect of [any] misclassifications," and that "'[i]t will be up to the trier of fact to assess, in light of the flaws [defendant] has pointed out, what significance to place on [the expert's] statistics.'" Dkt. 123 at 19 (quoting *Gerlib v. R.R. Donnelley & Sons Co.*, No.-95-C-7401, 2001 U.S. Dist. LEXIS 17879, at *42-43 (N.D. Ill. Oct. 30, 2001)).

17

Moreover, waiver couldn't occur where the ruling was sua sponte without notice.

What Neumark would say on remand is not irrelevant, as Infosys contends (Infosys.Br.43), but demonstrates the prejudice of the sua sponte ruling.

## G.     Neumark's Opinions Are Based on Sufficient Facts and Data.

Infosys argues that Plaintiffs misunderstand Rule 702's requirement that expert testimony be based "on sufficient facts or data." Fed. R. Evid. 702. "[S]ufficient facts or data" under Rule 702 means sufficient observations to employ the methodology, and that the expert relied on "'those kinds of facts or data'" that experts in the field rely on. *Manpower*, 732 F.3d at 808-09 (quoting Fed. R. Evid. 703).

Infosys doesn't dispute that Neumark relied on data that was accurate and the best available, i.e., Infosys' employee data listing place of birth for over 85% of employees and listing employee names.

While it is undisputed that Infosys withheld the PeopleFluent data, Infosys argues that PeopleFluent relied on the same underlying data, and Infosys didn't have an obligation to collect additional data. But this

18

argument misses the point. Infosys.Br.41-42. Where Infosys didn't produce better data, Plaintiffs were justified in relying on the data it produced. OB34.

Over 21,000 unique surnames is a sufficient number of observations. Mateos, *Names, Ethnicity and Populations*, at 123 (reference lists in analysis of published studies contained "from fewer than 100 to 27,000 names"). And Neumark's reliance on names from Infosys' "administrative files" is consistent with standard methodology. *See id.* at 126 (reference lists are created from datasets "usually sourced from [e.g.,] population administrative files").

Where Neumark used reliable methodology, the results of that analysis constitute "sufficient facts or data" for use in his statistical analyses. Fed. R. Evid. 702.

## II.   The District Court Abused Its Discretion in Denying Class Certification.

Infosys argues that, if Neumark was improperly excluded, denial of class certification can be affirmed on two alternative grounds. First, Infosys argues that summary judgment on Plaintiffs' individual claims precludes certification. Infosys.Br.71. But summary judgment should

19

also be vacated and remanded. *Buchanan*, 2017 U.S. Dist. LEXIS 212170, at *47-48 (denying as premature defendant's summary judgment motion as to individual claims, which are reserved for Phase Two of a class action brought under *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977)); *Colindres v. Quietflex Mfg.*, No. H-01-4319, 2004 U.S. Dist. LEXIS 27981, at *22 (S.D. Tex. Mar. 23, 2004) (summary judgment on individual claims premature where *Teamsters* class certification motion was pending).

If certification is granted, summary judgment should be evaluated under *Teamsters* and in light of Neumark's opinions. Infosys argues that a promotions class cannot be certified because Plaintiffs didn't appeal promotion claims, but that is inaccurate. OB33, 56 (appealing exclusion of promotion opinions and appealing summary judgment order).

Second, Infosys argues that there's no discriminatory policy providing glue to connect numerous Plaintiffs. But Plaintiffs have offered evidence of such discriminatory policies and practices favoring visa holders at Infosys. OB61 (citing SA3¶2; SA5-8¶¶6-8; SA10-11¶¶13-14). Courts have recognized that similar policies favoring visa holders from India provide such glue, certifying nationwide classes of thousands.

20

*Palmer*, 2022 U.S. Dist. LEXIS 198737, at *89 (certifying class of thousands where terminations were plausibly related to defendant's visa policies); *Buchanan*, 2017 U.S. Dist. LEXIS 212170, at *52-53 (sufficient "glue" where internal documents described "policy of favoring expats and visa-ready individuals who are predominantly South Asian").

This Court should "leave that determination [of class certification] to the district court to make in the first instance" on remand. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 761 (7th Cir. 2014).

### III.   The District Court Abused Its Discretion in Refusing to Consider the PeopleFluent Analyses on Summary Judgment.

Plaintiffs asked the district court to allow Plaintiffs to supplement their summary judgment briefing to incorporate belatedly-produced PeopleFluent analyses. SA237. The district court stated that it didn't want briefing on whether to allow such supplementation. *Id*. Infosys argues that Plaintiffs waived the argument because the record doesn't address the relevant factors for allowing supplemental briefing. Infosys.Br.46. But the record makes clear that supplemental briefing on summary judgment was sought because the PeopleFluent analyses were belatedly produced, and the district court rejected a request to brief the

issue of whether to allow it. SA237. Under those circumstances, Plaintiffs sufficiently raised the issue. *Cf. Mack v. City of Chi.*, 723 F. App'x 374, 377 (7th Cir. 2018) (finding no waiver of issue raised in connection with a motion where "there was no briefing on that motion before the judge denied it").

Rule 6(b) and the factors from *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380 (1993) apply to a motion to supplement a summary judgment record. *Christensen v. Weiss*, 145 F.4th 743, 755 (7th Cir. 2025).

While Infosys suggests Rule 16's "good cause" standard applies, that standard is satisfied. "Good cause is shown when despite a party's diligence, the deadlines could not reasonably have been met." *Simstad v. Scheub*, No. 2:07-cv-407, 2014 U.S. Dist. LEXIS 144312, at *2 (N.D. Ind. Oct. 10, 2014); Fed. R. Civ. P. 16(b) Adv. Cmte. Notes (1983 amendment) ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."). Here, PeopleFluent documents weren't produced until after summary judgment briefing was completed, despite Plaintiffs' diligent efforts to obtain them. OB14; *cf. Hibbert v. Bellmawr Park Mut. Hous.*

22

*Corp.*, No. 10-5386, 2013 U.S. Dist. LEXIS 108040, at *10 (D.N.J. Aug. 1, 2013) (finding good cause based on late production of documents).

Infosys argues that it would have been prejudiced by "re-briefing" summary judgment, but Plaintiffs sought leave only to file a supplement—not to "re-brief" the motion entirely, and did so almost three *years* before summary judgment was decided. OB53.

Plaintiffs have also demonstrated "excusable neglect," which is a "somewhat 'elastic concept,'" and includes "inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Pioneer*, 507 U.S. at 388, 392. Whether neglect is excusable requires an equitable determination, "taking account of all relevant circumstances surrounding the party's omission." *Id.* at 395.

As detailed in Plaintiffs' opening brief, Plaintiffs satisfied the relevant factors and the district court didn't apply the correct legal standard. OB50-55.

The magistrate judge advised against making additional filings before the district court on summary judgment as the district court judge was overwhelmed. Dkt. 209 at 37:00-37:47 (audio). The district court similarly voiced concern about the volume of filings in the case, expressed

23

that she didn't want briefing regarding a supplemental summary judgment filing, and took over *eight years* to decide summary judgment. RA4-5; INFAPP176 3:11-12; RA180-81 5:7-10, 6:18-19. Plaintiffs acted in good faith in seeking to minimize the number of filings they made until the PeopleFluent data became critical. They also believed, mistakenly, that where the belatedly-produced PeopleFluent data was already presented to the district court in class certification briefing, the district court wouldn't refuse to consider the same evidence on summary judgment.

Plaintiffs were prejudiced by the district court's refusal to consider the PeopleFluent data on summary judgment. First, although Plaintiffs had raw data underlying the PeopleFluent analyses, the district court excluded Neumark's analyses of the data, making the PeopleFluent analyses critical. Second, statistical evidence is relevant even to individual discrimination claims where it involves a "proper group" or evidences pretext. *Downing v. Abbott Lab'ys*, 48 F.4th 793, 807-08 (7th Cir. 2022) (citing cases); *Bell v. EPA*, 232 F.3d 546, 553 (7th Cir. 2000) ("evidence of systemic disparate treatment is relevant to and probative of

24

the issue of pretext even when it is insufficient to support a pattern and practice disparate treatment case").

## IV. <u>The District Court Erred in Granting Summary Judgment.</u>

Contrary to Infosys' arguments: (A) summary judgment shouldn't be affirmed on alternative grounds under the *Teamsters* framework; and the district court erred in granting summary judgment on the individual claims of (B) Gregory Handloser; (C) Kelly Parker; (D) Brenda Koehler; (E) Layla Bolten; and on (F) the disparate impact claims of Koehler and Parker.

### A. Summary Judgment Cannot Be Affirmed on Alternative Grounds Under *Teamsters*.

Infosys argues that, even if the district court abused its discretion in excluding Neumark's testimony and denying class certification, summary judgment should be affirmed on the alternative grounds that Infosys rebutted any *Teamsters* inference for each individual Plaintiff.

But under the *Teamsters* framework, Phase One addresses whether the defendant engaged in a pattern-or-practice of discrimination, and individual defenses are reserved for Phase Two. *Teamsters*, 431 U.S. at 360-61; *Buchanan*, 2017 U.S. Dist. LEXIS 212170, at *47-48 (denying as

premature defendant's summary judgment motion as to individual claims, which are reserved for Phase Two) (citing *Colindres*, 2004 U.S. Dist. LEXIS 27981, at *22); *see also Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1109 (10th Cir. 2001) ("During the first stage of a pattern-or-practice case . . . a summary judgment motion … must focus solely on whether there is sufficient evidence demonstrating that defendants had in place a pattern or practice of discrimination").

Even if it were appropriate to address individual claims on summary judgment during Phase One of a *Teamsters* case, the court would apply a presumption that Infosys had engaged in a pattern-or-practice of discrimination, and that all employment decisions were made pursuant to that pattern-or-practice. *Thiessen*, 267 F.3d at 1109. To rebut that presumption, Infosys must provide "clear and convincing evidence" that the individual plaintiffs weren't victims of discrimination. *United States v. Chicago*, 853 F.2d 572, 575 (7th Cir. 1988). Infosys cannot carry this heavy burden. OB65-80.

## B.    Gregory Handloser

Infosys argues that it is "unrebutted" that Handloser was discharged as part of a RIF targeting all employees at his level who

26

received the same performance review rating. Infosys.Br.50. But Handloser wasn't a poor performer. He was never placed on a PIP and was recommended a higher score of 3 by his manager who also sought to promote him, and Handloser was never informed of the alleged RIF, about which Infosys produced no evidence in discovery and instead relies on a single declaration to prove its existence. OB65-69.

While Infosys argues that Handloser's past performance is irrelevant, it ignores that Handloser's manager's recommendation of a performance review score of 3 confirms a strong performance that would have excluded Handloser from any RIF. SA27¶50.[2] Handloser didn't "agree" to his manipulated rating (of 4)—he *wasn't even informed of it.* *Id.* (noting only that Handloser's self-appraisal was "in the CRR 4 limits"); OB65. Infosys argues that Handloser failed to meet his New Revenue target and targeted New Accounts Opened, which is disputed, and ignores that Handloser met and exceeded other targets, such that

---

[2] Handloser's manager, Mr. Singh, confirmed that "[d]uring the period of the latest appraisal cycle, Greg [Handloser] has been successfully leading a pursuit at one of the business units at Toyota[.]" Dkt. 95-50 at 5.

the lowest appraisal score wasn't justified. INFAPP87-88 (acknowledging that Handloser met his first, second, and fifth key performance indicators and that the parties dispute whether Handloser opened a new account). The evidence shows that Handloser's performance rating was lowered to 4 not as part of a company-wide bell curve, but instead by Sanjay Jalona to justify Handloser's termination. SA28¶51 (termination decision came "right from the very top"). *Sauzek v. Exxon Coal USA, Inc.* is distinguishable, as there, "a careful review of the … ratings used to select employees for termination during the RIF demonstrate[d] that the rankings were not unusually harsh on the older employees," 202 F.3d 913, 921 (7th Cir. 2000), whereas here, ample evidence demonstrates that Handloser was terminated as part of Infosys' pattern-or-practice of discrimination.

Infosys claims that evidence undermining the existence of a RIF doesn't "survive the broader record," Infosys.Br.52, but the record raises a disputed material fact where the RIF is evidenced only by a self-serving declaration. Fed. R. Civ. P. 56(a); *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to

28

create a genuine issue of material fact."). Infosys claims that the declaration is an admissible Rule 1006 summary of "voluminous admissible writings," but Infosys hasn't made "the underlying originals … available for examination or copying," as required by the Rule. Fed. R. Evid. 1006(b).

Infosys' claim of poor performance is undermined by Handloser's supervisor's admission that a legal claim by Handloser would be "supported by records and data that he will undoubtedly have with him." SA29¶52.

"[B]ased on the record as a whole, genuine issues of material fact exist and . . . therefore, [Infosys'] motion for summary judgment [should have been] denied." *Thomsen v. Budget Rent a Car Corp.*, No. 92C1320, 1995 U.S. Dist. LEXIS 14101, at *7-8 (N.D. Ill. Sept. 26, 1995) ("Viewed in favor of [plaintiff], the non-moving party," evidence created inference that "terminating [plaintiff was] not merely a reduction-in-force, but a pretext for age discrimination").

## C.    Kelly Parker

Infosys doesn't dispute that Parker's claims were timely and that she properly exhausted her failure-to-hire claim. OB69-70, Infosys.Br.54-

29

59. Infosys argues that Parker lacked technical qualifications for the role, but Parker applied to the same role she had been performing as a contractor for Harley Davidson and was required to train her Indian replacement, who assumed her role. OB70.

Because the role Parker applied to was a Helpdesk/Desktop Support position (which she had already been performing), it is irrelevant that Infosys gave the position a different title, or whether Parker had "done little testing and no computer coding," which wasn't relevant to the position. Infosys.Br.55-56; SA21-22¶¶36, 38-39, SA76-79¶¶73-74. Infosys questions why Harley would retain Infosys if the role would remain the same, but Infosys' customers routinely hire Infosys to provide IT consulting services so the customer isn't required to maintain in-house staff. SA44¶15. Infosys cannot credibly claim that Parker lacks personal knowledge of her replacement and his responsibilities, where Parker trained Kapil Kulkarni to replace her and take over her desk. SA23¶¶41-42.

Infosys argues that systems engineer and Helpdesk/Desktop Support roles have different qualifications, Infosys.Br.56, but Parker didn't apply to a systems engineer role, as Infosys conceded. SA22¶38;

Dkt. 95-9 98:16-22 (Rule 30(b)(6) testimony admitting Parker applied for "Help desk, desktop support").

Infosys asserts that Kulkarni's engineering degree demonstrates that Parker was unqualified, Infosys.Br.56-57, but Parker was already competently performing the role.

Infosys' discriminatory prioritization of Indians is reflected in its prioritization of visa holders like Kulkarni, for whom Infosys obtained an H-1B visa for a different project in a different location, but slotted him into Parker's desktop support role when he needed a position. SA22-24¶¶39-43; Dkt. 95-28 (welcoming Kulkarni as "Desktop Support Analyst" who had "already completed the Knowledge Transfer," i.e., training from Parker).

Infosys claims that Parker's employment ended because the contract between Infosys and Soft HQ (Parker's contracting company) expired. Infosys.Br.57. But the Task Order creating an end date for the contract was signed weeks *after* Parker was given notice of her termination. SA105¶107. The Desktop Support specialist role with Infosys at Harley Davidson continued to exist, but was given to Kulkarni. *Id.* Further, Parker was told (by her Infosys supervisor, not an

anonymous employee as Infosys suggests, Dkt. 95-18 22:19-25, 215:2-216:17) that she was fired because her desk and IT area weren't "tidy," and she was late to work once, SA105¶107, demonstrating pretext. *See Murphy v. Caterpillar Inc.*, 140 F.4th 900, 915 (7th Cir. 2025) ("employer's shifting and inconsistent explanations for an adverse employment action can support an inference of pretext.").

Unlike in *Gunville v. Walker*, cited by Infosys, Parker didn't rely on inadmissible hearsay. 583 F.3d 979, 985 (7th Cir. 2009). Instead, she relied on statistical evidence demonstrating termination disparities, her termination in a role she was performing well, her replacement by an Indian she trained, and Infosys' shifting justifications for her termination. SA105¶107.

### D.   Brenda Koehler

Infosys contends that Koehler wasn't hired due to her lack of qualifications for the Lead VMware/Windows Administrator job. Infosys.Br.59-61. But Koehler had the requisite skill set and experience for the role, including Active Directory and Microsoft DNS, which weren't part of the listed job requirements, and Infosys hired Fazlul Halim, a South Asian. OB73, 75-76.

Infosys points to its own pretextual interview feedback to argue that Koehler was found lacking in required technical fundamentals. Infosys.Br.59. Infosys ignores that just eighteen minutes *before* Koehler's interview, Koehler's interviewers circulated an email suggesting she had been disqualified as she was "not reachable." Dkt. 95-16. Infosys argues that more than Koehler's own perception of her qualifications is required to defeat summary judgment, citing *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 865 (7th Cir. 1996). But Koehler has demonstrated that Infosys never intended to hire her (evidenced by its last-minute changes to the call-in procedure, email suggesting disqualification of Koehler minutes before her scheduled interview, the interview's heavy focus on areas other than VMware, the recruiter's general disregard of Koehler's Active Directory experience), and instead hired a South Asian. SA18-20¶¶30-34. While the lower court found the last-minute change to the interview process and irrelevant interview questions "may have been unexpected and . . . frustrating, [but] do not suggest racial discrimination," RA218, that finding ignored the copious other evidence, including Plaintiffs' statistical evidence, which demonstrates that Koehler suffered discrimination.

Infosys cites *Abebe v. Health & Hospital of Marion County*, but there, the plaintiff "ha[d] not identified a proper comparator," 35 F.4th 601, 606 (7th Cir. 2022), whereas Koehler has identified Halim, who Infosys specifically recruited and hired despite his minimal interest in the role. SA19-20¶¶33-34.

Infosys argues that its declaration was sufficient to defeat summary judgment where it was "more detailed" than its Rule 30(b)(6) testimony. Infosys.Br.60. But a corporation cannot defeat summary judgment, as here, "'based on an affidavit that … contains information that the Rule 30(b)(6) deponent professed not to know.'" *Snapp v. United Transp. Union*, 889 F.3d 1088, 1103 (9th Cir. 2018) (quoting 7 Moore's Fed. Prac. § 30.25[3]).

And the record is clear: Infosys rejected Koehler for the position she was performing well, despite her qualifications, and recruited and hired a South Asian employee who quit after just two months. SA19-20¶¶33-34; Dkt. 95-9 31:25-32:2 (Rule 30(b)(6) testimony that Koehler's interviewers "discussed her skills and capabilities for a role at Harley"), 32:8-19 (Koehler was considered for a Harley role in the U.S.). Infosys argues that Koehler was not *more* qualified than Halim, Infosys.Br.61,

but that's not required. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973) (requiring failure-to-hire plaintiff to establish that she "applied and was qualified for a job" and that defendant granted the job to someone outside of plaintiff's protected class).

### E.    Layla Bolten

The district court failed to consider the overwhelming evidence in support of Bolten's claim of constructive discharge. RA230 (citing only Plaintiffs' allegations that Bolten was denied a promotion, isolated by her coworkers' use of Hindi, subjected to taunts and insults, and had her workload unfairly reduced). In her five months at Infosys Public Services ("IPS"), in addition to the evidence cited by the district court, Bolten was repeatedly harassed, called "stupid American" by Indian coworkers, falsely accused of not working enough and lying on her timesheet, experienced increasingly hostile work conditions after she complained to her manager, and, as a final straw, was told rudely to pack up her work station and "sit in the corner." OB79. This is far more than "just three pieces of evidence." Infosys.Br.62.

Infosys attempts to undercut Bolten's claim by arguing that only the "stupid American" remark was race or nationality-related, that

35

Bolten testified that her colleagues' use of Hindi didn't impact her job performance, that no manager promised her a promotion, and that she continued to receive work just weeks before she quit. Infosys.Br.63-64. But the record contradicts those claims. SA30-33¶¶55-62. In addition to being called a "stupid American," following the Boston Marathon bombings Bolten's colleague pointed his finger at her and repeatedly called her "Russian, Russian, Russian," as if she were a terrorist. SA32¶60. Bolten's supervisor and her colleagues' use of Hindi was so severe that Bolten was forced to report this conduct to a non-South Asian supervisor. SA32¶59. Further, Bolten was promised that she'd be promoted to a Test Lead Analyst and would be given two testers, but never was. SA30¶55. And regardless of whether Bolten obtained new work before she quit, Infosys doesn't dispute that her responsibilities decreased to the point that Bolten had to proactively email other Test Leads to secure work and repeatedly sent her resume to IPS asking for more responsibility, which was denied. SA31-32¶¶57-58.

Viewing all of "the facts in the light most favorable to [Bolten]," *Orlowski v. Milwaukee Cnty.*, 872 F.3d 417, 425 (7th Cir. 2017), IPS' conduct not only communicated to Bolten that she would be terminated,

36

but also constituted a discriminatory work environment that was more egregious than a hostile work environment.[3]

### F.     Disparate Impact Claims of Koehler and Parker.

Because the district court improperly excluded Neumark's testimony and analyses and abused its discretion in failing to consider the PeopleFluent reports, summary judgment as to Koehler and Parker's disparate impact claims was improper.

Infosys argues that even if Plaintiffs were permitted to rely on Neumark and PeopleFluent, Koehler and Parker's disparate impact claims would still fail. Infosys.Br.65. Not so. Neumark's analyses properly demonstrated stark statistical disparities in Infosys' hiring practices, which disparately impacted non-South Asian candidates such as Koehler and Parker. SA4¶3 (Infosys' U.S. workforce is 89.39% South

---

[3] Infosys cites *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) for the position that the "mere prospect of discharge [is] insufficient to support [a claim of] constructive discharge." Infosys.Br.64. But the employer in *Chapin* actively encouraged the plaintiff to return to work, signaling that it didn't intend to fire him, while IPS grew increasingly hostile to Bolten.

Asian, while relevant labor markets in the U.S. are just 11.75% or 20.68% South Asian, a difference of 299.56 or 200.85 standard deviations); SA4¶4 (between 2009 and 2015, 75.18% of Infosys' hires for U.S. positions were South Asian). While Infosys faults Neumark for not comparing the number of eligible candidates to the number of those hired for the position(s), Infosys.Br.65, Infosys' data didn't distinguish between eligible and non-eligible candidates. Dkt. 123 at 12-13; *Mister v. Ill. Central Gulf R.R. Co.*, 832 F.2d 1427, 1430 (7th Cir. 1987) ("The plaintiffs' expert used the best data available; that the data were not better is the [defendant]'s fault, and we agree with the district court that the data at hand were good enough even though imperfect."). And the PeopleFluent analyses provided further statistical evidence supporting Neumark's conclusion that such skewed hiring figures had a less than 1 in 1 billion likelihood of occurring by chance. SA4¶4.

Infosys claims that Parker and Koehler cannot demonstrate they were qualified for the positions at issue. Infosys.Br.65. But that claim has been refuted, as Parker applied for the same Helpdesk/Desktop Support position that she was already performing and Koehler was well-qualified

for the Lead VMware/Windows Administrator role given her degree and work experience. OB70, 73.

Contrary to Infosys' argument, Infosys.Br.65-66, Plaintiffs have identified a facially neutral policy or practice causing a disparate impact. Specifically, Infosys' visa scheme—creating an "inventory" of South Asian visa employees from India through fraudulent applications, and instructing its Talent Acquisition Unit to prioritize the Indian visa holders—results in non-South Asians, including Parker and Koehler, being passed over. Dkt. 93 at 29-30. As detailed above, Kulkarni, a South Asian employee on an H-1B visa, was given the helpdesk role Parker applied to and was performing for Infosys, and Halim, who Infosys specifically recruited, was hired by Infosys in lieu of Koehler, despite Halim's lack of interest in the role. Thus, Infosys' claim that the policies identified by Plaintiffs didn't impact Koehler or Parker is inaccurate.

Date: March 10, 2026

KOTCHEN & LOW LLP

*/s/Daniel Low*
Daniel Kotchen
Daniel Low

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 32(c) because this brief contains 6,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in Microsoft Word using 14-point Century Schoolbook, a proportionally spaced typeface.

Date: March 10, 2026

> KOTCHEN & LOW LLP
>
> */s/Daniel Low*
> Daniel Low
>
> *Attorney for Plaintiffs-Appellants*

41